**2026-1052**

# United States Court of Appeals for the Federal Circuit

BAMBUSER AB,

*Plaintiff-Appellant,*

– v. –

SITO MOBILE R&D IP, LLC, SITO MOBILE, LTD.,

*Defendants-Appellees.*

*On Appeal from the United States District Court for the District of New Jersey in No. 2:23-cv-21757-JKS-JSA Honorable Jamel Semper, Judge*

## JOINT APPENDIX

RONALD M. DAIGNAULT
CHANDRAN B. IYER
SHAILENDRA MAHESHWARI
DAIGNAULT IYER LLP
8229 Boone Boulevard
Suite 450
Vienna, Virginia 22182
(202) 997-1925
rdaignault@daignaultiyer.com
cbiyer@daignaultiyer.com
smaheshwari@daignaultiyer.com

*Counsel for Defendants-Appellees*

JEFFREY I. KAPLAN
KAPLAN BREYER SCHWARZ, LLP
317 George Street, Suite 320
New Brunswick, New Jersey 08901
(732) 578-0103
jkaplan@kbsiplaw.com

VYASA M. MURTHY
ZUKERMAN GORE BRANDEIS &
CROSSMAN, LLP
11 Times Square, Floor 15
New York, New York 10036
(212) 223-6700
vmurthy@zukermangore.com

*Counsel for Plaintiff-Appellant*

MARCH 10, 2026

CP COUNSEL PRESS    (800) 4-APPEAL • (387018)

**TABLE OF CONTENTS**

| Date | Doc. No. | Document Title | Page No. |
|---|---|---|---|
| 9/30/25 | 40 | Opinion | Appx1 |
| 9/30/25 | 41 | Order | Appx10 |
|  | Required document per Rule 30(a)(1)(a)(i) | Docket Sheets | Appx11 |
| 11/1/23 | 1 | Complaint For Declaratory Judgment Of Non-Infringement And Invalidity | Appx17 |
| 11/30/23 | 10-1 | Memorandum In Support Of Defendants' Motion To Stay Or, In The Alternative, Transfer Under The First-To-File Rule | Appx43 |
|  | 10-2 | [Proposed] Order Granting Defendants' Motion To Stay Or, In The Alternative, Transfer Under The First-To-File Rule | Appx55 |
| 11/30/23 | 10-3 | Certificate Of Service | Appx56 |
| 12/22/23 | 15 | Text Order Reassigning Case | Appx67 |
| 1/8/24 | 16 | Plaintiff's Memorandum In Opposition To Defendants' Motion To Stay Or, In The Alternative, To Transfer | Appx68 |
| 1/8/24 | 16-1 | Declaration Of Jeffrey I. Kaplan In Opposition To Defendants' Motion To Stay Or, In The Alternative, Transfer Under The First-To-File Rule | Appx88 |
| 12/13/23 | 16-2 | Declaration Of Michael J. Zinna In Support Of Defendant's Motion To Dismiss | Appx92 |
| 12/13/23 | 16-3 | Declaration Of Michael J. Zinna In Support Of Defendant's Motion To Stay | Appx95 |
| 1/12/24 | 17 | Text Order | Appx97 |
| 1/16/24 | 18 | Notice Of Defendants' Motion To Dismiss Pursuant Fed. R. Civ. P. 12(b)(1) | Appx98 |

| Date | Doc. No. | Document Title | Page No. |
|---|---|---|---|
| 1/16/24 | 18-1 | Memorandum In Support Of Defendant's Motion To Dismiss Pursuant To Fed. R. Civ. P. 12(b)(1) | Appx100 |
| | 18-2 | [Proposed] Order Granting Defendants' Motion To Dismiss Pursuant To Fed. R. Civ. P. 12(b)(1) | Appx109 |
| 1/16/24 | 19 | Defendants' Reply In Support Of Its Motion To Stay Or, In The Alternative, Transfer Under The First-To-File Rule | Appx110 |
| 1/17/24 | 20 | Motion To File Sur-Reply | Appx121 |
| 1/17/24 | 20-1 | Exhibit A - Plaintiff's Sur-Reply In Opposition To Defendants' Motion To Stay Or, In The Alternative, Transfer Under The First-To-File Rule | Appx124 |
| 1/24/24 | 21 | Text Order | Appx133 |
| 1/17/24 | 22 | Plaintiff's Sur-Reply In Opposition To Defendants' Motion To Stay Or, In The Alternative, Transfer Under The First-To-File Rule | Appx134 |
| 2/6/24 | 23 | Plaintiff's Memorandum In Opposition To Defendants' Motion Dismiss | Appx142 |
| 2/6/24 | 23-1 | Declaration Of Jeffrey I. Kaplan In Opposition To Defendants' Motion To Dismiss | Appx158 |
| 2/13/24 | 24 | Defendants' Reply In Support Of Their Motion To Dismiss Pursuant To Fed. R. Civ. P. 12(b)(1) | Appx162 |
| 2/15/24 | 25 | Motion To File Sur-Reply | Appx169 |
| 2/15/24 | 25-1 | Plaintiff's Sur-Reply In Opposition To Defendants' Motion To Dismiss | Appx172 |
| 4/22/24 | 26 | Letter From Jeffrey I. Kaplan To The Honorable Jessica S. Allen | Appx177 |

| Date | Doc. No. | Document Title | Page No. |
|---|---|---|---|
| 4/19/24 | 26-1 | Order | Appx179 |
| 4/23/24 | 27 | Letter From Shalu Maheshwari To The Honorable Jamel K. Semper | Appx187 |
| 5/10/24 | 28 | Order Of The Honorable Jessica S. Allen | Appx189 |
| 5/24/24 | 29 | Letter From Jeffrey I. Kaplan To The Honorable Jamel K. Semper | Appx195 |
| 9/3/24 | 30 | Opinion | Appx198 |
| 9/3/24 | 31 | Order | Appx207 |
| 10/29/24 | 32 | First Amended Complaint For Declaratory Judgment Of Non-Infringement And Invalidity | Appx209 |
| 6/16/23 | 32-1 | Exhibit A - Complaint For Patent Infringement | Appx224 |
| 10/6/23 | 32-2 | Exhibit B - Letter From Shailendra Maheshwari | Appx313 |
| 11/13/24 | 33 | Stipulation And Consent Order Extending Time | Appx390 |
| 12/9/24 | 35 | Notice Of Defendants' Motion To Dismiss Pursuant Fed. R. Civ. P. 12(b)(1) | Appx394 |
| 12/9/24 | 35-1 | Memorandum In Support Of Defendants' Motion To Dismiss Pursuant To Fed. R. Civ. P. 12(b)(1) | Appx396 |
| 12/9/24 | 35-2 | Declaration Of Shailendra Maheshwari In Support Of Defendants' Motion To Dismiss Pursuant To Fed. R. Civ. P. 12(b)(1) | Appx415 |
| 9/8/23 | 35-3 | Exhibit 1 - Emails | Appx417 |
| 10/26/23 | 35-4 | Exhibit 2 - Emails | Appx434 |
| 11/3/23 | 35-5 | Exhibit 3 - Emails | Appx437 |

| Date | Doc. No. | Document Title | Page No. |
|---|---|---|---|
| | 35-6 | [Proposed] Order Granting Defendants' Motion To Dismiss Pursuant To Fed. R. Civ. P. 12(b)(1) | Appx440 |
| 1/22/25 | 38 | Plaintiff's Memorandum In Opposition To Defendants' Motion To Dismiss | Appx445 |
| 5/10/24 | 38-1 | Exhibit 1 - Order Of The Honorable Jessica S. Allen | Appx467 |
| 4/19/24 | 38-2 | Exhibit 2 - Order | Appx474 |
| 2/6/25 | 39 | Reply Brief In Support Of Defendants' Motion To Dismiss Pursuant To Fed. R. Civ. P. 12(b)(1) | Appx483 |
| 10/10/25 | 42 | Notice | Appx496 |
| 10/10/25 | 43 | Notice Of Appeal | Appx497 |
| 7/19/18 | 55 | Second Amended Complaint for Declaratory Judgment in *BroadSign Int'l, LLC v. T-Rex Prop. AB*, No. 16-CV-04586, 2018 WL 3418778 (S.D.N.Y. July 13, 2018) | Appx499 |
| 5/27/16 | 1 | Plaintiff's Complaint for Patent Infringement in *T-Rex Prop. AB v. Health Media Network, LLC*, No. 1:16-cv-5673 (N.D. Ill. May 27, 2016) | Appx522 |
| 7/11/16 | 22 | Plaintiff's Amended Complaint for Patent Infringement in *T-Rex Prop. AB v. ContextMedia Inc. and ContextMedia Health LLC*, No. 1:16-cv-04826 (N.D. Ill. July 11, 2016) | Appx542 |
| 5/9/16 | 1 | Plaintiff's Complaint for Patent Infringement in *T-Rex Prop. AB v. JCDecaux N. Am., Inc. and JCDecaux N. Am. Holdings, Inc.*, No. 4:16-cv-00303-ALM (E.D. Tex. May 9, 2016) | Appx568 |

Not for Publication

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| BAMBUSER AB, | |
| *Plaintiff*, | Civil Action No. 23-21757 |
| v. | **OPINION** |
| SITO MOBILE R&D IP, LLC, and SITO MOBILE, LTD., | September 30, 2025 |
| *Defendants*. | |

**SEMPER**, District Judge.

The current matter comes before the Court on Defendants SITO Mobile R&D IP, LLC and SITO Mobile, Ltd.'s ("SITO" or "Defendants") motion to dismiss Plaintiff Bambuser AB's ("Bambuser" or "Plaintiff") First Amended Complaint (ECF 32, "FAC") pursuant to Federal Rule of Civil Procedure 12(b)(1). (ECF 35, "Def. Mot."). Plaintiff opposed the motion. (ECF 38, "Opp."). Defendant filed a reply. (ECF 39, "Reply"). The Court has decided this motion upon the submissions of the parties, without oral argument, pursuant to Federal Rule of Civil Procedure 78 and Local Civil Rule 78.1. For the reasons stated below, SITO's Motion to Dismiss is **GRANTED**.

## I.    FACTUAL BACKGROUND AND PRODUCURAL HISTORY[1]

The Court does not retrace the full factual and procedural history in this case, which is detailed in its prior Opinion dated September 3, 2024, and incorporates such factual and procedural

---

[1] The allegations in the FAC must be accepted as true solely for purposes of this Motion, except where conclusory or implausible. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

Appx1

history herein.  (ECF 30, "Op." or "Opinion".)  To summarize, Defendant SITO owns and control

licensing rights to at least six United States patents ("the Patents") that deal broadly with adaptive

streaming technologies.  (*Id.* ¶ 6.)  SITO brought an action in federal court in the Western District

of Texas against SFA Holdings, Inc. ("SFA"), a non-party in this litigation, for patent infringement

related to the Patents (the "SFA Action").  (*Id.* ¶ 8; *see* ECF 32-1, "SFA Compl.")  That action

remains stayed pending final resolution of the instant lawsuit.  (ECF 26-1, "Order" in *SITO Mobile

R&D IP, LLC and SITO Mobile, LTD v. SFA Holdings, Inc.*, No. 23-688, (April 19, 2024 W.D.

Tex.).)  Plaintiff Bambuser is not party to the SFA Action but has contractually agreed to defend

and indemnify SFA in that action pursuant to the terms of an agreement governing the relationship

between SFA and Bambuser.  (Op. at 2.)

On November 1, 2023, Bambuser filed a lawsuit against Defendant SITO in this Court,

requesting declaratory judgment for each patent that Plaintiff has not infringed the six Patents

and/or that the Patents are invalid.  (ECF 1, "Compl." ¶ 1.)  On September 3, 2024, this Court

granted SITO's motion to dismiss Plaintiff's complaint for lack of standing under Federal Rule of

Civil Procedure 12(b)(1) and granted Plaintiff leave to file an amended complaint. (*See* Op. at 8-

9.)  Plaintiff filed the FAC on October 29, 2024, seeking the same declaratory relief as in the

original complaint.  (*Compare* FAC ¶ 1 *with* Compl. ¶ 1.) Defendant then filed the instant motion

to dismiss for lack of subject matter jurisdiction pursuant to Federal Rule of Civil Procedure

12(b)(1), arguing that Plaintiff still lacks standing in this lawsuit.  (*See* Def. Mot. at 1.)  Plaintiff

opposed the motion (ECF 38), and Defendant replied (ECF 39).

## II.    LEGAL STANDARD

Federal Rule of Civil Procedure 12(b)(1) allows a court to dismiss a complaint for lack of

subject matter jurisdiction because a party lacks standing. *Ballentine v. United States*, 486 F.3d

Appx2

806, 810 (3d Cir. 2007). Two types of challenges can be made under Rule 12(b)(1): a facial attack

or a factual attack. *In re Horizon Healthcare Servs. Inc. Data Breach Litig.*, 846 F.3d 625, 632 (3d

Cir. 2017). A facial attack "challenges subject matter jurisdiction without disputing the facts

alleged in the complaint, and it requires the court to consider the allegations of the complaint as

true." *Davis v. Wells Fargo*, 824 F.3d 333, 346 (3d Cir. 2016) (internal quotation marks and

citations omitted). A factual challenge "attacks the factual allegations underlying the complaint's

assertion of jurisdiction, either through the filing of an answer or 'otherwise present[ing]

competing facts.'" *Id*. (quoting *Const. Party of Penn. v. Aichele*, 757 F.3d 347, 358 (3d Cir. 2014)).

"In reviewing facial challenges to standing, [courts] apply the same standard as on review

of a motion to dismiss under Rule 12(b)(6)." *In re Horizon*, 846 F.3d at 633. Courts "only consider

the allegations of the complaint and documents referenced therein and attached thereto, in the light

most favorable to the plaintiff." *Const. Party of Penn.*, 757 F.3d at 358 (citations omitted). When

considering a factual challenge, by contrast, "a court may weigh and consider evidence outside the

pleadings." *Id.* (quotation marks and citations omitted).

## III.     <u>ANALYSIS</u>

Defendants move to dismiss under Rule 12(b)(1), arguing that this Court lacks subject

matter jurisdiction over this suit because Plaintiff lacks Article III standing to bring suit for

declaratory relief in this District.  (Def. Mot. at 1.)  Plaintiff asserts that it does have standing to

bring this declaratory judgment action because the FAC establishes that SITO's litigation efforts

against Bambuser's customers carried an implied assertion of infringement against Bambuser.

(Opp. at 1.)  Notably, all six counts from the originally filed complaint and the FAC are identical.

(*Compare* Compl. ¶¶ 16-39 *with* FAC ¶¶ 36-59).  Plaintiff adds no factual allegations that would

permit this Court to alter its ruling from its prior Opinion.

3

Appx3

The Declaratory Judgment Act ("DJA") provides that

> in the case of actual controversy within its jurisdiction . . . any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought.

28 U.S.C. § 2201(a). The Supreme Court has explained that the "actual controversy" requirement of the Act refers to the types of "cases" and "controversies" justiciable under Article III. *See MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 127 (2007) (citation omitted).

In the patent context, the Court of Appeals for the Federal Circuit has articulated the considerations for assessing whether a plaintiff seeking a declaratory judgment has met the case-or-controversy requirement of Article III. *See Mitek Sys., Inc. v. United Servs. Auto. Ass'n*, 34 F. 4th 1334 (Fed. Cir. 2022). This Court applies the law of the Court of Appeals for the Federal Circuit to this issue because an assessment of liability for patent infringement implicates substantive patent law. *See In re Spalding Sports Worldwide, Inc.*, 203 F.3d 800, 803 (Fed. Cir. 2000).

Under *Mitek*, to determine whether a plaintiff might reasonably be liable for infringement, a district court should look to the elements of the potential cause of action, then consider both the patent claims at issue and the alleged facts concerning the plaintiff in light of those elements. 34 F. 4th at 1343. Although the plaintiff is not obligated to prove, for jurisdictional purposes, that it infringes the patents-in-suit, "there must be allegations by the patentee or other record evidence that establish at least a reasonable potential that infringement claims against him could be brought." *Id.* (quoting *Microsoft Corp. v. Data Tern, Inc.*, 755 F.3d 899, 905 (Fed. Cir. 2014)). "This requires separate consideration of the separate types of infringement (notably, direct infringement, inducement of infringement, and contributory infringement) of the claims of the

Appx4

patents-in-suit, and of the bearing on any infringement of such claims of the fact stressed by the district court" *Id.*

The DJA also provides that courts "*may* declare the rights and other legal relations of any interested party seeking such declaration." 28 U.S.C. § 2201 (emphasis added). Based on this permissive language in the statute, the Supreme Court has held that its "textual commitment to discretion" vests federal courts with "unique and substantial discretion in deciding whether to declare the rights of litigants." *Wilton v. Seven Falls Co.*, 515 U.S. 277, 286 (1995) (citations omitted).

In *Mitek*, the Federal Circuit separately addressed the standard for discretionary dismissals of declaratory judgment actions. The Court in *Mitek* counseled that:

> [A]s long as a district court "acts in accordance with the purposes of the Declaratory Judgment Act and the principles of sound judicial administration, [it] has broad discretion to refuse to entertain a declaratory judgment action." *EMC Corp. v. Norand Corp.*, 89 F.3d 807, 813-14 (Fed. Cir. 1996). But, consistent with the constraints imposed by the noted statutory purposes and judicial-administration principles, we have insisted: "There must be well-founded reasons for declining to entertain a declaratory judgment action." *Capo, Inc. v. Dioptics Medical Products*, 387 F.3d 1352, 1355 (Fed. Cir. 2004); *see also Micron*, 518 F.3d at 903-05; *Genentech, Inc. v. Eli Lilly & Co.*, 998 F.2d 931, 936 (Fed. Cir. 1993). As an example, we explained in *Ford Motor Co. v. United States* that, "[w]hile the existence of another adequate remedy does not necessarily bar a declaratory judgment, district courts may refuse declaratory relief where an alternative remedy is better or more effective." 811 F.3d 1371, 1379-80 (Fed. Cir. 2016) (citations omitted); *see also* 10B Wright & Miller § 2758 & n.6 (4th ed. Apr. 2022 Update).

*Mitek*, 34 F. 4th at 1347. In short, the Court construes *Mitek* to require district courts to provide good reason for dismissing a declaratory judgment action.

Defendants here challenge the Court's subject matter jurisdiction based on the FAC. (*See* Def. Mot. at 3.) Both Plaintiff and Defendants argue that Federal Circuit precedent *Microsoft Corp. v. DataTern, Inc.* supports their position. 755 F.3d 899 (Fed. Cir. 2014). The Court follows the Federal Circuit's analysis in *Microsoft* in assessing Defendants' jurisdictional challenge.

5

Appx5

In *Microsoft*, the Federal Circuit reviewed whether the district court had subject matter jurisdiction *de novo*, holding that the district court did have jurisdiction over challenges to some patents but not others. *See* 755 F.3d at 903. The threshold question for declaratory judgment jurisdiction is "whether the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 127 (2007) (citation omitted). The Court in *Microsoft* determined that declaratory judgment jurisdiction existed for some patents specifically because the underlying infringement claims "carried an implied assertion that [the declaratory judgment plaintiff] was committing contributory infringement, and [the patentee] repeatedly communicated this implicit accusation directly to [the declaratory judgment plaintiff] during the course of a protracted negotiation process." *Microsoft*, 755 F.3d at 903 (quoting *Arris Group Inc. v. British Telecommunications PLC*, 639 F.3d 1368, 1381 (Fed. Cir. 2011).

Here, there are no factual allegations which indicate Plaintiff's direct or contributory infringement of the Patents. The Court in *Microsoft* centered its analysis on the relevant factual allegations in the underlying customer suits in distinguishing which patents afforded declaratory judgment jurisdiction and which did not. *See id.* at 905-06. This Court endeavors to do the same. In *Microsoft*, the patent claims that *did* establish declaratory judgment jurisdiction alleged Microsoft's involvement, specifically that Microsoft "encourage[ed] the exact use which DataTern asserts amount to direct infringement" and thus there was substantial controversy regarding Microsoft's inducement to infringe on the patents-in-suit. *Id.* at 905. Here, there are no claims or factual allegations that could be read to allege that Plaintiff encouraged the use of SITO patents that would amount to direct infringement. There are also no allegations that would establish

6

Appx6

controversy between SITO and Bambuser with respect to contributory infringement. Moreover, in the underlying SFA Action, SITO alleges that SFA directly infringed its patents but makes no mention of Plaintiff in the Complaint regarding direct infringement or contributory infringement through inducement.[2] (*See generally* SFA Compl.). The record does not provide this Court with sufficient allegations to establish a substantial controversy regarding inducement.

Similar to the present facts, the patent claims in *Microsoft* that *did not* establish declaratory judgment jurisdiction did not imply or assert that Microsoft had induced the alleged infringement: "Nothing in the record suggests that Microsoft encouraged the acts accused of direct infringement, and *simply selling a product capable of being used in an infringing manner is not sufficient to create a substantial controversy regarding inducement*." *Microsoft*, 755 F.3d at 904 (emphasis added).

Bambuser alleges that SITO through the SFA Action, as well as through threatened litigation against another Bambuser customer Uniqlo, has "implied . . . that Bambuser is committing contributory and/or induced infringement."[3] (FAC ¶¶ 9-27.) However, as discussed above, the FAC does not sufficiently show that there is a substantial controversy of sufficient

---

[2] In fact, the SFA Complaint makes no mention of Plaintiff Bambuser at all. (*See* ECF 32-1.)

[3] In addition to SITO's SFA Action, Bambuser relies on SITO's threatened litigation against Uniqlo in the Southern District of New York. (*See* FAC ¶¶ 17-29; FAC, Ex. B). However, to the extent that Bambuser attempts to pursue an economic theory out of concern for its current or potential customers' freedom to operate, this is an economic theory rejected by the Federal Circuit. *Arris*, 639 F.3d at 1374 ("[W]e have not held that economic injury alone is sufficient to confer standing in patent cases seeking a declaratory judgment.") As such, Plaintiff's FAC does not state a case or controversy as to the Uniqlo issue either. Bambuser also asserts that "[a]fter filing the SFA Complaint and transmitting the Uniqlo Complaint, SITO requested that Bambuser resolve all SITO's allegations of infringement against SFA, Uniqlo, and all other Bambuser customers by taking a license directly from SITO." (FAC ¶ 28.) However, this Court finds that these purported negotiations do not appear to rise to the level of a "protracted negotiation process" that might have supported jurisdiction. *Microsoft*, 755 F.3d at 906; *see also Arris*, 639 F.3d at 1381.

7

Appx7

immediacy and reality to warrant the issuance of a declaratory judgment. *See MedImmune*, 549

U.S. at 127. Plaintiff's conclusory argument that "it is clear that the FAC properly pleads that

SITO's allegations in its Uniqlo and SFA Complaints impliedly accuse Bambuser of infringement"

because the claims charts attached to its complaints indicate that it supplied SFA with technology

is unavailing. (Opp. at 10.) Moreover, Uniqlo has not been sued, and this Court already

determined that Defendants' threatened litigation against Uniqlo, another customer of Plaintiff, is

insufficient to confer standing here. (*See* Op. at 9.)

Plaintiff argues for the first time in opposition that it has sufficiently alleged contributory

infringement because the technology it supplied to SFA and Uniqlo "does not have any substantial

other uses." (FAC ¶ 26.) However, there is no evidence in the record beyond this conclusory

allegation that Plaintiff's technology "is not suitable for substantial non-infringing uses," or that

Plaintiff knew that it was "especially made or adapted for use in an infringement" of the Patents.

*Microsoft,* 755 F.3d at 906. Conclusory statements like these "are not entitled to the assumption

of truth." *Iqbal*, 556 U.S. at 679. Rather, courts must "disregard threadbare recitals of the elements

of a cause of action, legal conclusions, and conclusory statements." *Oakwood Lab'ys LLC v.

Thanoo*, 999 F.3d 892, 904 (3d Cir. 2021) (quoting *James v. City of Wilkes-Barre*, 700 F.3d 675,

681 (3d Cir. 2012)). This Court need not and will not here "accept as true a legal conclusion

couched as a factual allegation." *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 555).

Critically, the *Microsoft* Court specified that plaintiffs do not "have a right to bring [a]

declaratory judgment action solely because their customers have been sued for direct

infringement." *Id.* at 904. That is precisely what is happening here. In agreeing to indemnify

SFA, Plaintiff can defend SFA in federal court in the Western District of Texas and effectively

8

Appx8

participate in the SFA Action.  Plaintiff provides no other allegations of direct or contributory infringement sufficient for Article III standing.

For these reasons and for the same reasons the Court dismissed Plaintiff's original complaint, Plaintiff lacks Article III standing to bring this suit. (*See* Op. at 8-10.)  Therefore Defendants' Motion to Dismiss for lack of subject matter jurisdiction pursuant to Rule 12(b)(1) is **GRANTED**, and the FAC is **DISMISSED** without prejudice.  *See Malhan v. Beyer*, No. 23-3264, 2024 WL 5244547, at *1 (3d Cir. Dec. 30, 2024) ("When a court dismisses a case for lack of subject matter jurisdiction, the res judicata effect of such a decision is limited to the question of jurisdiction, and, because it is not an adjudication on the merits, the disposition of such a case should be without prejudice") (cleaned up).

## IV.   <u>CONCLUSION</u>

For the reasons stated above, SITO's motion to dismiss the FAC (ECF 35) is **GRANTED**. Plaintiff's FAC (ECF 32) is **DISMISSED** without prejudice.  An appropriate order follows.

*/s/ Jamel K. Semper          .*
**Hon. Jamel K. Semper**
**United States District Judge**

Orig:        Clerk
cc:          Jessica S. Allen, U.S.M.J.
             Parties

Appx9

<u>NOT FOR PUBLICATION</u>

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

|  |  |
|---|---|
| BAMBUSER AB, | Civil Action No. 23-21757 |
| *Plaintiff*, | |
| v. | **ORDER** |
| SITO MOBILE R&D IP, LLC, and SITO MOBILE, LTD., | September 30, 2025 |
| *Defendants*. | |

**SEMPER**, District Judge.

**THIS MATTER** having come before this Court upon Defendants SITO Mobile R&D IP, LLC and SITO Mobile, Ltd.'s ("SITO" or "Defendants") Motion to Dismiss (ECF 35) Plaintiff Bambuser AB's ("Plaintiff") First Amended Complaint (ECF 32), and this Court, having considered the submissions and reached its decision without oral argument pursuant to Federal Rule of Civil Procedure 78(b), for the reasons stated in this Court's Opinion dated September 23, 2025,

**IT IS**, on this 30ᵗʰ day of September 2025,

**ORDERED** that Defendants' Motion to Dismiss (ECF 35) is **GRANTED**; and it is finally

**ORDERED** that Plaintiff's FAC (ECF 32) is **DISMISSED** without prejudice. Plaintiff must request leave of this Court to file an Amended Complaint in this District.

*/s/ Jamel K. Semper*

**HON. JAMEL K. SEMPER**
**United States District Judge**

Orig:     Clerk
cc:       Jessica S. Allen, U.S.M.J.
          Parties

Appx10

**Query**    **Reports**    **Utilities**    **Help**    **Log Out**

APPEAL

# U.S. District Court
## District of New Jersey [LIVE] (Newark)
### CIVIL DOCKET FOR CASE #: 2:23-cv-21757-JKS-JSA

BAMBUSER AB v. SITO MOBILE R&D IP, LLC et al
Assigned to: Judge Jamel K. Semper
Referred to: Magistrate Judge Jessica S. Allen
Case in other court: Federal Circuit, 26-01052
Cause: 28:2201 Declaratory Judgment

Date Filed: 11/01/2023
Jury Demand: Plaintiff
Nature of Suit: 830 Patent
Jurisdiction: Federal Question

**Plaintiff**

**BAMBUSER AB**

represented by **JEFFREY I. KAPLAN**
KAPLAN BREYER SCHWARZ, LLP
317 GEORGE STREET
STE 320
NEW BRUNSWICK, NJ 08901
732-578-0103
Email: jkaplan@kbsiplaw.com
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**SITO MOBILE R&D IP, LLC**

represented by **SHAILENDRA K. MAHESHWARI**
DAIGNAULT IYER LLP
8618 WESTWOOD CENTER DRIVE
SUITE 150
VIENNA, VA 22182
202-997-1925
Email: smaheshwari@daignaultiyer.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**TEDD WILLIAM VAN BUSKIRK**
DAIGNAULT IYER LLP
8618 WESTWOOD CENTER DRIVE
SUITE 150
VIENNA, VA 22182
201-736-6751
Email: tvanbuskirk@daignaultiyer.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**SITO MOBILE, LTD.**

represented by **SHAILENDRA K. MAHESHWARI**
(See above for address)
*LEAD ATTORNEY*

Appx11

*ATTORNEY TO BE NOTICED*

**TEDD WILLIAM VAN BUSKIRK**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 11/01/2023 | 1 | COMPLAINT against SITO MOBILE R&D IP, LLC, SITO MOBILE, LTD. ( Filing and Admin fee $ 402 receipt number ANJDC-14839851) with JURY DEMAND, filed by BAMBUSER AB. (Attachments: # 1 Civil Cover Sheet, # 2 Summons, # 3 Summons) (KAPLAN, JEFFREY) (Entered: 11/01/2023) |
| 11/01/2023 | 2 | Corporate Disclosure Statement by BAMBUSER AB. (KAPLAN, JEFFREY) (Entered: 11/01/2023) |
| 11/01/2023 | 3 | AMENDED DOCUMENT by BAMBUSER AB. Amendment to 1 Complaint, *Civil Cover Sheet*. (KAPLAN, JEFFREY) (Entered: 11/01/2023) |
| 11/01/2023 | | Case Assigned to Magistrate Judge Jessica S. Allen. (ak, ) (Entered: 11/02/2023) |
| 11/06/2023 | 4 | SUMMONS ISSUED as to SITO MOBILE R&D IP, LLC, SITO MOBILE, LTD.. Attached is the official court Summons, please fill out Defendant and Plaintiffs attorney information and serve. (ld, ) (Entered: 11/06/2023) |
| 11/14/2023 | 5 | WAIVER OF SERVICE Returned Executed by BAMBUSER AB. All Defendants. (KAPLAN, JEFFREY) (Entered: 11/14/2023) |
| 11/14/2023 | 6 | WAIVER OF SERVICE Returned Executed by BAMBUSER AB. All Defendants. (KAPLAN, JEFFREY) (Entered: 11/14/2023) |
| 11/17/2023 | 7 | First MOTION for Leave to Appear Pro Hac Vice *for John Crossman* by BAMBUSER AB. (Attachments: # 1 Declaration of Jeffrey Kaplan, # 2 Text of Proposed Order granting phv application, # 3 Statement of John Crossman)(KAPLAN, JEFFREY) (Entered: 11/17/2023) |
| 11/20/2023 | 8 | ORDER Granting Leave to Appear Pro Hac Vice as to JOHN K. CROSSMAN, ESQ.. Signed by Magistrate Judge Jessica S. Allen on 11/20/2023. (ld, ) (Entered: 11/21/2023) |
| 11/27/2023 | 9 | Notice of Request by Pro Hac Vice John K. Crossman to receive Notices of Electronic Filings. (KAPLAN, JEFFREY) (Entered: 11/27/2023) |
| 11/28/2023 | | Pro Hac Vice counsel, JOHN K. CROSSMAN, ESQ., has been added to receive Notices of Electronic Filing. Pursuant to L.Civ.R. 101.1, only local counsel are entitled to sign and file papers, enter appearances and receive payments on judgments, decrees or orders. (ld, ) (Entered: 11/28/2023) |
| 11/30/2023 | 10 | MOTION to Stay *or in the alternative, transfer under the first-to-file rule* by SITO MOBILE R&D IP, LLC, SITO MOBILE, LTD.. (Attachments: # 1 Memorandum in support of Defendants' Motion to Stay or in the alternative, transfer under the first-to-file rule, # 2 Text of Proposed Order, # 3 Certificate of Service)(MAHESHWARI, SHAILENDRA) (Entered: 11/30/2023) |
| 11/30/2023 | 11 | Corporate Disclosure Statement by SITO MOBILE R&D IP, LLC, SITO MOBILE, LTD. identifying SITO Mobile, Ltd. as Corporate Parent.. (MAHESHWARI, SHAILENDRA) (Entered: 11/30/2023) |

Appx12

| | | |
|---|---|---|
| 12/01/2023 | 10 | MOTION to Stay *or in the alternative, transfer under the first-to-file rule* REFERRED to Jessica S. Allen. (cds) (Entered: 12/01/2023) |
| 12/01/2023 | | Pro Hac Vice fee received for John Crossman: $ 150, receipt number 135855 (jjc, ) (Entered: 12/04/2023) |
| 12/05/2023 | 12 | NOTICE of Appearance by TEDD WILLIAM VAN BUSKIRK on behalf of SITO MOBILE R&D IP, LLC, SITO MOBILE, LTD. (VAN BUSKIRK, TEDD) (Entered: 12/05/2023) |
| 12/07/2023 | | Set/Reset Deadlines as to 10 MOTION to Stay *or in the alternative, transfer under the first-to-file rule*. Motion set for 1/2/2024 before Magistrate Judge Jessica S. Allen. Unless otherwise directed by the Court, this motion will be decided on the papers and no appearances are required. Note that this is an automatically generated message from the Clerk`s Office and does not supersede any previous or subsequent orders from the Court. (ld, ) (Entered: 12/07/2023) |
| 12/16/2023 | 13 | STIPULATION re Set/Reset Motion and R&R Deadlines/Hearings, 10 MOTION to Stay *or in the alternative, transfer under the first-to-file rule* by BAMBUSER AB. (KAPLAN, JEFFREY) (Entered: 12/16/2023) |
| 12/18/2023 | 14 | STIPULATION & CONSENT ORDER extending time to file opposition through 1/8/2024. Signed by Magistrate Judge Jessica S. Allen on 12/18/2023. (lag, ) (Entered: 12/18/2023) |
| 12/22/2023 | 15 | TEXT ORDER REASSIGNING CASE. Case reassigned to Judge Jamel K. Semper for all further proceedings. Judge Susan D. Wigenton no longer assigned to case. So Ordered by Chief Judge Renee Marie Bumb on 12/22/2023. (smf) (Entered: 12/22/2023) |
| 01/08/2024 | 16 | BRIEF in Opposition filed by BAMBUSER AB re 10 MOTION to Stay *or in the alternative, transfer under the first-to-file rule* (Attachments: # 1 Affidavit In opposition to motion to stay, # 2 Exhibit A, # 3 Exhibit B)(KAPLAN, JEFFREY) (Entered: 01/08/2024) |
| 01/12/2024 | 17 | TEXT ORDER: Answer Due Deadline Update--The answer due date is dictated by (ECF No. 5 , 6 ) Waiver of Service. Defendants are now directed to answer, move, or otherwise reply to the complaint by **1/19/2024**. So Ordered by Judge Jamel K. Semper on 1/12/2024. (sms) (Entered: 01/12/2024) |
| 01/16/2024 | 18 | MOTION to Dismiss by SITO MOBILE R&D IP, LLC, SITO MOBILE, LTD.. Responses due by 2/6/2024. (Attachments: # 1 Memorandum in support of Motion to Dismiss, # 2 Text of Proposed Order)(MAHESHWARI, SHAILENDRA) (Entered: 01/16/2024) |
| 01/16/2024 | 19 | REPLY to Response to Motion filed by SITO MOBILE R&D IP, LLC, SITO MOBILE, LTD. re 10 MOTION to Stay *or in the alternative, transfer under the first-to-file rule* (MAHESHWARI, SHAILENDRA) (Entered: 01/16/2024) |
| 01/17/2024 | 20 | First MOTION re Motions Referred, 19 Reply to Response to Motion, 16 Brief in Opposition to Motion, *proposed surreply* by BAMBUSER AB. (Attachments: # 1 Brief (sureply) in opposition to motion to stay or transfer)(KAPLAN, JEFFREY) (Entered: 01/17/2024) |
| 01/17/2024 | | Set/Reset Deadlines as to 20 First MOTION re Motions Referred, 19 Reply to Response to Motion, 16 Brief in Opposition to Motion, *proposed surreply*, 18 MOTION to Dismiss . Motion set for 2/20/2024 before Judge Jamel K. Semper. Unless otherwise directed by the Court, this motion will be decided on the papers and no appearances are required. Note that this is an automatically generated message from the Clerk`s Office and does not supersede any previous or subsequent orders from the Court. (ld, ) (Entered: 01/17/2024) |

Appx13

| 01/24/2024 | 21 | TEXT ORDER: Plaintiff's Motion, (ECF No. 20 ), seeking leave to file its sur-reply, (ECF No. 20 - 1 ), attached thereto is GRANTED. Plaintiff shall file the sur-reply (ECF No. 20 - 1 ) by 1/26/24. So Ordered by Magistrate Judge Jessica S. Allen on 1/24/24. (jbb) (Entered: 01/24/2024) |
|---|---|---|
| 01/24/2024 | 22 | RESPONSE in Opposition filed by BAMBUSER AB re 10 MOTION to Stay *or in the alternative, transfer under the first-to-file rule surreply brief in opposition to SITO's Motion to Stay* (KAPLAN, JEFFREY) (Entered: 01/24/2024) |
| 02/06/2024 | 23 | MEMORANDUM in Opposition filed by BAMBUSER AB re 18 MOTION to Dismiss (Attachments: # 1 Declaration)(KAPLAN, JEFFREY) (Entered: 02/06/2024) |
| 02/13/2024 | 24 | REPLY to Response to Motion filed by SITO MOBILE R&D IP, LLC, SITO MOBILE, LTD. re 18 MOTION to Dismiss (MAHESHWARI, SHAILENDRA) (Entered: 02/13/2024) |
| 02/15/2024 | 25 | First MOTION re 23 Memorandum in Opposition of Motion, 18 MOTION to Dismiss , 24 Reply to Response to Motion by BAMBUSER AB. (Attachments: # 1 Memorandum surreply in opposition to motion to dismiss)(KAPLAN, JEFFREY) (Entered: 02/15/2024) |
| 02/20/2024 | | Set Deadlines as to 25 First MOTION re 23 Memorandum in Opposition of Motion, 18 MOTION to Dismiss , 24 Reply to Response to Motion . Motion set for 3/18/2024 before Judge Jamel K. Semper. Unless otherwise directed by the Court, this motion will be decided on the papers and no appearances are required. Note that this is an automatically generated message from the Clerk`s Office and does not supersede any previous or subsequent orders from the Court. (ld, ) (Entered: 02/20/2024) |
| 04/22/2024 | 26 | Letter re 23 Memorandum in Opposition of Motion, 18 MOTION to Dismiss , 10 MOTION to Stay *or in the alternative, transfer under the first-to-file rule*, 16 Brief in Opposition to Motion,. (Attachments: # 1 Memorandum and order from Texas Court staying related case)(KAPLAN, JEFFREY) (Entered: 04/22/2024) |
| 04/23/2024 | 27 | Letter from Shalu Maheshwari to Judge Semper in response to DI 26 re 26 Letter,. (MAHESHWARI, SHAILENDRA) (Entered: 04/23/2024) |
| 04/25/2024 | | 25 First MOTION re 23 Memorandum in Opposition of Motion, 18 MOTION to Dismiss , 24 Reply to Response to Motion no longer referred to the Magistrate Judge. Motion to be decided by the District Judge. (jbb) (Entered: 04/25/2024) |
| 05/10/2024 | 28 | LETTER ORDER denying 10 Motion to Stay or in the alternative, to transfer. The Clerk of the Court is directed to terminate the motion filed as ECF No. 10. Signed by Magistrate Judge Jessica S. Allen on 5/10/2024. (ld, ) (Entered: 05/10/2024) |
| 05/24/2024 | 29 | Letter from Counsel for Bambuser re 27 Letter. (KAPLAN, JEFFREY) (Entered: 05/24/2024) |
| 09/03/2024 | 30 | OPINION. Signed by Judge Jamel K. Semper on 9/3/2024. (ld, ) (Entered: 09/03/2024) |
| 09/03/2024 | 31 | ORDER granting 18 Motion to Dismiss; that the Complaint (ECF 1) is DISMISSED WITHOUT PREJUDICE; that Plaintiff's Motion to file a sur-reply (ECF 25) is GRANTED. Signed by Judge Jamel K. Semper on 9/3/2024. (ld, ) (Entered: 09/03/2024) |
| 09/03/2024 | | ***Civil Case Terminated. (ld, ) (Entered: 09/10/2024) |
| 10/29/2024 | 32 | AMENDED COMPLAINT against SITO MOBILE R&D IP, LLC, SITO MOBILE, LTD., filed by BAMBUSER AB. (Attachments: # 1 Exhibit A, # 2 Exhibit B)(KAPLAN, JEFFREY) (Entered: 10/29/2024) |
| 11/13/2024 | 33 | STIPULATION re 32 Amended Complaint *& Consent Order to extend time to answer* by SITO MOBILE R&D IP, LLC, SITO MOBILE, LTD.. (MAHESHWARI, SHAILENDRA) |

Appx14

| | | (Entered: 11/13/2024) |
|---|---|---|
| 11/14/2024 | 34 | STIPULATION AND CONSENT ORDER EXTENDING TIME: The date for SITO to answer, or otherwise plead, in response to Bambuser's Amended Complaint (Dkt. 32) is extended to December 10, 2024. Signed by Judge Jamel K. Semper on 11/14/2024. (ld, ) (Entered: 11/14/2024) |
| 12/09/2024 | 35 | MOTION to Dismiss for Lack of Jurisdiction by SITO MOBILE R&D IP, LLC, SITO MOBILE, LTD.. Responses due by 12/23/2024. (Attachments: # 1 Memorandum in support of Motion to Dismiss, # 2 Declaration of Shailendra Maheshwari, # 3 Exhibit 1, # 4 Exhibit 2, # 5 Exhibit 3, # 6 Text of Proposed Order)(MAHESHWARI, SHAILENDRA) (Entered: 12/09/2024) |
| 12/10/2024 | | Set Deadlines as to 35 MOTION to Dismiss for Lack of Jurisdiction . Motion set for 1/6/2025 before Judge Jamel K. Semper. Unless otherwise directed by the Court, this motion will be decided on the papers and no appearances are required. Note that this is an automatically generated message from the Clerk`s Office and does not supersede any previous or subsequent orders from the Court. (ld, ) (Entered: 12/10/2024) |
| 12/13/2024 | 36 | STIPULATION *for extension of time* by BAMBUSER AB. (KAPLAN, JEFFREY) (Entered: 12/13/2024) |
| 12/16/2024 | 37 | STIPULATION AND CONSENT ORDER EXTENDING TIME; that the date for Bambuser to file an opposition to SITO's motion to dismiss, filed on December 9, 2024 ("SITO's Motion to Dismiss"), is extended from December 23, 2024 to January 23, 2025; and the date for SITO to file a reply in further support of SITO's Motion to Dismiss is extended from December 30, 2024 to February 6, 2025. Signed by Judge Jamel K. Semper on 12/16/2024. (ld) (Entered: 12/17/2024) |
| 01/22/2025 | 38 | MEMORANDUM in Opposition filed by BAMBUSER AB re 35 MOTION to Dismiss for Lack of Jurisdiction (Attachments: # 1 Exhibit 1, # 2 Exhibit 2)(KAPLAN, JEFFREY) (Entered: 01/22/2025) |
| 02/06/2025 | 39 | RESPONSE in Support filed by SITO MOBILE R&D IP, LLC, SITO MOBILE, LTD. re 35 MOTION to Dismiss for Lack of Jurisdiction (MAHESHWARI, SHAILENDRA) (Entered: 02/06/2025) |
| 09/30/2025 | 40 | OPINION. Signed by Judge Jamel K. Semper on 9/30/2025. (sms2) (Entered: 09/30/2025) |
| 09/30/2025 | 41 | ORDER Granting Defendants' 35 Motion to Dismiss; Plaintiff's 32 First Amended Complaint is Dismissed without prejudice. Signed by Judge Jamel K. Semper on 9/30/2025. (sms2) (Entered: 09/30/2025) |
| 10/10/2025 | 42 | NOTICE by BAMBUSER AB (KAPLAN, JEFFREY) (Entered: 10/10/2025) |
| 10/10/2025 | 43 | NOTICE OF APPEAL to Federal Circuit by BAMBUSER AB. Filing fee $ 605, receipt number ANJDC-16723800. The Clerk's Office hereby certifies the record and the docket sheet available through ECF to be the certified list in lieu of the record and/or the certified copy of the docket entries. Appeal Record due by 11/7/2025. (KAPLAN, JEFFREY) (Entered: 10/10/2025) |
| 10/15/2025 | 44 | Federal Circuit Case Number 26-1052 for 43 Notice of Appeal (Federal Circuit), filed by BAMBUSER AB. (Document Restricted - Court Only) (dam) (Entered: 10/15/2025) |

**PACER Service Center**

**Transaction Receipt**

Appx15

| 10/23/2025 11:18:05 | | | |
|---|---|---|---|
| **PACER Login:** | cpnycpara16 | **Client Code:** | |
| **Description:** | Docket Report | **Search Criteria:** | 2:23-cv-21757-JKS-JSA Start date: 1/1/1980 End date: 10/23/2025 |
| **Billable Pages:** | 5 | **Cost:** | 0.50 |

Appx16

## IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| BAMBUSER AB,<br><br>        Plaintiff,<br><br>    v.<br><br>SITO MOBILE R&D IP, LLC AND SITO MOBILE, LTD.,<br><br>        Defendant. | C.A. No. 2:23-cv-21757<br><br>**JURY TRIAL DEMANDED** |

### COMPLAINT FOR DECLARATORY JUDGMENT OF NON-INFRINGEMENT AND INVALIDITY

1.      This is an action arising under the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, and the United States Patent Act, 35 U.S.C. § 1 *et seq*.  Plaintiff Bambuser AB ("Bambuser") seeks a declaration that six United States patents allegedly owned and/or controlled by Defendants (collectively, "Sito") are invalid, not infringed, and/or otherwise unenforceable.

## PARTIES

2.      Plaintiff Bambuser is a corporation organized under the laws of Sweden and having a principal place of business in Stockholm, Sweden.

3.      Bambuser is a state-of-the-art video commerce company that has built the world's leading video commerce software used by companies worldwide.

Page **1** of **10**

Appx17

4.      Defendant Sito Mobile, Ltd. ("SM") is a company organized and existing under the laws of the state of New York with its principal place of business located at 123 Town Square Place, Suite 419, Jersey City, New Jersey 07310.

5.      Defendant Sito Mobile R&D IP, LLC ("SMIP") is a limited liability company organized and existing under the laws of the state of New York with its principal place of business located at 123 Town Square Place, Suite 419, Jersey City, New Jersey 07310.  Upon information and belief, Defendant SMIP is a wholly owned subsidiary of SM.

6.      Defendants SMIP and SM (collectively, "Sito"), claim to own or control licensing rights to at least six (6) United States patents (the "Patents in Suit") that Sito claims deal broadly with adaptive bitrate streaming technologies.

7.      Specifically, Sito claims to own and/or control US Patent Nos. 7,191,244, 8,015,307, 8,554,940, 9,349,138, 10,735,781 and 10,769,675 (the '244 patent, '307 patent, '940 patent, '138 patent, '781 patent, and '675 patent, respectively).

8.      On June 16, 2023, Sito filed a lawsuit alleging patent infringement of the Patents In Suit against SFA Holdings, Inc.  That action is presently pending in the United States District Court for the Western District of Texas, and is styled *SITO MOBILE R&D IP, LLC AND SITO MOBILE, LTD v. SFA HOLDINGS, INC.,(f/k/a/ SAKS INCORPORATED)*, 23-cv-00688.

Appx18

9.    SFA is Bambuser's customer, has been sued for its use of Bambuser supplied technology, and SFA has requested Bambuser defend and indemnify SFA Holdings with respect to said suit.

10.    On or about October 6, 2023, Sito sent a draft complaint to Uniqlo USA, Inc., ("Uniqlo"), another Bambuser customer, citing the same 6 patents in suit, and threatening to sue Uniqlo for patent infringement. The accused technology is that supplied to Uniqlo by Bambuser, and Uniqlo has also sought defense and indemnity from Bambuser.

## JURISDICTION AND VENUE

11.    This action arises under the Patent Laws of the United States, 35 U.S.C. § 1 *et seq.*, including, but not limited to, 35 U.S.C. §§ 282, 283, and 285, and the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202.

12.    The Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1338(a), 2201, and 2202 because, as outlined above, Sito has sued or threatened to sue customers of Bambuser for infringement of the Patents in Suit, and Bambuser is thus faced with defending against the same patent infringement claims in multiple jurisdictions.

13.    Based upon at least the foregoing, there is an actual and judiciable dispute between Bambuser and Sito concerning infringement, validity and enforceability of the Patents in Suit.

Appx19

14. This Court has personal jurisdiction over Sito because Sito has its principle place of business in this District from which it regularly conducts its business.

15. Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 and/or 1400(b).

## COUNT I – Declaratory Judgment of Invalidity and Non-Infringement of the '244 Patent

16. Bambuser incorporates herein by reference all preceding paragraphs as if set forth herein in full.

17. The claims of the '244 patent are invalid under one or more sections of 35 U.S.C. §§102, 103, and/or 112. Such claims are either anticipated or rendered obvious by, at least, the following prior art patents and/or published patent publications, either alone or in obvious combination(s): 6,389,467; 6,385,596; 6,760,916; 5,931,901; 6,715,126; 2004/0015703; 2004/0083273.

18. In addition, one or more claim limitations of the claims in suit are not present, either literally or by equivalents, in the Bambuser supplied products and processes that Bambuser's customers use and which Sito has accused of infringing the Patents in Suit.

19. As a result of the foregoing, and to avoid further imminent harm to its business and harassment of its customers with meritless infringement claims, Bambuser is entitled to a declaratory judgment that its products and services,

Appx20

supplied to its customers and accused of infringement, do not infringe any valid claim of the '244 patent.

## COUNT II – Declaratory Judgment of Invalidity and Non-Infringement of the '307 Patent

20. Bambuser incorporates herein by reference all preceding paragraphs as if set forth herein in full.

21. The claims of the '307 patent are invalid under one or more sections of 35 U.S.C. §§102, 103, and/or 112. Such claims are either anticipated or rendered obvious by the following prior art patents and/or published patent publications, either alone or in obvious combination: 6,389,467; 6,385,596; 6,760,916; 5,931,901; 6,715,126; 2004/0015703; 2004/0083273.

22. In addition, one or more claim limitations of the claims in suit are not present, either literally or by equivalents, in the Bambuser supplied products and processes that Bambuser's customers use and that Sito has accused of infringing the patents in suit.

23. As a result of the foregoing, and to avoid further imminent harm to its business and harassment of its customers with meritless infringement claims, Bambuser is entitled to a declaratory judgment that its products and services, supplied to its customers and accused of infringement, do not infringe any valid claim of the '307 patent.

Appx21

## COUNT III – Declaratory Judgment of Invalidity and Non-Infringement of the '940 Patent

24.     Bambuser incorporates herein by reference all preceding paragraphs as if set forth herein in full.

25.     The claims of the '940 patent are invalid under one or more sections of 35 U.S.C. §§102, 103, and/or 112.  Such claims are either anticipated or rendered obvious by the following prior art patents and/or published patent publications, either alone or in obvious combination: 6,389,467; 6,385,596; 6,760,916; 5,931,901; 6,715,126; 2004/0015703; 2004/0083273.

26.     In addition, one or more claim limitations of the claims in suit are not present, either literally or by equivalents, in the Bambuser supplied products and processes that Bambuser's customers use and that Sito has accused of infringing the Patents in Suit.

27.     As a result of the foregoing, and to avoid further imminent harm to its business and harassment of its customers with meritless infringement claims, Bambuser is entitled to a declaratory judgment that its products and services, supplied to its customers and accused of infringement, do not infringe any valid claim of the '940 patent.

## COUNT IV – Declaratory Judgment of Invalidity and Non-Infringement of the '138 Patent

Appx22

28. Bambuser incorporates herein by reference all preceding paragraphs as if set forth herein in full.

29. The claims of the '138 patent are invalid under one or more sections of 35 U.S.C. §§102, 103, and/or 112. Such claims are either anticipated or rendered obvious by the following prior art patents and/or published patent publications, either alone or in obvious combination: 6,389,467; 6,385,596; 6,760,916; 5,931,901; 6,715,126; 2004/0015703; 2004/0083273.

30. In addition, one or more claim limitations of the claims in suit are not present, either literally or by equivalents, in the Bambuser supplied products and processes that Bambuser's customers use and that Sito has accused of infringing the Patents in Suit.

31. As a result of the foregoing, and to avoid further imminent harm to its business and harassment of its customers with meritless infringement claims, Bambuser is entitled to a declaratory judgment that its products and services, supplied to its customers and accused of infringement, do not infringe any valid claim of the '138 patent.

## COUNT V – Declaratory Judgment of Invalidity and Non-Infringement of the '781 Patent

32. Bambuser incorporates herein by reference all preceding paragraphs as if set forth herein in full.

Appx23

33.     The claims of the '781 patent are invalid under one or more sections of 35 U.S.C. §§102, 103, and/or 112.  Such claims are either anticipated or rendered obvious by the following prior art patents and/or published patent publications, either alone or in obvious combination: 6,389,467; 6,385,596; 6,760,916; 5,931,901; 6,715,126; 2004/0015703; 2004/0083273.

34.     In addition, one or more claim limitations of the claims in suit are not present, either literally or by equivalents, in the Bambuser supplied products and processes that Bambuser's customers use and that Sito has accused of infringing the Patents in Suit.

35.     As a result of the foregoing, and to avoid further imminent harm to its business and harassment of its customers with meritless infringement claims, Bambuser is entitled to a declaratory judgment that its products and services, supplied to its customers and accused of infringement, do not infringe any valid claim of the '781 patent.

## COUNT VI – Declaratory Judgment of Invalidity and Non-Infringement of the '675 Patent

36.     Bambuser incorporates herein by reference all preceding paragraphs as if set forth herein in full.

37.     The claims of the '675 patent are invalid under one or more sections of 35 U.S.C. §§102, 103, and/or 112.  Such claims are either anticipated or rendered obvious by the following prior art patents and/or published patent publications,

Appx24

either alone or in obvious combination: 6,389,467; 6,385,596; 6,760,916; 5,931,901; 6,715,126; 2004/0015703; 2004/0083273.

38.    In addition, one or more claim limitations of the claims in suit are not present, either literally or by equivalents, in the Bambuser supplied products and processes that Bambuser's customers use and that Sito has accused of infringing the Patents in Suit.

39.    As a result of the foregoing, and to avoid further imminent harm to its business and harassment of its customers with meritless infringement claims, Bambuser is entitled to a declaratory judgment that its products and services, supplied to its customers and accused of infringement, do not infringe any valid claim of the '675 patent.

## JURY TRIAL

40.    Bambuser herein demands trial by jury on all Counts and defenses triable by a jury.

## PRAYER FOR RELIEF

WHEREFORE, Bambuser respectfully requests judgment in its favor and against Sito, as follows:

A.    Declaring that the Bambuser products and services that Sito has accused of infringement, including but not limited to those used by SFA Holdings and Uniqlo USA Inc., do not infringe, induce infringement or contribute to the

Appx25

infringement of, either literally or by equivalents, any valid claim of any of the Patents in Suit;

  B. Declaring all claims of each of the Patents in Suit invalid;

  C. Declaring that this case is exceptional and awarding Bambuser its expenses, costs and attorneys' fees pursuant to 35 U.S.C. §285; and

  D. Granting to Bambuser any other and further relief as the Court deems just, proper, or equitable.

Dated:  November 1, 2023

    KAPLAN BREYER SCHWARZ, LLP

    /s/Jeffrey I. Kaplan
    Jeffrey I. Kaplan
    197 State Route 18, Ste 3000
    East Brunswick, NJ 08816
    jkaplan@kbsiplaw.com

    ZUKERMAN GORE BRANDEIS & CROSSMAN, LLC
    John K. Crossman (*pro hac vice* to be filed)
    Eleven Times Square
    New York, New York 10036
    212 223 6700
    jcrossman@zukermangore.com

    *Attorneys for Plaintiff Bambuser AB*

Appx26

Shailendra Maheshwari (001822004)*
Scott R. Samay (040561996)*
Tedd W. Van Buskirk (041261995)*
DAIGNAULT IYER LLP
8618 Westwood Center Drive, Suite 150
Vienna, VA 22182
smaheshwari@daignaultiyer.com
ssamay@daignaultiyer.com
tvanbuskirk@daignaultiyer.com
*Not admitted in Virginia

*Attorneys for Defendants*
*SITO Mobile R&D IP, LLC and*
*SITO Mobile, Ltd.*

### IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| **BAMBUSER AB,** | |
| **Plaintiff,** | **Case No. 2:23-cv-21757-SDW-JSA** |
| **v.** | **Motion Date: January 2, 2024** |
| **SITO MOBILE R&D IP, LLC, and SITO MOBILE, LTD.,** | **(Filed Electronically)** |
| **Defendants.** | |

### MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION TO STAY OR, IN THE ALTERNATIVE, TRANSFER UNDER THE FIRST-TO-FILE RULE

Appx43

## TABLE OF CONTENTS

Page

I.    Factual Background. ................................................................................................. 1

II.    Argument. ............................................................................................................... 2

    A.    The first-to-file rule requires a stay, or transfer, of this duplicative action
        in order to conserve the resources of both the courts and the parties. .................... 2

    B.    The Texas action was filed first, and Texas obtained the subject matter of the
        complaints first, necessitating a stay here.............................................................. 4

    C.    The Court should, alternatively, transfer this action to Texas. ............................... 6

III.    Conclusion. ............................................................................................................ 7

Appx44

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*EEOC v. Univ. of Pa.*,
  850 F.2d 969 (3d Cir. 1988)...........................................................................................4, 5

*EMC Corp.* v. *Norand Corp.*,
  89 F.3d 807 (Fed. Cir. 1996)................................................................................................3

*Franceski v. Freedom Mortgage Corp.*,
  2019 U.S. Dist. LEXIS 107446 (D.N.J. June 27, 2019) ........................................................6, 7

*Franceski v. Freedom Mortgage Corp.*,
  2021 U.S. Dist. LEXIS 22130 (D.N.J. February 5, 2021) ...........................................................7

*Futurewei Techs., Inc. v. Acacia Research Corp.*,
  737 F.3d 704 (Fed. Cir. 2013)..........................................................................................3, 7

*Genentech, Inc. v. Eli Lilly & Co.*,
  998 F.2d 931 (Fed. Cir. 1993).............................................................................................3

*Merial Ltd. v. Cipla Ltd.*,
  681 F.3d 1283 (Fed. Cir. 2012).............................................................................................3

*Nature's Benefit, Inc. v. NFI*,
  Civ. No. 06-4836, 2007 WL 2462625 (D.N.J. Aug. 27, 2007) ..................................................4

*Plating Res., Inc. v. UTI Corp.*,
  47 F. Supp. 2d 899 (N.D. Oh. 1999)........................................................................................4

*RJF Holdings III, Inc. v. Refractec, Inc.*,
  No. 03-1600, 2003 U.S. Dist. LEXIS 22144 (E.D. Pa. Nov. 24, 2003) ..............................4, 5

*Schering Corp. v. Amgen Inc.*,
  969 F. Supp. 258 (D. Del. 1997)........................................................................................4, 5

*Sony Elecs. Inc. v. Guardian Media*,
  497 F.3d 1271 (Fed. Cir. 2007)............................................................................................3

*Texas Instruments Inc. v. Micron Semiconductor, Inc.*,
  815 F. Supp. 994 (E.D. Tex. 1993)........................................................................................3

*Time Warner Cable, Inc. v. GPNE Corp.*,
  2007 U.S. Dist. LEXIS 52655 (D. Del. July 20, 2007) ............................................................6

ii

Appx45

*Versus Tech., Inc. v. Hillenbrand Indus., Inc.*,
   2004 U.S. Dist. LEXIS 28331 (W.D. Mich. Nov. 23, 2004).......................................................4

*Wilton v. Seven Falls Co.*,
   515 U.S. 277 (1995)..................................................................................................................2, 3

**Statutes**

28 U.S.C. § 1404(a) ...................................................................................................................6

Appx46

Defendants SITO Mobile R&D IP, LLC and SITO Mobile, Ltd. (collectively "Defendants" or "SITO"), through their undersigned counsel, respectfully move this Court to stay or, in the alternative, transfer this action to the Western District of Texas under the first-to-file rule.

## I.     Factual Background.

On June 16, 2023, Defendants filed an action styled *SITO Mobile R&D IP, LLC and SITO Mobile, LTD. v. SFA Holdings, Inc.,(f/k/a/ Saks Incorporated)*, 23-cv-00688-RLP, in the Western District of Texas against SFA Holdings, Inc. ("SFA") asserting infringement of U.S. patent nos. 7,191,244; 8,015,307; 8,554,940; 9,349,138; 10,735,781; and 10,769,675 (collectively the "asserted patents") by certain accused products (the "Texas action"). Plaintiff Bambuser AB ("Plaintiff" or "Bambuser") was fully aware of the Texas action and admits this fact in its declaratory-judgment complaint. D.I. 1 at ¶7-8. Plaintiff also admits that SFA is its customer and that SFA has been sued in Texas for the technology Plaintiff supplied. *Id.* at ¶ 9. More importantly, Plaintiff admits that "SFA has requested Bambuser defend and indemnify SFA with respect to [the Western District of Texas] suit." *Id.*[1]

But instead of contacting Defendants at any point to discuss the first-filed Texas action, *over 4.5 months later*, on November 1, 2023, Plaintiff filed a declaratory-judgment action in this Court seeking a declaration of invalidity and non-infringement of the *exact same patents and products* for which it was requested to defend and indemnify SFA in the first-filed Texas action. D.I. 1.

---

[1] To the extent that the declaratory-judgment complaint is unclear, Plaintiff has confirmed to Defendants that it is defending and indemnifying SFA in the Texas action.

Appx47

## II.     Argument.

### A.     The first-to-file rule requires a stay, or transfer, of this duplicative action in order to conserve the resources of both the courts and the parties.

This is a straightforward situation. Defendants filed a first action in Texas over *four and a half months* before Plaintiff filed a declaratory-judgment action here. The two actions involve the *identical* asserted patents and infringing products; all issues can and will be adjudicated in the first-filed Texas action. Indeed, Plaintiff is also defending and indemnifying SFA in the Texas action.[2] Accordingly, this Court should stay or, in the alternative, transfer this action to the Western District of Texas to conserve judicial resources and avoid duplication and/or the possibility of inconsistent results in the two jurisdictions.

This Court is not required to exercise jurisdiction over Plaintiff's declaratory-judgment complaint. *Wilton v. Seven Falls Co.*, 515 U.S. 277, 288 (1995). The Declaratory Judgment Act is "an enabling Act" that confers on courts "unique and substantial discretion in deciding whether to declare the rights of litigants." *Id*. This discretion is unique, and the Supreme Court explained "[t]he statute's textual commitment to discretion, and the breadth of leeway we have always understood it to suggest, distinguish the declaratory judgment context from other areas of the law in which concepts of discretion surface." *Wilton*, 515 U.S. at 286-87. "In the declaratory judgment context, the normal principle that federal courts should adjudicate claims within their jurisdiction yields to considerations of practicality and wise judicial administration." *Id*. at 288. Thus, as long as courts act in accordance with the purposes of the Declaratory Judgment Act and

---

[2] Plaintiff also cites Defendants' overtures to another customer, Uniqlo, Inc. and admits that the same asserted patents and products were identified in Defendants' draft complaint to Uniqlo. D.I. 1 at ¶10. Similar to SFA, Plaintiff is defending and indemnifying Uniqlo. *Id*. Therefore, the same issues that will be resolved in the first-filed Texas action will be applicable to Uniqlo, and any attempt by Plaintiff to cite to the defense of Uniqlo as a reason it filed suit here can, and should, be ignored.

Appx48

the principles of sound judicial administration, they can refuse to hear a declaratory judgment action. *EMC Corp.* v. *Norand Corp.*, 89 F.3d 807, 810 (Fed. Cir. 1996), distinguished on other grounds by *Sony Elecs. Inc. v. Guardian Media*, 497 F.3d 1271, 1283 (Fed. Cir. 2007).

Because both the Texas action and this action arise under the patent laws and involve claims related to the asserted patents, "[r]esolution of whether the second filed action should proceed . . . is governed by [Federal] Circuit[] law." *Futurewei Techs., Inc. v. Acacia Research Corp.*, 737 F.3d 704, 708 (Fed. Cir. 2013). The first-to-file rule is "a doctrine of federal comity, intended to avoid conflicting decisions and promote judicial efficiency, that favors pursuing only the first-filed action when multiple lawsuits involving the same claims are filed in different jurisdictions." *Merial Ltd. v. Cipla Ltd.*, 681 F.3d 1283, 1299 (Fed. Cir. 2012) (citations omitted). It is well settled, "[w]hen two actions that sufficiently overlap are filed in different federal district courts, one for infringement and the other for declaratory relief, the declaratory judgment action, if filed later, generally is to be stayed, dismissed, or transferred to the forum of the infringement action." *Futurewei Techs., Inc.,* 737 F.3d at 708. Indeed, the first-filed action is preferred "unless considerations of judicial and litigant economy, and the just and effective disposition of disputes, require otherwise." *Genentech, Inc. v. Eli Lilly & Co.*, 998 F.2d 931, 937 (Fed. Cir. 1993) overruled on other grounds by *Wilton v. Seven Falls Co.*, 515 U.S. 277 (1995). As such, the rule promotes "national uniformity in patent cases" and avoids "dispositive differences among the regional circuits." *Genentech*, 998 F.2d at 937; *Texas Instruments Inc. v. Micron Semiconductor, Inc.*, 815 F. Supp. 994, 997 (E.D. Tex. 1993) (The first-to-file rule applies where "two pending actions [are] so duplicative or involve substantially similar issues that one court should decide the subject matter of both actions[.]"). Accordingly, under the first-to-file rule and consistent with Federal Circuit precedent discussed above, this Court should stay

Appx49

or, in the alternative, transfer this action to the Western District of Texas to conserve judicial resources and avoid duplication and/or the possibility of inconsistent results in the two jurisdictions.

      **B.**     **The Texas action was filed first, and Texas obtained the subject matter of the complaints first, necessitating a stay here.**

As detailed above, the Texas action was filed on June 16, 2023, almost four and a half months *before* Plaintiff filed the declaratory-judgment suit here, making the Texas action the first-filed action. Further, June 16, 2023 is the relevant date for the first-to-file analysis even though Plaintiff was not specifically named as a defendant in Texas because the rule does not require that the two actions involve identical parties. *See Nature's Benefit, Inc. v. NFI*, Civ. No. 06-4836, 2007 WL 2462625, at *5 (D.N.J. Aug. 27, 2007) (finding, although the claims in both lawsuits were not identical, "the complaints have a 'substantial overlap' of parties and issues to establish prima facie support for implementation of the first-to-file rule"); *see also Versus Tech., Inc. v. Hillenbrand Indus., Inc.,* 2004 U.S. Dist. LEXIS 28331, at *16 (W.D. Mich. Nov. 23, 2004) (citing *Hartford Accident & Indem. Co. v. Margolis,* No. 90-16626, 1992 U.S. App. LEXIS 4234, at *1 (9th Cir. Mar. 5, 1992) ("Absolute identity of parties in the two cases is not required."); *Plating Res., Inc. v. UTI Corp.,* 47 F. Supp. 2d 899, 903 (N.D. Oh. 1999) (same).

Instead, the Third Circuit has confirmed that the first-filed rule requires that "[i]n all cases of federal concurrent jurisdiction, *the court which first has possession of the subject must decide it*." *EEOC v. Univ. of Pa.,* 850 F.2d 969, 971 (3d Cir. 1988) (emphasis added)*; see also RJF Holdings III, Inc. v. Refractec, Inc.,* No. 03-1600, 2003 U.S. Dist. LEXIS 22144, at *6 (E.D. Pa. Nov. 24, 2003) (The first-filed rule turns on which court first obtains possession of the subject of the dispute, not the parties of the dispute.); *Schering Corp. v. Amgen Inc*., 969 F. Supp.

Appx50

258, 267 (D. Del. 1997) (holding that the first-to-file rule turns "on which court first obtains possession of the subject of the dispute, not the parties of the dispute").

The first-to-file rule is squarely at issue here. Defendants filed an action in Texas asserting the *identical* patents and products against SFA that Plaintiff implicates here. The Texas action was the first-filed lawsuit. Indeed, despite not being named in that suit, Plaintiff has admitted in its declaratory-judgment complaint that its products are at issue in the first-filed Texas action, and that it is defending and indemnifying SFA there. D.I. 1 at ¶ 9. And further, in the declaratory-judgment suit here, Plaintiff seeks declarations of non-infringement and invalidity of the same patents as the Texas action. The declarations of non-infringement and invalidity that Plaintiff seeks in this Court are matters that can and should be resolved in the litigation presently before the Western District of Texas. Thus, despite any difference in identity of the parties between Defendant SFA(Texas) and Plaintiff Bambuser (here), the first court that obtained possession of the subject matter at issue here was the district court in the Western District of Texas. Under these circumstances, a stay of the second-filed declaratory-judgment action is warranted. *See e.g., EEOC*, 850 F.2d at 971; *RJF Holdings III, Inc.,* 2003 U.S. Dist. LEXIS 22144 at *6; *Schering Corp.*, 969 F. Supp. at 267.

Further, principles of judicial economy, the avoidance of piecemeal litigation, as well as the discretionary jurisdiction conferred by the Declaratory Judgment Act, warrant a stay of the instant action in this Court. Plaintiff brought its declaratory-judgment action only after learning of the Texas action. Rather than proceeding in the Texas action where it is already defending and indemnifying SFA, Plaintiff instead opted to file a new duplicative action in a different

5

Appx51

jurisdiction, thus engaging in improper forum shopping. [3] *See Time Warner Cable, Inc. v. GPNE Corp.,* 2007 U.S. Dist. LEXIS 52655, at *17 (D. Del. July 20, 2007) (Defendant's filing of a declaratory-judgment suit in Delaware after plaintiff's patent infringement suit in Texas was considered to be an example of forum shopping; the court dismissed defendant's second-filed declaratory-judgment action).

Accordingly, this Court should stay Plaintiff's declaratory-judgment action under the first-to-file rule.

### C.    The Court should, alternatively, transfer this action to Texas.

As an alternative remedy to a stay, the court should transfer this action to Texas where the first-filed action is pending. The determination of whether to transfer a case is predicated on the same reasoning as the above stay analysis. *Franceski v. Freedom Mortgage Corp.*, 2019 U.S. Dist. LEXIS 107446, *9-10, (D.N.J. June 27, 2019). "[T]o determine whether the first-filed rule is applicable, in addition to the above considerations, a court may consider a host of factors, which are found under 28 U.S.C. § 1404(a)." *Id.* at *10 (citations omitted). Courts in the Third Circuit have held that a finding that the first-filed rule is applicable is alone sufficient to support transfer. *Id.* at *13. "Courts in this Circuit have frequently held that the pendency of a related or similar case in another forum is a powerful reason to grant a motion for a change of venue." *Id.* citing *Am. Inst. for History Educ., LLC v. E-Learning Sys.*, No. 10-2607 (RMB/KMW), 2010 U.S. Dist. LEXIS 120946, at *7-9 (D.N.J. Nov. 16, 2010); *see also Futurewei Techs., Inc.,* 737

---

[3] It is noteworthy to mention that the Western District of Texas is already familiar with Defendants' patents, including the asserted patents. Indeed, since 2020, Defendants have been involved in six other actions in the Western District of Texas, in addition to the pending first-filed action against SFA. Thus, the judges in Texas are well positioned to adjudicate the claims and defenses in the first-filed action and it is unnecessary to burden another judge in a different jurisdiction with the same issues.

Appx52

F.3d at 708. Because the Texas action was the first-filed action by a significant margin and will address all the same allegations and issues as this action, transfer of this action would be an equally appropriate remedy in lieu of a stay. *Franceski*, 2019 U.S. Dist. LEXIS 107446, at *13.[4] Additionally, as noted *supra* at fn. 3, the Western District of Texas is already very familiar with the asserted patents and the technology at issue, further obviating the need for this Court to address the second-filed declaratory judgment complaint.

**III.    Conclusion.**

For the reasons stated above, this Court should stay or, alternatively, transfer to Western District of Texas, Plaintiff's second-filed declaratory-judgment complaint based on the first-to-file rule because the first-filed Texas action, which asserts the exact same patents as those identified here and the same accused infringing products, takes precedence over Plaintiff's second-filed action, and would prevent piecemeal litigation, wasteful duplication, and also conserve judicial resources and costs for the parties.

---

[4] *See Franceski v. Freedom Mortgage Corp.*, 2021 U.S. Dist. LEXIS 22130, *6-8, (D.N.J. February 5, 2021) (Court ordered transfer of the matter upon resolution of a personal jurisdiction issue in the first-filed case).

7

Appx53

November 30, 2023                          Respectfully submitted,

                                           */s/ Shailendra Maheshwari*
                                           Shailendra Maheshwari (001822004)*
                                           Scott R. Samay (040561996)*
                                           Tedd W. Van Buskirk (041261995)*
                                           DAIGNAULT IYER LLP
                                           8618 Westwood Center Drive, Suite 150
                                           Vienna, VA 22182
                                           smaheshwari@daignaultiyer.com
                                           ssamay@daignaultiyer.com
                                           tvanbuskirk@daignaultiyer.com

                                           *Not admitted in Virginia*

                                           *Attorneys for Plaintiffs*
                                           *SITO Mobile R&D IP, LLC and*
                                           *SITO Mobile Ltd.*

8

Appx54

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| BAMBUSER AB,<br><br>                  Plaintiff,<br><br>     v.<br><br><br>SITO MOBILE R&D IP, LLC and SITO MOBILE, LTD.,<br><br>               Defendants. | Case No. 2:23-cv-21757-SDW-JSA<br><br>Motion Date: January 2, 2024 |

**[PROPOSED] ORDER GRANTING DEFENDANTS' MOTION TO STAY OR,**
**IN THE ALTERNATIVE, TRANSFER UNDER THE FIRST-TO-FILE RULE**

THIS MATTER, having been opened to the Court by Defendants for entry of an order staying this proceeding pursuant to the first-to-file rule, pending the resolution of a related proceeding in the United States District Court for the Western District of Texas styled *SITO Mobile R&D IP, LLC and SITO Mobile, LTD. v. SFA Holdings, Inc. (f/k/a/ Saks Incorporated)*, 23-cv-00688-RLP or, in the alternative, transferring this proceeding to the Western District of Texas, and the Court having considered the Motion and for good cause shown;

IT IS on this _____ day of _____, 202__

ORDERED as follows:

Defendants' Motion to Stay is Granted in its entirety, and this proceeding is [stayed][transferred to the Western District of Texas as a related case to *Mobile R&D IP, LLC and SITO Mobile, LTD. v. SFA Holdings, Inc.,(f/k/a/ Saks Incorporated)*, 23-cv-00688-RLP].

_____
Hon. Susan D. Wigenton, W.S.D.J.

Appx55

Shailendra Maheshwari (001822004)*
Scott R. Samay (040561996)*
Tedd W. Van Buskirk (041261995)*
DAIGNAULT IYER LLP
8618 Westwood Center Drive, Suite 150
Vienna, VA 22182
smaheshwari@daignaultiyer.com
ssamay@daignaultiyer.com
tvanbuskirk@daignaultiyer.com
*Not admitted in Virginia

*Attorneys for Defendants*
*SITO Mobile R&D IP, LLC and*
*SITO Mobile, Ltd.*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| **BAMBUSER AB,** | |
| **Plaintiff,** | **Case No. 2:23-cv-21757-SDW-JSA** |
| **v.** | **CERTIFICATE OF SERVICE** |
| **SITO MOBILE R&D IP, LLC and SITO MOBILE, LTD.,** | **(Filed Electronically)** |
| **Defendants.** | |

SHAILENDRA MAHESHWARI, hereby certifies:

1.    I am an attorney-at-law of the State of New Jersey and a partner at the law firm of

Daignault Iyer LLP, counsel for Defendants SITO Mobile R&D IP, LLC and SITO Mobile, Ltd.

in the above-captioned matter.

2.    On November 30, 2023, true and correct copies of (1) Notice of Defendants'

Motion to Stay Or, In The Alternative, Transfer Under The First-To-File Rule; (2) Memorandum

Appx56

in Support of Defendants' Motion; (3) [Proposed] Order; and (4) Certificate of Service were filed

electronically with the Court, and copies of same were sent via e-mail to the following counsel:

Jeffrey I. Kaplan
Kaplan Breyer Schwarz, LLP
197 State Route 18, Ste 3000
East Brunswick, NJ 08816
jkaplan@kbsiplaw.com

*Attorneys for Plaintiff*
*Bambuser AB*

       3.      I hereby certify that the foregoing statements made by me are true. I am aware

that if any of the foregoing statements made by me are willfully false, I am subject to

punishment.


Dated: November 30, 2023          */s/ Shailendra Maheshwari*
                            Shailendra Maheshwari

Appx57

15 TEXT ORDER REASSIGNING CASE. Case reassigned to Judge Jamel K. Semper for all further proceedings. Judge Susan D. Wigenton no longer assigned to case. So Ordered by Chief Judge Renee Marie Bumb on 12/22/2023. (smf) (Entered: 12/22/2023)

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY**

BAMBUSER AB,

               Plaintiff,

v.

SITO MOBILE R&D IP, LLC, and
SITO MOBILE, LTD.,

               Defendants.

Case No. 2:23-cv-21757-SDW-JSA

Motion Date: February 5, 2024

(Filed Electronically)

**Plaintiff's Memorandum in Opposition To
Defendants' Motion To Stay
Or, In The Alternative, To Transfer**

Appx68

**TABLE OF CONTENTS**

I.  PRELIMINARY STATEMENT ...................................................................... 1

II.  FACTS AND PROCEDURAL HISTORY ..................................................... 3

III.  ARGUMENT .............................................................................................. 5

    **A.**  The First To File Rule Does Not Apply Here
    The Customer Suit Exception Applies Instead ...................................... 5

        i.  Saks is a "Mere Reseller" for Purposes of
           the Customer-Suit Exception ......................................................... 6

        ii.  Saks Agrees to be Bound by the Outcome
           of the Declaratory Suit .................................................................. 8

        iii.  Bambuser is, and Assumes the Role of,
           the Major Source of the Accused Technology ............................... 8

    B.  Even Absent The Customer-Suit Exception This
    Court  Should Not Apply the First-to-File Rule Here ........................... 9

        i.  Witnesses are More Available in the District of New Jersey ........ 10

        ii.  Jurisdiction is Proper in the District of New Jersey,
           but Not in the Western District of Texas ..................................... 11

        iii.  Consolidation of Related Cases is More Appropriate
           in This Suit Than in the Saks Suit ................................................ 12

    C.  The Transfer Factors Do Not Support Transferring This Case ........... 13

IV.  CONCLUSION ........................................................................................ 15

Appx69

TABLE OF AUTHORITIES

**CASES**

*Amperex Tech. Ltd. v. Maxell, Ltd.*, No. CV2108461KMMF, 2021 WL 4398804
(D.N.J. Sept. 27, 2021), *appeal withdrawn*,
No. 2022-1017, 2022 WL 1021590 (Fed. Cir. Jan. 21, 2022) ................................................ 10

*Barth v. Walt Disney Parks & Resorts U.S., Inc.*,
697 F. App'x 119 (3d Cir. 2017) ........................................................................................ 11

*Canales v. Michaux*,
No. 1:18-CV-507-RP, 2019 WL 13153212 (W.D. Tex. Dec. 9, 2019) ................................ 11

*Database Am., Inc. v. Bellsouth Advert. & Pub. Corp.*,
825 F. Supp. 1195 (D.N.J. 1993) ........................................................................................ 11

*E.E.O.C. v. Univ. of Pennsylvania*,
850 F.2d 969 (3d Cir. 1988),
*aff'd*, 493 U.S. 182 (1990) ...........................................................................................9-10, 10

*Early Warning Servs., LLC v. Grecia*,
No. CV 21-1050, 2021 WL 1264029 (E.D. Pa. Apr. 6, 2021) ........................................ 5, 7

*Genentech, Inc. v. Eli Lilly & Co.*,
998 F.2d 931 (Fed. Cir. 1993),
*abrogated on other grounds*, 515 U.S. 277 (1995) .......................................................... 10

*Glenayre Elecs. Inc. v. Jackson*,
443 F.3d 851 (Fed. Cir. 2006) .......................................................................................... 13

*In re Google Inc.*,
588 F. App'x 988 (Fed. Cir. 2014) .................................................................................. 6, 7

*In re Nintendo of Am., Inc.*,
756 F.3d 1363 (Fed. Cir. 2014) ........................................................................................ 5, 6

*Jumara v. State Farm Ins. Co.*,
55 F.3d 873 (3d Cir. 1995) ................................................................................................ 13

*Katz v. Lear Siegler, Inc.*,
909 F.2d 1459 (Fed. Cir. 1990) ........................................................................................ 5, 6

ii

Appx70

*Maximum Hum. Performance, Inc. v. Dymatize Enterprises, Inc.*,
  No. CIV.A. 09-235(PGS), 2009 WL 2778104 (D.N.J. Aug. 27, 2009), *report and recommendation adopted*, No. CIV.A 09-235(PGS), 2009 WL 2952034 (D.N.J. Sept. 14, 2009) ........................................................................ 13, 14

*Micron Tech., Inc. v. Mosaid Techs., Inc.*,
  518 F.3d 897 (Fed. Cir. 2008) .................................................................. 10

*Pragmatus Telecom, LLC v. Advanced Store Co.*,
  No. CIV.A. 12-088-RGA, 2012 WL 2803695 (D. Del. July 10, 2012) ........................ 8, 9, 13

*Spread Spectrum Screening LLC v. Eastman Kodak Co.*,
  657 F.3d 1349 (Fed. Cir. 2011) ................................................................ 5, 6

*TC Heartland v. Kraft Food Groups Brands LLC*,
  581 U.S. 258 (2017) ................................................................................ 12

*Tegic Commc'ns Corp. v. Bd. of Regents of Univ. of Texas Sys.*,
  458 F.3d 1335 (Fed. Cir. 2006) .................................................................. 6

*Telebrands Corp. v. Nat'l Exp., Inc.*,
  No. CIV.A. 12-6671 (FSH), 2014 WL 4930897 (D.N.J. Oct. 2, 2014) ...................... 5

*Ultra Prod., Inc. v. Best Buy Co.*,
  No. CIV.A.09-1095MLC, 2009 WL 2843888 (D.N.J. Sept. 1, 2009) ...................... 10

## OTHER AUTHORITIES

28 U.S.C. § 1391(b) ..................................................................................... 11

28 U.S.C. § 1400(b) .............................................................................. 11, 12,14

28 U.S.C. § 1404(a) ..................................................................................... 13

Fed. R. Civ. Prod. 12(b)(2) ........................................................................... 4

Fed. R. Civ. Prod 12(b)(3) ............................................................................. 4

Fed. R. Civ. Prod 12(b)(6) ............................................................................. 5

Appx71

Plaintiff Bambuser AB ("Bambuser") submits this memorandum of law in opposition to defendants SITO Mobile R&D IP, LLC and SITO Mobile, Ltd.'s (collectively, "SITO") motion to stay, or in the alternative, to transfer this action to the Western District of Texas.

## I.   PRELIMINARY STATEMENT

SITO has moved to stay or transfer this case solely on the grounds that the first-to-file rule requires SITO's previously filed patent infringement action in the Western District of Texas take precedence over this this declaratory judgment action. However, the first-to-file rule simply does not apply here – the customer-suit exception to the first-to-file rule applies instead. The customer-suit exception provides that a technology manufacturer who is forced to defend and indemnify one or more of its customers against infringement suits is entitled to bring a single declaratory judgment action in its chosen forum, because that technology manufacturer is the real party in interest.

The customer-suit exception mandates the technology manufacturer's declaratory judgment action takes precedence over the patent owner's infringement suit – <u>even when filed after the infringement suit</u>. As a litany of case law establishes, this exception allows the real party in interest to litigate infringement and validity issues in one forum, rather than in multiple forums around the country, sequentially, as the patent owner sues one customer after another, each of whom separately seeks indemnification from the manufacturer.

As detailed below, the customer-suit exception to the first-to-file rule applies here, and Bambuser already faces up to two different lawsuits from SITO in two different forums – on the same technology, for infringement of the same patents. Remarkably, SITO's entire brief in support of their motion argues the first-to-file rule applies, and fails to dispute or even address

1

Appx72

the customer-suit exception, despite the fact that, as explained below, SITO was well aware of that exception and its applicability here before it filed its present motion.

Even absent the customer suit exception, the motion to stay or transfer should be denied. Initially, the first-to-file rule is not a firm rule, but is an equitable and flexible doctrine that courts often refuse to apply on a fact specific basis. Here, the factors courts consider in determining whether to apply the first-to-file rule all weigh against a stay or transfer. For example, SITO's own offices and employees are located in New Jersey, and Saks is in Manhattan, both a half hour drive from this Court. There is no connection at all of any witnesses, evidence, parties, or even counsel for the parties to the Western District of Texas, where SITO chose to sue Saks.

Second, Saks is not subject to either personal jurisdiction or venue in the Western District of Texas, and has already filed a motion to dismiss on those grounds. However, this Court unquestionably has jurisdiction over all of the parties and venue is properly laid in this district. This District is also the more convenient forum as all relevant witnesses and evidence would be available in New Jersey, or closer to New Jersey, than to Texas.

SITO's alternative relief to transfer this case to the Western District of Texas should similarly be denied. The factors this Court must consider when evaluating whether to transfer to another District, including the availability of jurisdiction, the availability of witnesses and evidence, and the efficiency of proceedings, strongly support maintaining this case in the District of New Jersey.

For these reasons, Bambuser respectfully requests that this Court deny SITO's motion to stay or transfer this case.

2

## II.    FACTS AND PROCEDURAL HISTORY

On June 16, 2023, SITO filed the Saks Suit in the Western District of Texas, Austin Division, against SFA Holdings Inc., a subsidiary of Saks Incorporated, which is an American luxury department store chain commonly known as Saks Fifth Avenue. (Declaration of Jeffrey I. Kaplan ("Kaplan Decl.") ¶ 6, Ex. A Declaration of Michael J. Zinna in support of Saks motion to dismiss the Saks Suit ("Saks Decl.") ¶ 5). The Saks Suit is captioned: *SITO Mobile R&D IP, LLC & SITO Mobile, LTD. v. SFA Holdings Inc. f/k/a SAKS Incorporated*, No. 1:23-cv-00688-RP (W.D. Tex.). (*Id.* at ¶ 6). In the Saks Suit, SITO alleges that Saks has infringed U.S. Pat. Nos. 7,191,244 ("the '244 patent"); 8,015,307 ("the '307 patent"); 8,554,940 ("the '940 patent"); 9,349,138 ("the '138 patent"); 10,735,781 ("the '781 patent"); and 10,769,675 ("the '675 patent") (collectively, the "Asserted Patents") by using video streaming technology that SITO alleges infringes on its patents (the "Accused Technology"). (*Id.* at ¶ 7). SITO did not name Bambuser as a party in the Saks Suit. (*Id.* at ¶ 6).

Saks is a customer of Bambuser, which manufactures and provides video streaming technology to Saks. (*Id.* at ¶ 5). Based on Saks' investigation, Bambuser is currently believed to be the only manufacturer providing the video streaming technology that SITO alleges infringes the six patents asserted in the Complaint. (*Id.* at Ex. A Saks Decl. ¶ 8).

On August 22, 2023, Saks requested that Bambuser defend and indemnify Saks in relation to the Saks Suit pursuant to the terms of the agreement governing the relationship between Saks and Bambuser. (*Id.* at ¶ 8). On or around September 8, 2023, based upon the information in SITO's complaint filed in the Saks Suit and the information provided by Saks, Bambuser agreed to defend Saks in relation to the Saks Suit and indemnify Saks for any infringement by Bambuser's video-streaming product. (*Id.* at ¶ 9).

On or about October 6, 2023, SITO sent a letter—that did not include Bambuser as an addressee—and a draft complaint to Uniqlo citing the same six patents in this suit, and threatening to sue Uniqlo for patent infringement in the Southern District of New York. (*Id.* at ¶¶ 10-12). The accused technology cited in SITO's draft complaint sent to Uniqlo is supplied to Uniqlo by Bambuser, is the same technology supplied to Saks and at issue in the Texas case, and Uniqlo has also sought defense and indemnity from Bambuser. (*Id.* at ¶ 13; Complaint ¶ 10).

On November 1, 2023, Bambuser filed this suit seeking a declaration of the non-infringement and invalidity of the Asserted Patents. (*Id.* at ¶ 14; ECF. No. 1, Complaint). Bambuser asserts in this suit that all of the patent claims asserted by SITO against Saks, and threatened to be asserted against Uniqlo, are invalid and/or not infringed by the Bambuser technology at issue. (Complaint pp. 9-10).

On or around November 13, 2023, acting in defense of Saks, counsel for Bambuser approached counsel for SITO to ask if they would consent to stay the Saks Suit in favor of this suit based upon the customer-suit exception. (Kaplan Decl. ¶ 15). That exception does not allow SITO to sequentially sue Bambuser's customers in different forums all over the country. SITO delayed responding to this inquiry for at least two weeks while counsel for Bambuser patiently waited. Ultimately, SITO's counsel announced that they would not consent. (*Id.*) Within three days thereafter, SITO, *without warning or prior discussion*, filed their motion to stay this suit in favor of the Saks Suit, even though the Saks Suit does not even name Uniqlo or Bambuser as parties. (*Id.*) SITO's motion to stay also omits any mention of the customer-suit exception— which counsel had discussed at length, and which is discussed *infra*. (*Id.*)

On December 13, 2023, Saks concurrently filed: 1) a motion to dismiss the Saks suit pursuant to Fed. R. Civ. Prod. 12(b)(2) (lack of personal jurisdiction), 12(b)(3) (improper venue),

4

Appx75

and 12(b)(6) (failure to state a claim); and 2) a motion to stay the Saks Suit pending resolution of this suit based on both the customer-suit exception to the first-to-file rule and that court's inherent power to stay a case. (*Id.* at ¶ 16).

No response to that motion has been filed, no answer to the complaint has been filed, and no substantive proceedings have taken place in the Western District of Texas.

## III.    ARGUMENT

### A.    The First To File Rule Does Not Apply Here The Customer Suit Exception Applies Instead

Under the customer suit exception, courts routinely stay earlier-filed patent infringement suits in favor of proceeding with later-filed declaratory judgment actions by manufacturers. *Telebrands Corp. v. Nat'l Exp., Inc.*, No. CIV.A. 12-6671 (FSH), 2014 WL 4930897, at*3 (D.N.J. Oct. 2, 2014) (staying retail defendant cases in lieu of manufacturer action) (citing *Katz v. Lear Siegler, Inc.*, 909 F.2d 1459, 1464 (Fed. Cir. 1990)).

The customer-suit exception "exists to avoid, if possible, imposing the burdens of trial on the customer, for it is the manufacturer who is generally the 'true defendant' in the dispute." *In re Nintendo of Am., Inc.*, 756 F.3d 1363, 1365 (Fed. Cir. 2014); *Katz*, 909 F.2d at 1464 ("it is a simple fact of life that a manufacturer must protect its customers, either as a matter of contract, or good business, or in order to avoid the damaging impact of an adverse ruling against its products"); *Early Warning Servs., LLC v. Grecia*, No. CV 21-1050, 2021 WL 1264029, at *7 (E.D. Pa. Apr. 6, 2021) ("[C]ourts apply the customer suit exception to stay earlier-filed litigation against a customer while a later-filed case involving the manufacturer proceeds in another forum") (citing *Spread Spectrum Screening LLC v. Eastman Kodak Co.,* 657 F.3d 1349, 1357 (Fed. Cir. 2011)). "When a patent owner files an infringement suit against a manufacturer's

5

customer and the manufacturer then files an action of noninfringement or patent invalidity, the suit by the manufacturer generally take precedence." *Nintendo*, 756 F.3d at 1365

To warrant prioritizing the case involving the manufacturer, that suit "need only have the potential to resolve the 'major issues' concerning the claims against the customer—not every issue." *Spread Spectrum,* 657 F.3d at 1358 (*citing Katz*, 909 F.2d at 1464). Courts implement the customer-suit exception to o "avoid wasteful expenditure of resources" where "substantial savings of litigation resources can be expected" by prioritizing the manufacturer suit over the customer suit. *See In re Google Inc.*, 588 F. App'x 988, 991 (Fed. Cir. 2014); *see also Nintendo*, 756 F.3d at 1365-66 (the customer-suit exception is "designed to facilitate just, convenient, efficient, and less expensive determination." (citations omitted)).

Courts analyze three factors when determining whether the customer-suit exception applies: (1) whether the customer-defendant in the earlier-filed case is merely a reseller; (2) whether the customer-defendant agrees to be bound by any decision in the later-filed case that is in favor of the patent owner; and (3) whether the manufacturer is the only source of the infringing product. *See Tegic Commc'ns Corp. v. Bd. of Regents of Univ. of Texas Sys.*, 458 F.3d 1335, 1343 (Fed. Cir. 2006). These factors should be analyzed with the understanding that "the guiding principles in the customer suit exception cases are efficiency and judicial economy." *See Spread Spectrum*, 657 F.3d at 1357.

Here, the customer-suit exception applies because all of the relevant factors are met.

### i. Saks is a "Mere Reseller" for Purposes of the Customer-Suit Exception

In the context of the customer-suit exception, the term "mere reseller" includes not only traditional resellers of physical manufactured goods, but also customers or end users that purchase and use a manufacturer's software or web-based products in furtherance of their own

6

Appx77

business. *See Early Warning Servs., LLC*, 2021 WL 1264029 at *9 (holding that customer of accused check depositing software was a mere reseller for purposes of the customer-suit exception). This is consistent with the purpose of the exception to avoid judicial waste by advancing the suit involving the true defendant—the manufacturer or creator of the accused product. *See Google*, 588 F. App'x at 991 (A "flexible approach" should be applied when "the other suit is so closely related that substantial savings of litigation resources can be expected" by application of the exception).

Saks is clearly a mere reseller of the Accused Technology. Saks is a customer of Bambuser, who created, licensed, white-labeled, and supplied Saks with video streaming technology. (Kaplan Decl. ¶ 5). Saks merely uses the Bambuser product in furtherance of its business operations and plays no role in the creation of the accused technology supplied by Bambuser. (*Id.* at Ex. A Saks Decl. ¶ 11).

In furtherance of its role as the manufacturer of video-streaming technology supplied to Saks and based on information in the Complaint and provided by Saks, Bambuser has agreed to defend and indemnify Saks in accordance with the terms of the agreement governing the relationship between Saks and Bambuser. (*Id.* at ¶¶ 8-9). Uniqlo, another Bambuser customer, has made a similar request to Bambuser upon receiving a draft complaint from SITO alleging that technology provided to Uniqlo by Bambuser infringes on the same six Asserted Patents. (*Id.* at ¶¶ 10-13; Complaint ¶ 10). Saks is in the same position as Uniqlo—being accused of infringement by SITO for, as it currently seems, technology created and provided by Bambuser, despite merely being Bambuser's customers. Bambuser would thus have to offer Uniqlo a defense to SITO's complaint in the Southern District of New York. (Kaplan Decl. ¶ 12-13).

7

What's more, only SITO knows how many more customers of Bambuser, in how many more forums around the country, it plans to sue for infringement of the same patents by the same Bambuser technology. Bambuser filed this suit in an effort to re-direct and focus the burden of litigation from multiple suits against multiple customers in multiple forums to where it rightfully belongs, with Bambuser, litigating against SITO, in SITO's own home state. There is no reason for Bambuser's customers to be embroiled in litigation with SITO all over the country while this case between SITO and Bambuser is pending. Indeed, this would provide SITO with the ability to use the high cost of each of many litigations to extract "nuisance value" settlements for each of multiple litigations in multiple courts. This factor thus favors application of the customer-suit exception.

### ii. Saks Agrees to be Bound by the Outcome of the Declaratory Suit

Saks agrees to be bound by the outcome of this suit, which concerns all of the Asserted Patents. (Kaplan Decl., Ex. B Declaration of Michael J. Zinna in support of Saks' motion to stay the Saks Suit ("Saks Stay Decl.") ¶ 11). That is dispositive for this factor. *See Pragmatus Telecom, LLC v. Advanced Store Co.*, No. CIV.A. 12-088-RGA, 2012 WL 2803695, at *3 (D. Del. July 10, 2012) (granting stay of suits against customers pending resolution of manufacturer's declaratory action where customers "agree[] to be bound by any decision in [manufacturer's] DJ Action").

### iii. Bambuser is, and Assumes the Role of, the Major Source of the Accused Technology

Bambuser is providing Accused Technology to Saks, and Saks has advised Bambuser that the Complaint in the Saks Suit implicates Bambuser as the only manufacturer providing the Accused Technology to the company. (Kaplan Decl. ¶ 8). Although SITO's allegations in the Saks Suit complaint are so vague that it is impossible to know whether SITO might subsequently

8

seek to accuse the technology of another Saks vendor of infringement, but at present it currently appears that the Accused Technology is sourced from Bambuser. And, as is undeniably the case, Bambuser has at this time accepted that it appears to be the source of the Accused Technology. (*See* Kaplan Decl. ¶ 9). As a result, Bambuser is on the hook for any loss related to any portion of Bambuser's Accused Technology that is found to infringe on the Asserted Patents.

Even if another entity were someday identified that could also step in to defend and/or indemnify Saks, the customer-suit exception would still apply because, regardless of the source of the Accused Technology, this suit would resolve the major issues of claim construction, invalidity, etc., related to the Asserted Patents, issues that would otherwise have to be separately litigated in many different federal courts around the country, and with the potential for inconsistent results. That single resolution would be unaffected even if some portion of the Accused Technology were ultimately attributed to another vendor. However, as things now stand, Bambuser is providing a complete defense to Saks and it is understood that the Saks Suit is about Bambuser's technology.

This factor favors applying the customer-suit exception. *See Pragmatus*, 2012 WL 2803695 at *3 (finding customer-suit exception applies where "[c]ustomers argue that [manufacturer's] technology is the only source of accused infringement, or, in the alternative, is at the center of [patent holder's] infringement allegations and is a 'major issue'").

Accordingly, all factors of the customer-suit exception apply, and the first-to-file rule does not apply to this case.

**B.    Even Absent The Customer-Suit Exception This Court Should Not Apply the First-to-File Rule Here**

Even if the customer-suit exception did not apply here (and it does), the first-to-file rule is not a "rigid or inflexible rule to be mechanically applied." *E.E.O.C. v. Univ. of Pennsylvania*,

9

850 F.2d 969, 976 (3d Cir. 1988), *aff'd*, 493 U.S. 182 (1990); *Ultra Prod., Inc. v. Best Buy Co.*, No. CIV.A.09-1095MLC, 2009 WL 2843888, at *2 (D.N.J. Sept. 1, 2009) ("[b]ut this general preference for the first-filed action is not absolute, and should be applied with a degree of flexibility and common sense"). "The letter and spirit of the first-filed rule, therefore, are grounded on equitable principles." *E.E.O.C.,* 850 F.2d at 977 (declining to dismiss second-filed case).

This Court has the discretion to consider several factors in deciding whether to apply the first-to-file rule, including three "convenience" factors set forth in *Micron Tech., Inc. v. Mosaid Techs., Inc.*, 518 F.3d 897, 904-05 (Fed. Cir. 2008): "the convenience and availability of witnesses, the absence of jurisdiction over all necessary or desirable parties, and the possibility of consolidation with related litigation." *See Amperex Tech. Ltd. v. Maxell, Ltd.*, No. CV2108461KMMF, 2021 WL 4398804, at *3 (D.N.J. Sept. 27, 2021), *appeal withdrawn*, No. 2022-1017, 2022 WL 1021590 (Fed. Cir. Jan. 21, 2022) (departing from the first-to-file rule in patent infringement dispute) (citing *Micron*, 518 F.3d 897 at 904-05). Other factors important to analyzing whether to apply the first-to-file rule include the "importance of conservation of judicial resources and the comprehensive disposition of litigation." *Id.* (citing *Genentech, Inc. v. Eli Lilly & Co.*, 998 F.2d 931, 937 (Fed. Cir. 1993), *abrogated on other grounds*, 515 U.S. 277 (1995)).

Here, all three *Micron* convenience factors favor denying SITO's motion.

### i. Witnesses are More Available in the District of New Jersey

First, witnesses for either the Saks Suit or this suit are far more available in New Jersey than Texas. Both SITO entities have their principal place of business in New Jersey and Bambuser, which is based in Stockholm, Sweden, is closer to New Jersey than Texas. (Complaint ¶¶ 2, 4, 5). Further, a simple Internet search shows many daily, convenient, nonstop

flights from Stockholm to the New York/New Jersey area airports, all within a short drive of this Court, whereas flights from Stockholm to San Antonio Texas are significantly more costly, lengthy, and require up to several connecting flights with delays in between. Bambuser also maintains an office in New York City, which is a half-hour drive from this District's courthouse. (*See* Kaplan Decl. ¶ 4). The principal place of business for Saks is also in New York City. (*Id.*, Ex. A Saks Decl. ¶ 4).

> **ii.    Jurisdiction is Proper in the District of New Jersey,
> but Not in the Western District of Texas**

Second, the District of New Jersey has personal jurisdiction over SITO, as both SITO entities have their principal places of business in this District. *Barth v. Walt Disney Parks & Resorts U.S., Inc.*, 697 F. App'x 119 (3d Cir. 2017) ("To establish [general] personal jurisdiction, a plaintiff must show that the defendant's connections to the forum state are so continuous and systematic as to render [the corporation] essentially at home in the forum State. . . . A corporation is 'at home' in the State of its place of incorporation and *principal place of business*") (quotation marks and citations omitted) (emphasis added); (Complaint ¶¶ 4-5). SITO's residence in New Jersey also makes venue proper pursuant to 28 U.S.C. § 1391(b), which applies to declaratory actions. *Database Am., Inc. v. Bellsouth Advert. & Pub. Corp.*, 825 F. Supp. 1195, 1207 (D.N.J. 1993) ("Venue in a declaratory judgment action for patent or copyright infringement is governed by the general venue statute at 28 U.S.C. § 1391(b), rather than by the specific venue statute for infringement actions at 28 U.S.C. § 1400(b)").

However, the Western District of Texas does not have personal jurisdiction over Bambuser as Bambuser is neither incorporated nor has its principal place of business in Texas and does not have any employees, offices, or facilities in Texas. *See Canales v. Michaux*, No. 1:18-CV-507-RP, 2019 WL 13153212, at *2-3 (W.D. Tex. Dec. 9, 2019) (finding personal

Appx82

jurisdiction in Texas relies on finding either general or specific jurisdiction; general jurisdiction for a corporation depends on its "place of incorporation and principal place of business" and specific jurisdiction applies "when a nonresident defendant 'has purposefully directed its activities at [Texas] and the litigation results from alleged injuries that arise out of or relate to those activities"). The Western District of Texas similarly does not have personal jurisdiction over Saks, as the defendant entity in the Saks Suit, SFA Holdings Inc., has no offices in Texas, no employees in Texas, conducts no business in Texas, does not own or operate any stores in Texas, and does not own or operate any facilities of any kind in Texas. (Kaplan Decl., Ex. A. Saks Decl. ¶ 6). Since neither Bambuser nor SFA Holdings Inc. reside nor have a regular and established place of business in Texas, venue is improper in the Western District of Texas pursuant to 28 U.S.C. 1400(b), which governs patent infringement suits. *See TC Heartland v. Kraft Food Groups Brands LLC*, 581 U.S. 258, 266 (2017). Saks has filed a motion to dismiss the Saks Suit based, in part, on these jurisdictional defects. (Kaplan Decl. ¶ 16).

### iii.    Consolidation of Related Cases is More Appropriate in This Suit Than in the Saks Suit

Finally, any related cases would most likely be consolidated into this case and not into the Saks Suit because this suit includes the real parties in interest—Bambuser and SITO—for any dispute concerning infringement of the Asserted Patents by technology provided by Bambuser. Indeed, all of the know-how and details of how the Bambuser technology works, and how it might relate to certain patent claim limitations, and how it was developed and differs from prior systems and/or the patents at issue, resides with the engineers and software developers at Bambuser – not with Saks.

In short, even if the customer-suit exception did not prevent application of the first-to-file rule – and it does – the factors to be considered when applying the first-to-file rule all weigh

Appx83

against staying this case in favor of a case against Saks in Texas. It is simply more equitable and efficient for the Court and the parties to allow Bambuser to resolve the issues related to SITO's suit against Saks, threatened suit against Uniqlo, and any future suits against Bambuser customers for use of the same technology, all at once in one forum. And, if SITO prevails – in one litigation in New Jersey where SITO itself is based – it will exhaust its remedies as a patent holder by being compensated by Bambuser for use of Bambuser's technology by all Bambuser customers that infringe with that technology. *See Pragmatus*, 2012 WL 2803695 at *2 ("[s]imilarly, if [patent holder] prevails and [manufacturer] fully compensates [patent holder] for its Customers' use of the [manufacturer's] technology, [patent holder] would be barred from seeking further compensation from the Customers based on the same harm) (citing *Glenayre Elecs. Inc. v. Jackson*, 443 F.3d 851, 858 (Fed. Cir. 2006)).

Accordingly, denying SITO's motion to stay this case will be in the best interests of judicial economy.

### C.        The Transfer Factors Do Not Support Transferring This Case

In considering a motion to transfer pursuant to 28 U.S.C. 1404(a), this Court "must balance both public and private interests to determine whether 'the litigation would more conveniently proceed and the interest of justice be better served by transfer to a different forum.'" *Maximum Hum. Performance, Inc. v. Dymatize Enterprises, Inc.*, No. CIV.A. 09-235(PGS), 2009 WL 2778104, at *7 (D.N.J. Aug. 27, 2009), *report and recommendation adopted*, No. CIV.A 09-235(PGS), 2009 WL 2952034 (D.N.J. Sept. 14, 2009) (quoting *Jumara v. State Farm Ins. Co.*, 55 F.3d 873, 879 (3d Cir. 1995)). The private factors include: "(1) the plaintiff's choice of forum; (2) the defendant's preference; (3) whether the claim arose elsewhere; (4) the convenience of the parties; (5) the convenience of the expected witnesses; and (6) the

13

Appx84

location of books and records." *Id.* The public considerations include: "(1) the enforceability of the judgment; (2) practical considerations that could make the trial easy, expeditious, or inexpensive; (3) the relative administrative difficulty in the two fora resulting from court congestion; (4) the local interest in deciding controversies; and (5) the public policies of the fora." *Id.*

The overwhelming balance of the relevant private and public factors support denying SITO's alternative relief of transferring this case. With respect to the private factors:

1) Bambuser, the plaintiff, chose the District of New Jersey as the forum;

2) SITO, the defendants, prefer the Western District of Texas even though that district is not available due to its lack of personal jurisdiction over the parties and lack of proper venue under the patent venue statute (*supra* section III.B.ii);

3) Where the claim arose is not relevant as it is a claim for declaring the non-infringement and invalidity of the Asserted Patents. To the extent SITO argues the claim arose in the Western District of Texas by infringement by Saks, that district does not have personal jurisdiction over Saks and venue there is improper pursuant to 28 U.S.C. § 1400(b) (*supra* section III.B.ii);

4) The District of New Jersey is the most convenient venue because the principal place of business for both SITO entities is in New Jersey, SITO's lawyers are closer to New Jersey than Texas, and Bambuser's lawyers are in New York and New Jersey (*See* Complaint ¶¶ 4-5);

5) Witnesses from Bambuser are likely near Bambuser's principal place of business in Stockholm, which is closer to New Jersey than Texas, and witnesses from SITO would presumably be near SITO's New Jersey principal place of business.

14

(Complaint ¶¶ 2, 4, 5). Witnesses from Bambuser may also be near Bambuser's New York City office. (Kaplan Decl. ¶ 4). To the extent they are needed, witnesses from Saks would likely be near Saks' New York City principal place of business (*Id.*, Ex. A. Saks Decl. ¶ 4);

6) The location of books and records would similarly be in Stockholm, New Jersey, and near New York City.

With respect to the relevant public factors:

1) The judgment would be enforceable in this District as SITO resides in New Jersey and Bambuser has subjected itself to jurisdiction in this District;

2) The trial would be far easier, more expeditious, and less expensive in New Jersey where SITO resides, than in Texas where no party is located;

3) Having this one suit in this Court resolve the non-infringement and invalidity of the Asserted Patents, instead of multiple suits in multiple courts against multiple Bambuser customers, would inherently cause less court congestion.

4) Local interests and public policy support resolving the non-infringement and invalidity of the Asserted Patents in the District of New Jersey because this suit is the only case that can provide complete relief to Bambuser's claims, as opposed to the Saks Suit, which cannot provide relief relating to infringement allegations against Uniqlo or any other Bambuser customer that is not Saks.

Accordingly, this case should not be transferred.

## IV.    CONCLUSION

For the foregoing reasons, the Court should deny SITO's motion.

15

Appx86

Dated: January 8, 2024

Respectfully submitted,

KAPLAN BREYER SCHWARZ, LLP


By: */s/ Jeffrey I. Kaplan/*
    Jeffrey I. Kaplan
197 State Route 18, Ste 3000
East Brunswick, New Jersey 08816
Telephone: (732) 578-0103
Facsimile: (732) 578-0104
jkaplan@kbsiplaw.com

ZUKERMAN GORE BRANDEIS &
CROSSMAN, LLP
John K. Crossman (*pro hac vice*)
Eleven Times Square
New York, New York 10036
Telephone: (212) 223-6700
Facsimile: (212) 223-6433
jcrossman@zukermangore.com

*Attorneys for Plaintiff Bambuser AB*

16

Appx87

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY**

BAMBUSER AB,

                Plaintiff,

v.

SITO MOBILE R&D IP, LLC, and
SITO MOBILE, LTD.,

                Defendants.

Case No. 2:23-cv-21757-SDW-JSA

Motion Date: February 5, 2024

(Filed Electronically)

**DECLARATION OF JEFFREY I. KAPLAN IN OPPOSITION TO
DEFENDANTS' MOTION TO STAY OR,
IN THE ALTERNATIVE, TRANSFER UNDER THE FIRST-TO-FILE RULE**

I, Jeffrey I. Kaplan, declare as follows:

1.    I am a lawyer admitted to practice before the courts of the State of New Jersey and am a partner at Kaplan Breyer Schwarz, LLP, counsel of record for plaintiff Bambuser AB ("Bambuser").

2.    I submit this declaration in opposition to defendants SITO Mobile R&D IP, LLC and SITO Mobile, Ltd.'s (collectively, "SITO") Motion to Stay.

3.    If called upon as a witness, I could and would competently testify as follows.

4.    Bambuser is a corporation organized under the laws of Sweden and has its principal place of business in Stockholm, Sweden. Bambuser also maintains an office in New York City located at 401 Broadway, New York, New York 10013. Bambuser does not have any offices in Texas, any employees in Texas, and does not own or operate any facilities in Texas.

5.    Bambuser created, licensed, white-labeled, and supplied SFA Holdings Inc. f/k/a Saks Incorporated ("Saks") with video streaming technology. Saks is a customer of Bambuser.

6.    On June 16, 2023, SITO filed a suit against Saks in the Western District of Texas, Austin Division, alleging infringement of six patents by Saks' use of video streaming technology (the "Saks Suit"). The Saks Suit is captioned: *SITO Mobile R&D IP, LLC & SITO Mobile, LTD.*

1

Appx88

*v. SFA Holdings Inc. f/k/a SAKS Incorporated*, No. 1:23-cv-00688-RP (W.D. Tex.). SITO did not name Bambuser as a party to the Saks Suit.

7.    In the Saks Suit, SITO alleges that Saks has infringed U.S. Pat. Nos. 7,191,244 ("the '244 patent"); 8,015,307 ("the '307 patent"); 8,554,940 ("the '940 patent"); 9,349,138 ("the '138 patent"); 10,735,781 ("the '781 patent"); and 10,769,675 ("the '675 patent") (collectively, the "Asserted Patents") by using video streaming technology that SITO alleges infringes on its patents (the "Accused Technology").

8.    On August 22, 2023, after receiving notice of the above-captioned lawsuit, Saks requested Bambuser defend and indemnify Saks pursuant to the terms of the agreement governing Saks and Bambuser's relationship. Saks has advised Bambuser that the Complaint in the Saks Suit implicates Bambuser as the only manufacturer providing the Accused Technology to the company.

9.    On or around September 8, 2023, based upon the information in the Complaint and the information provided by Saks, Bambuser agreed to defend Saks in relation to the above-captioned suit and indemnify Saks for any infringement by Bambuser's video-streaming product.

10.    In addition to the above-captioned case, plaintiffs SITO Mobile R&D IP, LLC and SITO Mobile, Ltd. (collectively, "SITO"), on or about October 6, 2023, sent a 76-page unfiled patent infringement complaint to Uniqlo Co., Ltd. ("Uniqlo"), another customer of Bambuser.

11.    That unfiled complaint was accompanied by a letter—which did not identify Bambuser as an addressee—threatening that SITO plans to file that complaint in a lawsuit against Uniqlo. That letter and complaint each alleged infringement of the same six patents asserted in the Complaint, implicating the same Bambuser technology supplied to Saks and also at issue in the above-captioned action.

12.    SITO threatened to file the additional lawsuit against Uniqlo, and captioned the Complaint for filing in the United States District Court for the Southern District of New York.

13.    The accused technology cited in SITO's draft complaint sent to Uniqlo is supplied to Uniqlo by Bambuser, and Uniqlo has also sought defense and indemnity from Bambuser.

14.    On November 1, 2023, Bambuser filed this declaratory judgment action in the United States District Court for the District of New Jersey concerning the validity and infringement of the same six patents asserted in the above-captioned lawsuit.

15.    On or around November 13, 2023, acting in defense of Saks, counsel for Bambuser approached counsel for SITO to ask if they would consent to stay the Saks Suit in favor of this suit based upon the customer-suit exception. SITO delayed responding to this inquiry for at least two weeks while counsel for Bambuser patiently waited. Ultimately, SITO's counsel announced that they would not consent. Within three days thereafter, SITO, *without warning or prior discussion*, filed their motion to stay this suit in favor of the Saks Suit, even though the Saks Suit does not even name Uniqlo or Bambuser as parties. SITO's motion to stay also omits any mention of the customer-suit exception—which counsel had discussed at length.

16.    On December 13, 2023, Saks concurrently filed: 1) a motion to dismiss the Saks suit pursuant to Fed. R. Civ. Prod. 12(b)(2) (lack of personal jurisdiction), 12(b)(3) (improper venue), and 12(b)(6) (failure to state a claim); and 2) a motion to stay the Saks Suit pending resolution of this suit based on both the customer-suit exception to the first-to-file rule and that court's inherent power to stay a case.

17.    Attached as Exhibit A is a true and correct copy of the Declaration of Michael J. Zinna in Support of Defendant Saks' Motion to Dismiss the Saks Suit.

18.    Attached as Exhibit B is a true and correct copy of the Declaration of Michael J. Zinna in Support of Defendant Saks' Motion to Stay the Saks Suit.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct when based upon personal knowledge, and believed to be true and correct when based upon information and belief.

3

Appx91

DATED:  January 8, 2023

__/s/Jeffrey I. Kaplan_____

Jeffrey I. Kaplan

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION**

|  |  |
|---|---|
| SITO MOBILE R&D IP, LLC, and SITO MOBILE, LTD.,<br><br>Plaintiffs,<br><br>v.<br><br>SFA HOLDINGS INC. f/k/a/ SAKS INCORPORATED,<br><br>Defendant. | Case No. 1:23-cv-00688-RP |

**DECLARATION OF MICHAEL J. ZINNA IN SUPPORT OF
DEFENDANT'S MOTION TO DISMISS**

I, Michael J. Zinna, declare as follows:

1.     I am a lawyer admitted to practice before the courts of the States of New York and New Jersey and in the Western District of Texas, and am a partner at Kelley Drye & Warren LLP, counsel of record for Defendant SFA Holdings Inc. f/k/a Saks Incorporated ("Saks").

2.     I submit this declaration in support of Defendant's Motion to Dismiss.

3.     I have personal knowledge of the following facts except where otherwise indicated, and if called upon as a witness, I could and would competently testify thereto.

4.     SFA Holdings Inc. is incorporated in the State of Tennessee and has its principal place of business in the State of New York.

5.     SFA Holdings Inc. is a subsidiary of Saks Incorporated, which is an American luxury department store chain commonly known as Saks Fifth Avenue.

6.     SFA Holdings Inc. has no offices in Texas, no employees in Texas, conducts no business in Texas, does not own or operate any stores in Texas, and does not own or operate any facilities of any kind in Texas.

1

Appx92

7.      Saks is a customer of Bambuser AB ("Bambuser"), which manufactures and provides video streaming technology to Saks.

8.      Based on Saks' investigation, Bambuser is the only manufacturer providing the video streaming technology that SITO alleges infringes the six patents asserted in the Complaint.

9.      On August 22, 2023, after receiving notice of the above-captioned lawsuit, Saks requested Bambuser defend and indemnify Saks pursuant to the terms of the agreement governing Saks and Bambuser's relationship.

10.      On or around September 8, 2023, based upon the information in the Complaint and the information provided by Saks, Bambuser agreed to defend Saks in relation to the above-captioned suit and to indemnify Saks for any infringement of the patents-in-suit by Bambuser's video-streaming product.

11.      Saks merely uses the Bambuser product in furtherance of its business operations and plays no role in developing or manufacturing the accused technology supplied by Bambuser.

12.      On November 1, 2023, Bambuser filed a declaratory judgment action in the United States District Court for the District of New Jersey for non-infringement and patent invalidity involving the exact same patents, the exact same patent holders, and the exact same allegedly infringing technology at issue in the above-captioned lawsuit (the "Declaratory Suit"). The Declaratory Suit is captioned: *Bambuser AB v. SITO Mobile R&D IP, LLC and SITO Mobile, Ltd.*, C.A. No. 2:23-cv-21757.

13.      I am informed and believe, based on conversations with counsel for Bambuser and my review of the Complaint in the Declaratory Suit, that in addition to suing Saks, SITO has threatened suit against another Bambuser customer (the "Second Customer") based on the same allegedly infringing video streaming technology used by Saks, and based upon the same six patents asserted in the Complaint.

14.      Attached as Exhibit A is a true and correct copy of a table reproducing direct infringement allegations made by SITO in the Complaint for the six patents asserted in the Complaint (the "Asserted Patents"), juxtaposed with the language from the corresponding

2

Appx93

Asserted Patent of the claim used by SITO as an example of a claim allegedly infringed from that asserted patent.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

DATED:  December 13, 2023          By  _____

                                         Michael J. Zinna

Appx94

Case 2:23-cv-17573-JKS-006ᴬ8-RPDocument 46-30-3Filed 0ᴵ112/813423 Page 1 of 22PageID: 89

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**AUSTIN DIVISION**

| | |
|---|---|
| SITO MOBILE R&D IP, LLC, and SITO MOBILE, LTD., | Case No. 1:23-cv-00688-RP |
| Plaintiffs, | |
| v. | |
| SFA HOLDINGS INC. f/k/a/ SAKS INCORPORATED, | |
| Defendant. | |

**DECLARATION OF MICHAEL J. ZINNA IN SUPPORT OF**
**DEFENDANT'S MOTION TO STAY**

I, Michael J. Zinna, declare as follows:

1.      I am a lawyer admitted to practice before the courts of the States of New York and New Jersey and in the Western District of Texas, and am a partner at Kelley Drye & Warren LLP, counsel of record for Defendant SFA Holdings Inc. f/k/a Saks Incorporated ("Saks").

2.      I submit this declaration in support of Defendant's Motion to Stay.

3.      I have personal knowledge of the following facts except where otherwise indicated, and if called upon as a witness, I could and would competently testify thereto.

4.      SFA Holdings Inc. is incorporated in Tennessee, has no offices or employees in Texas, and does not own or operate any stores in Texas, or elsewhere.

5.      Saks is a customer of Bambuser AB ("Bambuser"), who created, licensed, white-labeled, and supplied Saks with video streaming technology.

6.      On August 22, 2023, after receiving notice of the above-captioned lawsuit, Saks requested Bambuser defend and indemnify Saks pursuant to the terms of the agreement governing Saks and Bambuser's relationship.

1

Appx95

7.     On or around September 8, 2023, based upon the information in the Complaint and the information provided by Saks, Bambuser agreed to defend Saks in relation to the above-captioned suit and indemnify Saks for any infringement by Bambuser's video-streaming product.

8.     No other technology vendor has agreed to defend or indemnify Saks in relation to the above-captioned action.

9.     Saks merely uses the Bambuser product in furtherance of its business operations and plays no role in the creation of the accused technology supplied by Bambuser.

10.     On November 1, 2023, Bambuser filed a declaratory judgment action in the United States District Court for the District of New Jersey concerning the validity and infringement of the same six patents asserted in the above-captioned lawsuit (the "Declaratory Suit"). The Declaratory Suit is captioned: *Bambuser AB v. SITO Mobile R&D IP, LLC and SITO Mobile, Ltd.*, C.A. No. 2:23-cv-21757.

11.     Saks agrees to be bound by the outcome of the Declaratory Suit.

12.     Pursuant to Local Rule CV-7(g), counsel for Bambuser, acting in defense of Saks, met and conferred with counsel for Plaintiff from November 13, 2023 through November 27, 2023. Counsel for Plaintiff stated that Plaintiff does not believe a stay is warranted under the circumstances as they understand them at this time.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

DATED:  December 13, 2023          By  _____

                                           Michael J. Zinna

2

Appx96

Appx97

17 TEXT ORDER: Answer Due Deadline Update--The answer due date is dictated by (ECF No. 5 , 6 ) Waiver of Service. Defendants are now directed to answer, move, or otherwise reply to the complaint by **1/19/2024**. So Ordered by Judge Jamel K. Semper on 1/12/2024. (sms) (Entered: 01/12/2024)

Appx97

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| BAMBUSER AB,<br><br>             Plaintiff,<br><br>     v.<br><br>SITO MOBILE R&D IP, LLC and SITO MOBILE, LTD.,<br><br>             Defendants. | Case No. 2:23-cv-21757-JKS-JSA<br><br>Motion Date: February 20, 2024<br><br>NO HEARING REQUESTED |

**NOTICE OF DEFENDANTS' MOTION TO DISMISS
PURSUANT FED. R. CIV. P. 12(b)(1)**

**PLEASE TAKE NOTICE** that on February 20, 2024 or as soon thereafter as counsel may be heard, Defendants SITO MOBILE R&D IP, LLC and SITO MOBILE, LTD. (collectively "SITO" or "Defendants"), by and through their attorneys Daignault Iyer LLP, will apply for an order dismissing this action pursuant to Fed. R. Civ. P. 12(b)(1) for lack of subject-matter jurisdiction pursuant to the Federal Circuit's holding in *Microsoft Corp. v. DataTern, Inc.*, 755 F.3d 899 (Fed. Cir. 2014). There is related first-filed proceeding pending in the United States District Court for the Western District of Texas styled *SITO Mobile R&D IP, LLC and SITO Mobile, LTD. v. SFA Holdings, Inc.,(f/k/a/ Saks Incorporated),* 23-cv-00688, which involves the same subject matter as Plaintiff's second-filed declaratory-judgment action here and where Plaintiff has come forward to defend and indemnify its customer, SFA Holdings, Inc.

**PLEASE TAKE FURTHER NOTICE** that a proposed form of Order is also submitted.

Appx98

**PLEASE TAKE FURTHER NOTICE** that Defendants do not request oral argument per Local Rule 78.1.

Dated: January 16, 2024                    Respectfully submitted,

*/s/ Shailendra Maheshwari*
Shailendra Maheshwari (001822004)*
Scott R. Samay (040561996)*
Tedd W. Van Buskirk (041261995)*
DAIGNAULT IYER LLP
8618 Westwood Center Drive, Suite 150
Vienna, VA 22182
smaheshwari@daignaultiyer.com
ssamay@daignaultiyer.com
tvanbuskirk@daignaultiyer.com

*\*Not admitted in Virginia*

*Attorneys for Plaintiffs*
*SITO Mobile R&D IP, LLC and*
*SITO Mobile Ltd.*

Appx99

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

BAMBUSER AB,

           Plaintiff,

    v.

SITO MOBILE R&D IP, LLC, and
SITO MOBILE, LTD.,

           Defendants.

Case No. 2:23-cv-21757-JKS-JSA

Motion Date: February 20, 2024

## MEMORANDUM IN SUPPORT OF DEFENDANT'S
## MOTION TO DISMISS PURSUANT TO FED. R. CIV. P. 12(b)(1)

Appx100

## TABLE OF CONTENTS

I.    INTRODUCTION ......................................................................................................... 1

II.   ARGUMENT ................................................................................................................ 2

    A.    *Microsoft v. DataTern* holds that a vendor that has accepted its indemnification and defense obligations for a customer must litigate in the jurisdiction of the first-filed customer suit. ................................................................................................2

    B.    A dismissal will also conserve judicial resources and promote efficiency. .....................4

III.  CONCLUSION .............................................................................................................. 5

Appx101

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Early Warning Services, LLC, v. William Grecia et. al*,
    2021 U.S. Dist. LEXIS 147548, C.A. No. 21-1050 (E.D. Pa. August 6, 2021) .......................4

*Early Warning Services, LLC, v. William Grecia et. al*,
    C.A. No. 21-1050 (E.D. Pa. August 6, 2021) ..........................................................................4

*Finisar Corp., v. Capella Photonics, Inc.*,
    2021 U.S. Dist. LEXIS 41077, C.A. No. 20-cv-07629-EMC (N.D. Cal. March
    3, 2021) .....................................................................................................................................3

*Merial Ltd. v. Cipla Ltd.*,
    681 F.3d 1283 (Fed. Cir. 2012)................................................................................................5

*Microsoft Corp. v. DataTern, Inc.*,
    755 F.3d 899 (Fed. Cir. 2014)......................................................................................*passim*

*Petruska v. Gannon Univ.*,
    462 F.3d 294 (3d Cir. 2006)................................................................................................2, 4

*SITO Mobile R&D IP, LLC and SITO Mobile, LTD. v. SFA Holdings, Inc.,(f/k/a/*
    *Saks Incorporated)*,
    23-cv-00688 .............................................................................................................................1

**Other Authorities**

Fed. R. Civ. P. 12(b)(1).................................................................................................................1

Appx102

## I.    INTRODUCTION

Defendants SITO Mobile R&D IP, LLC and SITO Mobile, Ltd. (collectively "Defendants" or "SITO") hereby move to dismiss Plaintiff Bambuser AB's ("Bambuser") declaratory-judgment complaint for lack of subject matter jurisdiction pursuant to Fed. R. Civ. P. 12(b)(1).

On June 16, 2023, Defendants filed an action styled *SITO Mobile R&D IP, LLC and SITO Mobile, LTD. v. SFA Holdings, Inc.,(f/k/a/ Saks Incorporated)*, 23-cv-00688, in the Western District of Texas against SFA Holdings, Inc. ("SFA") asserting infringement of U.S. patent nos. 7,191,244; 8,015,307; 8,554,940; 9,349,138; 10,735,781; and 10,769,675 (collectively the "asserted patents") by certain accused products (the "Texas action"). Over four months later, on November 1, 2023, Bambuser filed a declaratory-judgment action in this Court requesting rulings of non-infringement and invalidity with respect to the same asserted patents. *See* D.I. 1. Bambuser was fully aware of the earlier first-filed Texas action and admits this in its declaratory-judgment complaint. *Id.* at ¶7-8. Bambuser also admits that SFA is its customer and that SFA has been sued in Texas for the technology Plaintiff supplied. *Id.* at ¶ 9. Bambuser further admits that the same six asserted patents in the WDTX action are at issue here. *Id.* at ¶ 6-7. Most importantly, Plaintiff admits that "SFA has requested Bambuser defend and indemnify SFA with respect to [the Western District of Texas] suit." *Id.* And Bambuser has admitted that it has accepted its indemnity and defense obligations. *See* D.I.16 at 3.

As detailed below, this Court should grant SITO's motion to dismiss Bambuser's second-filed declaratory-judgment action for lack of subject matter jurisdiction under Fed. R. Civ. P. 12(b)(1) and the Federal Circuit's holding in *Microsoft v. DataTern*.

1

Appx103

## II.    ARGUMENT

### A. *Microsoft v. DataTern* holds that a vendor that has accepted its indemnification and defense obligations for a customer must litigate in the jurisdiction of the first-filed customer suit.

SITO's challenge is a facial 12(b)(1) challenge; SITO's motion attacks the complaint on its face without contesting its alleged facts and is like a 12(b)(6) motion in requiring the court to "consider the allegations of the complaint as true." *Petruska v. Gannon Univ.*, 462 F.3d 294, 302 n.3 (3d Cir. 2006). As noted above, SITO filed suit against Bambuser's customer, SFA, in WDTX almost *four* months before to the declaratory-judgment action here. The identical patents are at issue in both cases. Bambuser accepted its indemnification and defense obligations on behalf of Saks and is defending it with respect to the WDTX action. Bambuser's affirmative acceptance of its indemnification and defense obligations precludes it from filing a declaratory-judgment action in this Court when there is already a first-filed pending suit in Texas because this Court lacks subject-matter jurisdiction over the declaratory filing.

In *Microsoft v. DataTern*, a case with facts analogous to those here, Microsoft sought declaratory relief in a second action in the Southern District of New York in response to a first suit DataTern had previously filed in the Eastern District of Texas against two of Microsoft's customers. The district court denied DataTern's motion to dismiss for lack of subject matter jurisdiction, but the Federal Circuit reversed the district court and stated:

> Importantly, even if there were such an obligation—to indemnify a customer already sued by the patentee in Texas—it would not justify what Appellees seek here. *A case has already been filed against these customers in the Eastern District of Texas. Appellees cannot seek a declaration from a New York court on behalf of customers they must indemnify where a suit against these very same customers on all the same issues was already underway in a Texas court.* (citation omitted). *By agreeing to indemnify any one of their customers, Microsoft could defend its customers and efficiently and effectively participate in the Texas action.*

2

Appx104

*Microsoft Corp. v. DataTern, Inc.*, 755 F.3d 899, 904 (Fed. Cir. 2014) (emphasis added).

The same situation exists here. Despite an already-pending first suit in West Texas against Saks where Bambuser admits that it is indemnifying and defending Saks as of September 8, 2023, Bambuser filed a second-action here in New Jersey on November 1, 2023. Under *Microsoft*, the case here in New Jersey should be dismissed because Bambuser is required to proceed in Texas under its indemnification obligations where it could defend its customer(s) and efficiently and effectively participate in that action. *Id.* at 904.

Other courts regularly adhere to the holding set forth in *Microsoft*. In *Finisar Corp., v. Capella Photonics, Inc.*, Finisar sought a declaratory-judgment in the Northern District of California with respect to numerous customers Capella had already sued in EDTX. Finisar argued that its later-filed declaratory-judgment action should take priority over Capella's suits against the Texas customers under the customer-suit exception to the first-to-file rule. Capella filed a motion to dismiss Finisar's declaratory-judgement complaint for lack of standing. Because the Court found Finisar's indemnification obligations were conclusory, it found Finisar lacked standing for the declaratory action and granted Capella's motion to dismiss. But of relevance to the situation here, the court stated with respect to the indemnification obligations:

> More importantly, Finisar's indemnification obligations to its customers, assuming arguendo they exist, *would allow Finisar to sue in the Eastern District of Texas*, _not_ this Court . . . . Therefore, under Microsoft, if Finisar is required to indemnify the Texas Defendants, *it has standing to defend them in the Texas Actions, not to file a declaratory judgment action here*.

*Finisar Corp., v. Capella Photonics, Inc.*, 2021 U.S. Dist. LEXIS 41077, at *9-10, C.A. No. 20-cv-07629-EMC (N.D. Cal. March 3, 2021) (emphasis added). In other words, in a case where indemnification obligations exist, the first-filed jurisdiction is where any action by the vendor must be brought and there is no subject-matter jurisdiction to hear the second filed action.

Appx105

Similarly, in *Early Warning Services, LLC, v. William Grecia et. al*, C.A. No. 21-1050, (E.D. Pa. August 6, 2021), the Court relied on *Microsoft* stating:

> We follow the Court of Appeals for the Federal Circuit. Early Warning assumed the obligation to indemnify and defend Frost Bank—"a customer already sued by [Mr. Grecia]" in Texas. The Texas suit "was already underway" when Early Warning sued here two months after Mr. Grecia sued its indemnified customer in Texas, and the Texas suit involves the same patents and the same claimed products. *As Early Warning has an obligation to indemnify Frost Bank against Mr. Grecia's claims, a case or controversy lies between Early Warning and Frost Bank. But Microsoft instructs us Early Warning should litigate this controversy in connection with the first action.*

*Early Warning Services, LLC, v. William Grecia et. al*, 2021 U.S. Dist. LEXIS 147548 *, at *20-21, C.A. No. 21-1050 (E.D. Pa. August 6, 2021) (emphasis added). Accordingly, *Microsoft* and its follow-on cases make clear that Bambuser cannot proceed in a second different jurisdiction (New Jersey) when it has accepted the indemnification and defense obligations for a customer in the first jurisdiction, i.e., the Western District of Texas. For that reason, SITO's motion to dismiss should be granted.

As detailed, Bambuser admits in no uncertain terms that it has accepted and is indemnifying and defending Saks in Texas. Therefore, taking the allegations in the pleadings as true (*Petruska*, 462 F.3d at 302 n.3), this Court does not have subject matter jurisdiction for Bambuser's declaratory-judgment action and should, therefore, grant SITO's motion to dismiss. Bambuser can litigate any dispute it has with SITO in Texas in connection with the first action.

**B.  A dismissal will also conserve judicial resources and promote efficiency.**

A significant additional benefit to all parties and the Courts, and one that is grounded in the law, is that a dismissal will conserve judicial resources and promote efficiency. Though discussed in the context of the first-to-file rule in SITO's motion to stay (D.I. 10 at 3), the same considerations are applicable here with respect to a motion to dismiss. Dismissing in favor of the

4

Appx106

first-filed case, which is required under *Microsoft*, "avoid[s] conflicting decisions and promote[s] judicial efficiency, that favors pursuing only the first-filed action when multiple lawsuits involving the same claims are filed in different jurisdictions." *Merial Ltd. v. Cipla Ltd.*, 681 F.3d 1283, 1299 (Fed. Cir. 2012) (citations omitted). Accordingly, consistent with Federal Circuit's precedent in *Microsoft*, this Court should dismiss this action in favor of the Western District of Texas action which will allow for the conservation of judicial resources and avoid duplication and/or the possibility of inconsistent results in the two jurisdictions.

## III.    CONCLUSION

For the reasons stated above, this Court should dismiss Bambuser's declaratory-judgment action for lack of subject-matter jurisdiction in light of the Federal Circuit's holding in *Microsoft v. DataTern*.

January 16, 2024                                           Respectfully submitted,

                                                           */s/ Shailendra Maheshwari*
                                                           Shailendra Maheshwari (001822004)*
                                                           Scott R. Samay (040561996)*
                                                           Tedd W. Van Buskirk (041261995)*
                                                           DAIGNAULT IYER LLP
                                                           8618 Westwood Center Drive, Suite 150
                                                           Vienna, VA 22182
                                                           smaheshwari@daignaultiyer.com
                                                           ssamay@daignaultiyer.com
                                                           tvanbuskirk@daignaultiyer.com

                                                           *Not admitted in Virginia*

                                                           *Attorneys for Plaintiffs*
                                                           *SITO Mobile R&D IP, LLC and*
                                                           *SITO Mobile Ltd.*

Appx107

## CERTIFICATE OF SERVICE

I hereby certify that on this 16th day of January, 2024, a true and correct copy of the foregoing pleading was filed via ECF filing and forwarded by electronic mail to all counsel of record for Plaintiff.

/s/ *Shailendra Maheshwari*
Shailendra Maheshwari

6

Appx108

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

|  |  |
|---|---|
| BAMBUSER AB,<br><br>                     Plaintiff,<br><br>          v.<br><br>SITO MOBILE R&D IP, LLC and SITO<br>MOBILE, LTD.,<br><br>                     Defendants. | Case No. 2:23-cv-21757-JKS-JSA<br><br>Motion Date: February 20, 2024 |

## [PROPOSED] ORDER GRANTING DEFENDANTS' MOTION TO DISMISS PURSUANT TO FED. R. CIV. P. 12(b)(1)

THIS MATTER, having been opened to the Court by Defendants for entry of an order dismissing this proceeding pursuant to Fed. R. Civ. P. 12(b)(1) pursuant to the Federal Circuit's holding in *Microsoft Corp. v. DataTern, Inc.*, 755 F.3d 899 (Fed. Cir. 2014), and in favor of a related first-filed proceeding in the United States District Court for the Western District of Texas styled *SITO Mobile R&D IP, LLC and SITO Mobile, LTD. v. SFA Holdings, Inc.,(f/k/a/ Saks Incorporated)*, 23-cv-00688 where Plaintiff can litigate any and all claims on behalf of its customer, SFA Holdings, Inc., whom it is indemnifying in that action, and the Court having considered the Motion and for good cause shown;

IT IS on this _____ day of _____, 2024 ORDERED as follows:

1.  Defendants' Motion to Dismiss is Granted in its entirety; and

2.  This case is dismissed without prejudice.

                                        _____
                                        Hon. Jamel K. Semper, District Judge

Appx109

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY**

|  |  |
|---|---|
| BAMBUSER AB, | |
| Plaintiff, | |
| v. | Case No. 2:23-cv-21757- JKS -JSA |
| | Jury Trial Demanded |
| SITO MOBILE R&D IP, LLC, and SITO MOBILE, LTD., | |
| Defendants. | |

**DEFENDANTS' REPLY IN SUPPORT OF ITS MOTION TO STAY OR, IN THE
ALTERNATIVE, TRANSFER UNDER THE FIRST-TO-FILE RULE**

Appx110

## **TABLE OF CONTENTS**

Page

I.     INTRODUCTION ............................................................................................... 1

II.    ARGUMENT ...................................................................................................... 2

       A.     *Microsoft v. DataTern* holds that the customer-suit exception does not apply
              because Bambuser has agreed to defend and indemnify Saks in the WDTX
              first-filed case and must litigate in that jurisdiction................................................ 2

       B.     The transfer factors do not need to be considered in light of *Microsoft v.
              DataTern.* ............................................................................................................ 6

III.   CONCLUSION................................................................................................... 6

i

Appx111

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Early Warning Services, LLC, v. William Grecia et. al*,
    2021 U.S. Dist. LEXIS 147548, C.A. No. 21-1050 (E.D. Pa. August 6, 2021) ........................5

*Early Warning Services, LLC, v. William Grecia et. al*,
    C.A. No. 21-1050 (E.D. Pa. August 6, 2021) ...........................................................................4

*Finisar Corp., v. Capella Photonics, Inc.*,
    2021 U.S. Dist. LEXIS 41077, C.A. No. 20-cv-07629-EMC (N.D. Cal. March
    3, 2021) .....................................................................................................................................3, 4

*Microsoft Corp. v. DataTern, Inc.*,
    755 F.3d 899 (Fed. Cir. 2014)................................................................................. *passim*

*SITO Mobile R&D IP, LLP et. al v. SFA Holdings, Inc.*,
    23-cv-00688-RP (WDTX) ........................................................................................................1

**Other Authorities**

Fed. R. Civ. P. 4(k)(2)....................................................................................................................6

Fed. R. Civ. P. 12(b)(1)..................................................................................................................2

Appx112

## I.    INTRODUCTION

Plaintiff Bambuser's opposition to SITO's motion to stay suffers from a flaw that it cannot overcome. Specifically, in *Microsoft v. DataTern*, the Federal Circuit established in where an admitted indemnitor (here, Bambuser) can litigate an action after it has accepted its indemnification and defense obligations for a customer (here, Saks) when a first-filed action is already pending. And that venue, in Bambuser's case, is *not* New Jersey. Instead, Bambuser is limited to litigating the subject matter in this case in the first-filed Texas action.[1]

Though Bambuser spills significant ink in its opposition discussing the customer-suit exception to the first-to-file rule, as well as transfer/convenience factors, Bambuser fails to cite or even account for *Microsoft*. And that is problematic because *Microsoft* in no uncertain terms holds that the customer-suit exception does not apply when the vendor has accepted its indemnification and defense obligations, and a first suit is already pending in another jurisdiction.

Bambuser also makes a rather confusing argument stating that the Court should ignore the first-to-file rule even if the customer-suit exception does not apply under the premise that convenience factors would allow the Court to proceed on Bambuser's declaratory-judgment action. But by affirmatively stepping in to defend and indemnify its customer, Saks, in the first-filed WDTX action, Bambuser's argument fails and the cases it cites are inapposite. Bambuser has come to defend Saks in Texas, and take on the patent infringement and validity issues there. It cannot now litigate them in New Jersey. Therefore, asking this Court to ignore the Federal

---

[1] As detailed in SITO's opening brief, Bambuser, on behalf of Saks, filed a motion to stay in the Western District of Texas, also citing the customer-suit exception. Like here, Bambuser failed to cite *Microsoft* or its progeny line of cases. SITO filed its opposition to that motion on January 10, 2024 and has provided the Texas court with a detailed analysis of *Microsoft* and the customer-suit exception's inapplicability to the first-to-file rule in an indemnitor situation. *See* D.I. 14, *SITO Mobile R&D IP, LLP et. al v. SFA Holdings, Inc.*, 23-cv-00688-RP (WDTX).

Appx113

Circuit's holding in *Microsoft's* in favor of the second-filed declaratory-judgment action is not supported by the law.

Accordingly, SITO requests the Court to stay this case in favor of the first-filed action in the Western District of Texas where Bambuser is indemnifying and defending its customer. Concurrently with the filing of this opposition, SITO has filed a motion to dismiss Bambuser's declaratory-judgment complaint under Fed. R. Civ. P. 12(b)(1) and the Federal Circuit's precedent in *Microsoft*. *See* D.I. 18.

## II. ARGUMENT

### A. *Microsoft v. DataTern* holds that the customer-suit exception does not apply because Bambuser has agreed to defend and indemnify Saks in the WDTX first-filed case and must litigate in that jurisdiction.

Though the first-to-file arguments SITO detailed in its opening brief provide ample support for why the Court should grant this motion, the basis to grant SITO's request is even simpler because Bambuser should never have filed a declaratory-judgment action in New Jersey in the first place.

The customer-suit exception to the first-to-file doctrine does not apply here because Bambuser admits, in no uncertain terms, that it has accepted its indemnification and defense obligations for Saks and is stepping-in to fulfill those obligations in Texas. *See* D.I. 16 at 3 ("On or around September 8, 2023, based upon the information in the Complaint and the information provided by Saks, *Bambuser agreed to defend Saks in relation to the above-captioned suit and indemnify Saks for any infringement by Bambuser's video-streaming product*.") (emphasis added). Because Bambuser has accepted its indemnification and defense obligations, and taking its allegations as true that it provides all the technology relevant to Saks, Bambuser cannot file a declaratory-judgment action in a second jurisdiction to circumvent the first-filed case and adjudicate the same claims as those in the first case. That is the Federal Circuit's holding in

2

Appx114

*Microsoft v. DataTern* and follow-on cases. Bambuser never addresses *Microsoft* in its opposition here and, similarly, omits any discussion of *Microsoft* in its stay motion in Texas. But that is not surprising, because *Microsoft* undercuts all of Bambuser's arguments.

In *Microsoft v. DataTern*, a case with an analogous factual situation to the one here, Microsoft sought declaratory relief in a second action in the Southern District of New York in response to a first suit DataTern had previously filed in EDTX against two of Microsoft's customers. Microsoft invoked the customer-suit exception to the first-to-file rule, as Bambuser does here. But the Federal Circuit reversed the district court and stated:

> Importantly, even if there were such an obligation—to indemnify a customer already sued by the patentee in Texas—it would not justify what Appellees seek here. *A case has already been filed against these customers in the Eastern District of Texas. Appellees cannot seek a declaration from a New York court on behalf of customers they must indemnify where a suit against these very same customers on all the same issues was already underway in a Texas court.* (citations omitted). *By agreeing to indemnify any one of their customers, Microsoft could defend its customers and efficiently and effectively participate in the Texas action.*

*Microsoft Corp. v. DataTern, Inc.*, 755 F.3d 899, 904 (Fed. Cir. 2014) (emphasis added).

This is precisely the same situation here. Despite an already-pending first suit in West Texas against Saks where Bambuser admits that it is indemnifying and defending Saks *as of September 8, 2023*, Bambuser filed a second action here in New Jersey *on November 1, 2023*. Under *Microsoft*, the case here in New Jersey should not proceed (or more likely have even been filed) because Bambuser is required to proceed in Texas under its indemnification obligations where it could defend its customer(s) and efficiently and effectively participate in that action. *Id.* at 904.

Other courts regularly adhere to the holding set forth in *Microsoft*. In *Finisar Corp., v. Capella Photonics, Inc.*, Finisar sought a declaratory-judgment in the Northern District of California with respect to numerous customers Capella had already sued in the Eastern District

3

Appx115

of Texas. Finisar argued that its later-filed declaratory-judgment action should take priority over

Capella's suits against the Texas customers under the customer-suit exception to the first-to-file

rule. Capella filed a motion to dismiss Finisar's declaratory-judgement complaint for lack of

standing. Because the Court found Finisar's indemnification obligations were conclusory, it

found Finisar lacked standing for the declaratory action and granted Capella's motion to dismiss.

But of relevance to the situation here, the court stated with respect to the indemnification

obligations:

> More importantly, *Finisar's indemnification obligations to its customers,
> assuming arguendo they exist, would allow Finisar to sue in the Eastern District
> of Texas, not this Court* . . . . Therefore, under *Microsoft*, if Finisar is required to
> indemnify the Texas Defendants, it has standing to defend them in the Texas
> Actions, *not* to file a declaratory judgment action here.

*Finisar Corp., v. Capella Photonics, Inc.*, 2021 U.S. Dist. LEXIS 41077, at *9-10, C.A. No. 20-

cv-07629-EMC (N.D. Cal. March 3, 2021) (emphasis added). In other words, in a case where

indemnification obligations exist, the first-filed jurisdiction is where any action by the vendor

must be brought.

Similarly, in *Early Warning Services, LLC, v. William Grecia et. al*, C.A. No. 21-1050,

(E.D. Pa. August 6, 2021), the Court relied on *Microsoft* stating:

> We follow the Court of Appeals for the Federal Circuit. Early Warning assumed
> the obligation to indemnify and defend Frost Bank—"a customer already sued by
> [Mr. Grecia]" in Texas. The Texas suit "was already underway" when Early
> Warning sued here two months after Mr. Grecia sued its indemnified customer in
> Texas, and the Texas suit involves the same patents and the same claimed
> products. As Early Warning has an obligation to indemnify Frost Bank against Mr.
> Grecia's claims, a case or controversy lies between Early Warning and Frost
> Bank. *But Microsoft instructs us Early Warning should litigate this controversy in
> connection with the first action*.

4

Appx116

*Early Warning Services, LLC, v. William Grecia et. al*, 2021 U.S. Dist. LEXIS 147548 *, at *20-21, C.A. No. 21-1050 (E.D. Pa. August 6, 2021) (emphasis added).[2] Accordingly, *Microsoft* and its follow-on cases make clear that Bambuser cannot proceed in a second different jurisdiction (New Jersey) when it has accepted the indemnification and defense obligations for a customer in the first jurisdiction, *i.e.*, the Western District of Texas. For that reason, SITO's motion to stay should be granted.

In light of *Microsoft* and its line of follow-on cases, Bambuser's concern that SITO did not dispute or address the customer-suit exception in SITO's stay motion as if SITO were acting with some unfounded and underhanded purpose is misguided and not true. D.I. 16 at 1-2. Simply put, SITO's motion to stay in New Jersey involves a straightforward application of the first-to-file rule, and as the Federal Circuit's holding in *Microsoft* demonstrates, the customer-suit exception does not apply. As noted previously, Bambuser admits in no uncertain terms that it has accepted and is indemnifying and defending Saks in Texas. Therefore, Bambuser's arguments that the customer-suit exception to the first-to-file rule applies in favor of a later-filed declaratory-judgement action here in New Jersey has *no* support in the law and SITO respectfully requests that the Court grant its motion to stay. Indeed, Bambuser's further invitation for the Court to not apply the first-to-file rule even if the customer-suit exception is rejected cannot be countenanced in light of *Microsoft*.

---

[2] *Bambuser* cites a prior opinion in its opposition brief between Early Warning and Grecia, from April 6, 2021. *See* D.I. 16 at 5, 7. But SITO cites the more recent decision from August 6, 2021, where the district granted patent-holder's renewed motion to dismiss relying on the holding in *Microsoft*.

5

**B.      The transfer factors do not need to be considered in light of *Microsoft v. DataTern.***

SITO requested the Court to transfer this action as an alternative to a stay and, in light of *Microsoft*, such an order from the Court would be equally proper to granting a stay. Because Bambuser cannot bring an action in this Court, there are no transfer factors it can cite that would support its request to deny SITO's alternative request. Indeed, the cases Bambuser cites are all distinguishable because none involve the factual situation here, *i.e.*, Bambuser's acceptance and defense of its indemnification obligations in the first-filed suit in Texas. D.I. 16 at 13-14.[3, 4] The proper venue for Bambuser to litigate the claims is the location of the first-filed case, *i.e.*, WDTX. Therefore, just as the customer-suit factors are not applicable or relevant, the "convenience" factors are not relevant to SITO's motion to stay, or alternatively, transfer.

**III.     CONCLUSION**

For the reasons stated above and in its opening brief, SITO respectfully requests this Court to stay or, alternatively, transfer to Western District of Texas, Plaintiff's second-filed declaratory-judgment complaint based on the holding of *Microsoft v. DataTern*.

---

[3] As practical matter, one of Bambuser's arguments against transfer is that it would not be subject to jurisdiction or venue in Texas. D.I. 16 at 14. But that is simply untrue as Bambuser is a Swedish corporation and, accordingly, can be sued in *any* jurisdiction in the U.S. under Fed. R. Civ. P. 4(k)(2), and it is clear that Bambuser is subject to personal jurisdiction in Texas as it agreed to defend and indemnify Saks in WDTX and sells its infringing products there.

[4] Of further note, it is telling that Bambuser fully ignores SITO's identification of WDTX (and Texas in general) as the venue that is already familiar with SITO's patents and technology by virtue of the several prior cases that SITO filed and litigated there. SITO's prior WDTX cases and that court's familiarity with SITO's patents undercuts the majority of Bambuser's arguments regarding judicial efficiency and duplication of efforts.

6

Appx118

January 16, 2024                              Respectfully submitted,

                                             */s/ Shailendra Maheshwari*
                                             Shailendra Maheshwari (001822004)*
                                             Scott R. Samay (040561996)*
                                             Tedd W. Van Buskirk (041261995)*
                                             DAIGNAULT IYER LLP
                                             8618 Westwood Center Drive, Suite 150
                                             Vienna, VA 22182
                                             smaheshwari@daignaultiyer.com
                                             ssamay@daignaultiyer.com
                                             tvanbuskirk@daignaultiyer.com

                                             *Not admitted in Virginia*

                                             *Attorneys for Plaintiffs*
                                             *SITO Mobile R&D IP, LLC and*
                                             *SITO Mobile Ltd.*

7

Appx119

## CERTIFICATE OF SERVICE

I hereby certify that on this 16th day of January, 2024, a true and correct copy of the foregoing pleading was filed via ECF filing and forwarded by electronic mail to all counsel of record for Plaintiff.

*/s/ Shailendra Maheshwari*
Shailendra Maheshwari

8

Appx120

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| BAMBUSER AB,<br><br>                        Plaintiff,<br><br>v.<br><br>SITO MOBILE R&D IP, LLC, and<br>SITO MOBILE, LTD.,<br><br>                        Defendants. | Case No. 2:23-cv-21757-SDW-JSA<br><br>Motion Date: February 5, 2024<br><br>(Filed Electronically)<br><br>**MOTION TO FILE SUR-REPLY** |

**PLEASE TAKE NOTICE** that, on a date to be set by the Court, the undersigned attorney for Plaintiff Bambuser AB ("Bambuser"), will move the Court for an Order granting permission to file a sur-reply concerning Defendants' motion to stay, or in the alternative, transfer under the first-to-file rule (Dkt. 10) (the "Motion").

In lieu of a separate brief in support of this motion, Bambuser notes that, when filing the Motion, Defendants were aware of the customer-suit exception that rendered the first-to-file rule inapplicable here, as the parties had discussed the same in detail. (Dkt. 16, pp. 4-5). Yet, Defendants intentionally chose to refrain from raising that exception until their Reply, to avoid Bambuser being able to respond their arguments regarding it.   Bambuser thus seeks to file the attached 5-page sur-reply, strictly limited to Defendants newly raised arguments concerning the customer suit exception.

Appx121

Dated: January 17, 2024                    Respectfully submitted,

                                           KAPLAN BREYER SCHWARZ, LLP


                                           By: */s/ Jeffrey I. Kaplan/*
                                           Jeffrey I. Kaplan
                                           197 State Route 18, Ste 3000
                                           East Brunswick, New Jersey 08816
                                           Telephone: (732) 578-0103
                                           Facsimile: (732) 578-0104
                                           jkaplan@kbsiplaw.com

                                           ZUKERMAN GORE BRANDEIS &
                                           CROSSMAN, LLP
                                           John K. Crossman (*pro hac vice*)
                                           Eleven Times Square
                                           New York, New York 10036
                                           Telephone: (212) 223-6700
                                           Facsimile: (212) 223-6433
                                           jcrossman@zukermangore.com

                                           *Attorneys for Plaintiff Bambuser AB*

Appx122

## CERTIFICATE OF SERVICE

I hereby certify that on January 17, 2024 I served a copy of the

foregoing document through the CM/ECF system upon all counsel of record.

By: */s/ Jeffrey I. Kaplan/*
    Jeffrey I. Kaplan
KAPLAN BREYER SCHWARZ, LLP
197 State Route 18, Ste 3000
East Brunswick, New Jersey 08816
Telephone: (732) 578-0103
Facsimile: (732) 578-0104
jkaplan@kbsiplaw.com

*Attorneys for Plaintiff Bambuser AB*

Appx123

# EXHIBIT A

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY**

BAMBUSER AB,

                      Plaintiff,

v.

SITO MOBILE R&D IP, LLC, and
SITO MOBILE, LTD.,

                      Defendants.

Case No. 2:23-cv-21757-SDW-JSA

Motion Date: February 5, 2024

(Filed Electronically)

**PLAINTIFF'S SUR-REPLY IN OPPOSITION TO
DEFENDANTS' MOTION TO STAY OR, IN THE ALTERNATIVE,
<u>TRANSFER UNDER THE FIRST-TO-FILE RULE</u>**

Appx125

# TABLE OF CONTENTS

**ARGUMENT**........................................................................................................... 1

# TABLE OF AUTHORITIES

**CASES**

*Arris Grp., Inc. v. British Telecomms. PLC*,
   639 F.3d 1368 (Fed. Cir. 2011)............................................................................4

*Early Warning Servs., LLC v. Grecia*,
   No. 21-cv-1050, 2021 WL 3471165 (E.D. Pa. August 6, 2021) ..................... 1, 2, 4

*Finisar Corp. v. Capella Photonics, Inc.*,
   No. 20-cv-07629-EMC, 2021 WL 810227 (N.D. Cal. March 3, 2021).............................. 1, 4

*Katz v. Lear Siegler, Inc.*,
   909 F.2d 1459 (Fed. Cir. 1990)...........................................................................5

*Mantissa Corp. v. Old Second Bancorp, Inc.*,
   No. 17 C 9175, 2018 WL 3059604 (N.D. Ill. June 20, 2018) ..................... 1, 2, 4, 5

*Microsoft Corp. v. DataTern, Inc.*,
   755 F.3d 899 (Fed. Cir. 2014)......................................................................*passim*

*Spread Spectrum Screening LLC v. Eastman Kodak Co.*,
   657 F.3d 1349 (Fed. Cir. 2011)..................................................................3, 5-6

Appx126

SITO's manufactured "indemnity obligation" rule confuses the requirements for legal injury sufficient for Article III *standing* with the separate requirements to invoke the customer-suit exception.

Specifically, *Microsoft Corp. v. DataTern, Inc.*, 755 F.3d 899 (Fed. Cir. 2014), addresses only Article III *standing* to bring a declaratory judgment suit, but nowhere even mentions the customer-suit exception. In both *Early Warning Servs., LLC v. Grecia*, No. 21-cv-1050, 2021 WL 3471165, at *6 (E.D. Pa. August 6, 2021) and *Finisar Corp. v. Capella Photonics, Inc.*, No. 20-cv-07629-EMC, 2021 WL 810227, at *4 (N.D. Cal. March 3, 2021), the Court held the supplier had standing under *Microsoft* to bring its declaratory judgment action in the already existing patent infringement action *based solely upon indemnity obligations*. Both cases ultimately declined to apply the customer-suit exception, but did so with completely separate and lengthy analyses of the customer-suit exception factors, all of which would have been unnecessary and meaningless if the Court's explicit finding that there was an indemnity obligation summarily foreclosed application of the exception as SITO incorrectly argues here.

Moreover, in *Mantissa Corp. v. Old Second Bancorp, Inc.*, 17-cv-9175, 2018 WL 3059604, at *2, 5 (N.D. Ill. June 20, 2018), the Court explicitly found there was an indemnity obligation that provided standing for the declaratory judgement action. Yet, after separately analyzing the customer-suit exception factors, the

1

Appx127

court *also* found the customer suit exception did apply, vitiating SITO's proposed rule. *Mantissa Corp.*, 2018 WL 3059604 at *2, 5 (citing cases).

The correct rule is that a contractual indemnity obligation requiring the supplier to pay damages that may be awarded against its customer is sufficient to establish Article III standing for the supplier to bring a declaratory judgment action, because the supplier will ultimately be liable for any resulting damages. *Microsoft,* 755 F.3d at 904 ("If Appellees had an obligation to indemnify their customers, they would then have standing to bring this suit"); *Early Warning*, 2021 WL 3471165 at *6-7.

However, not all contractual indemnity obligations from a supplier to its customer involve an allegation that the *supplier's* product infringe the patent. For example, as *Microsoft* explained, "suppose that the accused [supplied] product was capable of multiple uses and there was no evidence or allegation that the [supplier] encouraged the [customer's infringing] use accused of infringement." *Microsoft*, 755 F.3d at 904 n.2. Or, suppose the supplier sold its customer a component not accused of infringement, and the alleged infringement resulted only from the customer combining it with many other parts to build an infringing machine.

In such situations, while the supplier may have some private contractual obligation (or a business incentive) to defend and indemnify its customer, the infringement allegations result from the *customer's conduct, not from the*

2

Appx128

*supplier's product or the supplier*. Other customers could use the supplier's product differently, which use might or might not be accused of infringement, and might involve completely different infringement theories and issues. Indeed, the supplier and supplier's product itself might not be accused of infringement at all.

In such instances, the customer-suit exception does not apply, because the entire purpose of the exception is to litigate alleged infringement of a single supplied product with the real party in interest – the supplier – in one forum instead of in multiple infringement suits, against multiple customers, in multiple forums, all litigating the same infringement allegations against the same product. *Spread Spectrum Screening LLC v. Eastman Kodak Co.,* 657 F.3d 1349, 1357 (Fed. Cir. 2011) ("The guiding principles in the customer-suit exception are efficiency and judicial economy") (citing cases).

Thus, an indemnity obligation *alone* will give the supplier Article III standing to join the already existing patent infringement suit against the supplier's customer, but it does not permit filing a separate declaratory judgment action in a different forum, and will *not* trump the first to file rule. *Microsoft*, 755 F.3d at 904.

Application of the customer-suit exception however, is triggered, *regardless of* whether or not there exists an indemnity obligation, where the patent owner expressly charges the supplier itself with infringement for selling the product, or impliedly does so by basing its infringement allegations against the supplier's

3

Appx129

customer upon the supplier's product as supplied to that customer. *Microsoft*, 755

F.3d at 911 (claim charts in customer suit impliedly charged supplier product with

infringement by relying heavily upon supplier product); *Arris Grp., Inc. v. British*

*Telecomms. PLC*, 639 F.3d 1368, 1375-79 (Fed. Cir. 2011) (infringement

allegations in customer suit impliedly charged supplier); *Mantissa Corp.*, 2018 WL

3059604 at *2, 5.

In *this* situation, absent the customer-suit exception, the patent owner could

sue customer after customer, in forum after forum, for use of the *same* product.

This proper distinction between the rules applicable for establishing legal

injury for standing, and those for invoking the customer-suit exception, is clearly

demonstrated by SITO's own cited cases. The courts in *Early Warning*, at *2-8,

and *Finisar*, at *5-6, both explicitly found an indemnity obligation, but directed the

customer-suit exception analysis exclusively to a detailed examination of whether

the patent owner's infringement charges implicated the supplier's product or the

customer's conduct, and the remaining customer-suit exception factors.

*Microsoft* involved the assertion in a *Texas court* of two patents against

Microsoft's customers, and Microsoft's subsequently filed declaratory judgment

action against the same two patents in the *Southern District of New York*.

*Microsoft*, 755 F.3d at 904. With respect to the '402 patent, the Federal Circuit

held that *if* Microsoft had an indemnity obligation, Microsoft could bring its

Appx130

declaratory judgment action by joining the Texas case, *but it could not file a separate declaratory judgment action in New York. Id.* However, and critically, with respect to the '502 patent, the Court held that Microsoft's subsequently filed declaratory judgment action in New York *was* appropriate, and even affirmed the New York Court's substantive holding that Microsoft did not infringe the '502 patent. *Id.* at 905, 911. In explaining why the court held differently for the two different patents, the Court analyzed, in significant detail, the allegations and claim charts presented in the previously filed customer suit. The Court ultimately concluded that for the '502 patent, Microsoft's *own* product was implicated, but for the '402 patent, only the customer's conduct was implicated. *Id.* at 904-07; s*ee also Mantissa Corp.*, 2018 WL 3059604 at *2, 5 (finding indemnity obligation and applying customer-suit exception because supplier's product was implicated).

Here, SITO does not dispute Bambuser's evidence establishing that it is *Bambuser's technology itself* that forms the basis of the alleged infringement. (Dkt. 16, pp. 6-7). The customer-suit exception does not depend upon indemnification, but upon whether the infringement allegations are against the supplier itself, rather than the conduct of one, but not necessarily other, supplier customers.[1]

---

[1] SITO's proposed rule is facially nonsensical because *both* seminal Federal Circuit cases essentially *establishing* the customer-suit exception explicitly state that the exception was created based upon the Court's "recognition that…a manufacturer must protect its customer, *either as a matter of contract*, or good business…" *Katz v. Lear Siegler, Inc.*, 909 F.2d 1459, 1464 (Fed. Cir. 1990); *Spread Spectrum, 657*

Appx131

Finally, SITO recently sent another Bambuser customer, Uniqlo Co., Ltd. ("Uniqlo"), a draft complaint with an explicit threat to file suit for infringement of the same patents in the Southern District of New York. (Dkt. 16, p. 4, citing evidence). Bambuser cannot vindicate Uniqlo's rights by joining the case in Texas against Saks.

Dated: January 17, 2024                     Respectfully submitted,

                                            KAPLAN BREYER SCHWARZ, LLP


                                            By: */s/ Jeffrey I. Kaplan/*
                                               Jeffrey I. Kaplan
                                            197 State Route 18, Ste 3000
                                            East Brunswick, New Jersey 08816
                                            Telephone: (732) 578-0103
                                            Facsimile: (732) 578-0104
                                            jkaplan@kbsiplaw.com

                                            ZUKERMAN GORE BRANDEIS &
                                            CROSSMAN, LLP
                                            John K. Crossman (*pro hac vice*)
                                            Eleven Times Square
                                            New York, New York 10036
                                            Telephone: (212) 223-6700
                                            Facsimile: (212) 223-6433
                                            jcrossman@zukermangore.com

                                            *Attorneys for Plaintiff Bambuser AB*

---

F.3d at 1357 (emphasis added). SITO thus argues the Federal Circuit created a doctrine to address situations when the supplier is contractually obligated to defend its customer, and also precluded courts from applying that same doctrine *when the supplier is contractually obligated to defend its customer*.

6

Appx132

21 TEXT ORDER: Plaintiff's Motion, (ECF No. <u>20</u> ), seeking leave to file its sur-reply, (ECF No. <u>20</u> - <u>1</u> ), attached thereto is GRANTED. Plaintiff shall file the sur-reply (ECF No. <u>20</u> - <u>1</u> ) by 1/26/24. So Ordered by Magistrate Judge Jessica S. Allen on 1/24/24. (jbb) (Entered: 01/24/2024)

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

BAMBUSER AB,

                      Plaintiff,

v.

SITO MOBILE R&D IP, LLC, and
SITO MOBILE, LTD.,

                      Defendants.

Case No. 2:23-cv-21757-SDW-JSA

Motion Date: February 5, 2024

(Filed Electronically)

**PLAINTIFF'S SUR-REPLY IN OPPOSITION TO
DEFENDANTS' MOTION TO STAY OR, IN THE ALTERNATIVE,
<u>TRANSFER UNDER THE FIRST-TO-FILE RULE</u>**

Appx134

# TABLE OF CONTENTS

**ARGUMENT**.................................................................................................................... 1

# TABLE OF AUTHORITIES

## CASES

*Arris Grp., Inc. v. British Telecomms. PLC*,
    639 F.3d 1368 (Fed. Cir. 2011)................................................................................ 4

*Early Warning Servs., LLC v. Grecia*,
    No. 21-cv-1050, 2021 WL 3471165 (E.D. Pa. August 6, 2021) .................................... 1, 2, 4

*Finisar Corp. v. Capella Photonics, Inc.*,
    No. 20-cv-07629-EMC, 2021 WL 810227 (N.D. Cal. March 3, 2021)............................. 1, 4

*Katz v. Lear Siegler, Inc.*,
    909 F.2d 1459 (Fed. Cir. 1990)................................................................................. 5

*Mantissa Corp. v. Old Second Bancorp, Inc.*,
    No. 17 C 9175, 2018 WL 3059604 (N.D. Ill. June 20, 2018) ..................................... 1, 2, 4, 5

*Microsoft Corp. v. DataTern, Inc.*,
    755 F.3d 899 (Fed. Cir. 2014).......................................................................*passim*

*Spread Spectrum Screening LLC v. Eastman Kodak Co.*,
    657 F.3d 1349 (Fed. Cir. 2011)..................................................................................3, 5-6

Appx135

SITO's manufactured "indemnity obligation" rule confuses the requirements for legal injury sufficient for Article III *standing* with the separate requirements to invoke the customer-suit exception.

Specifically, *Microsoft Corp. v. DataTern, Inc.*, 755 F.3d 899 (Fed. Cir. 2014), addresses only Article III *standing* to bring a declaratory judgment suit, but nowhere even mentions the customer-suit exception. In both *Early Warning Servs., LLC v. Grecia*, No. 21-cv-1050, 2021 WL 3471165, at *6 (E.D. Pa. August 6, 2021) and *Finisar Corp. v. Capella Photonics, Inc.*, No. 20-cv-07629-EMC, 2021 WL 810227, at *4 (N.D. Cal. March 3, 2021), the Court held the supplier had standing under *Microsoft* to bring its declaratory judgment action in the already existing patent infringement action *based solely upon indemnity obligations*. Both cases ultimately declined to apply the customer-suit exception, but did so with completely separate and lengthy analyses of the customer-suit exception factors, all of which would have been unnecessary and meaningless if the Court's explicit finding that there was an indemnity obligation summarily foreclosed application of the exception as SITO incorrectly argues here.

Moreover, in *Mantissa Corp. v. Old Second Bancorp, Inc.*, 17-cv-9175, 2018 WL 3059604, at *2, 5 (N.D. Ill. June 20, 2018), the Court explicitly found there was an indemnity obligation that provided standing for the declaratory judgement action. Yet, after separately analyzing the customer-suit exception factors, the

1

Appx136

court *also* found the customer suit exception did apply, vitiating SITO's proposed rule. *Mantissa Corp.*, 2018 WL 3059604 at *2, 5 (citing cases).

The correct rule is that a contractual indemnity obligation requiring the supplier to pay damages that may be awarded against its customer is sufficient to establish Article III standing for the supplier to bring a declaratory judgment action, because the supplier will ultimately be liable for any resulting damages. *Microsoft,* 755 F.3d at 904 ("If Appellees had an obligation to indemnify their customers, they would then have standing to bring this suit"); *Early Warning*, 2021 WL 3471165 at *6-7.

However, not all contractual indemnity obligations from a supplier to its customer involve an allegation that the *supplier's* product infringe the patent. For example, as *Microsoft* explained, "suppose that the accused [supplied] product was capable of multiple uses and there was no evidence or allegation that the [supplier] encouraged the [customer's infringing] use accused of infringement." *Microsoft*, 755 F.3d at 904 n.2. Or, suppose the supplier sold its customer a component not accused of infringement, and the alleged infringement resulted only from the customer combining it with many other parts to build an infringing machine.

In such situations, while the supplier may have some private contractual obligation (or a business incentive) to defend and indemnify its customer, the infringement allegations result from the *customer's conduct, not from the*

2

Appx137

*supplier's product or the supplier*. Other customers could use the supplier's product differently, which use might or might not be accused of infringement, and might involve completely different infringement theories and issues. Indeed, the supplier and supplier's product itself might not be accused of infringement at all.

In such instances, the customer-suit exception does not apply, because the entire purpose of the exception is to litigate alleged infringement of a single supplied product with the real party in interest – the supplier – in one forum instead of in multiple infringement suits, against multiple customers, in multiple forums, all litigating the same infringement allegations against the same product. *Spread Spectrum Screening LLC v. Eastman Kodak Co.,* 657 F.3d 1349, 1357 (Fed. Cir. 2011) ("The guiding principles in the customer-suit exception are efficiency and judicial economy") (citing cases).

Thus, an indemnity obligation *alone* will give the supplier Article III standing to join the already existing patent infringement suit against the supplier's customer, but it does not permit filing a separate declaratory judgment action in a different forum, and will *not* trump the first to file rule. *Microsoft*, 755 F.3d at 904.

Application of the customer-suit exception however, is triggered, *regardless of* whether or not there exists an indemnity obligation, where the patent owner expressly charges the supplier itself with infringement for selling the product, or impliedly does so by basing its infringement allegations against the supplier's

3

Appx138

customer upon the supplier's product as supplied to that customer. *Microsoft*, 755 F.3d at 911 (claim charts in customer suit impliedly charged supplier product with infringement by relying heavily upon supplier product); *Arris Grp., Inc. v. British Telecomms. PLC*, 639 F.3d 1368, 1375-79 (Fed. Cir. 2011) (infringement allegations in customer suit impliedly charged supplier); *Mantissa Corp.*, 2018 WL 3059604 at *2, 5.

In *this* situation, absent the customer-suit exception, the patent owner could sue customer after customer, in forum after forum, for use of the *same* product.

This proper distinction between the rules applicable for establishing legal injury for standing, and those for invoking the customer-suit exception, is clearly demonstrated by SITO's own cited cases. The courts in *Early Warning*, at *2-8, and *Finisar*, at *5-6, both explicitly found an indemnity obligation, but directed the customer-suit exception analysis exclusively to a detailed examination of whether the patent owner's infringement charges implicated the supplier's product or the customer's conduct, and the remaining customer-suit exception factors.

*Microsoft* involved the assertion in a *Texas court* of two patents against Microsoft's customers, and Microsoft's subsequently filed declaratory judgment action against the same two patents in the *Southern District of New York*. *Microsoft*, 755 F.3d at 904. With respect to the '402 patent, the Federal Circuit held that *if* Microsoft had an indemnity obligation, Microsoft could bring its

Appx139

declaratory judgment action by joining the Texas case, *but it could not file a separate declaratory judgment action in New York. Id.* However, and critically, with respect to the '502 patent, the Court held that Microsoft's subsequently filed declaratory judgment action in New York *was* appropriate, and even affirmed the New York Court's substantive holding that Microsoft did not infringe the '502 patent. *Id.* at 905, 911. In explaining why the court held differently for the two different patents, the Court analyzed, in significant detail, the allegations and claim charts presented in the previously filed customer suit. The Court ultimately concluded that for the '502 patent, Microsoft's *own* product was implicated, but for the '402 patent, only the customer's conduct was implicated. *Id.* at 904-07; s*ee also Mantissa Corp.*, 2018 WL 3059604 at *2, 5 (finding indemnity obligation and applying customer-suit exception because supplier's product was implicated).

Here, SITO does not dispute Bambuser's evidence establishing that it is *Bambuser's technology itself* that forms the basis of the alleged infringement. (Dkt. 16, pp. 6-7). The customer-suit exception does not depend upon indemnification, but upon whether the infringement allegations are against the supplier itself, rather than the conduct of one, but not necessarily other, supplier customers.[1]

---

[1] SITO's proposed rule is facially nonsensical because *both* seminal Federal Circuit cases essentially *establishing* the customer-suit exception explicitly state that the exception was created based upon the Court's "recognition that…a manufacturer must protect its customer, *either as a matter of contract*, or good business…" *Katz v. Lear Siegler, Inc*., 909 F.2d 1459, 1464 (Fed. Cir. 1990); *Spread Spectrum,* 657

Appx140

Finally, SITO recently sent another Bambuser customer, Uniqlo Co., Ltd. ("Uniqlo"), a draft complaint with an explicit threat to file suit for infringement of the same patents in the Southern District of New York. (Dkt. 16, p. 4, citing evidence). Bambuser cannot vindicate Uniqlo's rights by joining the case in Texas against Saks.

Dated: January 17, 2024          Respectfully submitted,

                                 KAPLAN BREYER SCHWARZ, LLP


                                 By: */s/ Jeffrey I. Kaplan/*
                                     Jeffrey I. Kaplan
                                 197 State Route 18, Ste 3000
                                 East Brunswick, New Jersey 08816
                                 Telephone: (732) 578-0103
                                 Facsimile: (732) 578-0104
                                 jkaplan@kbsiplaw.com

                                 ZUKERMAN GORE BRANDEIS & CROSSMAN, LLP
                                 John K. Crossman (*pro hac vice*)
                                 Eleven Times Square
                                 New York, New York 10036
                                 Telephone: (212) 223-6700
                                 Facsimile: (212) 223-6433
                                 jcrossman@zukermangore.com

                                 *Attorneys for Plaintiff Bambuser AB*

---

F.3d at 1357 (emphasis added). SITO thus argues the Federal Circuit created a doctrine to address situations when the supplier is contractually obligated to defend its customer, and also precluded courts from applying that same doctrine *when the supplier is contractually obligated to defend its customer*.

6

Appx141

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

BAMBUSER AB,

                   Plaintiff,

v.

SITO MOBILE R&D IP, LLC, and
SITO MOBILE, LTD.,

                   Defendants.

Case No. 2:23-cv-21757-SDW-JSA

Motion Date: February 20, 2024

(Filed Electronically)

## Plaintiff's Memorandum in Opposition To
## Defendants' Motion Dismiss

Appx142

**TABLE OF CONTENTS**

I.      PRELIMINARY STATEMENT .................................................................1

II.     FACTS AND PROCEDURAL HISTORY ....................................................3

III.    ARGUMENT.........................................................................................5

      A.      SITO Misinterprets Microsoft, Which Actually Supports
           Bambuser's Standing to Bring This Suit...............................................6

           i.   SITO's Other Cases Further Demonstrate
               SITO's Flawed Interpretation of Microsoft ..................................10

      B.      This Suit is the Most Efficient Suit to Resolve SITO's
           Infringement Claims Against Bambuser's Customers.......................11

IV.     CONCLUSION.....................................................................................12

Appx143

## TABLE OF AUTHORITIES

### CASES

*Arris Grp., Inc. v. British Telecomms. PLC*,
   639 F.3d 1368 (Fed. Cir. 2011) ...................................................................6, 7, 9

*Early Warning Servs., LLC v. Grecia*,
   No. 21-cv-1050, 2021 WL 3471165 (E.D. Pa. August 6, 2021) ................10, 11

*Finisar Corp. v. Capella Photonics, Inc.*,
   No. 20-cv-07629-EMC, 2021 WL 810227 (N.D. Cal. March 3,
   2021) ........................................................................................................10, 11

*Mantissa Corp. v. Old Second Bancorp, Inc.*,
   No. 17 C 9175, 2018 WL 3059604 (N.D. Ill. June 20, 2018) .................. 1-2, 10

*Microsoft Corp. v. DataTern, Inc.*,
   755 F.3d 899 (Fed. Cir. 2014) .................................................... *passim*

*Teva Pharms. USA, Inc. v. Novartis Pharms. Corp.*,
   482 F.3d 1330 (Fed. Cir. 2007) ..........................................................6

### OTHER AUTHORITIES

Fed. R. Civ. Prod. 12(b)(1) ....................................................................5

Appx144

Plaintiff Bambuser AB ("Bambuser") submits this memorandum of law in opposition to defendants SITO Mobile R&D IP, LLC and SITO Mobile, Ltd.'s (collectively, "SITO") motion to dismiss.

## I.    PRELIMINARY STATEMENT

SITO's entire argument on its motion to dismiss (the "Motion") relies on a flawed interpretation of *Microsoft Corp. v. DataTern, Inc.*, 755 F.3d 899 (Fed. Cir. 2014) to argue that the case supports a rule it actually refutes. SITO claims that *Microsoft* establishes a rule that *any* supplier that indemnifies a customer faced with a patent infringement suit has Article III standing to bring a declaratory suit only in the same venue as the infringement suit. However, *Microsoft*'s actual holdings are: 1) an indemnification obligation *alone* provides the supplier/indemnitor with sufficient legal injury to establish standing for the indemnitor to assert a declaratory judgment in the existing litigation against the supplier's customer that gives rise to the indemnification obligation; and 2) if that existing indemnity obligation implicates the supplier's own product, then the supplier may bring that declaratory suit in a different forum. *Id.* at 904-05, 911.

In fact, cases finding that an indemnification obligation exists reject the concocted indemnification rule SITO puts forth here. *See Mantissa Corp. v. Old Second Bancorp, Inc.*, No. 17 C 9175, 2018 WL 3059604, at *2, 5 (N.D. Ill. June

Appx145

20, 2018) (finding indemnity obligation and staying customer suit in favor of supplier declaratory judgment action in a different forum) (citing Fed. Cir. cases).

*Microsoft* involved two patents, and the Federal Circuit found the different forum in which the declaratory judgment action was brought on both was proper for one of the patents but not the other. *Microsoft*, 755 F.3d at 904-05, 911. In explaining the reason for this difference, the Court explained that the infringement allegations for one of the patents implicated the supplier's product, whereas for the other one it did not. *Id.* Nothing in this analysis depends in any way upon indemnity obligations.

*Microsoft* thus supports Bambuser's standing to bring this declaratory suit in this District as SITO has impliedly and directly accused Bambuser's product of infringement, including by: 1) implicating Bambuser's product in SITO's allegations in both SITO's suit against SFA Holdings Inc. f/k/a Saks Incorporated ("Saks") in the Western District of Texas and SITO's threatened suit against Uniqlo Co., Ltd. ("Uniqlo") in the Southern District of New York; and 2) attempting to negotiate a license with Bambuser for its customers concerning the patents asserted in the suit against Saks and threatened suit against Uniqlo.

Accordingly, Bambuser's obligation to indemnify its customers, Saks and Uniqlo, does not prohibit Bambuser from filing suit in this District since Bambuser does not rely solely on that obligation for standing.

2

Appx146

This suit is also unquestionably the most efficient forum to resolve SITO's existing and future infringement suits against Bambuser's customers. SITO's suits against Bambuser's individual customers, such as SITO's suit against Saks and threatened suit against Uniqlo, can only resolve SITO's claims concerning the customer named in that suit. Thus, dismissing this suit would allow for an avalanche of suits against individual customers that all relate to the same Bambuser product. However, this suit can resolve SITO's claims against all of Bambuser's customers at once, which is far more efficient. This is consistent with the judicial economy rationale underpinning the customer-suit exception to the first-to-file rule, which SITO completely ignores despite its applicability to prioritize this one suit by the supplier over individual customer suits by SITO.

## II.    FACTS AND PROCEDURAL HISTORY

On June 16, 2023, SITO filed a lawsuit captioned *SITO Mobile R&D IP, LLC and SITO Mobile, LTD. V. SFA Holdings Inc. f/k/a Saks Incorporated*, No. 1:23-cv-00688-RP in the Western District of Texas against Saks (the "Saks Suit"), alleging that Saks has infringed U.S. Pat. Nos. 7,191,244 ("the '244 patent"); 8,015,307 ("the '307 patent"); 8,554,940 ("the '940 patent"); 9,349,138 ("the '138 patent"); 10,735,781 ("the '781 patent"); and 10,769,675 ("the '675 patent") (collectively, the "Asserted Patents") by using video-streaming technology

3

Appx147

supplied by Bambuser. (Declaration of Jeffrey Kaplan in Opposition to Motion to Dismiss ("Kaplan Decl.") ¶¶ 6-7).

On August 22, 2023, Saks requested that Bambuser defend and indemnify Saks in relation to the Saks Suit pursuant to the terms of the agreement governing the relationship between Saks and Bambuser. (Kaplan Decl. ¶ 8). On or around September 8, 2023, Bambuser agreed to defend Saks in relation to the Saks Suit and indemnify Saks for any infringement by Bambuser's video-streaming product. (*Id.* at ¶ 9).

On or around October 6, 2023, SITO sent a letter and a draft complaint, captioned for the Southern District of New York, to Uniqlo, another Bambuser customer, threatening to sue Uniqlo for infringement of the same Asserted Patents in the Saks Suit by Uniqlo's use of the same video-streaming technology supplied by Bambuser (the "Threatened Uniqlo Suit"). (*Id.* at ¶¶ 10-13). Uniqlo also sought defense and indemnification from Bambuser, which agreed to defend and indemnify Uniqlo in relation to the Threatened Uniqlo Suit. (*Id.* at ¶ 13).

On November 1, 2023, Bambuser filed this suit in the District of New Jersey seeking a declaration of invalidity and non-infringement of the Asserted Patents in relation to the Saks Suit, the Threatened Uniqlo Suit, and any future infringement claims by SITO against Bambuser's customers. (*Id.* at ¶ 14; Dkt. 1, Complaint ¶¶ 8-10, 19, 23, 27, 31, 35, 39).

Appx148

On or around November 17, 2023, counsel for SITO and Bambuser had a video-meeting to discuss Bambuser's request to SITO that SITO stipulate to stay the Saks Suit pending resolution of this suit based upon the customer-suit exception. These discussions lasted over the course of two meetings. (Kaplan Decl. ¶ 15).

As a part of these discussions, counsel for SITO informed counsel for Bambuser of SITO's efforts to identify at least some of Bambuser's customers that use the Bambuser technology accused of infringement in the Saks Suit and the Threatened Uniqlo Suit. SITO's counsel then indicated that all of SITO's claims for infringement against all of Bambuser's customers, including against Saks and Uniqlo, could be resolved if Bambuser directly licensed the Asserted Patents from SITO. SITO's counsel proposed a seven-figure amount for this license. (*Id.* at ¶¶ 16-17).

## III.    ARGUMENT

SITO moves to dismiss solely under Fed. R. Civ. Prod. 12(b)(1), arguing that this Court lacks subject matter jurisdiction over this suit because Bambuser lacks Article III standing to bring this suit for declaratory relief in the District of New Jersey. Article III standing to bring a declaratory suit exists when "there is a substantial controversy, between the parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory

Appx149

judgment." *Teva Pharms. USA, Inc. v. Novartis Pharms. Corp.*, 482 F.3d 1330, 1337-38 (Fed. Cir. 2007). Such substantial controversy may be established by any appropriate legal injury, including direct or implied accusations of patent infringement. *See Arris Grp., Inc. v. British Telecomms. PLC*, 639 F.3d 1368, 1374-79 (Fed. Cir. 2011). Bambuser has established such appropriate legal injury here, regardless of Bambuser's obligation to indemnify its customers, via SITO's implied and direct accusations that Bambuser's product infringes the Asserted Patents.

A.    **SITO Misinterprets Microsoft, Which Actually Supports Bambuser's Standing to Bring This Suit**

SITO's entire motion to dismiss relies on a flawed interpretation of *Microsoft*, which actually supports Bambuser's standing. SITO cherry picks language from the case to make it seem like *Microsoft* holds that *any* supplier that indemnifies a customer must bring a declaratory suit in the same forum as a first-filed infringement suit. (Dkt. 18-1, ("SITO Br."), pp. 2-3). However, Microsoft actually holds: 1) that a supplier's obligation to indemnify a customer, by itself, can provide standing to bring a declaratory suit; and 2) if a supplier relies *solely* on an indemnification obligation for standing, *only* then is the supplier limited to bring a declaratory suit in the same forum as a first-filed infringement suit. *Microsoft*, 755 F.3d at 903-05.

6

Appx150

*Microsoft* further holds that if beyond the indemnity obligation, the supplier's own product is implicated, then the supplier may bring the declaratory judgment action in a different forum. *Id.* at 903 ("declaratory judgment jurisdiction exists where a patentee accuses customers of direct infringement based on the use of the supplier's product"). This is consistent with the rule that allegations made directly against the supplier, or allegations against the supplier's product in the litigation against the customer, are sufficient to establish Article III standing. *See Arris*, 639 F.3d at 1375-79 (Fed. Cir. 2011) (holding supplier had standing to bring declaratory action where infringement allegations in customer suit implicated supplier's products).

This rule is demonstrated by *Microsoft's* facts, which involve the assertion in a *Texas court* of two patents against Microsoft's customers, and Microsoft's subsequently filed declaratory judgment action against the same two patents in the Southern District of New York. Microsoft had no indemnity obligation with respect to either patent. *Microsoft*, 755 F.3d at 902. With respect to the '402 patent, the Federal Circuit held that *if* Microsoft had an indemnity obligation, Microsoft could bring its declaratory judgment action by joining the Texas case, *but it could not file a separate declaratory judgment action in New York*. *Id.* at 904. However, and critically, with respect to the '502 patent, the Court held that Microsoft's subsequently filed declaratory judgment action in New York *was* appropriate, and

Appx151

even affirmed the New York Court's substantive holding that Microsoft did not infringe the '502 patent. *Id.* at 905, 911.

Microsoft's customers had been equally accused of direct infringement of both patents. The Court explained the different results at length in *Microsoft*, but nothing in the explanation has anything to do with whether there were indemnity obligations. Instead, the Court analyzed, in significant detail, the difference in the infringement allegations and claim charts presented in the previously filed customer suit. The Court ultimately concluded the infringement allegations and claim charts for the '402 patent were *not directed to Microsoft's own product* but to the customer's conduct, whereas with respect to the '502 patent, the infringement allegations and claim charts *implicated Microsoft's product*. *Id.* at 904-07.

Here, Bambuser does not rely solely upon its obligation to indemnify Saks for standing. Instead, Bambuser relies on SITO impliedly and directly accusing Bambuser's product of infringement. SITO impliedly accused Bambuser's product of infringement by basing its claims of infringement against Bambuser's customers, Saks and Uniqlo, on the use of Bambuser's product, as opposed to any conduct by Bambuser's customers. When Bambuser explained this in detail, alongside extensive supporting evidence, in its opposition to SITO's motion to stay, *SITO failed to dispute or even address it*. (Dkt. 16, ("Bambuser Stay Opp."),

Appx152

pp. 5-9, 12-13; Dkt. 19, ("SITO Stay Reply")). Moreover, SITO has directly accused Bambuser's product with infringing the patents in suit, even going so far as attempting to negotiate a global license between SITO and Bambuser for all of Bambuser's customers. (Kaplan Decl. ¶¶ 15-18). *Either* SITO's implication of Bambuser's product in its infringement claims against Saks and Uniqlo or its attempt to demand a license fee would permit the declaratory judgment action to be brought in a separate district. *See Arris*, 639 F.3d at 1375-79; *Microsoft*, 755 F.3d at 905.

Even if SITO were somehow correct that Bambuser's obligation to indemnify Saks meant that Bambuser could only litigate issues related to Saks in the same venue as the Saks Suit, which it is not, Bambuser would still have separate standing to bring this suit due to the Threatened Uniqlo Suit. There is no dispute that SITO did not include Uniqlo in the Saks Suit, but instead has threatened to sue Uniqlo separately in the Southern District of New York. (Kaplan Decl. ¶¶ 6, 10-12; Complaint ¶¶ 8-10). Bambuser brought this suit to address not only SITO's claims against Saks, but also against Uniqlo, and any other Bambuser customer SITO may seek to sue concerning the Asserted Patents. (Complaint ¶¶ 8-10, 19, 23, 27, 31, 35, 39). This presents a separate case or controversy that supplies this suit with Article III standing. *See Arris*, 639 F.3d at 1375-79; *Microsoft*, 755 F.3d at 903-07.

9

Appx153

Ultimately, SITO is propounding a rule that does not exist, is not supported by *Microsoft*, and is refuted by cases prioritizing declaratory suits brought by a supplier in a different forum over a patent infringement suit against a customer. *See Mantissa*, 2018 WL 3059604 at *2, 5 (staying customer suit pursuant to customer-suit exception after finding indemnity obligation existed).

### i.    SITO's Other Cases Further Demonstrate SITO's Flawed Interpretation of Microsoft

The other two cases SITO cites, *Early Warning Servs., LLC v. Grecia*, No. 21-cv-1050, 2021 WL 3471165 (E.D. Pa. August 6, 2021), and *Finisar Corp. v. Capella Photonics, Inc.*, No. 20-cv-07629-EMC, 2021 WL 810227 (N.D. Cal. March 3, 2021), both reflect the actual rule established by *Microsoft*—that a supplier may gain standing to bring a declaratory suit solely from an indemnification obligation, but if it does so, then it must bring that suit in the same venue as the infringement suit—and not SITO's self-serving, manufactured rule.

In *Early Warning*, the Court relied on *Microsoft* to find that a supplier had standing *based solely upon indemnity obligations*, which allowed the supplier to bring its declaratory judgment action in the already existing patent infringement action. *Early Warning*, 2021 WL 3471165 at *6. Unlike Bambuser, the supplier in *Early Warning* lacked standing to file suit elsewhere because it was not implicated in the patent holder's infringement claims as the patent holder expressly and repeatedly represented that he had no claims or potential claims against the

Appx154

supplier or its customers. *Id.* at \*6-8. The Court reasoned similarly in *Finisar*,
holding that if the supplier's alleged indemnification obligations existed, they
would independently provide the supplier with standing, but only in the same
venue as the filed infringement suit. *Finisar*, 2021 WL 8102274 at \*4 (citing
*Microsoft*). Neither case is relevant here where Bambuser has standing independent
from its obligation to indemnify its customers.

**B.      This Suit is the Most Efficient Suit to Resolve SITO's
Infringement Claims Against Bambuser's Customers**

SITO again ignores the customer-suit exception to the first-to-file rule in
arguing that the Saks Suit is the most efficient forum to resolve SITO's
infringement claims by virtue of being the first-filed suit. (SITO Br., pp. 4-5). As
explained more fully in Bambuser's opposition, (Dkt. 16, Bambuser Stay Opp.),
and sur-reply, (Dkt. 22, "Bambuser Stay Sur-Reply"), to SITO's motion to stay,
the judicial economy rationale underpinning the application of the customer-suit
exception to the Saks Suit strongly favors this suit as the most efficient forum to
resolve SITO's infringement claims against Bambuser's customers.

The customer-suit exception recognizes the efficiency of resolving what
would otherwise be multiple customer lawsuits in one suit between the true
defendant, the supplier, and the patent holder. *See Spread Spectrum Screening*, 657
F.3d at 1357 ("The guiding principles in the customer-suit exception are efficiency
and judicial economy"). Here, SITO already sued one of Bambuser's customers in

Appx155

the Western District of Texas and has threatened to sue another in the Southern District of New York, both concerning alleged infringement of the same Asserted Patents by the same technology supplied by Bambuser. It is far more efficient to resolve both disputes in this one suit between Bambuser and SITO, rather than give SITO the green light to bring as many suits as there are Bambuser customers.

The Saks Suit also cannot resolve all of the issues present in this suit. That suit concerns SITO's allegations against only one of Bambuser's customers, Saks, and does not name or concern Uniqlo, or any other Bambuser customer. Whereas this suit can resolve all such issues as the declaratory relief sought by Bambuser concerns the issues related to Saks, Uniqlo, and any other Bambuser customer sued for infringing the Asserted Patents by use of technology supplied by Bambuser. (Complaint ¶¶ 8-10, 19, 23, 27, 31, 35, 39).

Finally, the Saks Suit faces jurisdictional and venue obstacles that are not present in this suit. The District of New Jersey has personal jurisdiction over SITO and Bambuser and venue is proper. (Bambuser Stay Opp., p. 11-12). However, the Western District of Texas lacks personal jurisdiction over Saks and venue is improper, and that court is currently considering Saks' motion to dismiss based, in part, on these defects. (*Id.*)

## IV.    CONCLUSION

For the foregoing reasons, the Court should deny SITO's motion.

12

Appx156

Dated: February 6, 2024            Respectfully submitted,

                                   KAPLAN BREYER SCHWARZ, LLP


                                   By: */s/ Jeffrey I. Kaplan/*
                                      Jeffrey I. Kaplan
                                   197 State Route 18, Ste 3000
                                   East Brunswick, New Jersey 08816
                                   Telephone: (732) 578-0103
                                   Facsimile: (732) 578-0104
                                   jkaplan@kbsiplaw.com

                                   ZUKERMAN GORE BRANDEIS &
                                   CROSSMAN, LLP
                                   John K. Crossman (*pro hac vice*)
                                   Eleven Times Square
                                   New York, New York 10036
                                   Telephone: (212) 223-6700
                                   Facsimile: (212) 223-6433
                                   jcrossman@zukermangore.com

                                   *Attorneys for Plaintiff Bambuser AB*

13

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| BAMBUSER AB, | Case No. 2:23-cv-21757-SDW-JSA |
| Plaintiff, | Motion Date: February 20, 2024 |
| v. | (Filed Electronically) |
| SITO MOBILE R&D IP, LLC, and SITO MOBILE, LTD., | |
| Defendants. | |

### DECLARATION OF JEFFREY I. KAPLAN IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

I, Jeffrey I. Kaplan, declare as follows:

1. I am a lawyer admitted to practice before the courts of the State of New Jersey and am a partner at Kaplan Breyer Schwarz, LLP, counsel of record for plaintiff Bambuser AB ("Bambuser").

2. I submit this declaration in opposition to defendants SITO Mobile R&D IP, LLC and SITO Mobile, Ltd.'s (collectively, "SITO") Motion to Dismiss.

3. If called upon as a witness, I could and would competently testify as follows.

4. Bambuser is a corporation organized under the laws of Sweden and has its principal place of business in Stockholm, Sweden. Bambuser also maintains an office in New York City located at 401 Broadway, New York, New York 10013.

1

Appx158

5.     Bambuser created, licensed, white-labeled, and supplied SFA Holdings Inc. f/k/a Saks Incorporated ("Saks") with video streaming technology. Saks is a customer of Bambuser.

6.     On June 16, 2023, SITO filed a suit against Saks in the Western District of Texas, Austin Division, alleging infringement of six patents by Saks' use of video streaming technology (the "Saks Suit"). The Saks Suit is captioned: *SITO Mobile R&D IP, LLC & SITO Mobile, LTD. v. SFA Holdings Inc. f/k/a SAKS Incorporated*, No. 1:23-cv-00688-RP (W.D. Tex.). SITO did not name Bambuser as a party to the Saks Suit.

7.     In the Saks Suit, SITO alleges that Saks has infringed U.S. Pat. Nos. 7,191,244 ("the '244 patent"); 8,015,307 ("the '307 patent"); 8,554,940 ("the '940 patent"); 9,349,138 ("the '138 patent"); 10,735,781 ("the '781 patent"); and 10,769,675 ("the '675 patent") (collectively, the "Asserted Patents") by using video streaming technology that SITO alleges infringes on its patents (the "Accused Technology").

8.     On August 22, 2023, after receiving notice of the Saks Suit, Saks requested Bambuser defend and indemnify Saks pursuant to the terms of the agreement governing Saks and Bambuser's relationship. Saks has advised Bambuser that the Complaint in the Saks Suit implicates Bambuser as the only supplier providing the Accused Technology to Saks.

9.     On or around September 8, 2023, based upon the information in the Complaint and the information provided by Saks, Bambuser agreed to defend Saks in relation to the Saks Suit and indemnify Saks for any infringement by Bambuser's video-streaming product.

10.    In addition to the Saks Suit, SITO, on or about October 6, 2023, sent a 76-page unfiled patent infringement complaint to Uniqlo Co., Ltd. ("Uniqlo"), another customer of Bambuser.

Appx159

11.     That unfiled complaint was accompanied by a letter—which did not identify Bambuser as an addressee—threatening that SITO plans to file that complaint in a lawsuit against Uniqlo. That letter and complaint each alleged infringement of the same six patents asserted in the Saks Suit, implicating the same Bambuser technology supplied to Saks and also at issue in the Saks Suit.

12.     SITO threatened to file the additional lawsuit against Uniqlo, and captioned the complaint sent to Uniqlo for filing in the United States District Court for the Southern District of New York.

13.     The accused technology cited in SITO's draft complaint sent to Uniqlo is supplied to Uniqlo by Bambuser, and Uniqlo has also sought defense and indemnity from Bambuser, which agreed to defend and indemnify Uniqlo in relation to the threatened litigation by SITO.

14.     On November 1, 2023, Bambuser filed this declaratory judgment action in the United States District Court for the District of New Jersey concerning the invalidity and non-infringement of the six Asserted Patents in relation to SITO's filed suit against Saks, threatened suit against Uniqlo, and any future infringement claims by SITO against Bambuser's customers.

15.     On or around November 17, 2023, counsel for SITO and Bambuser had a video-meeting to discuss Bambuser's request to SITO that SITO stipulate to stay the Saks Suit based upon the customer-suit exception. These discussions lasted over the course of two meetings.

16.     Although the meeting was arranged to discuss whether the parties could avoid litigating the applicability of the customer-suit exception, during either that meeting or a follow up meeting we had shortly thereafter, counsel for SITO stated that he had performed some preliminary research to identify at least some of Bambuser's customers that use the Bambuser technology at issue in the Saks Suit. SITO's counsel then indicated that all of SITO's claims for infringement against

Appx160

all of Bambuser's customers could be resolved if Bambuser directly licensed the Asserted Patents from SITO.

17. SITO's counsel proposed a seven-figure amount for this license.

18. Based upon SITO's allegations in filed and unfiled pleadings, including their attachments, and upon their conversations with us up to that point, their correspondence, as well as their proposal to give Bambuser a license to use SITO technology in exchange for a seven-figure payment, it was obvious that SITO was accusing Bambuser itself, and Bambuser's technology, of infringing the Asserted Patents, and that it was only the end-customer's use of the Bambuser technology which was the basis for SITO's suit against Saks in Texas, and its imminently threatened suit against Uniqlo in New York. Accordingly, SITO unmistakably made clear that Bambuser's own technology is the technology at issue in SITO's suit against Saks and threatened suit against Uniqlo.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct when based upon personal knowledge, and believed to be true and correct when based upon information and belief.

DATED:  February 6, 2024

__/s/Jeffrey I. Kaplan_____

Jeffrey I. Kaplan

4

Appx161

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

BAMBUSER AB,

               Plaintiff,

     v.

SITO MOBILE R&D IP, LLC, and
SITO MOBILE, LTD.,

               Defendants.

Case No. 2:23-cv-21757-JKS-JSA

Motion Date: February 20, 2024

**DEFENDANTS' REPLY IN SUPPORT OF THEIR
<u>MOTION TO DISMISS PURSUANT TO FED. R. CIV. P. 12(b)(1)</u>**

Appx162

## I.     Introduction.

Plaintiff Bambuser's opposition to SITO's motion to dismiss is a tortured attempt to rewrite Federal Circuit law, create alternative facts, and generally provide an excuse for its wholly unnecessary second-filed case here in New Jersey. *See* D.I. 23. Bambuser ignores the Federal Circuit's directive that Bambuser, as the indemnitor in the first-filed Texas action on the identical patents for which it seeks a declaratory judgment order here, must litigate in that first jurisdiction even if it potentially has standing to bring suit here.

Bambuser goes so far as to claim that this second suit is the most "efficient forum to resolve SITO's existing and future infringement suits against Bambuser's customers." *Id.* at 3. Bambuser continues to rely on some undefined future suit(s) as a way to avoid addressing the *current* suit that was filed first in the Western District of Texas. This fact alone undercuts Bambuser's efficiency arguments because resolving the suit in Texas, where Bambuser is already defending and indemnifying its customer, Saks, will resolve all issues related to Bambuser's infringing conduct. Again, Bambuser came forward in Texas to indemnify Saks. Moreover, as also detailed in SITO's motion to stay, Texas is already quite familiar with the SITO patents and technology, a fact that Bambuser cannot refute.

Accordingly, SITO respectfully requests this Court to dismiss Bambuser's declaratory-judgment action.[1]

---

[1] It is troublesome that Bambuser's counsel has apparently violated FRE 408 and disclosed the contents of the parties' settlement discussions, including the range of SITO's settlement offer. Bambuser was not authorized to disclose this information, nor did it ever contact SITO regarding authorization for such disclosure. *See* D.I. 23 at 5.

1

Appx163

**II.    Argument.**

    **A.    *Microsoft v. DataTern* is clear that a vendor that has accepted its indemnification and defense obligations for a customer must litigate in the jurisdiction of the first-filed customer suit; there is no misinterpretation.**

Bambuser refuses to acknowledge the plain language of *Microsoft* but that is not surprising. The Federal Circuit stated:

> Importantly, even if there were such an obligation—to indemnify a customer already sued by the patentee in Texas—it would not justify what Appellees seek here. *A case has already been filed against these customers in the Eastern District of Texas. Appellees cannot seek a declaration from a New York court on behalf of customers they must indemnify where a suit against these very same customers on all the same issues was already underway in a Texas court.* (citation omitted). *By agreeing to indemnify any one of their customers, Microsoft could defend its customers and efficiently and effectively participate in the Texas action.*

*Microsoft Corp. v. DataTern, Inc.*, 755 F.3d 899, 904 (Fed. Cir. 2014) (emphasis added).

Bambuser dances around this clear holding and tries to fabricate reasons why its case should proceed here in New Jersey. Specifically, Bambuser states:

> "Microsoft had no indemnity obligation with respect to either patent. *Microsoft*, 755 F.3d at 902. With respect to the '402 patent, the Federal Circuit held that *if* Microsoft had an indemnity obligation, Microsoft could bring its declaratory judgment action by joining the Texas case, *but it could not file a separate declaratory judgment action in New York. Id.* at 904. However, and critically, with respect to the '502 patent, the Court held that Microsoft's subsequently filed declaratory judgment action in New York was appropriate."

*See* D.I. 23 at 7 (emphasis in the original). It is apparent that Bambuser does not understand the consequences of its own argument. There are no "ifs" here because Bambuser is on record as having ***accepted*** its indemnity and defense obligations in Texas on behalf of Saks. And, more importantly, unlike *Microsoft*, there are ***no*** differences in the patents asserted in the suits in the Texas and New Jersey actions, *i.e.*, the patents are identical. Therefore, as Bambuser itself admits, the Federal Circuit "held that [if a party] has an indemnity obligation, [the party] could bring its declaratory judgment action by joining the Texas case, *but it could not file a separate*

Appx164

*declaratory judgment action in New York." Id.* There is nothing further to consider and the inquiry should end because Bambuser was precluded from filing a declaratory-judgment action in New Jersey.

To make up for the clear defects in its argument, Bambuser cites *Arris Grp., Inc. v. British Telecomms. PLC*, a case that predates *Microsoft* and where Bambuser deliberately excludes material facts from its analysis. 639 F. 3d 1368 (Fed. Cir. 2011). Bambuser relies on *Arris* in its assertion that SITO's infringement claims, "would permit the declaratory judgment action to be brought in a separate district." *See* D.I. 23 at 9. This statement mischaracterizes the law and also fails to mention that there was ***no*** infringement action against a customer, brought in any district, at the time Arris filed its declaratory-judgment action. Further, Arris' indemnification obligations arose from negotiations between British Telecom and Cable One over the scope of Cable One's infringement and potential licensing. Those negotiations between British Telecom and Cable One led to multiple meetings between Arris and British Telecom, which reasonably led Arris to believe that there was a potential contributory infringement case against it. The facts here diverge from those of *Arris* since (1) an infringement action had already been filed in WDTX against Saks, (2) SITO was completely unaware of Bambuser's existence at the time of the filing or thereafter, and (3) Bambuser already expressly accepted its indemnification obligations on behalf of Saks in WDTX. Accordingly, *Arris* does not address nor contradict the holding in *Microsoft*, which controls here for the reasons mentioned above (and in SITO's opening brief).[2]

---

[2] The only other case Bambuser cites in its motion is *Mantissa Corp. v. Old Second Bancorp., Inc.*, 2018 U.S.  Dist. LEXIS 103365 (N.D. Ill., June 20, 2018). But that case does not even address *Microsoft*, does not have an analogous factual situation to the case here, and was decided in the context of a stay motion. It has no relevance to SITO's motion to dismiss.

Appx165

**B.      Bambuser's efficiency arguments are contrary to logic and reason.**

To support a strained efficiency argument, Bambuser continues to harp on the customer-suit exception. But SITO has already explained that the customer-suit exception does not apply under *Microsoft* when a party is indemnifying a customer in a first-filed suit on the same patents. Bambuser also insists that litigating in this second jurisdiction here will somehow be more efficient than proceeding in Texas where the first-filed action was commenced. But Bambuser provides no compelling reason why this second-filed case would achieve anything different from the case for which it is defending and indemnifying Saks. Bambuser tries to use the specter of some ambiguous future suits against its customers as a reason to proceed in New Jersey instead of Texas, but, unsurprisingly, cites no law to support that proposition. *See* D.I. 23 at 11-12. That is because the first-filed Texas case can resolve all the issues between SITO and Bambuser. Moreover, as SITO detailed in its motion to stay (D.I. 10, 19), the Western District of Texas is already familiar with and has knowledge of the SITO patents and technology through the prior actions SITO has filed in that court. Therefore, any efficiency concerns actually favor Texas.

**III.      Conclusion.**

For the reasons stated above, SITO respectfully reiterates its request that this Court dismiss Bambuser's declaratory-judgment action for lack of subject-matter jurisdiction in light of the Federal Circuit's holding in *Microsoft v. DataTern*.

Appx166

February 13, 2024                          Respectfully submitted,

                                           */s/ Shailendra Maheshwari*
                                           Shailendra Maheshwari (001822004)*
                                           Scott R. Samay (040561996)*
                                           Tedd W. Van Buskirk (041261995)*
                                           DAIGNAULT IYER LLP
                                           8618 Westwood Center Drive, Suite 150
                                           Vienna, VA 22182
                                           smaheshwari@daignaultiyer.com
                                           ssamay@daignaultiyer.com
                                           tvanbuskirk@daignaultiyer.com

                                           *Not admitted in Virginia*

                                           *Attorneys for Plaintiffs*
                                           *SITO Mobile R&D IP, LLC and*
                                           *SITO Mobile Ltd.*

Appx167

**CERTIFICATE OF SERVICE**

I hereby certify that on this 13th day of February, 2024, a true and correct copy of the

foregoing pleading was filed via ECF filing and forwarded by electronic mail to all counsel of

record for Plaintiff.


*/s/ Shailendra Maheshwari*
Shailendra Maheshwari

Appx168

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

BAMBUSER AB,

                Plaintiff,

v.

SITO MOBILE R&D IP, LLC, and
SITO MOBILE, LTD.,

                Defendants.

Case No. 2:23-cv-21757-SDW-JSA

Motion Date: February 20, 2024

(Filed Electronically)

**MOTION TO FILE SUR-REPLY**

    **PLEASE TAKE NOTICE** that, on a date to be set by the Court, the undersigned attorney for Plaintiff Bambuser AB ("Bambuser"), will move the Court for an Order granting permission to file a sur-reply concerning Defendants' motion to dismiss (Dkt. 18) (the "Motion").

    In lieu of a separate brief in support of this motion, Bambuser notes that Defendants have accused Bambuser of violating FRE 408, which Bambuser has not violated, without giving Bambuser the opportunity to respond to that accusation. (Dkt. 24 at p.1 n.1).

    Bambuser requests permission to file the sur-reply attached as Exhibit A here, which is only 2 pages in length, and strictly limited to Defendants newly raised accusation in their Reply concerning FRE 408.

Dated: February 15, 2024        Respectfully submitted,

                        KAPLAN BREYER SCHWARZ, LLP

Appx169

By: */s/ Jeffrey I. Kaplan/*
    Jeffrey I. Kaplan
197 State Route 18, Ste 3000
East Brunswick, New Jersey 08816
Telephone: (732) 578-0103
Facsimile: (732) 578-0104
jkaplan@kbsiplaw.com

ZUKERMAN GORE BRANDEIS &
CROSSMAN, LLP
John K. Crossman (*pro hac vice*)
Eleven Times Square
New York, New York 10036
Telephone: (212) 223-6700
Facsimile: (212) 223-6433
jcrossman@zukermangore.com

*Attorneys for Plaintiff Bambuser AB*

Appx170

**CERTIFICATE OF SERVICE**

I hereby certify that on January 17, 2024 I served a copy of the

foregoing document through the CM/ECF system upon all counsel of record.

By: */s/ Jeffrey I. Kaplan/*
   Jeffrey I. Kaplan
KAPLAN BREYER SCHWARZ, LLP
197 State Route 18, Ste 3000
East Brunswick, New Jersey 08816
Telephone: (732) 578-0103
Facsimile: (732) 578-0104
jkaplan@kbsiplaw.com

*Attorneys for Plaintiff Bambuser AB*

Appx171

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEW JERSEY

BAMBUSER AB,

                Plaintiff,

v.

SITO MOBILE R&D IP, LLC, and
SITO MOBILE, LTD.,

                Defendants.

Case No. 2:23-cv-21757-SDW-JSA

Motion Date: February 20, 2024

(Filed Electronically)

## PLAINTIFF'S SUR-REPLY IN OPPOSITION TO
## DEFENDANTS' MOTION TO DISMISS

Appx172

# TABLE OF CONTENTS

**ARGUMENT** ...........................................................................................................1

# TABLE OF AUTHORITIES

## CASES

*BTG Int'l Inc. v. Bioactive Labs.*,
   No. 15-04885, 2016 WL 3519712 (E.D. Pa. June 28, 2016) .............................1

*United States v. Hauert*,
   40 F.3d 197 (7th Cir. 1994) ...............................................................................2

*Wiener v. Farm Credit Bank of St. Louis*,
   759 F. Supp. 510 (E.D. Ark. 1991),
    *aff'd sub nom.*, *Wiener v. E. Arkansas Planting Co.*,
   975 F.2d 1350 (8th Cir. 1992*)* ..........................................................................2

## OTHER AUTHORITIES

Fed. R. Evidence 408 .............................................................................................1, 2

Appx173

In their reply, SITO accuses Bambuser of violating FRE 408 without citing to any authority or providing Bambuser the opportunity to respond to such accusation. (Dkt. 24 at p.1 n.1). SITO contends that by stating the undisputed fact that SITO attempted to negotiate a global license with Bambuser for all of Bambuser's customers for a seven-figure amount, Bambuser impermissibly disclosed settlement discussions. (*Id.*; Dkt. 23 at pp. 5, 9). However, to the extent these discussions are deemed settlement discussions, Bambuser's use of such discussions does not violate FRE 408 in anyway as Bambuser did not use such discussions to prove or disprove liability (e.g., to prove patent invalidity or refute infringement), but simply to show that SITO had knowledge of and agreed that Bambuser's product was the technology alleged to infringe in SITO's suit against SFA Holdings Inc. f/k/a Saks Incorporated ("Saks") and threatened suit against Uniqlo Co., Ltd. ("Uniqlo").

Rule 408 excludes the use of settlement communications to "prove or disprove the validity or amount of a disputed claim or to impeach by a prior inconsistent statement or a contradiction." FRE 408(a). The rule explicitly allows a court to "admit this evidence for another purpose." FRE 408(b). Such other purposes include showing the knowledge or intent of a party. *See, e.g., BTG Int'l Inc. v. Bioactive Labs.*, No. 15-04885, 2016 WL 3519712 at *8 (E.D. Pa. June 28, 2016) ("Rule 408 does not bar the introduction of settlement discussions if offered

1

Appx174

for 'another purpose,' such as to show a party's knowledge or intent"); *United States v. Hauert*, 40 F.3d 197, 200 (7th Cir. 1994) (holding evidence of settlement admissible where "[t]he purpose of the evidence in question was to show [defendant's] knowledge and intent"); *Wiener v. Farm Credit Bank of St. Louis*, 759 F. Supp. 510, 521 (E.D. Ark. 1991), *aff'd sub nom.*, *Wiener v. E. Arkansas Planting Co.*, 975 F.2d 1350 (8th Cir. 1992) (allowing use of settlement offer where the purpose of such use was to show defendant's knowledge).

Here, Bambuser cited to SITO's attempt to negotiate a license with Bambuser strictly to show that SITO understood and acknowledged the technology accused of infringement was supplied to Saks and Uniqlo by Bambuser – that the "true defendant" in SITO's suit against Saks and threatened suit against Uniqlo is Bambuser. That knowledge shows why SITO attempted to negotiate a license directly with Bambuser. This use is permissible pursuant to FRE 408(b).

Accordingly, Bambuser did not violate FRE 408 and this Court may freely consider the fact that SITO attempted to negotiate a license directly with Bambuser as evidence of SITO's knowledge that Bambuser's product was the technology alleged to have infringed the patents at issue.

Dated: February 15, 2024                    Respectfully submitted,

                                            KAPLAN BREYER SCHWARZ, LLP

2

Appx175

By: */s/ Jeffrey I. Kaplan/*
    Jeffrey I. Kaplan
197 State Route 18, Ste 3000
East Brunswick, New Jersey 08816
Telephone: (732) 578-0103
Facsimile: (732) 578-0104
jkaplan@kbsiplaw.com

ZUKERMAN GORE BRANDEIS &
CROSSMAN, LLP
John K. Crossman (*pro hac vice*)
Eleven Times Square
New York, New York 10036
Telephone: (212) 223-6700
Facsimile: (212) 223-6433
jcrossman@zukermangore.com

*Attorneys for Plaintiff Bambuser AB*

3

Appx176



# Kaplan Breyer Schwarz, LLP
## Intellectual Property Attorneys

Jeffrey I. Kaplan, Esq.
Partner
NJ and NY Bars, Reg. Patent Attorney
Email:  jkaplan@kbsiplaw.com
Phone:  732-578-0103 x231

April 22, 2024

**VIA ECF**

The Honorable Jessica Allen, USDJ
US District Court – District of New Jersey
50 Walnut Street
Newark, NJ 07102

**Re:    Bambuser AB v. Sito Mobile, et al. 23-cv-21757**

Dear Judge Allen:

I, together with Zukerman Gore Brandeis & Crossman, LLP, represent Plaintiff Bambuser AB ("Bambuser") in the above captioned litigation. We write to bring to the Court's attention the enclosed order, issued on April 19, 2024, (the "Order"),  staying the related case of *SITO Mobile R&D IP, LLC and SITO Mobile, LTD. v. SFA Holdings Inc. f/k/a Saks Incorporated*, No. 1:23-cv-00688-RP, filed by SITO Mobile R&D IP, LLC and SITO Mobile, Ltd. (collectively "SITO") against SFA Holdings Inc. f/k/a/ Saks Incorporated ("Saks") in the Western District of Texas (the "Saks Suit"), "pending full and final resolution of the declaratory judgment action pending in the District of New Jersey." (Order, p. 8).   As mentioned in Bambuser's opposition here to SITO's motion to stay in this case ("Opp.," Dkt. 16),  and as the Texas Court has now found, the customer suit exception to the first to file rule provides that this action takes precedence over SITO's suit in Texas against Bambuser's customer, Saks.  (*Id.* at pp. 4-5).  The Texas Court also stayed that case based upon the general stay factors. *Id.*

The Texas Court properly found that, as set forth in Bambuser's Opp. here,  SITO's reliance upon *Microsoft Corp. v. DataTern, Inc.*, 755 F.3d 899 (Fed. Cir. 2014) and its follow-on cases is "inapposite [because those] cases addressed Article III standing [only and] nowhere does *Microsoft* address or allude to the customer-suit exception." (Order, pp. 4-5).  Not only is SITO's contrary argument here based upon *Microsoft* now barred by collateral estopped and *stare decises*, but substantively, review of *Microsoft* shows the Texas Court's ruling is clearly correct on the merits.  Bambuser respectfully requests this Court consider this correspondence and the attached Order in connection with SITO's pending motions here. (Dkt#s 10, 16, 18, 23).

**NEW JERSEY OFFICE:**                                                                              **New York Office:**
317 George Street New Brunswick, New Jersey 08901          600 Third Avenue • 2nd Floor • New York, New York • 10016
Phone: (732) 578-0103 • Fax: (732) 578-0104                         Phone: (646) 571-2300 • Fax: (732) 578-0104

**Please send all correspondence to the NJ office**
**www.kbsiplaw.com**

Appx177

Respectfully Submitted,
Kaplan Breyer Schwarz, LLP


Jeffrey I. Kaplan

NEW JERSEY OFFICE:
317 George Street New Brunswick, New Jersey 08901
Phone: (732) 578-0103 • Fax: (732) 578-0104

New York Office:
600 Third Avenue • 2nd Floor • New York, New York • 10016
Phone: (646) 571-2300 • Fax: (732) 578-0104

**Please send all correspondence to the NJ office**
**www.kbsiplaw.com**

Appx178

Case 2:23Cas2117537-dk-9J6S8-RPDocumeent26-30    Filed 04/29/24    Page 1 of 88 PageID: 171

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION**

| | | |
|---|---|---|
| SITO MOBILE R&D IP, LLC and SITO MOBILE, LTD., | § § | |
| Plaintiff, | § | |
| v. | § § | No. 1:23-CV-688-RP |
| SFA HOLDINGS INC. f/k/a SAKS INCORPORATED, | § § § | |
| Defendant. | § | |

## ORDER

Before the court is Defendant SFA Holding Inc.'s Opposed Motion to Stay Pending Resolution of True Defendant's Declaratory Judgment Action (Dkt. 10) and all related briefing.[1] Having considered the parties' written submissions and determining that a hearing is unnecessary, the undersigned **GRANTS** the motion.

### I.    BACKGROUND

Plaintiffs SITO Mobile R&R IP, LLC and SITO Mobile, Ltd. (together "SITO") are suing Defendant SFA Holdings Inc. ("Saks") for patent infringement. Dkt. 1 at 1.[2] Saks seeks to the stay this proceeding until a pending declaratory judgment action ("Declaratory Suit") filed by non-party Bambuser AB ("Bambuser") in the District of New Jersey is resolved. Dkt. 10 at 5. Bambuser provided the allegedly infringing technology to Saks and has acknowledged a contractual obligation to defend Saks in this case. *Id.* Saks contends the Declaratory Suit "will address the non-infringement and invalidity of the exact same allegedly infringing technology at issue here." *Id.*[3]

---

[1] United States District Judge Robert Pitman referred this Motion to the undersigned for disposition pursuant to 28 U.S.C. § 636(b)(1)(A), Rule 72 of the Federal Rules of Civil Procedure, and Rule 1(c) of Appendix C of the Local Rules of the United States District Court for the Western District of Texas. Text Order, March 14, 2024.

[2] Page numbers correspond to the page number in the CM/ECF-generated header.

[3] Saks also points out that both Plaintiffs' principal places of business are in New Jersey. Dkt. 5 at 5.

1

Appx179

Case 2:23Cas2:17:37-dk-90698-RPDocDmcentE0-30   Filed 04/29/24   PBage 2 of 88 PageID: 172

Saks argues that this case should be stayed pursuant to the customer-suit exception to the first-filed rule or, in the alternative, pursuant to the general principles courts typically consider when determining whether to grant a stay. SITO opposes a stay.

## II.   APPLICABLE LAW

### A.  Customer-suit exception

A trial court has broad discretion to stay an action against a party to promote judicial economy. *Anderson v. Red River Waterway Comm'n*, 231 F.3d 211, 214 (5th Cir. 2000); *see also Landis v. N. Am. Co.*, 299 U.S. 248, 254–55 (1936) ("[T]he power to stay proceedings is incidental to the power inherent in every court to control the disposition of the causes on its docket with economy of time and effort for itself, for counsel, and for litigants."). Where suit is brought against a manufacturer and its customers, the action against the customers should be stayed pending resolution of the case against the manufacturer to promote judicial economy. *See In re Nintendo of Am., Inc.*, 756 F.3d 1363, 1365–66 (Fed. Cir. 2014).

The "customer-suit exception" to the first-filed rule provides that "litigation against or brought by the manufacturer of infringing goods takes precedence over a suit by the patent owner against customers of the manufacturer." *Katz v. Lear Siegler*, 909 F.2d 1459, 1464 (Fed. Cir. 1990). This exception "exists to avoid, if possible, imposing the burdens of trial on the customer, for it is the manufacturer who is generally the 'true defendant' in the dispute." *Nintendo*, 756 F.3d at 1365 (citation omitted). "[C]ourts apply the customer suit exception to stay earlier-filed litigation against a customer while a later-filed case involving the manufacturer proceeds in another forum." *Spread Spectrum Screening v. Eastman Kodak Co.*, 657 F.3d 1349, 1357 (Fed. Cir. 2011). The Federal Circuit has applied the customer-suit exception to cases in which the supplier and customer are named as defendants in the same case. *Nintendo*, 756 F.3d at 1365.

Appx180

To warrant a stay of the customer suit, the case involving the manufacturer "need only have the potential to resolve the 'major issues' concerning the claims against the customer—not every issue." *Spread Spectrum*, 657 F.3d at 1358 (citing *Katz*, 909 F.2d at 1464). Courts use a "flexible approach" to avoid wasteful expenditure of resources, and therefore "stay[] proceedings if the other suit is so closely related that substantial savings of litigation resources can be expected." *In re Google*, 588 F. App'x 988, 991 (Fed. Cir. 2014); *see also Nintendo*, 756 F.3d at 1365–66 (determining that the customer-suit exception is "designed to facilitate just, convenient, efficient, and less expensive determination" (citations omitted)).

In determining whether the customer suit exception applies, courts analyze three factors: "(1) whether the customer-defendant in the earlier-filed case is merely a reseller; (2) whether the customer-defendant agrees to be bound by any decision in the later-filed case that is in favor of the patent owner; and (3) whether the manufacturer is the only source of the infringing product." *Dodots Licensing Sols. v. Samsung Elecs. Co.*, No. 6:22-CV-00535-ADA, 2023 U.S. Dist. LEXIS 125803, at *5 (W.D. Tex. 2023) (quoting *CyWee Grp. v. Huawei Device Co.*, No. 2:17-CV-495-WCB, 2018 U.S. Dist. LEXIS 142173, at *14 (E.D. Tex. Aug. 22, 2018)). The "guiding principles in the customer suit exception cases are efficiency and judicial economy." *Spread Spectrum*, 657 F.3d at 1357 (citation omitted).

### B. Stays generally

The factors courts typically consider when determining whether to grant a stay include: "(1) whether a stay would unduly prejudice or present a clear tactical disadvantage to the non-moving party; (2) whether a stay will simplify the issues and trial of the case; (3) whether discovery is completed; and (4) whether a trial date has been set." *In re Trustees of Bos. Univ. Patent Cases*,

No. CV 13-12327-PBS, 2014 U.S. Dist. LEXIS 206352, 2014 WL 12576638, at *2 (D. Mass. May 16, 2014).

### III. ANALYSIS

### A. Customer-suit exception

Saks contends that a stay is warranted because all of the customer-suit exception factors are met. Dkt. 10 at 12. SITO responds that "[t]he customer-suit exception to the first-to-file doctrine does not apply here because [non-party] Bambuser admits . . . that is has accepted its indemnification and defense obligations for Saks and is stepping in to fulfill those obligations here in Texas." Dkt. 14 at 5 (citing Saks's Motion at 1).[4]

The customer-suit exception applies because: (1) SITO's infringement claims against Saks hinge on Saks's use of Bambuser's technology; (2) Saks agrees to be bound by the outcome of the Declaratory Suit; and (3) Bambuser is the only source of the accused products.

#### 1. Whether Saks is merely a reseller

Saks contends it is merely a reseller of Bambuser's technology. Dkt. 10 at 12. It asserts "Saks is a customer of Bambuser, who created, licensed, white-labeled, and supplied Saks with video streaming technology." *Id.* at 12–13. Saks posits that it "merely uses the Bambuser product in furtherance of its business operations and plays no role in the creation of the accused technology supplied by Bambuser." *Id.* at 13.

SITO, contending that Bambuser is representing Saks in the instant action, argues that "whatever nuance Bambuser is trying to put forward, a reseller is a customer" and "under *Microsoft v. Data Tern* [*sic*], the customer-suit exception to the first-to-file rule does not apply here." Dkt. 14 at 11. But *Microsoft* and the follow-on cases SITO cites are inapposite. Those cases addressed

---

[4] SITO's statement is inaccurate or its citation does not support the statement.

4

Appx182

Article III standing. Indeed, nowhere does *Microsoft* address or allude to the customer-suit exception. *See generally*, *Microsoft Corp. v. DataTern*, 755 F.3d 899, 901 (Fed. Cir. 2014).

The court concludes that Saks is a "mere reseller" of Bambuser's technology because it is an end user of Bambuser's product in furtherance of its own business. SITO does not challenge this notion. Courts in the Fifth Circuit have consistently found that the first customer-suit exception factor weighs in favor of a stay where a customer-defendant is accused of merely using, operating, or promoting an accused product that had been developed and supplied by a third-party. *See, e.g., Topia Tech. v. Dropbox*, No. 6:21-CV-01373-ADA, 2022 U.S. Dist. LEXIS 234470, 2022 WL 18109619, at *4 (W.D. Tex. Dec. 29, 2022) (finding the first factor favored applying the customer-suit exception because the plaintiff only accused the defendants of "using or promoting" the manufacturer's accused products.); *GreatGigz Sols. v. Costco Wholesale*, No. 6-21-CV-00807, 2022 U.S. Dist. LEXIS 63778, at *3 (W.D. Tex. 2022) (finding the first factor favored applying the customer-suit exception because the complaint was "predicated entirely on Defendants' use of the supplier's product"); *Lighthouse Consulting Group v. Truist Bank*, No. 2:19-CV-03340-JRG, 2020 U.S. Dist. LEXIS 219276, 2020 WL 6781977, at *2 (E.D. Tex. Apr. 7, 2020) (finding the first factor favored applying the customer-suit exception because the defendants did not develop or create the accused technology, but merely licensed it from the actual developer and supplier).

*2. Whether Saks agrees to be bound by the outcome of the Declaratory Suit*

"Saks agrees to be bound by the outcome of the declaratory suit . . . ." Dkt. 10 at 13. Such an agreement "weighs heavily in favor of staying the current suit." *Slick Slide v. NKDZ DFW*, No. 4:23-cv-00643-O, 2024 U.S. Dist. LEXIS 28411, at *10 (N.D. Tex. 2024) (quoting *Wapp Tech. v. Hewlett-Packard Enter. Co.*, No. 4:18-CV-00468, 2019 U.S. Dist. LEXIS 137091, 2019 WL 3818761, at *4 (E.D. Tex. Aug. 14, 2019)). This factor favors granting the stay.

5

*3. Whether Bambuser is the only source of the allegedly infringing technology*

Saks argues that the Complaint alleges that "Bambuser is the only manufacturer providing the Accused Technology to [Saks]." Dkt. 10 at 14. Or "[p]ut another way, Saks does not get what it obtains from Bambuser from another vendor too." *Id.* "[A]s things now stand, Bambuser is providing a complete defense to Saks and it is understood that the case is about Bambuser's technology." *Id.* at 14–15. SITO does not address this factor. Thus, the third factor counsels in favor of a stay.

Because all three of the customer-suit exception factors weigh in favor of a stay, the undersigned will grant the Motion.

## B. Traditional stay factors

The court gives great weight to the three factors considered under the customer-suit exception. But, for the sake of completeness, the court considers the traditional stay factors.

*1. Whether SITO is unduly prejudiced by a stay*

Saks argues that "[a] stay will not unduly prejudice SITO because the major issues present in its suit against Saks will be heard in the Declaratory Suit, in which SITO is a party." Dkt. 10 at 18 (citing *Glob. Equity Mgmt. (SA) Pty. Ltd. v. Ericsson*, No. 2:16-cv-00618-RWS-RSP, 2017 U.S. Dist. LEXIS 9971, at *10 (E.D. Tex. 2017). Saks goes on that "[a] stay would also not unduly delay any potential enforcement of SITO's patent rights." *Id.* at 19 (citing *GreatGigz Sols.*, 2022 WL 1037114 at *3). And it cites *VirtualAgility v. Salesforce.com*, 759 F.3d 1307, 1318 (Fed. Cir. 2014), for the principle that "[a] stay will not diminish the monetary damages to which [plaintiff] will be entitled if it succeeds in its infringement suit—it only delays realization of those damages and delays any potential injunctive remedy." Saks concludes that "the venue of the District of New

6

Appx184

Jersey does not disadvantage SITO, as both SITO entities have their principal place of business in New Jersey." *Id.* (citing *In re Google*, 588 F. App'x at 991).

SITO responds by pointing back to *Microsoft*, the Article III case, and urges "just as the customer-suit factors are not applicable or relevant, the traditional stay factors are not relevant and have no applicability to, and provide no support for, Bambuser's motion to stay." Dkt. 14 at 12.[5]

A stay would not prejudice SITO's vindication of its patent rights.

### 2. Whether a stay would simplify the issues in this case

As Saks points out, "[t]he Declaratory Suit seeks a declaration of invalidity and non-infringement of the same six patents asserted in this case." Dkt. 10 at 20. "Thus, if those patents are found to be invalid or not infringed, that will be dispositive of SITO's infringement claims here." *Id.*

SITO did not specifically address this factor, but urged that "the traditional stay factors are not relevant." Dkt. 14 at 12.

The court finds that a stay would also simplify the issues in this case. As the Federal Circuit has held, "resolution of the major issues" in Bambuser's Declaratory Suit will likely "resolve the[] issues as to their customers." *Katz v. Lear Siegler*, 909 F.2d at 1464. Thus, the court finds that this factor weighs in favor of a stay.

### 3. Whether discovery is completed and whether a trial date has been set

The court notes that after briefing was complete on this Motion, a scheduling order was entered in this case. Dkt. 29. Discovery has begun and the trial date has been set. *Id.* However, as discovery has *just* begun and the trial date is more than two years away in October 2026, *id.*, the court finds this factor is neutral.

---

[5] The court notes the Motion is Saks's.

Appx185

### IV. CONCLUSION & ORDER

Under both the customer-suit exception factors and the traditional stay factors, Saks has demonstrated that a stay is appropriate in this case. Indeed, a stay serves efficiency and judicial economy, *see Spread Spectrum*, 657 F.3d at 1357, and "substantial savings of litigation resources can be expected." *In re Google*, 588 F. App'x at 991. Accordingly, Defendant SFA Holding Inc.'s Opposed Motion to Stay Pending Resolution of True Defendant's Declaratory Judgment Action (Dkt. 10) is **GRANTED**.

This case is **STAYED** pending full and final resolution of the declaratory judgment action pending in the District of New Jersey, in an action captioned: *Bambuser AB v. SITO Mobile R&D IP, LLC and SITO Mobile, Ltd.*, C.A. No. 2:23-cv-21757.

SIGNED April 19, 2024.

_____
MARK LANE
UNITED STATES MAGISTRATE JUDGE

Appx186



**Shalu Maheshwari***
202.997.1925
smaheshwari@daignaultiyer.com

8618 Westwood Center Drive
Suite 150, Vienna, VA 22182
*Not admitted in Virginia*

April 23, 2024

**VIA ECF**

The Honorable Jamel K. Semper, USDJ
US District Court – District of New Jersey
50 Walnut Street
Newark, NJ 07102

        Re: **Bambuser AB v. Sito Mobile, et al. - C.A. No. 2:23-cv-21757**

Dear Judge Semper,

        We write in response to Bambuser AB's ("Bambuser") April 22, 2024 letter in the above-captioned matter, where Bambuser provided the Court with a status update for the action pending in Western District of Texas between SITO Mobile R&D IP, LLC and SITO Mobile, Ltd. ("SITO") and Bambuser's indemnitee, Saks Fifth Avenue Holdings, Inc. (D.I. 26). Bambuser's letter purports to inform the Court of the Magistrate's decision granting a stay of the Texas action, but then proceeds to opine on the correctness of the decision. But Bambuser's attorneys fail to inform the Court of SITO's right to raise objections to the Magistrate's opinion within fourteen days of the opinion. Given the significant error(s) of law contained in the Magistrate's ruling, SITO intends to timely raise such objections.

        Further, Bambuser's letter states that the Magistrate correctly ruled that the *Microsoft* decision related to standing and thus was inapplicable to the customer-suit exception for patent cases under which Bambuser (wrongly) believes the cases should proceed. (D.I. 26 at 1). But the entirety of the Magistrate's reasoning of the Federal Circuit's *Microsoft* decision is set forth in a mere two lines in the opinion and contains no analysis whatsoever of the case and its holdings, a precedential Federal Circuit decision. (D.I. 26-1, at 4-5).

        It is clear that the Magistrate ignored, or did not understand, the plain holding of *Microsoft*. SITO has cited the relevant holding in its Motion to Dismiss (D.I. 18) and reiterates it here:

        "Importantly, even if there were such an obligation—to indemnify a customer already sued by the patentee in Texas—it would not justify what Appellees seek here. *A case has already been filed against these customers in the Eastern District*

Appx187

April 23, 2024
Page 2

> *of Texas. Appellees cannot seek a declaration from a New York court on behalf of customers they must indemnify where a suit against these very same customers on all the same issues was already underway in a Texas court. See Futurewei Techs., Inc. v. Acacia Research Corp.*, 737 F.3d 704, 708 (Fed.Cir.2013). *By agreeing to indemnify any one of their customers, Microsoft could defend its customers and efficiently and effectively participate in the Texas action.*"

*Microsoft Corp. v. DataTern, Inc.*, 755 F.3d 899, 904 (Fed. Cir. 2014) (emphasis added).

Therefore, whether *Microsoft* addressed the customer-suit exception is irrelevant. Because Bambuser has admitted that it is indemnifying Saks in Texas, the Federal Circuit dictates that Bambuser is not permitted to bring a declaratory action here in New Jersey for the same claims of relief on the same patents that already exists in Texas. The Texas Magistrate Judge appears to have ignored this holding in reaching his decision and such a clear error of law is properly the subject of objections that SITO will be raise there.

SITO respectfully requests this Court to take the fact that SITO will be filing objections to the Texas Magistrate's order into account when considering the parties' pending motions, as well as the Federal Circuit's clear holding in *Microsoft*.

Very truly yours,

Shalu Maheshwari
Daignault Iyer LLP

cc:    All counsel (via ECF and e-mail)

Appx188

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

Chambers of
**Jessica S. Allen**
United States Magistrate Judge

Martin Luther King, Jr. Federal Bldg.
& U.S. Courthouse
50 Walnut Street
Newark, New Jersey 07102
(973) 645-2580

May 10, 2024

**LETTER ORDER**

TO:    ALL COUNSEL OF RECORD

Re:    **Bambuser AB v. SITO Mobile R&D IP, LLC, et al.**
       **Civil Action No. 23-21757 (JKS) (JSA)**

Dear Counsel:

This matter comes before the Court upon the motion of Defendants SITO Mobile R&D IP, LLC ("SMIP") and SITO Mobile, Ltd. ("SM") (sometimes collectively, "Sito") to stay this case, or alternatively transfer it to the United States District Court for the Western District of Texas, pursuant to 28 U.S.C. § 1404(a). (ECF No. 10). Plaintiff Bambuser AB ("Bambuser") opposes the motion. The Court did not hear oral argument, pursuant to Federal Rule of Civil Procedure 78. Having considered all of the parties' submissions (ECF Nos. 10, 16, 19, 22), and for good cause shown, and for the reasons set forth below, Sito's motion is **DENIED**.

**I.    RELEVANT BACKGROUND**

As alleged in the Complaint, Bambuser is a manufacturer of a "video commerce software." (Compl. ¶ 3, ECF No. 1). Sito "claim[s] to own or control licensing rights to at least six (6) United States patents (the 'Patents in Suit') that Sito claims deal broadly with adaptive bitrate streaming technologies." (*Id.* at ¶ 6). According to Bambuser, Sito specifically "claims to own and/or control" U.S. Patent Nos. 7,191,244; 8,015,307; 8,554,940; 9,349,138; 10,735,781; and 10,769,675. (*Id.* at ¶ 7).

On June 16, 2023, Sito commenced a patent infringement action regarding the Patents in Suit against SFA Holdings, Inc. ("SFA"). (*Id.* at ¶ 8). That action captioned *SITO Mobile R&D IP, LLC v. SFA Holdings, Inc. f/k/a Saks Incorporated*, Civil Action No. 23-688, is presently pending in the United States Court for the Western District of Texas (the "SFA Action"). (*Id.*). There, Sito alleges that SFA "uses [an] HTTP Live Streaming (HLS) protocol to stream video content. HLS is an HTTP-based adaptive bitrate streaming technique that enables high-quality streaming of media content over the Internet from web servers." (SFA Action, ECF No. 1 ¶ 19). According to Sito, SFA has infringed upon the Patents in Suit by "own[ing], control[ling],

Appx189

operat[ing], and us[ing] a system for streaming media . . . that practices and infringes the media streaming method" covered by the patents and inducing customers to use the same. (*See, e.g.*, *id.* ¶¶ 52–53, 59–64).

SFA is one of Bambuser's customers. (Compl. ¶ 9, ECF No. 1; Kaplan Decl. ¶ 5, ECF No. 16-1; Ex. A, Zinna Decl. ¶ 7, ECF No. 16-2). According to Bambuser, Sito sued SFA based on its use of Bambuser's supplied technology. (*Id.*). Bambuser is not a party in the SFA Action. However, SFA has requested Bambuser defend and indemnify SFA, pursuant to the terms of an agreement governing the relationship between SFA and Bambuser. (*Id.*; ECF No. 16 at 3 (citing Kaplan Decl. ¶ 8, ECF No. 16-1); Ex. A, Zinna Decl. ¶ 9, ECF No. 16-2). Bambuser agreed to defend and indemnify SFA for "any infringement by Bambuser's video-streaming product." (ECF No. 16 at 3 (citing Kaplan Decl. ¶ 9, ECF No. 16-1); Ex. A, Zinna Decl. ¶ 10, ECF No. 16-2; *see also* ECF No. 10-1 at 1 (citing Compl. ¶ 9, ECF No. 1)).

On November 1, 2023, Bambuser filed suit against Sito in this Court, requesting a declaratory judgment that Bambuser has not infringed the six Patents in Suit and/or that the six Patents in Suit are invalid. (Compl. at ¶ 1, ECF No. 1). Sito's instant motion to stay ensued, (ECF No. 10), followed by Sito's motion to dismiss Bambuser's complaint for lack of subject matter jurisdiction. (ECF No. 18).[1]

On December 13, 2023, SFA filed a motion to stay the SFA Action pending resolution of this action. (ECF No. 16 at 4–5; SFA Action, ECF No. 10). On April 19, 2024, the Court in the SFA Action granted SFA's motion to stay. (*See* Bambuser 4/22/24 Ltr, ECF No. 26 & Order, ECF No. 26-1)). Applying the customer suit exception to the first-to-file rule, the Court found that SFA is a "mere reseller" of Bambuser's supplied technology—a notion not challenged by Sito. (ECF No. 26-1 at 5). The Court also found that SFA agreed to be bound by the outcome of the instant declaratory judgment suit. (*Id.*). Finally, the Court determined that Bambuser is the only source of the allegedly infringing technology—a factor not addressed by Sito. (*Id.* at 6). Based on these three factors, the Court concluded that a stay was appropriate. (*Id.* at 6). The Court further found that the traditional stay factors weighed in favor of a stay. (*Id.* at 6–7).

Against this backdrop, this Court considers Sito's motion to stay, or in the alternative, transfer.

## II.    MOTION TO STAY, OR ALTERNATIVELY, TRANSFER

Sito asserts that the "first-to-file rule" requires a stay of this action, pending the resolution of the SFA Action, or alternatively, a transfer to the Western District of Texas. (ECF No. 10-1 at 2–7). According to Sito, the first-to-file rule, in the interests of comity, "'favors pursuing only the first-filed action when multiple lawsuits involving the same claims are filed in different jurisdictions.'" (*Id.* at 3 (quoting *Merial Ltd. v. Cipla Ltd.*, 681 F.3d 1283, 1299 (Fed. Cir. 2012))). Sito continues that when there are two overlapping actions, as here, for patent infringement and declaratory judgment, the later-filed action—here, the instant declaratory judgment action—is generally dismissed, stayed, or transferred to the forum of the infringement action. (*Id.*). Relying on the Third Circuit's decision in *EEOC v. University of Pennsylvania*, 850 F.2d 969 (3d Cir.

---

[1] Sito's motion to dismiss is currently pending before the Honorable Jamel K. Semper, U.S.D.J.

2

Appx190

1988), Sito claims that the first-to-file rule requires that the court which first obtained possession of the subject of the dispute must decide it. (*Id.* at 4). Sito continues that "principles of judicial economy, the avoidance of piecemeal litigation, as well as the discretionary jurisdiction conferred by the Declaratory Judgment Act" warrant a stay of this action. (*Id.* at 5). As alternative relief, Sito asserts that, even if the Court declines to stay this action, the first-to-file rule is "alone sufficient to support transfer" under 28 U.S.C. § 1404(a). (*Id.* at 6–7).

In opposition, Bambuser contends that the "customer-suit exception" to the first-to-file rule requires that this action, *i.e.*, the manufacturer's suit, proceed before the SFA Action, *i.e.*, the customer suit. (ECF No. 16 at 1–2, 5–9). Bambuser advances three primary arguments. First, the customer suit exception permits the manufacturer, the "real party in interest" in the patent infringement suit, to "litigate infringement and validity issues in one forum." (*Id.* at 1). According to Bambuser, the customer suit exception applies when the customer-defendant in the earlier-filed action is a "mere reseller," the customer-defendant agrees to be bound by the later-filed action, and the manufacturer is the "only source" of the allegedly infringing product. (*Id.* at 5–9). Bambuser relies on the declarations of SFA's counsel of record in the SFA Action, wherein counsel confirmed that SFA is a customer of Bambuser that "merely uses" Bambuser's product and "agrees to be bound by the outcome of [this action]." (*Id.* at 7–8; Ex. A, Zinna Decl. ¶ 11, ECF No. 16-2; Ex. B, Zinna Decl. ¶¶ 9, 11, ECF No. 16-3). Second, Bambuser asserts that application of the first-to-file rule is discretionary and depends on "convenience" factors, such as the relative proximity of witnesses to New Jersey as compared to Texas and challenges to establishing personal jurisdiction over Bambuser in the Western District of Texas. Bambuser submits that these factors all weigh in favor of litigating its declaratory judgment action in the District of New Jersey. (*Id.* at 10–13). Finally, Bambuser contends that, should the Court consider transferring this action under Section 1404(a), the relevant factors identified by the Third Circuit in *Jumara v. State Farm Insurance Company*, 55 F.3d 873 (3d Cir. 1995), on balance, weigh against transfer. (*Id.* at 13–15).

On reply, Sito argues that, consistent with the Federal Circuit's decision in *Microsoft Corporation v. Data Tern, Inc.*, 755 F.3d 899 (Fed. Cir. 2014), the customer suit exception does not apply where, as here, the manufacturer has agreed to indemnify the customer-defendant in the patent infringement action. (ECF No. 19 at 1–5). According to Sito, in such situations, the manufacturer lacks standing to bring its own suit. (*Id.* at 2–5). And so, Bambuser cannot bring an action related to the Patents in Suit in this Court. (*Id.* at 5–6).

On sur-reply, Bambuser responds that *Microsoft Corporation v. Data Tern, Inc.* is not applicable as that case addresses Article III standing, not the customer suit exception. Bambuser continues that, even considering the Federal Circuit's decision in *Microsoft*, manufacturers, like Bambuser, have standing to bring their own declaratory judgment actions, so long as the disputed infringing conduct is attributable to the manufacturer, not the customer.[2] (ECF No. 22 at 1–5).

---

[2] On January 16, 2024, Sito filed a Rule 12(b)(1) motion to dismiss this action for lack of subject matter jurisdiction, solely on the grounds that Bambuser lacks standing following the Federal Circuit's decision in *Microsoft Corporation v. DataTern, Inc*. (ECF No. 18). That motion is pending before the Honorable Jamel K. Semper. The Undersigned need not (and does not) reach the merits of the parties' dispute over standing to decide Sito's motion to stay. To be clear, the Undersigned makes no findings as to whether Bambuser has standing to bring the instant declaratory judgment suit, which is at the heart of Sito's motion to dismiss before Judge Semper.

3

Appx191

III.    <u>**ANALYSIS**</u>

The first-to-file rule is a "doctrine of federal comity" under which, generally, "a district court may choose to stay, transfer, or dismiss a duplicative later-filed action" in favor of the earlier so-called "first-filed" action. *Merial Ltd. v. Cipla Ltd.*, 681 F.3d 1283, 1299 (Fed. Cir. 2012). The "key objectives" of the rule are "minimization or avoidance of duplication of effort, waste of judicial resources, and risk of inconsistent rulings that would accompany parallel litigation." *Futurewei Techs., Inc. v. Acacia Rsch. Corp.*, 737 F.3d 704, 709 (Fed. Cir. 2013) (internal quotation marks omitted). "[T]he rule is not rigidly or mechanically applied," and courts wield an "ample degree of discretion" to either apply the rule or certain exceptions. *Merial Ltd.*, 681 F.3d at 1299 (citing *Kerotest Mfg. Co. v. C-O Two Fire Equip. Co.*, 342 U.S. 180, 183–84 (1952)); *see, e.g.*, *Micron Tech., Inc. v. Mosaid Techs., Inc.*, 518 F.3d 897, 904 (Fed. Cir. 2008) ("The first-filed suit rule, for instance, will not always yield the most convenient and suitable forum."). Indeed, the Third Circuit, in *EEOC v. University of Pennsylvania*, on which Sito relies, emphasized that the first-to-file rule does not require a "wooden application" and that courts "have always had discretion to retain jurisdiction given appropriate circumstances justifying departure from the first-filed rule." 850 F.2d at 972 (internal citations omitted). As detailed below, the customer suit exception is an appropriate circumstance warranting departure from the rule in this case.

Contrary to Sito's assertions, the "customer suit exception" to the first-to-file rule applies. The exception provides that "[w]hen a patent owner files an infringement suit against a manufacturer's customer and the manufacturer then files an action of noninfringement or patent invalidity, the suit by the manufacturer generally take precedence." *In re Nintendo of Am., Inc.*, 756 F.3d 1363, 1365 (Fed. Cir. 2014). The exception "exists to avoid, if possible, imposing the burdens of trial on the customer, for it is the manufacturer who is generally the 'true defendant' in the dispute." *Id. See Katz v. Lear Siegler, Inc.*, 909 F.2d 1459, 1464 (Fed. Cir. 1990) ("'[I]t is a simple fact of life that a manufacturer must protect its customers, either as a matter of contract, or good business, or in order to avoid the damaging impact of an adverse ruling against its products.'") (citation omitted). As with the first-to-file rule, "the guiding principles in the customer suit exception cases are efficiency and judicial economy." *Tegic Commc'ns Corp. v. Bd. of Regents of Univ. of Texas Sys.*, 458 F.3d 1335, 1343 (Fed. Cir. 2006). "Generally speaking, courts apply the customer suit exception to stay earlier-filed litigation against a customer while a later-filed case involving the manufacturer proceeds in another forum." *Spread Spectrum Screening LLC v. Eastman Kodak Co.*, 657 F.3d 1349, 1357 (Fed. Cir. 2011). "The customer suit exception 'is based on the manufacturer's presumed greater interest in defending its actions against charges of patent infringement; and to guard against possibility of abuse.'" *Id.* (quoting *Kahn. v. Gen. Motors Corp.*, 889 F.2d 1078, 1081 (Fed. Cir. 1989)).

A review of the judicial landscape reveals that neither the Federal Circuit nor the Third Circuit have adopted a uniform set of factors to consider in evaluating the customer suit exception. *See, e.g., Tegic Commc'ns Corp.*, 458 F.3d at 1343; *Spread Spectrum Screening LLC*, 657 F.3d at 1358; *Katz*, 909 F.2d 1464. However, this Court has synthesized these decisions, which have stated that the relevant inquiry turns on whether the manufacturer's suit for declaratory judgment has "the potential to resolve the 'major issues' concerning the claims against the customer—not

4

Appx192

every issue—in order to justify a stay of the customer suits." *Spread Spectrum Screening LLC*, 657 F.3d at 1358 (quoting *Katz*, 909 F.2d at 1464); *Tegic Commc'ns Corp.*, 458 F.3d at 1343 (quoting *Katz*, 909 F.2d at 1463 ("[I]n evaluating the customer suit exception 'the primary question is whether the issues and parties are such that the disposition of one case would be dispositive of the other.'")). Here, it is undisputed that the SFA Action is the first-filed action and this suit is the later-filed manufacturer's declaratory judgment action. (Compl. ¶ 8, ECF No. 1; ECF No. 10-1 at 1; ECF No. 16 at 3). Further, the parties agree both actions involve the same patents and allegedly infringing products. (ECF No. 16 at 1; ECF No. 10-1 at 2; Ex. A, Zinna Decl. ¶ 12, ECF No. 16-2). Bambuser and SFA certify that SFA is Bambuser's customer and Bambuser supplied SFA with all of its video streaming technology at issue in both lawsuits. (Kaplan Decl. ¶¶ 5, 8, ECF No. 16-1; Ex. A, Zinna Decl. ¶¶ 7, 8, 11, ECF No. 16-2). Sito does not argue otherwise in support of its instant motion. (ECF No. 10-1 at 1 (citing Compl. ¶ 9, ECF No. 1); ECF No. 19 at 2). SFA avers that Bambuser is the only manufacturer providing SFA with this technology. (Ex. A, Zinna Decl. ¶ 8, ECF No. 16-2). Accordingly, this Court finds that Bambuser is the true defendant in interest, and this action has the potential to resolve the major issues in the SFA Action, including Bambuser's allegedly infringing technology and the validity of the Patents in Suit.

The Federal Circuit and several courts in this Circuit have analyzed two other factors. First, courts have considered whether the customer-defendant in the infringement action is a "mere reseller" of the manufacturer's product. *See Kahn*, 889 F.2d at 1082 (collecting cases). *See also Early Warning Servs., LLC v. Grecia*, 2021 WL 1264029, at *9 (E.D. Pa. Apr. 6, 2021) (exception applied where customer used computer product "exclusively made and distributed" by manufacturer); *Pragmatus Telecom, LLC v. Advanced Store Co.*, 2012 WL 2803695, at *3 (D. Del. July 10, 2012) (exception applied where customers claimed infringement actions were for "ordinary use" of technology); *Ricoh Co., Ltd. v. Aeroflex Inc.*, 279 F. Supp. 2d 554, 557 (D. Del. 2003) (manufacturer's declaratory judgment action should be given preference over patentee's suit against customers when customers "are being sued for their ordinary use of the manufacturer's products"). Second, courts have considered whether the manufacturer's customer has agreed to be bound by the results of this instant action. *Katz*, 909 F.2d at 1464 (citing *Kahn,* 889 F.2d at 1082 ("considering whether the customer would be bound in declaratory judgment action by manufacturer")).

Turning to the "mere reseller" factor, as previously noted, the parties do not dispute that SFA is Bambuser's customer. Further, Bambuser and SFA have certified that Bambuser supplied SFA with the disputed video streaming technology. (Kaplan Decl. ¶¶ 5, 8, ECF No. 16-1; Ex. A, Zinna Decl. ¶¶ 7, 8, 11, ECF No. 16-2). Sito does not argue to the contrary. (ECF No. 10-1 at 1 (citing Compl. ¶ 9, ECF No. 1); ECF No. 19 at 2). Finally, SFA certifies that the disputed technology is supplied *exclusively* by Bambuser. (Ex. A, Zinna Decl. ¶ 8, ECF No. 16-2). Thus, the Undersigned finds that SFA is a mere reseller of Bambuser's video streaming technology that has no role in the development or manufacture of the technology, and Sito does not contest SFA's reseller status in its motion papers.

As to the secondary consideration, SFA has agreed to be bound by the outcome of this action. (Ex. B, Zinna Decl. ¶ 11, ECF No. 16-3). Finally, as a practical consideration, this Court notes that the Court in the SFA Action granted SFA's motion to stay based on similar factors applicable to the customer suit exception. (ECF No. 26-1 at 4–6). Accordingly, the Undersigned

5

Appx193

finds that, based on all of the relevant considerations, the customer suit exception to the first-to-file rule applies, and thus **DENIES** Sito's motion to stay the instant action.

As to Sito's alternative relief for a transfer to the Western District of Texas, its sole basis in support of a transfer is that the first-to-file rule is "alone sufficient to support transfer" under 28 U.S.C. § 1404(a). (ECF No. 10-1 at 6–7; ECF No. 19 at 6 ("The transfer factors do not need to be considered. . . .")). This conclusory argument alone does not support a transfer especially when the Court has found already that the customer suit exception applies to the first-to-file rule, and thus serves as an independent basis to deny the stay. In any event, Sito's passing reference to Section 1404(a) does not carry its burden "of establishing the need for transfer." *Jumara*, 55 F.3d at 879 (citations omitted). Indeed, Sito's papers are silent on the propriety of transfer under the applicable *Jumara* factors that courts must consider in a Section 1404(a) analysis. *See id.* Accordingly, the Court **DENIES** Sito's request for a transfer on these grounds.

## IV.   CONCLUSION

For the foregoing reasons, Sito's motion to stay, or in the alternative, to transfer, is **DENIED**. The Clerk of the Court is directed to terminate the motion filed as ECF No. 10.


        **SO ORDERED.**

                            */s/ Jessica S. Allen*
                            **HON. JESSICA S. ALLEN**
                            **United States Magistrate Judge**


cc:      **Hon. Jamel K. Semper, U.S.D.J.**

Appx194



# Kaplan Breyer Schwarz, LLP
## Intellectual Property Attorneys

Jeffrey I. Kaplan, Esq.
Partner
NJ and NY Bars, Reg. Patent Attorney
Email: jkaplan@kbsiplaw.com
Phone: 732-578-0103 x231

May 24, 2024

**VIA ECF**

The Honorable Jamel K. Semper, USDJ
US District Court – District of New Jersey
50 Walnut Street
Newark, NJ 07102

Re: **Bambuser AB v. Sito Mobile, et al. 23-cv-21757**

Dear Judge Semper:

I, together with Zukerman Gore Brandeis & Crossman, LLP, represent Plaintiff Bambuser AB ("Bambuser") in the above captioned litigation.  We write to bring to the Court's attention the enclosed order, issued on May 23, 2024, (the "Order"),  in the related case of *SITO Mobile R&D IP, LLC and SITO Mobile, LTD. v. SFA Holdings Inc. f/k/a Saks Incorporated*, No. 1:23-cv-00688-RP, filed by SITO Mobile R&D IP, LLC and SITO Mobile, Ltd. (collectively "SITO") against SFA Holdings Inc. f/k/a/ Saks Incorporated ("Saks") in the Western District of Texas (the "Saks Suit").  In the Order, the Texas district court judge affirmed the magistrate judge's ruling that the Saks Suit shall remain stayed "pending full and final resolution of the declaratory judgment action pending in the District of New Jersey."  (See, Dkt# 26, enclosing Magistrate Judge's ruling.)

Respectfully Submitted,
Kaplan Breyer Schwarz, LLP

Jeffrey I. Kaplan

c: John Crossman

**NEW JERSEY OFFICE:**
317 George Street New Brunswick, New Jersey 08901
Phone: (732) 578-0103 • Fax: (732) 578-0104

**New York Office:**
600 Third Avenue • 2nd Floor • New York, New York • 10016
Phone: (646) 571-2300 • Fax: (732) 578-0104

**Please send all correspondence to the NJ office**
**www.kbsiplaw.com**

Appx195

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| SITO MOBILE R&D IP, LLC and SITO MOBILE, LTD., | § § § § § | |
| Plaintiffs, | § § | |
| v. | § § | 1:23-CV-688-RP |
| SFA HOLDINGS INC. *formerly known as* Saks Incorporated | § § § | |
| Defendant. | § § | |

### ORDER

Before the Court is Plaintiffs SITO Mobile R&D IP, LLC and SITO Mobile, Ltd.("Plaintiffs") appeal of United States Magistrate Judge Mark Lane's Order, (Dkt. 31). (Appeal, Dkt. 30).[1] In his order, Judge Lane granted Defendant SFA Holdings, Inc.'s ("Defendant") Motion to Stay the Case. (Mot., Dkt. 10; Order, Dkt. 30). Plaintiffs filed an objection to Judge Lane's determination that the case should be stayed under the customer-suit exception. (Dkt. 31).

A district judge may reconsider any pretrial matter determined by a magistrate judge where it has been shown that the magistrate judge's order is clearly erroneous or contrary to law. 28 U.S.C. § 636(b)(1)(A). District courts apply a "clearly erroneous" standard when reviewing a magistrate judge's ruling under the referral authority of that statute. *Castillo v. Frank*, 70 F.3d 382, 385 (5th Cir. 1995). The clearly erroneous or contrary to law standard of review is "highly deferential" and requires the court to affirm the decision of the magistrate judge unless, based on the entire evidence, the court reaches "a definite and firm conviction that a mistake has been committed." *Gomez v. Ford Motor Co.*, No. 5:15-CV-866-DAE, 2017 WL 5201797, at *2 (W.D. Tex. Apr. 27, 2017) (quoting

---

[1] Plaintiffs captions their filing as an objection to the magistrate's order. (Dkt. 31). Because the Court is reviewing Judge Lane's order, (Dkt. 30), the Court construes Plaintiffs' objection as an appeal of Judge Lane's order.

1

Appx196

*United States v. United States Gypsum Co.*, 333 U.S. 364, 395 (1948)). The clearly erroneous standard "does not entitle the court to reverse or reconsider the order simply because it would or could decide the matter differently." *Id.* (citing *Guzman v. Hacienda Records & Recording Studio, Inc.*, 808 F.3d 1031, 1036 (5th Cir. 2015)).

Because Plaintiffs timely appealed a portion of Judge Lane's order, the Court reviews that portion of Judge Lane's order for clear error or for conclusions that are contrary to law. Having done so, the Court denies Plaintiffs' appeal. Upon its own review, this Court finds that Judge Lane's order was not clearly erroneous or contrary to law. Plaintiffs also do not identify a clear error in Judge Lane's analysis under the traditional stay factors. (*See* Order, Dkt. 30, at 6–7; Appeal, Dkt. 31). Therefore, this action would remain stayed regardless of the disposition of Judge Lane's customer-suit exception analysis.

Accordingly, the Court **AFFIRMS** the order granting Defendant's motion to stay, (Dkt. 30), and **DENIES** Plaintiffs' appeal. (Dkt. 31).

**SIGNED** on May 23, 2024.

ROBERT PITMAN
UNITED STATES DISTRICT JUDGE

2

Appx197

<u>NOT FOR PUBLICATION</u>

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

---

BAMBUSER AB,

       Plaintiff,

       v.

SITO MOBILE R&D IP, LLC, and SITO
MOBILE, LTD.,

       Defendants.

Civil Action No. 23-21757

**OPINION**

September 3, 2024

---

**SEMPER**, District Judge.

The current matter comes before the Court on SITO Mobile R&D IP, LLC and SITO Mobile, Ltd.'s ("Sito" or "Defendants") Motion to Dismiss Plaintiff Bambuser AB's ("Bambuser" or "Plaintiff") Complaint (ECF 1, "Compl.") pursuant to Rule 12(b)(1). (ECF 18, "MTD.")[1] The Court reviewed all submissions in support and in opposition and decided the motions without oral argument pursuant to Federal Rule of Civil Procedure 78 and Local Civil Rule 78.1. For the reasons stated below, Defendants' Motion to Dismiss is **GRANTED**.

### I.    <u>FACTUAL BACKGROUND AND PROCEDURAL HISTORY</u>[2]

As alleged in the Complaint, Bambuser is a manufacturer of a "video commerce software." (ECF 1, Compl. ¶ 3.) Sito "claim[s] to own or control licensing rights to at least six (6) United States patents (the 'Patents in Suit') that Sito claims deal broadly with adaptive bitrate streaming technologies." (*Id.* ¶ 6.) According to Bambuser, Sito specifically "claims to own and/or control"

---

[1] The Court also considers Plaintiff's sur-reply. (ECF 25.)

[2] The allegations in the Complaint must be accepted as true solely for purposes of this Motion, except where conclusory and/or implausible. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

Appx198

U.S. Patent Nos. 7,191,244; 8,015,307; 8,554,940; 9,349,138; 10,735,781; and 10,769,675. (*Id.* ¶ 7.)

On June 16, 2023, Sito commenced a patent infringement action regarding the Patents in Suit against SFA Holdings, Inc. ("SFA"). (*Id.* ¶ 8.) That action captioned *SITO Mobile R&D IP, LLC v. SFA Holdings, Inc. f/k/a Saks Incorporated*, Civil Action No. 23-688, is pending in the United States Court for the Western District of Texas (the "SFA Action"). (*Id.*) There, Sito alleges that SFA "uses [an] HTTP Live Streaming (HLS) protocol to stream video content. HLS is an HTTP-based adaptive bitrate streaming technique that enables high-quality streaming of media content over the Internet from web servers." (SFA Action, ECF 1 ¶ 19.) According to Sito, SFA has infringed upon the Patents in Suit by "own[ing], control[ling], operat[ing], and us[ing] a system for streaming media . . . that practices and infringes the media streaming method" covered by the patents and inducing customers to use the same. (*See, e.g., id.* ¶¶ 52-53, 59-64.)

SFA is one of Bambuser's customers. (ECF 1, Compl. ¶ 9.) According to Bambuser, Sito sued SFA based on its use of Bambuser's supplied technology. (*Id.*) Bambuser is not a party in the SFA Action. However, SFA has requested Bambuser defend and indemnify SFA, pursuant to the terms of an agreement governing the relationship between SFA and Bambuser. (*Id.*; ECF 16 at 3.) Bambuser agreed to defend and indemnify SFA for "any infringement by Bambuser's video-streaming product." (ECF 16 at 3; *see also* ECF 10-1 at 1 (citing ECF 1, Compl. ¶ 9).)

On November 1, 2023, Bambuser filed suit against Sito in this Court, requesting a declaratory judgment that Bambuser has not infringed the six Patents in Suit and/or that the six Patents in Suit are invalid. (ECF 1, Compl. at ¶ 1.) On December 13, 2023, SFA filed a motion to stay the SFA Action pending resolution of this action. (ECF 16 at 4-5; SFA Action, ECF 10). On April 19, 2024, the Court in the SFA Action granted SFA's motion to stay. (*See* ECF 26, Bambuser

Appx199

4/22/24 Letter; *see also* ECF 26-1, Order.) The SFA Action remains stayed pending full and final resolution of the instant action. (ECF 26-1.)

On January 16, 2024, Sito filed its Motion to Dismiss Bambuser's Complaint for lack of subject matter jurisdiction. (ECF 18, MTD). Bambuser filed an opposition. (ECF 23, "Opp.") Sito filed a reply brief. (ECF 24, "Reply.") Bambuser filed a sur-reply. (ECF 25.)

## II.    <u>LEGAL STANDARD</u>

Federal Rule of Civil Procedure 12(b)(1) allows a court to dismiss a complaint for lack of subject matter jurisdiction because a party lacks standing. *Ballentine v. United States*, 486 F.3d 806, 810 (3d Cir. 2007). Two types of challenges can be made under Rule 12(b)(1): a facial attack or a factual attack. *In re Horizon Healthcare Servs. Inc. Data Breach Litig.*, 846 F.3d 625, 632 (3d Cir. 2017). A facial attack "challenges subject matter jurisdiction without disputing the facts alleged in the complaint, and it requires the court to consider the allegations of the complaint as true." *Davis v. Wells Fargo*, 824 F.3d 333, 346 (3d Cir. 2016) (internal quotation marks and citations omitted). A factual challenge "attacks the factual allegations underlying the complaint's assertion of jurisdiction, either through the filing of an answer or 'otherwise present[ing] competing facts.'" *Id.* (quoting *Const. Party of Penn. v. Aichele*, 757 F.3d 347, 358 (3d Cir. 2014)).

"In reviewing facial challenges to standing, [courts] apply the same standard as on review of a motion to dismiss under Rule 12(b)(6)." *In re Horizon*, 846 F.3d at 633. Courts "only consider the allegations of the complaint and documents referenced therein and attached thereto, in the light most favorable to the plaintiff." *Const. Party of Penn.*, 757 F.3d at 358 (citations omitted). When considering a factual challenge, by contrast, "a court may weigh and consider evidence outside the pleadings." *Id.* (quotation marks and citations omitted).

Appx200

### III.    <u>ANALYSIS</u>

Defendants move to dismiss under Rule 12(b)(1), arguing that this Court lacks subject matter jurisdiction over this suit because Plaintiff lacks Article III standing to bring this suit for declaratory relief in the District of New Jersey. (*See* ECF 18, MTD.) Plaintiff asserts that manufacturers like Bambuser have standing to bring their own declaratory judgment actions so long as the disputed infringing conduct is attributable to the manufacturer and not the customer. (*See* ECF 23, Opp.)

The Declaratory Judgment Act ("DJA") provides that,

> in the case of actual controversy within its jurisdiction . . . any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought.

28 U.S.C. § 2201(a). The Supreme Court has explained that the "actual controversy" requirement of the Act refers to the types of "cases" and "controversies" justiciable under Article III. *See MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 127 (2007) (citation omitted).

In the patent context, the Court of Appeals for the Federal Circuit has articulated the considerations for assessing whether a plaintiff seeking a declaratory judgment has met the case-or-controversy requirement of Article III. *See Mitek Sys., Inc. v. United Servs. Auto. Ass'n*, 34 F. 4th 1334 (Fed. Cir. 2022). This Court applies the law of the Court of Appeals for the Federal Circuit to this issue because an assessment of liability for patent infringement implicates substantive patent law. *See In re Spalding Sports Worldwide, Inc.*, 203 F.3d 800, 803 (Fed. Cir. 2000).

Under *Mitek*, to determine whether a plaintiff might reasonably be liable for infringement, a district court should look to the elements of the potential cause of action, then consider both the patent claims at issue and the alleged facts concerning the plaintiff in light of those elements. 34

4

Appx201

F. 4th at 1343. Although the plaintiff is not obligated to prove, for jurisdictional purposes, that it infringes the patents-in-suit (which is what it ultimately seeks to disprove in its case), "there must be allegations by the patentee or other record evidence that establish at least a reasonable potential that infringement claims against him could be brought." *Id.* (quoting *Microsoft Corp. v. Data Tern, Inc.*, 755 F.3d 899, 905 (Fed. Cir. 2014)). "This requires separate consideration of the separate types of infringement (notably, direct infringement, inducement of infringement, and contributory infringement) of the claims of the patents-in-suit, and of the bearing on any infringement of such claims of the fact stressed by the district court" *Id.*

The DJA also provides that courts "*may* declare the rights and other legal relations of any interested party seeking such declaration." 28 U.S.C. § 2201 (emphasis added). Based on this permissive language in the statute, the Supreme Court has held that its "textual commitment to discretion" vests federal courts with "unique and substantial discretion in deciding whether to declare the rights of litigants." *Wilton v. Seven Falls Co.*, 515 U.S. 277, 286 (1995) (citations omitted).

In *Mitek*, the Federal Circuit separately addressed the standard for discretionary dismissals of declaratory judgment actions. The *Mitek* Court counseled that:

> [A]s long as a district court "acts in accordance with the purposes of the Declaratory Judgment Act and the principles of sound judicial administration, [it] has broad discretion to refuse to entertain a declaratory judgment action." *EMC Corp. v. Norand Corp.*, 89 F.3d 807, 813-14 (Fed. Cir. 1996). But, consistent with the constraints imposed by the noted statutory purposes and judicial-administration principles, we have insisted: "There must be well-founded reasons for declining to entertain a declaratory judgment action." *Capo, Inc. v. Dioptics Medical Products*, 387 F.3d 1352, 1355 (Fed. Cir. 2004); *see also Micron*, 518 F.3d at 903-05; *Genentech, Inc. v. Eli Lilly & Co.*, 998 F.2d 931, 936 (Fed. Cir. 1993). As an example, we explained in *Ford Motor Co. v. United States* that, "[w]hile the existence of another adequate remedy does not necessarily bar a declaratory judgment, district courts may refuse declaratory relief where an alternative remedy is better or more effective." 811 F.3d 1371, 1379-80 (Fed. Cir. 2016) (citations omitted); *see also* 10B Wright & Miller § 2758 & n.6 (4th ed. Apr. 2022 Update).

Appx202

*Mitek*, 34 F. 4th at 1347. In short, the Court construes *Mitek* to require district courts to provide good reason for dismissing a declaratory judgment action.

The instant motion brings a facial challenge to the subject matter jurisdiction based on the Complaint. (MTD at 2.) Both Bambuser and Sito argue that Federal Circuit precedent, *Microsoft Corp. v. DataTern, Inc.*, supports their position. 755 F.3d 899 (Fed. Cir. 2014). The Court follows the Federal Circuit's analysis in *Microsoft* in assessing Sito's jurisdictional challenge.

In *Microsoft*, the Federal Circuit reviewed whether the district court had subject matter jurisdiction *de novo*, holding that the district court did have jurisdiction over challenges to some patents but not others. *Microsoft*, 755 F.3d at 903. The threshold question for declaratory judgment jurisdiction is "whether the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 127 (2007) (citation omitted). The *Microsoft* Court agreed with the district court that the factual allegations in the claim charts that were included in the underlying customer suits strongly supported finding jurisdiction. *Microsoft*, 755 F.3d at 903. The Court specifically cited *Arris*: "where a patent holder accuses customers of direct infringement based on the sale or use of a supplier's equipment, the supplier has standing to commence a declaratory judgment action if . . . there is a controversy between the patentee and the supplier as to the *supplier's liability for induced or contributory infringement based on the alleged acts of direct infringement by its customers.*" *Arris Group Inc. v. British Telecommunications PLC*, 639 F.3d 1368, 1375 (Fed. Cir. 2011) (emphasis added). The *Microsoft* Court determined that declaratory judgment jurisdiction existed for some patents specifically because the underlying infringement claims "carried an implied assertion that [the declaratory judgment plaintiff] was committing contributory

Appx203

infringement, and [the patentee] repeatedly communicated this implicit accusation directly to [the declaratory judgment plaintiff] during the course of a protracted negotiation process." *Microsoft*, 755 F.3d at 903 (quoting *Arris*, 639 F.3d at 1381).

Critically, the *Microsoft* Court specified that plaintiffs do not have a right to bring a declaratory judgment action solely because their customers have been sued for direct infringement. *Microsoft*, 755 F.3d at 904. Here, in the underlying SFA Action, Sito alleges that SFA directly infringed its patents and makes no claims accusing Bambuser of direct infringement. (*See* SFA Action, ECF 1.) Sito makes no mention of Bambuser in its Complaint at all. (*Id.*)

Importantly, Bambuser acknowledges that it agreed to indemnify SFA in the SFA action. (Compl. ¶ 9; Opp. at 2, 4.) However, even an obligation to indemnify "would not justify" what Bambuser seeks here: a case has already been filed against Bambuser's customer in the Western District of Texas. *See Microsoft,* 755 F.3d at 904. In agreeing to indemnify their customer, Bambuser could defend SFA and effectively participate in the SFA Action.

The *Microsoft* Court centered its analysis on the relevant factual allegations in the underlying customer suits in distinguishing which patents afforded declaratory judgment jurisdiction and which did not. *See id.* at 905-06. This Court endeavors to do the same. In *Microsoft*, the patent claims that <u>did</u> establish declaratory judgment jurisdiction alleged Microsoft's involvement: "these claim charts can be read to allege that Microsoft is encouraging the exact use which DataTern asserts amount to direct infringement. This record evidence supports Microsoft's claim that there is a substantial controversy regarding inducement." *Id*. at 905. Here, there are no claims or factual allegations that could be read to allege that Bambuser encouraged the use of Sito patents that would amount to direct infringement. The record does not provide this Court with sufficient evidence establishing substantial controversy regarding inducement. There

Appx204

are also no allegations that would establish controversy between Sito and Bambuser with respect to contributory infringement either. Similarly, the patent claims in *Microsoft* that <u>did not</u> establish declaratory judgment jurisdiction did not impliedly assert that Microsoft induced the alleged infringement: "Nothing in the record suggests that Microsoft encouraged the acts accused of direct infringement, and simply selling a product capable of being used in an infringing manner is not sufficient to create a substantial controversy regarding inducement." *Id.* Further, the Court determined that the same patent claim charts did not impliedly assert contributory infringement against Microsoft:

> [T]hey do not imply or suggest that Microsoft's ADO.NET is not "a staple article or commodity of commerce suitable for substantial non-infringing use." 35 U.S.C. § 271(c) (2012). Indeed, our review of the record does not uncover any evidence that Microsoft's ADO.NET is not suitable for substantial non-infringing uses, or that Microsoft knew that it was "especially made or adapted for use in an infringement" of DataTern's patents. *Id.*

*Id.* at 906.

Bambuser argues that Sito "impliedly and directly accus[ed] Bambuser's product of infringement" and that Sito based its claims of infringement against Bambuser's customers on the use of Bambuser's product.[3] (Opp. at 8-9.) However, as discussed above, Bambuser's Complaint and other submissions do not sufficiently show that there is a substantial controversy of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.[4] *See MedImmune*, 549

---

[3] Bambuser also invokes negotiations with Sito for a global license for Bambuser's customers. To the extent this off-handed remark is relevant, the Court notes that these negotiations do not appear to rise to the level of a "protracted negotiation process" that might have supported jurisdiction. *See Microsoft*, 755 F.3d at 906; *see also Arris*, 639 F.3d at 1381.

[4] Of note, Bambuser invokes Sito's threatened litigation against another Bambuser customer, Uniqlo, in the Southern District of New York. (Opp. at 9, Compl. ¶¶ 8-10.) To the extent that Plaintiff attempts to pursue an economic theory out of concern for its current or potential customers' freedom to operate, this is an economic theory rejected by the Federal Circuit. *Arris*, 639 F.3d at 1374 ("[W]e have not held that economic injury alone is sufficient to confer standing in patent cases seeking a declaratory judgment.") As such, the Complaint does not state a case or controversy on this issue either.

Appx205

U.S. at 127. As such, Sito's Motion to Dismiss for lack of subject matter jurisdiction is **GRANTED** and Bambuser's Complaint is **DISMISSED WITHOUT PREJUDICE**.

### IV.    CONCLUSION

For the reasons stated above, Defendants' Motion to Dismiss (ECF 18) is **GRANTED**. Plaintiff's Complaint is (ECF 1) **DISMISSED WITHOUT PREJUDICE**. Plaintiff may file an amended complaint within sixty (60) days. The Court considered Plaintiff's sur-reply; accordingly, ECF 25 is **GRANTED**. An appropriate order follows.

*/s/ Jamel K. Semper*
**HON. JAMEL K. SEMPER**
**United States District Judge**

Orig:  Clerk
cc:    Jessica S. Allen, U.S.M.J.
       Parties

Appx206

<u>**NOT FOR PUBLICATION**</u>

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

|  |  |
|---|---|
| BAMBUSER AB,<br><br>        Plaintiff,<br><br>        v.<br><br>SITO MOBILE R&D IP, LLC, and SITO MOBILE, LTD.,<br><br>        Defendants. | Civil Action No. 23-21757<br><br>**ORDER**<br><br>September 3, 2024 |

**SEMPER**, District Judge.

This matter having come before the Court on SITO Mobile R&D IP, LLC and SITO Mobile, Ltd.'s ("Sito" or "Defendants") Motion to Dismiss Plaintiff Bambuser AB's ("Bambuser" or "Plaintiff") Complaint (ECF 1, "Compl.") pursuant to Rule 12(b)(1) (ECF 18, "MTD") and Plaintiff's Motion to file a sur-reply (ECF 25), and the Court having considered the submissions of the parties, for the reasons stated in this Court's Opinion dated September 3, 2024,

**IT IS** on this 3rd day of September 2024,

1. **ORDERED** that Defendants' Motion to Dismiss Plaintiff's Complaint (ECF 18) is **GRANTED**.

2. **ORDERED** that the Complaint (ECF 1) is **DISMISSED WITHOUT PREJUDICE**.

3. **ORDERED** that Plaintiff's Motion to file a sur-reply (ECF 25) is **GRANTED**.

                                          */s/ Jamel K. Semper*
                                          **HON. JAMEL K. SEMPER**
                                          **United States District Judge**

Appx207

Orig:   Clerk
cc:     Jessica S. Allen, U.S.M.J.
        Parties

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| BAMBUSER AB,<br><br>      Plaintiff,<br><br>    v.<br><br>SITO MOBILE R&D IP, LLC AND SITO MOBILE, LTD.,<br><br>      Defendant. | C.A. No. 2:23-cv-21757<br><br>**JURY TRIAL DEMANDED** |

**FIRST AMENDED COMPLAINT FOR DECLARATORY JUDGMENT OF
<u>NON-INFRINGEMENT AND INVALIDITY</u>**

1. This is an action arising under the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, and the United States Patent Act, 35 U.S.C. § 1 *et seq*. Plaintiff Bambuser AB ("Bambuser") seeks a declaration that six United States patents allegedly owned and/or controlled by Defendants (collectively, "Sito") are invalid, not infringed, and/or otherwise unenforceable.

## <u>PARTIES</u>

2. Plaintiff Bambuser is a corporation organized under the laws of Sweden and having a principal place of business in Stockholm, Sweden.

3. Bambuser is a state-of-the-art video commerce company that has built the world's leading video commerce software used by companies worldwide.

1

Appx209

4.      Defendant Sito Mobile, Ltd. ("SM") is a company organized and existing under the laws of the state of New York with its principal place of business located at 123 Town Square Place, Suite 419, Jersey City, New Jersey 07310.

5.      Defendant Sito Mobile R&D IP, LLC ("SMIP") is a limited liability company organized and existing under the laws of the state of New York with its principal place of business located at 123 Town Square Place, Suite 419, Jersey City, New Jersey 07310. Upon information and belief, Defendant SMIP is a wholly owned subsidiary of SM.

## SITO'S ALLEGATIONS OF INFRINGEMENT

6.      Defendants SMIP and SM (collectively, "Sito"), claim to own or control licensing rights to at least six (6) United States patents (the "Patents in Suit") that Sito claims deal broadly with adaptive bitrate streaming technologies.

7.      Specifically, Sito claims to own and/or control US Patent Nos. 7,191,244, 8,015,307, 8,554,940, 9,349,138, 10,735,781 and 10,769,675 (the '244 patent, '307 patent, '940 patent, '138 patent, '781 patent, and '675 patent, respectively)(Collectively, the "SITO Patents").

8.      On June 16, 2023, Sito filed a lawsuit alleging patent infringement of the Patents In Suit against SFA Holdings, Inc. That action is presently pending in the United States District Court for the Western District of Texas, and is styled *SITO MOBILE R&D IP, LLC AND SITO MOBILE, LTD v. SFA HOLDINGS, INC.,(f/k/a/*

Appx210

*SFA INCORPORATED)*, 23-cv-00688. ("SFA Complaint").  SFA is an affiliated corporation to Sak's Fifth Avenue, a well-known retailer.

9.    SFA is Bambuser's customer, has been sued for its use of Bambuser supplied technology, and SFA has requested Bambuser defend and indemnify SFA Holdings with respect to said suit.  Bambuser has agreed to provide defense and indemnification to SFA in accordance with the contract between Bambuser and SFA.

10.    The SFA Complaint contains detailed allegations of infringement, including relatively detailed claim charts allegedly mapping technology used on the SFA website, to the claims of the Sito Patents. (Ex. A).

11.    The SITO claim charts implicating the SFA conduct point directly and exclusively to technology supplied by Bambuser to SFA, and allege that SFA' use of Bambuser technology results in SFA' infringing the Sito patents. Thus, the claim charts accuse SFA of direct infringement based solely on SFA's use of Bambuser's technology, without any other technology.

12.    At paragraphs 54-138 of the SFA Complaint, SITO presents six claim charts that purport to establish the implementation of each claim limitation of six of the SITO patent claims, one from each of the six asserted SITO Patents, in the accused website purportedly operated by SFA.

13.    Each of these paragraphs cites only items implemented by the

3

Bambuser supplied software.

14.    For example, ¶55 of the SFA Complaint purports to establish the claim limitation of "identifying at least one program in which at least a portion of the media is available (e.g.; STATUS 200 OK)."  This claim limitation is then followed by a display that purportedly shows it on the accused website, which display is what results from execution of the Bambuser supplied software.

15.    By way of another example, paragraph 57 purports to show that the accused website "generates a reservation…associated with the presentation as demonstrated by the example provided below" and then shows an image of what the Bambuser software does when executed on the accused website.

16.    All of the paragraphs 54-138 cite claim limitations and then rely upon methods allegedly executed by the Bambuser software in order to establish the alleged presence of that claim limitation in the accused website.

17.    On or about October 6, 2023, Sito sent a draft complaint to Uniqlo USA, Inc., ("Uniqlo"), another Bambuser customer, citing the same 6 patents in suit, and threatening to sue Uniqlo for patent infringement. (Ex. B, "Uniqlo Complaint").

18.    The Uniqlo Complaint was drafted for filing in the Southern District of New York, and was sent under cover of a letter from Uniqlo's counsel threatening to have "the Court determine the appropriate remedy for Uniqlo's

Appx212

unauthorized use of Sito's patents" if Uniqlo did not purchase a license from Sito.

19.     The Uniqlo Complaint, contains detailed claim charts that purport to map video streaming technology implemented on the Uniqlo website to the claims of the SITO patents.

20.     The claim charts in the Uniqlo Complaint point directly to technology supplied by Bambuser to Uniqlo. Thus, the claim charts accuse Uniqlo of direct infringement based solely on Uniqlo's use of Bambuser's technology.

21.     The Uniqlo Complaint contains claim charts that, one by one, purport to show the presence of each claim limitation of six patent claims, one from each of the six SITO Patents, implemented in the Uniqlo website.   (Ex. B, ¶¶ 48-107). Each claim limitation is followed by what purports to be a screen shot of the Uniqlo website that indicates implementation of the cited claim limitation, and these screen shots all point to what is generated by the Bambuser supplied software.  (Ex. B, ¶¶ 48-52; 57-64, 69-75, 80-85, 88-97, 102-107.)

22.     For example, the Uniqlo Complaint recites the claim limitation in claim 2 of SITO's '244 Patent, "identif[ying] at least one program in which at least of portion of the media is available," and purports to show that limitation is implemented on the Uniqlo website by citing to images that are generated by the Bambuser supplied software. (Ex. B, ¶ 49).

23.     The Uniqlo Complaint states that another claim limitation of claim 2

5

Appx213

of SITO's '244 Patent, "process[ing] the request (e.g..; GET request) with at least one program rule of the at least one program to generate a presentation (e.g., M3U8 file) identifying the at least the portion of the media" and purports to show the presence of that claim limitation in the Uniqlo website by reproducing a screen shot of what is generated from the Bambuser supplied software.  (Ex. B,  ¶ 50).

24.    Bambuser is, pursuant to the terms of its contract with Uniqlo, defending and indemnifying Uniqlo against SITO's infringement charges.

25.    The features cited in the SFA and Uniqlo Complaints to map the patent claims to the SFA and Uniqlo websites are all features practiced by the Bambuser technology as used by those entities in exactly the manner in which Bambuser intends and instructs those entities to use it, and Bambuser knows its technology will be so used when provided to its customers.

26.    Other than generating the images and features relied upon and shown in the claim charts contained in the Uniqlo and SFA Complaints to allege infringement,  the Bambuser technology does not have any substantial other uses.

27.    Both the Uniqlo Complaint and the SFA Complaint allege infringement by Bambuser's customers based upon the use of Bambuser's product supplied to those customers. Such infringement allegations carry an implied assertion that Bambuser is committing contributory and/or induced infringement.

28.    After filing the SFA  Complaint and transmitting the Uniqlo

6

Appx214

Complaint, SITO requested that Bambuser resolve all SITO's allegations of infringement against SFA, Uniqlo, and all other Bambuser customers by taking a license directly from SITO.

29.    In making this request, SITO never articulated any specific conduct of any of said other Bambuser customers that constituted infringement, other than that they were infringers because they were using the Bambuser provided technology. Thus, as in the SFA and Uniqlo Complaints, SITO relied only upon use of Bambuser technology as provided by Bambuser, without regard to what the Bambuser customer was otherwise doing, as SITO's sole basis to allege infringement.

30.    SITO repeatedly indicated its understanding that it was the Bambuser technology causing the infringement, not what the Bambuser customers were adding to it, because SITO consistently took the position that a payment from Bambuser would resolve all infringement claims for all Bambuser customers using that technology, without regard for, or reference to, any other conduct in which such customers would engage, and without regard to any other technology they might use.

## JURISDICTION AND VENUE

31.    This action arises under the Patent Laws of the United States, 35 U.S.C. § 1 *et seq.*, including, but not limited to, 35 U.S.C. §§ 282, 283, and 285, and the

Appx215

Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202.

32.    The Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1338(a), 2201, and 2202 because, as outlined above, Sito has sued or threatened to sue customers of Bambuser for infringement of the Patents in Suit based upon their use of Bambuser technology, and Bambuser is thus faced with defending against the same patent infringement claims in multiple jurisdictions.

33.    Based upon at least the foregoing, there is an actual and judiciable dispute between Bambuser and Sito concerning infringement, validity and enforceability of the Patents in Suit.

34.    This Court has personal jurisdiction over Sito because Sito has its principle place of business in this District from which it regularly conducts its business.

35.    Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 and/or 1400(b).

## COUNT I – Declaratory Judgment of Invalidity and Non-Infringement of the '244 Patent

36.    Bambuser incorporates herein by reference all preceding paragraphs as if set forth herein in full.

37.    The claims of the '244 patent are invalid under one or more sections of 35 U.S.C. §§102, 103, and/or 112. Such claims are either anticipated or rendered obvious by, at least, the following prior art patents and/or published patent

8

Appx216

publications, either alone or in obvious combination(s): 6,389,467; 6,385,596; 6,760,916; 5,931,901; 6,715,126; 2004/0015703; 2004/0083273.

38.   In addition, one or more claim limitations of the claims in suit are not present, either literally or by equivalents, in the Bambuser supplied products and processes that Bambuser's customers use and which Sito has accused of infringing the Patents in Suit.

39.   As a result of the foregoing, and to avoid further imminent harm to its business and harassment of its customers with meritless infringement claims, Bambuser is entitled to a declaratory judgment that its products and services, supplied to its customers and accused of infringement, do not infringe any valid claim of the '244 patent.

## COUNT II – Declaratory Judgment of Invalidity and Non-Infringement of the '307 Patent

40.   Bambuser incorporates herein by reference all preceding paragraphs as if set forth herein in full.

41.   The claims of the '307 patent are invalid under one or more sections of 35 U.S.C. §§102, 103, and/or 112. Such claims are either anticipated or rendered obvious by the following prior art patents and/or published patent publications, either alone or in obvious combination: 6,389,467; 6,385,596; 6,760,916; 5,931,901; 6,715,126; 2004/0015703; 2004/0083273.

42.   In addition, one or more claim limitations of the claims in suit are not

9

Appx217

present, either literally or by equivalents, in the Bambuser supplied products and processes that Bambuser's customers use and that Sito has accused of infringing the patents in suit.

43.    As a result of the foregoing, and to avoid further imminent harm to its business and harassment of its customers with meritless infringement claims, Bambuser is entitled to a declaratory judgment that its products and services, supplied to its customers and accused of infringement, do not infringe any valid claim of the '307 patent.

## COUNT III – Declaratory Judgment of Invalidity and Non-Infringement of the '940 Patent

44.    Bambuser incorporates herein by reference all preceding paragraphs as if set forth herein in full.

45.    The claims of the '940 patent are invalid under one or more sections of 35 U.S.C. §§102, 103, and/or 112. Such claims are either anticipated or rendered obvious by the following prior art patents and/or published patent publications, either alone or in obvious combination: 6,389,467; 6,385,596; 6,760,916; 5,931,901; 6,715,126; 2004/0015703; 2004/0083273.

46.    In addition, one or more claim limitations of the claims in suit are not present, either literally or by equivalents, in the Bambuser supplied products and processes that Bambuser's customers use and that Sito has accused of infringing the Patents in Suit.

10

Appx218

47.     As a result of the foregoing, and to avoid further imminent harm to its business and harassment of its customers with meritless infringement claims, Bambuser is entitled to a declaratory judgment that its products and services, supplied to its customers and accused of infringement, do not infringe any valid claim of the '940 patent.

## COUNT IV – Declaratory Judgment of Invalidity and Non-Infringement of the '138 Patent

48.     Bambuser incorporates herein by reference all preceding paragraphs as if set forth herein in full.

49.     The claims of the '138 patent are invalid under one or more sections of 35 U.S.C. §§102, 103, and/or 112. Such claims are either anticipated or rendered obvious by the following prior art patents and/or published patent publications, either alone or in obvious combination: 6,389,467; 6,385,596; 6,760,916; 5,931,901; 6,715,126; 2004/0015703; 2004/0083273.

50.     In addition, one or more claim limitations of the claims in suit are not present, either literally or by equivalents, in the Bambuser supplied products and processes that Bambuser's customers use and that Sito has accused of infringing the Patents in Suit.

51.     As a result of the foregoing, and to avoid further imminent harm to its business and harassment of its customers with meritless infringement claims, Bambuser is entitled to a declaratory judgment that its products and services,

11

Appx219

supplied to its customers and accused of infringement, do not infringe any valid claim of the '138 patent.

## COUNT V – Declaratory Judgment of Invalidity and Non-Infringement of the '781 Patent

52.　Bambuser incorporates herein by reference all preceding paragraphs as if set forth herein in full.

53.　The claims of the '781 patent are invalid under one or more sections of 35 U.S.C. §§102, 103, and/or 112. Such claims are either anticipated or rendered obvious by the following prior art patents and/or published patent publications, either alone or in obvious combination: 6,389,467; 6,385,596; 6,760,916; 5,931,901; 6,715,126; 2004/0015703; 2004/0083273.

54.　In addition, one or more claim limitations of the claims in suit are not present, either literally or by equivalents, in the Bambuser supplied products and processes that Bambuser's customers use and that Sito has accused of infringing the Patents in Suit.

55.　As a result of the foregoing, and to avoid further imminent harm to its business and harassment of its customers with meritless infringement claims, Bambuser is entitled to a declaratory judgment that its products and services, supplied to its customers and accused of infringement, do not infringe any valid claim of the '781 patent.

12

Appx220

## COUNT VI – Declaratory Judgment of Invalidity and Non-Infringement of the '675 Patent

56. Bambuser incorporates herein by reference all preceding paragraphs as if set forth herein in full.

57. The claims of the '675 patent are invalid under one or more sections of 35 U.S.C. §§102, 103, and/or 112. Such claims are either anticipated or rendered obvious by the following prior art patents and/or published patent publications, either alone or in obvious combination: 6,389,467; 6,385,596; 6,760,916; 5,931,901; 6,715,126; 2004/0015703; 2004/0083273.

58. In addition, one or more claim limitations of the claims in suit are not present, either literally or by equivalents, in the Bambuser supplied products and processes that Bambuser's customers use and that Sito has accused of infringing the Patents in Suit.

59. As a result of the foregoing, and to avoid further imminent harm to its business and harassment of its customers with meritless infringement claims, Bambuser is entitled to a declaratory judgment that its products and services, supplied to its customers and accused of infringement, do not infringe any valid claim of the '675 patent.

## JURY TRIAL

60. Bambuser herein demands trial by jury on all Counts and defenses triable by a jury.

Appx221

## <u>PRAYER FOR RELIEF</u>

WHEREFORE, Bambuser respectfully requests judgment in its favor and against Sito, as follows:

A.    Declaring that the Bambuser products and services that Sito has accused of infringement, including but not limited to those used by SFA Holdings and Uniqlo USA Inc., do not infringe, induce infringement or contribute to the infringement of, either literally or by equivalents, any valid claim of any of the Patents in Suit;

B.    Declaring all claims of each of the Patents in Suit invalid;

C.    Declaring that this case is exceptional and awarding Bambuser its expenses, costs and attorneys' fees pursuant to 35 U.S.C. §285; and

D.    Granting to Bambuser any other and further relief as the Court deems just, proper, or equitable.

Dated: October 29, 2024

KAPLAN BREYER SCHWARZ, LLP

/s/Jeffrey I. Kaplan
Jeffrey I. Kaplan
317 George Street – Suite 320
New Brunswick, NJ 08901
jkaplan@kbsiplaw.com

14

Appx222

ZUKERMAN GORE BRANDEIS &
CROSSMAN, LLC
John K. Crossman (*pro hac vice*)
Eleven Times Square
New York, New York 10036
212 223 6700
jcrossman@zukermangore.com

*Attorneys for Plaintiff Bambuser AB*

15

Appx223

Case 2:23-cv-21757-JKS-JSA    Document 32-1    Filed 10/29/24    Page 1 of 89 PageID: 216

# EXHIBIT A

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION**

|  |  |
|---|---|
| SITO MOBILE R&D IP, LLC, and SITO MOBILE, LTD., <br><br> Plaintiffs, <br><br> v. <br><br> SFA HOLDINGS INC. f/k/a SAKS INCORPORATED, <br><br> Defendant. | Case No. 1:23-cv-00688 <br><br> Jury Trial Demanded |

**COMPLAINT FOR PATENT INFRINGEMENT**

Plaintiffs SITO Mobile R&D IP, LLC and SITO Mobile, Ltd., by and through their undersigned counsel, file this Complaint against SFA Holdings Inc. f/k/a Saks Incorporated ("Saks") for patent infringement of United States Patent Nos. 7,191,244; 8,015,307; 8,554,940; 9,349,138; 10,735,781; and 10,769,675 (collectively, the "patents-in-suit" and attached as Exhibits 1-6 respectively) and allege as follows:

**NATURE OF THE ACTION**

1.      This is an action for patent infringement arising under the patent laws of the United States, 35 U.S.C. §§ 1 *et seq.*

Appx225

Case 2:23-cv-2157-JK-S-JSO/688 Document 81-1 Filed 06/10/29/24 Page 2 of 38 of 89 PageID: 218

## THE PARTIES

2.      Plaintiff SITO Mobile, Ltd. is a company organized and existing under the laws of the State of Delaware with its principal place of business located at 123 Town Square Place, Suite 419, Jersey City, New Jersey 07310.

3.      Plaintiff SITO Mobile R&D IP, LLC is a limited liability company organized and existing under the laws of the State of Delaware with its principal place of business located at 123 Town Square Place, Suite 419, Jersey City, New Jersey 07310. Plaintiff SITO Mobile R&D IP, LLC is a wholly owned subsidiary of Plaintiff SITO Mobile, Ltd. (collectively "SITO"). SITO Mobile R&D IP, LLC is a patent holding company that does not exist separate from its parent SITO Mobile, Ltd. In that regard, SITO Mobile, Ltd. controls all of SITO Mobile R&D IP, LLC's business operations and SITO Mobile R&D IP, LLC's financials roll-up into SITO Mobile, Ltd.

4.      On information and belief, Saks is a Tennessee corporation with a principal place of business at 225 Liberty St, Fl 31, New York, NY 10281-1089.

5.      On information and belief, Saks maintains a regular and established place of business at 7400 San Pedro Ave., San Antonio, TX 78216.

## JURISDICTION AND VENUE

6.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1338(a) because this action arises under the patent laws of the United States, 35 U.S.C. §§ 1 *et seq.*

7.      This Court has personal jurisdiction over Saks in accordance with due process and/or the Texas Long Arm Statue because, because it has committed and

2

Appx226

continues to commit acts of infringement giving rise to this action in the State of Texas in violation of at least 35 U.S.C. §§ 271(a). In particular, on information and belief, Saks has made, used, offered to sell and/or sold infringing products, services and/or systems in the State of Texas.

8.    This Court has personal jurisdiction over Saks for at least the following reasons: (1) Saks is present in within or has minimum contacts within the State of Texas and the Western District of Texas; (2) Saks has purposefully availed itself of the privileges of conducting business in the State of Texas and in this district; (3) Saks has sought privileges, protections, and benefits from the laws of the State of Texas; and (4) Saks regularly conducts business within the State of Texas and within this district, and Plaintiff's cause of action arises directly from Defendant's business contacts and other activities in the State of Texas and in this district, including deriving substantial revenue from the infringing goods and services in the State of Texas and this judicial district.

9.    On information and belief, Saks owns and operates department stores in this judicial district, including at least at 7400 San Pedro Ave., San Antonio, TX 78216.

10.    On information and belief, Saks solicits Texas-based customers through its infringing video streaming services, including through its performance of demonstrations of infringing products and services in the State of Texas and in this Judicial District including by accessing www.saksfifthavenue.com.

11.    On information and belief, Saks (or those acting on its behalf) makes, uses, sells, imports and/or offers to sell the infringing video streaming services, including through the www.saksfifthavenue.com website in the United States, and this judicial

3

Appx227

district that infringe (literally and/or under the doctrine of equivalents) one or more claims of each of the patents-in-suit.

12.    This Court has personal jurisdiction over Saks because Saks has sufficient minimum contacts with this forum as a result of business conducted within the State of Texas and this judicial district. In particular, this Court has personal jurisdiction over Saks because, inter alia, Saks, on information and belief (directly and/or through its subsidiaries, affiliates, or intermediaries), has substantial, continuous, and systematic business contacts in this judicial district, and derives substantial revenue from infringing goods and services provided to individuals in the State of Texas and this Judicial District.

13.    Saks (directly and/or through its subsidiaries, affiliates, or intermediaries) has purposefully availed itself of the privileges of conducting business within the State of Texas and in this Judicial District, has established sufficient minimum contacts with this Judicial District such that it should reasonably and fairly anticipate being hauled into court in this Judicial District, has purposefully directed activities at residents of this judicial district, and at least a portion of the patent infringement claims alleged in this Complaint arise out of or are related to one or more of the foregoing activities.

14.    On information and belief, Saks is subject to the Court's jurisdiction because it regularly markets, conducts, and solicits business, or otherwise engages in other persistent courses of conduct in the State of Texas, and/or derives substantial revenue from the sale and distribution of goods and services provided to individuals and businesses in the State of Texas including with respect to the

4

accused Saks Video Streaming Service.

15.     On information and belief, the accused Saks Video Streaming Service, that Saks uses, makes, markets, distributes, offers to sell, and sells to consumers throughout the United States, including in the State of Texas, infringe one or more claims of the patents-in-suit.

16.     Venue is proper pursuant to 28 U.S.C. §§ 1391(b), (c), (d), 1400(b) and the Federal Circuit's decision in *In re Monolithic Power Sys.*, 50 F.4th 157 (Fed. Cir. 2022), because in addition to Saks' physical locations in this judicial district, upon information and belief, Saks has numerous known employees based out of this division of this judicial district as listed on LinkedIn,[1] and, upon and information and belief, uses these employees' homes to transact its business including performing secretarial services, and storing literature, documents, and products. Saks has also directly and/or indirectly committed acts of patent infringement in this district.

---

[1] *See e.g.,*
https://www.linkedin.com/search/results/people/?currentCompany=%5B%22157315%22%2C%223961319%22%2C%2293075952%22%2C%2289989306%22%5D&geoUrn=%5B%2290000064%22%5D&heroEntityKey=urn%3Ali%3Aorganization%3A157315&keywords=saks%20fifth%20avenue&origin=FACETED_SEARCH&position=1&searchId=f08ed9a3-724a-4c7f-9683-52e2c05f8a3a&sid=CB5.

Appx229



**SAKS VIDEO STREAMING SERVICE**

17.    Saks is the premier destination for luxury fashion, driven by a mission to

help customers express themselves through relevant and inspiring style.[2]

---

[2] https://www.saksfifthavenue.com/

6

Appx230

18.    Saks users can access its services through any device including phones, tablets, and computers.[3]

19.    Saks streams videos using a network(s) of servers ("Saks Streaming Platform"). Saks uses HTTP Live Streaming (HLS) protocol to stream video content. HLS is an HTTP-based adaptive bitrate streaming technique that enables high-quality streaming of media content over the Internet from web servers. The operation of HLS is described in standards documents.[4]

20.    With HLS, a video may be broken up into thousands of small HTTP-based file segments. Each segment contains a short interval of playback time of the video. The segments are encoded at a variety of different bit rates (speeds). After a video is selected to be streamed, the media player on the subscriber device is provided with a file that informs the player, amongst other things, how to obtain the segments sequentially and how to handle ad breaks (if any). As the video is playing, the subscriber device determines the bit rate that it can handle and requests a segment(s) encoded at that bit rate. The player plays the segments in sequential order and continuously requests segments until the player has received all of the segments that make up the video.

## THE PATENTS-IN-SUIT

## United States Patent No. 7,191,244

---

[3] *Id.*

[4] The MPEG-DASH standard is available at https://www.iso.org/ics/35.040.40/x/. A copy of the HLS standard is attached hereto as Exhibit 7.

Appx231

21.     On March 13, 2007, the USPTO duly and legally issued United States Patent No. 7,191,244 ("the '244 patent") entitled "System and Method for Routing Media" to inventor Charles A. Jennings et al. The '244 patent is attached as Exhibit 1.

22.     The '244 patent is presumed valid under 35 U.S.C. § 282.

23.     SITO Mobile R&D IP, LLC owns all rights, title, and interest in the '244 patent.

24.     SITO Mobile, Ltd. maintains equitable title over the '244 patent as SITO Mobile R&D IP, LLC is a wholly-owned subsidiary of SITO Mobile, Ltd. As part of this ownership, SITO Mobile, Ltd. exercises complete control over SITO Mobile R&D IP, LLC, including control over all of SITO Mobile R&D IP, LLC's business decisions and SITO Mobile R&D IP, LLC's patent enforcement, assignment, and licensing policies.

25.     Because of the structure of this corporate relationship and SITO Mobile, Ltd.'s complete control over SITO Mobile R&D IP, LLC's patent licensing and enforcement policies, SITO Mobile, Ltd. has and has had control over the '244 patent and has enjoyed exclusive rights thereunder.

**United States Patent No. 8,015,307**

26.     On September 06, 2011, the USPTO duly and legally issued United States Patent No. 8,015,307 ("the '307 patent") entitled "System and Method for Streaming Media" to inventor Charles A. Jennings et al. The '307 patent is attached as Exhibit 2.

27.     The '307 patent is presumed valid under 35 U.S.C. § 282.

8

Appx232

28.     SITO Mobile R&D IP, LLC owns all rights, title and interest in the '307 patent.

29.     SITO Mobile, Ltd. maintains equitable title over the '307 patent as SITO Mobile R&D IP, LLC is a wholly-owned subsidiary of SITO Mobile, Ltd. As part of this ownership, SITO Mobile, Ltd. exercises complete control over SITO Mobile R&D IP, LLC, including control over all of SITO Mobile R&D IP, LLC's business decisions and SITO Mobile R&D IP, LLC's patent enforcement, assignment, and licensing policies.

30.     Because of the structure of this corporate relationship and SITO Mobile, Ltd.'s complete control over SITO Mobile R&D IP, LLC's patent licensing and enforcement policies, SITO Mobile, Ltd. has and has had control over the '307 patent and has enjoyed exclusive rights thereunder.

### United States Patent No. 8,554,940

31.     On October 08, 2013, the USPTO duly and legally issued United States Patent No. 8,554,940 ("the '940 patent") entitled "System and Method for Routing Media" to inventor Charles A. Jennings et al. The '940 patent is attached as Exhibit 3.

32.     The '940 patent is presumed valid under 35 U.S.C. § 282.

33.     SITO Mobile R&D IP, LLC owns all rights, title and interest in the '940 patent.

34.     SITO Mobile, Ltd. maintains equitable title over the '940 patent as SITO Mobile R&D IP, LLC is a wholly-owned subsidiary of SITO Mobile, Ltd. As part of this ownership, SITO Mobile, Ltd. exercises complete control over SITO Mobile R&D IP,

Appx233

Case 2:23-cv-21751-JKS-JSA Document 32-1 Filed 06/10/23/24 Page 10 of 89 PageID: 226

LLC, including control over all of SITO Mobile R&D IP, LLC's business decisions and SITO Mobile R&D IP, LLC's patent enforcement, assignment, and licensing policies.

35.    Because of the structure of this corporate relationship and SITO Mobile, Ltd.'s complete control over SITO Mobile R&D IP, LLC's patent licensing and enforcement policies, SITO Mobile, Ltd. has and has had control over the '940 patent and has enjoyed exclusive rights thereunder.

### United States Patent No. 9,349,138

36.    On May 24, 2016, the USPTO duly and legally issued United States Patent No. 9,349,138 ("the '138 patent") entitled "System and Method for Streaming Media" to inventor Charles A. Jennings et al. The '138 patent is attached as Exhibit 4.

37.    The '138 patent is presumed valid under 35 U.S.C. § 282.

38.    SITO Mobile R&D IP, LLC owns all rights, title and interest in the '138 patent.

39.    SITO Mobile, Ltd. maintains equitable title over the '138 patent as SITO Mobile R&D IP, LLC is a wholly-owned subsidiary of SITO Mobile, Ltd. As part of this ownership, SITO Mobile, Ltd. exercises complete control over SITO Mobile R&D IP, LLC, including control over all of SITO Mobile R&D IP, LLC's business decisions and SITO Mobile R&D IP, LLC's patent enforcement, assignment, and licensing policies.

40.    Because of the structure of this corporate relationship and SITO Mobile, Ltd.'s complete control over SITO Mobile R&D IP, LLC's patent licensing and enforcement policies, SITO Mobile, Ltd. has and has had control over the '138 patent and has enjoyed exclusive rights thereunder.

Appx234

<u>**United States Patent No. 10,735,781**</u>

41.     On August 04, 2020, the USPTO duly and legally issued United States Patent No. 10,735,781 ("the '781 patent") entitled "System and Method for Routing Media" to inventor Charles A. Jennings et al. The '781 patent is attached as Exhibit 5.

42.     The '781 patent is presumed valid under 35 U.S.C. § 282.

43.     SITO Mobile R&D IP, LLC owns all rights, title and interest in the '781 patent.

44.     SITO Mobile, Ltd. maintains equitable title over the '781 patent as SITO Mobile R&D IP, LLC is a wholly-owned subsidiary of SITO Mobile, Ltd. As part of this ownership, SITO Mobile, Ltd. exercises complete control over SITO Mobile R&D IP, LLC, including control over all of SITO Mobile R&D IP, LLC's business decisions and SITO Mobile R&D IP, LLC's patent enforcement, assignment, and licensing policies.

45.     Because of the structure of this corporate relationship and SITO Mobile, Ltd.'s complete control over SITO Mobile R&D IP, LLC's patent licensing and enforcement policies, SITO Mobile, Ltd. has and has had control over the '781 patent and has enjoyed exclusive rights thereunder.

<u>**United States Patent No. 10,769,675**</u>

46.     On September 8, 2020, the USPTO duly and legally issued United States Patent No. 10,769,675 ("the '675 patent") entitled "System and Method for Routing Media" to inventor Charles A. Jennings et al. The '675 patent is attached as Exhibit 6.

47.     The '675 patent is presumed valid under 35 U.S.C. § 282.

11

Appx235

48.     SITO Mobile R&D IP, LLC owns all rights, title and interest in the '675 patent.

49.     SITO Mobile, Ltd. maintains equitable title over the '675 patent as SITO Mobile R&D IP, LLC is a wholly-owned subsidiary of SITO Mobile, Ltd. As part of this ownership, SITO Mobile, Ltd. exercises complete control over SITO Mobile R&D IP, LLC, including control over all of SITO Mobile R&D IP, LLC's business decisions and SITO Mobile R&D IP, LLC's patent enforcement, assignment, and licensing policies.

50.     Because of the structure of this corporate relationship and SITO Mobile, Ltd.'s complete control over SITO Mobile R&D IP, LLC's patent licensing and enforcement policies, SITO Mobile, Ltd. has and has had control over the '675 patent and has enjoyed exclusive rights thereunder.

**CLAIMS FOR RELIEF**

**Count I – Infringement of United States Patent No. 7,191,244**

51.     SITO alleges, and incorporates by reference, as if fully set forth here, the preceding paragraphs of this Complaint.

52.     Saks directly infringes (literally and/or under the doctrine of equivalents) the '244 patent by using the method covered by at least claim 2 of the '244 patent.

53.     On information and belief, and without SITO's approval, authorization and license, Saks owns, controls, operates, and uses a system for streaming media that includes the Saks Streaming Platform, as well as other Saks networks, systems, devices, components and/or services for streaming media, that practices and infringes the media streaming method recited in at least claim 2 of the '244 patent.

12

Appx236

54.     Saks performs a method of streaming video content based on a request

(e.g., GET request) as demonstrated by the example provided below:



*See e.g.,* [*https://www.saksfifthavenue.com/c/live-stream/video*](https://www.saksfifthavenue.com/c/live-stream/video)



Appx237



*See e.g.,* [https://www.saksfifthavenue.com/c/live-stream/video](https://www.saksfifthavenue.com/c/live-stream/video)

55.    Saks identifies at least one program in which at least a portion of the

media is available (e.g., STATUS 200 OK).



14



*See e.g.,* *https://www.saksfifthavenue.com/c/live-stream/video*

56.     Saks processes the request (e.g., GET request) with at least one program

rule of the at least one program to generate a presentation (e.g., M3U8 file) identifying

the at least the portion of the media.

15



16



See e.g., *https://www.saksfifthavenue.com/c/live-stream/video*

57.     Saks generates a reservation (e.g., connection, session) associated with the

presentation as demonstrated by the example provided below:



17

Appx241



See e.g., https://www.saksfifthavenue.com/c/live-stream/video



18



See e.g., https://www.saksfifthavenue.com/c/live-stream/video

58. Saks identifies at least one resource (e.g., CDN) to stream the presentation

for reception by the viewer (e.g., client device) based on the reservation.

19

Appx243



Appx244



*See e.g.,* *https://www.saksfifthavenue.com/c/live-stream/video*



21



*See e.g.,* *https://www.saksfifthavenue.com/c/live-stream/video*

59.     On information and belief, Saks has been on notice of the '244 patent at least as early as January 26, 2023, when Saks' in-house counsel responded to SITO's counsel's January 9, 2023 letter concerning Saks' infringement of the patents-in-suit.

60.      On information and belief, at least since January 26, 2023, Saks knowingly encouraged and continues to encourage, it customers to directly infringe one or more claims of the '244 patent, including by Saks' actions that include, without limitation, instructing and encouraging its customers to use the Saks Video Streaming Services through the publishing, distribution, and propagation of targeted user emails, shopping offers, support documents, blog posts, live events, and instructions, including but not limited to the examples of such materials cited above.

22

Appx246

61.     On information and belief, at least since acquiring its January 2023 knowledge of the '244 patent, Saks knows the acts Saks induced its customers to take constitute patent infringement and Saks' encouraging acts result in direct infringement of one or more claims of the '244 patent by its customers.

62.     On information and belief, Saks' customers directly infringe at least claim 2 of the '244 patent through their use of the Saks Streaming Video Service.

*63.*     On information and belief, Saks is in violation of 35 U.S.C. § 271(b) and has been, at least since its January 2023 knowledge of the '244 patent, indirectly infringing and continues to indirectly infringe at least claim 2 of the '244 patent by knowingly and specifically intending to induce infringement by others (including, without limitation, Saks' users) and possessing specific intent to encourage infringement by Saks' users. The Saks Video Streaming Service is specifically configured to function in accordance with the '244 patent claims.

64.     SITO has been damaged by the direct and indirect infringement of Saks, and is suffering and will continue to suffer irreparable harm and damages as a result of this infringement.

### Count II– Infringement of United States Patent No. 8,015,307

65.     SITO alleges, and incorporates by reference, as if fully set forth here, the preceding paragraphs of this Complaint.

66.     Saks directly infringes (literally and/or under the doctrine of equivalents) the '307 patent by using the method covered by at least claim 30 of the '307 patent.

23

Appx247

67.     On information and belief, and without SITO's approval, authorization and license, Saks owns, controls, operates and uses a system for streaming media that includes the Saks Streaming Platform, as well as other Saks networks, systems, devices, components and/or services for streaming media, that practices and infringes the media streaming method recited in at least claim 30 of the '307 patent.

68.     Saks performs a method of streaming video as demonstrated by the example provided below:



*See e.g., https://www.saksfifthavenue.com/c/live-stream/video*

69.     Saks processes a request (e.g., GET request) for media at a management system (e.g., contained within Saks streaming service server(s)) and builds in response thereto a reservation (e.g., session or connection) comprising a reservation identification (e.g., the reservation identification is appended with the universal resource locator) and

24

Appx248

a presentation identification (e.g., M3U8 file), the presentation identification identifying

a presentation (e.g., M3U8 file) comprising at least one network distribution rule (e.g.,

bandwidth) and a media play list (e.g., segment list for the media) comprising a

plurality of media names.



Appx249



See e.g., https://www.saksfifthavenue.com/c/live-stream/video



26



*See e.g.,* [https://www.saksfifthavenue.com/c/live-stream/video](https://www.saksfifthavenue.com/c/live-stream/video)

Appx251

70.    Saks reserves a resource (e.g., Media server) to stream media for the reservation (e.g., connection, session) at the management system (e.g., contained within Saks streaming service server).



Appx252



*See e.g.,* *https://www.saksfifthavenue.com/c/live-stream/video*

71.     Saks transmits the presentation (e.g., M3U8 file) and reservation data comprising a valid reservation identification (e.g., the reservation identification is appended with the universal resource locator) from the management system (e.g., Saks streaming service server(s)) to a routing processor (e.g., Saks streaming server(s)) and transmits the reservation formatted for reception by the viewer.

29

Appx253



30

Appx254



*See e.g.,* [*https://www.saksfifthavenue.com/c/live-stream/video*](https://www.saksfifthavenue.com/c/live-stream/video)

72.     Saks selects a media switch (e.g., CDN) at the routing processor based on the at least one network distribution rule, the at least one network distribution rule comprising at least one member of a group comprising a capacity rule, a load rule, a bandwidth rule, a resource rule, and a session rule.

31

Appx255



32



*See e.g.,* *https://www.saksfifthavenue.com/c/live-stream/video*

73.    Saks determines, at the routing processor, if the media switch (e.g., CDN) is configured to stream the media identified by the media playlist (e.g., segment list contained within the M3U8 file).

33

Appx257



34



*See e.g., https://www.saksfifthavenue.com/c/live-stream/video*



35

Appx259



*See e.g.,* [https://www.saksfifthavenue.com/c/live-stream/video](https://www.saksfifthavenue.com/c/live-stream/video)

74.    Saks transmits the reservation data from the routing processor to the

media switch (e.g., CDN) if the media switch is configured, at least initially, to stream

the media for the media play list.

36

Appx260



37

Appx261



See e.g., *https://www.saksfifthavenue.com/c/live-stream/video*

75.     Saks validates the reservation identification with the reservation data at the media switch and for each media name on the media play list, streaming at least partially the media identified by the media name if the reservation identification is valid.

38

Appx262



39



*See e.g.,* [*https://www.saksfifthavenue.com/c/live-stream/video*](https://www.saksfifthavenue.com/c/live-stream/video)



Appx264



*See e.g.,* *https://www.saksfifthavenue.com/c/live-stream/video*

76.    On information and belief, Saks has been on notice of the '307 patent at least as early as January 26, 2023, when Saks' in-house counsel responded to SITO's counsel's January 9, 2023 letter concerning Saks' infringement of the patents-in-suit.

77.    On information and belief, at least since January 26, 2023, Saks knowingly encouraged and continues to encourage, it customers to directly infringe one or more claims of the '307 patent, including by Saks' actions that include, without limitation, instructing and encouraging its customers to use the Saks Video Streaming Services through the publishing, distribution, and propagation of targeted user emails, shopping offers, support documents, blog posts, live events, and instructions, including but not limited to the examples of such materials cited above.

41

Appx265

78.  On information and belief, at least since acquiring its January 2023 knowledge of the '307 patent, Saks knows the acts Saks induced its customers to take constitute patent infringement and Saks' encouraging acts result in direct infringement of one or more claims of the '307 patent by its customers.

79.  On information and belief, Saks' customers directly infringe at least claim 30 of the '307 patent through their use of the Saks Video Streaming Service.

80.  On information and belief, Saks is in violation of 35 U.S.C. § 271(b) and has been, at least since its January 2023 knowledge of the '307 patent, indirectly infringing and continues to indirectly infringe at least claim 30 of the '307 patent by knowingly and specifically intending to induce infringement by others (including, without limitation, Saks' users) and possessing specific intent to encourage infringement by Saks' users. The Saks Video Streaming Service is specifically configured to function in accordance with the '307 patent claims.

81.  SITO has been damaged by the direct and indirect infringement of Saks, and is suffering and will continue to suffer irreparable harm and damages as a result of this infringement.

**Count III– Infringement of United States Patent No. 8,554,940**

82.  SITO alleges, and incorporates by reference, as if fully set forth here, the preceding paragraphs of this Complaint.

83.  Saks directly infringes (literally and/or under the doctrine of equivalents) the '940 patent by using the method covered by at least claim 1 of the '940 patent.

42

Appx266

84.　On information and belief, and without SITO's approval, authorization and license, Saks owns, controls, operates and uses a system for streaming media that includes the Saks Streaming Platform, as well as other Saks networks, systems, devices, components and/or services for streaming media, that practices and infringes the media streaming method recited in at least claim 1 of the '940 patent.

85.　Saks performs a method of streaming video as demonstrated by the example provided below:



*See e.g.,* *https://www.saksfifthavenue.com/c/live-stream/video*

86.　Saks processes a request (e.g., GET request) at a reservation system (e.g., Saks Streaming Service server(s)) to identify at least one program (e.g., requested media or video) comprising at least one program routing rule (e.g., geographic restrictions) and a list of media from which at least a portion of the media is identified.

43



*See e.g.,* [https://www.saksfifthavenue.com/c/live-stream/video](https://www.saksfifthavenue.com/c/live-stream/video)

87. Saks processes the request (e.g., GET request) with the at least one

program routing rule and the list of media of the program to generate a presentation

44

(e.g., M3U8 file) identifying the at least the portion of the media, the presentation being

in a format receivable by the viewer.



Appx269



*See e.g., https://www.saksfifthavenue.com/c/live-stream/video*

88.    Saks generates and transmits a reservation (e.g., session or connection)

associated with the presentation (e.g., M3U8 file) from the reservation system.



46



See e.g., https://www.saksfifthavenue.com/c/live-stream/video



Appx271



See e.g., *https://www.saksfifthavenue.com/c/live-stream/video*

89.    On information and belief, Saks receives the reservation (e.g., session,

connection) at a routing processor (e.g., Saks streaming server(s)) and, at the routing

processor (e.g., Saks streaming server(s)) determines a priority for a plurality of media

48

switches (e.g., edge servers of the CDN) available to stream the at least the portion of the media (e.g., media segments contained within the M3U8 file) identified in the presentation (e.g., M3U8 file) based on the at least one program routing rule.

90.   On information and belief, Saks receives the reservation (e.g., session, connection) at a routing processor (e.g., Saks streaming server(s)) and, at the routing processor (e.g., Saks streaming server(s)) selects at least one of the plurality of media switches (e.g., edge servers of the CDN) to stream the at least the portion of the media (e.g., media segments contained within the M3U8 file) identified in the presentation (e.g., M3U8 file) based on the priority.

91.   On information and belief, Saks receives the reservation (e.g., session, connection) at a routing processor (e.g., Saks streaming server(s)) and, at the routing processor (e.g., Saks streaming server(s)) generates an address (e.g., URL) of the selected at least one of the plurality of media switches (e.g., e.g., edge servers of the CDN) in a format receivable by the viewer.

49

Appx273



50



*See e.g., https://www.saksfifthavenue.com/c/live-stream/video*



Appx275



*See e.g.,* *https://www.saksfifthavenue.com/c/live-stream/video*

92.     On information and belief, Saks has been on notice of the '940 patent at least as early as January 26, 2023, when Saks' in-house counsel responded to SITO's counsel's January 9, 2023 letter concerning Saks' infringement of the patents-in-suit.

93.     On information and belief, at least since January 26, 2023, Saks knowingly encouraged and continues to encourage, it customers to directly infringe one or more claims of the '940 patent, including by Saks' actions that include, without limitation, instructing and encouraging its customers to use the Saks Video Streaming Services through the publishing, distribution, and propagation of targeted user emails, shopping offers, support documents, blog posts, live events, and instructions, including but not limited to the examples of such materials cited above.

52

Appx276

94.     On information and belief, at least since acquiring its January 2023 knowledge of the '940 patent, Saks knows the acts Saks induced its customers to take constitute patent infringement and Saks' encouraging acts result in direct infringement of one or more claims of the '940 patent by its customers.

95.     On information and belief, Saks' customers directly infringe at least claim 1 of the '940 patent through their use of the Saks Video Streaming Service.

96.     On information and belief, Saks is in violation of 35 U.S.C. § 271(b) and has been, at least since its January 2023 knowledge of the '940 patent, indirectly infringing and continues to indirectly infringe at least claim 1 of the '940 patent by knowingly and specifically intending to induce infringement by others (including, without limitation, Saks' users) and possessing specific intent to encourage infringement by Saks' users. The Saks Video Streaming Service is specifically configured to function in accordance with the '940 patent claims.

97.     SITO has been damaged by the direct and indirect infringement of Saks, and is suffering and will continue to suffer irreparable harm and damages as a result of this infringement.

### Count IV – Infringement of United States Patent No. 9,349,138

98.     SITO alleges, and incorporates by reference, as if fully set forth here, the preceding paragraphs of this Complaint.

99.     Saks directly infringes (literally and/or under the doctrine of equivalents) claim 11 of the '138 patent.

53

Appx277

100.    On information and belief, and without SITO's approval, authorization and license, Saks owns, controls, operates and uses a system for streaming media that includes the Saks Streaming Platform, as well as other Saks networks, systems, devices, components and/or services for streaming media, that practices and infringes claim 11 of the '138 patent.

101.    Saks performs a method for managing streaming of video content to a client device (*e.g.*, personal computer, mobile device, and/or television) as demonstrated by the example provided below:



*See e.g.*, *https://www.saksfifthavenue.com/c/live-stream/video*

102.    On information and belief, Saks causes a media switch (e.g., Content delivery network, CDN) to generate a media switch state model, the media switch state model comprises at least one state change for at least one state (e.g., streaming paused,

54

Appx278

resumed, or skipped to the next segment) occurring for a session of streaming the media to at least one of a plurality of viewers (e.g., client devices), the at least one state change comprising at least one member selected from a group consisting of a session initiation state, a viewing event state, and a session termination state, each comprising a reservation identification (e.g., the reservation identification is appended with the universal resource locator) for the reservation.

103.    On information and belief, Saks generates a routing processor state model of a routing processor (e.g., contained within the Saks streaming server), the routing processor state model comprising an identification of the media switch (e.g., CDN) selected to stream the media and the reservation identification (e.g., the reservation identification is appended with the universal resource locator) to the at least one of a plurality of viewers, wherein the media switch is selected based on at least one network distribution rule (e.g., bandwidth supported by the client device).

Appx279



56

Appx280



*See e.g.,* *https://www.saksfifthavenue.com/c/live-stream/video*

104.    On information and belief, Saks receives, by at least one processor, a routing processor identification (e.g., contained within the Saks streaming server) and a reservation identification for the reservation (e.g., the reservation identification is appended with the universal resource locator), the routing processor identification identifying a routing processor to select a media switch to stream the media to at least one of a plurality of viewers, the routing processor selecting the media switch based on the at least one network distribution rule.

Appx281



Appx282



*See e.g.,* *https://www.saksfifthavenue.com/c/live-stream/video*



59



*See e.g., https://www.saksfifthavenue.com/c/live-stream/video*

105.    On information and belief, Saks receives, by the at least one processor, a media switch identification and the reservation identification for the reservation, the media switch identification identifying the media switch selected to stream the media.

106.    On information and belief, Saks receives, by the at least one processor, a state change identification and the reservation identification for the reservation, the state change identification identifying the at least one state change for the at least one state occurring for the session of streaming the media to the at least one of a plurality of viewers, wherein the session initiation state and the session termination state each comprise a reservation identification for the reservation.

107.    On information and belief, Saks has been on notice of the '138 patent at least as early as January 26, 2023, when Saks' in-house counsel responded to SITO's counsel's January 9, 2023 letter concerning Saks' infringement of the

60

patents-in-suit.

108.    On information and belief, at least since January 26, 2023, Saks knowingly encouraged and continues to encourage, it customers to directly infringe one or more claims of the '138 patent, including by Saks' actions that include, without limitation, instructing and encouraging its customers to use the Saks Video Streaming Services through the publishing, distribution, and propagation of targeted user emails, shopping offers, support documents, blog posts, live events, and instructions, including but not limited to the examples of such materials cited above.

109.    On information and belief, at least since acquiring its January 2023 knowledge of the '138 patent, Saks knows the acts Saks induced its customers to take constitute patent infringement and Saks' encouraging acts result in direct infringement of one or more claims of the '138 patent by its customers.

110.    On information and belief, Saks' customers directly infringe at least claim 11 of the '138 patent through their use of the Saks Video Streaming Service.

111.    On information and belief, Saks is in violation of 35 U.S.C. § 271(b) and has been, at least since its January 2023 knowledge of the '138 patent, indirectly infringing and continues to indirectly infringe at least claim 11 of the '138 patent by knowingly and specifically intending to induce infringement by others (including, without limitation, Saks' users) and possessing specific intent to encourage infringement by Saks' users. The Saks Video Streaming Service is specifically configured to function in accordance with the '138 patent claims.

61

Appx285

112.    SITO has been damaged by the direct and indirect infringement of Saks, and is suffering and will continue to suffer irreparable harm and damages as a result of this infringement.

### Count V – Infringement of United States Patent No. 10,735,781

113.    SITO alleges, and incorporates by reference, as if fully set forth here, the preceding paragraphs of this Complaint.

114.    Saks directly infringes (literally and/or under the doctrine of equivalents) the '781 patent by using the method covered by at least claim 1 of the '781 patent.

115.    On information and belief, and without SITO's approval, authorization and license, Saks owns, controls, operates, and uses a system for streaming media that includes the Saks Streaming Platform, as well as other Saks networks, systems, devices, components, and/or services for streaming media, that practices and infringes the media streaming method recited in at least claim 1 of the '781 patent.

116.    Saks performs a method of streaming video content to a client device (*e.g.*, a client device such as a personal computer, mobile device, and/or television) as demonstrated by the example provided below:

62

Appx286



See e.g., *https://www.saksfifthavenue.com/c/live-stream/video*

117.    On information and belief, Saks provides the video content to a content distribution network for storage in a plurality of geographically separated resources of the content distribution network.

118.    Saks selects one or more advertisement media clips based on statistical information associated with a user of the client device.

63

Appx287

**From Automatic Site or App Data Collection Technologies:** We, or third parties working on our behalf, may use cookies, web beacons, javascript and pixel tags, log files, or other technologies to collect certain non-personally identifying information about visitors to our Site or App, users of our online Services, and interactions with our emails and online advertisements, and to allow Saks to keep track of analytics and certain statistical information. For example, we may collect information such as your browser type, operating system type or mobile device model, viewed webpages, links that are clicked, IP address, mobile device identifier or other unique identifier, sites or apps visited before coming to our Site or App, the amount of time you spend viewing or using the Site or App, the number of times you return, or other click-stream or site usage data, emails we send that you open, forward, or click through to our Site or App. Collecting this information, and linking it with your personal information, helps us to tailor our Site and App and enhance your online shopping experience by saving your preferences while you are visiting a particular Site or App, and to help identify Site or App features, promotions, advertisements, and offers that may be of particular interest to you and retarget online and mobile advertisements to you across computers or devices you may use.

**From Third-Party Sources:** We may acquire information from other sources to update or supplement the information that you provide or that we collect automatically (such as information to validate or update your address or other demographic information), or when you connect with the company through a third party (including through social networks) based on your registration and privacy settings on those third-party sites.

**Combination of Information:** We may combine the information we receive from or about you, including information you provide to us and information we automatically collect through the Site or App, as well as information across other computers or devices that you use, with information we collect or receive about you from other online and offline sources, or from other third-party sources. This may also include using technologies to recognize multiple interactions and combine them into a single customer profile where appropriate.

**From Third-Party Analytics and Advertisements:** We also may use third-party advertisements, analytics, and tracking tools to better understand who is using the Site or App, how people are using the Site or App, how to improve the effectiveness of the Services and related content, and to help us or those third parties serve more targeted advertising to you across our media channels. These third parties may use technology such as cookies, web beacons, javascript and pixel tags, log files, flash cookies, or other technologies to collect and store information. They may also combine information they collect from your interaction with the Site or App with information they collect from other sources, which combination may be subject to the third party's control and privacy policy.

See e.g., *https://www.saksfifthavenue.com/c/content/privacy-policy*

119.    Saks receives, from the client device (*e.g.*, personal computer, mobile device, television) via a packet-based telecommunication network (e.g., Internet), signaling (*e.g.*, GET request) to have the stored video content streamed to the client device as demonstrated by the example provided below:

64

Appx288



*See e.g.,* *https://www.saksfifthavenue.com/c/live-stream/video*

120.    In response to the received signaling (*e.g.*, GET request), Saks transmits

one or more files (*e.g.*, (M3U8 file)) having a format compatible with a media player to

the client device (*e.g.*, personal computer, mobile device, television) over the packet-

65

based telecommunication network (*e.g.*, the Internet) as demonstrated by the example

provided below:



Appx290



*See e.g.,* *https://www.saksfifthavenue.com/c/live-stream/video*

121.    The M3U8 includes an identification (*e.g.*, URL that resolves an IP address) of one or more of the resources (*e.g.*, media streaming server(s)) of the content distribution network available to facilitate streaming of one or more segments of the stored video content to the client device (*e.g.*, personal computer, mobile device, television), the identification is dependent at least in part on a relationship between a geographic location of the client device and geographic locations (*e.g.*, CDNs) of the resources of the content distribution network as demonstrated by the examples provided below:

Appx291



Appx292



*See e.g.,* *https://www.saksfifthavenue.com/c/live-stream/video*



69



*See e.g.,* *https://www.saksfifthavenue.com/c/live-stream/video*

122.    The M3U8 includes an identification of an advertising server, the identification of the advertising server being dependent at least in part on a relationship between the geographic location (*e.g.*, CDNs) of the client device (*e.g.*, personal computer, mobile device, television) and a geographic location of the advertising server.

Appx294

**From Automatic Site or App Data Collection Technologies:** We, or third parties working on our behalf, may use cookies, web beacons, javascript and pixel tags, log files, or other technologies to collect certain non-personally identifying information about visitors to our Site or App, users of our online Services, and interactions with our emails and online advertisements, and to allow Saks to keep track of analytics and certain statistical information. For example, we may collect information such as your browser type, operating system type or mobile device model, viewed webpages, links that are clicked, IP address, mobile device identifier or other unique identifier, sites or apps visited before coming to our Site or App, the amount of time you spend viewing or using the Site or App, the number of times you return, or other click-stream or site usage data, emails we send that you open, forward, or click through to our Site or App. Collecting this information, and linking it with your personal information, helps us to tailor our Site and App and enhance your online shopping experience by saving your preferences while you are visiting a particular Site or App, and to help identify Site or App features, promotions, advertisements, and offers that may be of particular interest to you and retarget online and mobile advertisements to you across computers or devices you may use.

**From Third-Party Sources:** We may acquire information from other sources to update or supplement the information that you provide or that we collect automatically (such as information to validate or update your address or other demographic information), or when you connect with the company through a third party (including through social networks) based on your registration and privacy settings on those third-party sites.

**Combination of Information:** We may combine the information we receive from or about you, including information you provide to us and information we automatically collect through the Site or App, as well as information across other computers or devices that you use, with information we collect or receive about you from other online and offline sources, or from other third-party sources. This may also include using technologies to recognize multiple interactions and combine them into a single customer profile where appropriate.

**From Third-Party Analytics and Advertisements:** We also may use third-party advertisements, analytics, and tracking tools to better understand who is using the Site or App, how people are using the Site or App, how to improve the effectiveness of the Services and related content, and to help us or those third parties serve more targeted advertising to you across our media channels. These third parties may use technology such as cookies, web beacons, javascript and pixel tags, log files, flash cookies, or other technologies to collect and store information. They may also combine information they collect from your interaction with the Site or App with information they collect from other sources, which combination may be subject to the third party's control and privacy policy.

*See e.g., https://www.saksfifthavenue.com/c/content/privacy-policy*

123.    The M3U8 causes the client device to communicate with resources (*e.g.,* media streaming servers) of the content distribution network and the advertising server to cause the one or more segments of the stored video to be streamed to the client device (*e.g.,* personal computer, mobile device, television) by the identified one or more resources of the content distribution network and cause one or more advertisements to be streamed from the advertising server to the client device.

71



*See e.g.,* *https://www.saksfifthavenue.com/c/live-stream/video*

**From Automatic Site or App Data Collection Technologies:** We, or third parties working on our behalf, may use cookies, web beacons, javascript and pixel tags, log files, or other technologies to collect certain non-personally identifying information about visitors to our Site or App, users of our online Services, and interactions with our emails and online advertisements, and to allow Saks to keep track of analytics and certain statistical information. For example, we may collect information such as your browser type, operating system type or mobile device model, viewed webpages, links that are clicked, IP address, mobile device identifier or other unique identifier, sites or apps visited before coming to our Site or App, the amount of time you spend viewing or using the Site or App, the number of times you return, or other click-stream or site usage data, emails we send that you open, forward, or click through to our Site or App. Collecting this information, and linking it with your personal information, helps us to tailor our Site and App and enhance your online shopping experience by saving your preferences while you are visiting a particular Site or App, and to help identify Site or App features, promotions, advertisements, and offers that may be of particular interest to you and retarget online and mobile advertisements to you across computers or devices you may use.

**From Third-Party Sources:** We may acquire information from other sources to update or supplement the information that you provide or that we collect automatically (such as information to validate or update your address or other demographic information), or when you connect with the company through a third party (including through social networks) based on your registration and privacy settings on those third-party sites.

**Combination of Information:** We may combine the information we receive from or about you, including information you provide to us and information we automatically collect through the Site or App, as well as information across other computers or devices that you use, with information we collect or receive about you from other online and offline sources, or from other third-party sources. This may also include using technologies to recognize multiple interactions and combine them into a single customer profile where appropriate.

**From Third-Party Analytics and Advertisements:** We also may use third-party advertisements, analytics, and tracking tools to better understand who is using the Site or App, how people are using the Site or App, how to improve the effectiveness of the Services and related content, and to help us or those third parties serve more targeted advertising to you across our media channels. These third parties may use technology such as cookies, web beacons, javascript and pixel tags, log files, flash cookies, or other technologies to collect and store information. They may also combine information they collect from your interaction with the Site or App with information they collect from other sources, which combination may be subject to the third party's control and privacy policy.

*See e.g.,* *https://www.saksfifthavenue.com/c/content/privacy-policy*

124. On information and belief, Saks has been on notice of the '781 patent at least as early as January 26, 2023, when Saks' in-house counsel responded to SITO's counsel's January 9, 2023 letter concerning Saks' infringement of the patents-in-suit.

125. On information and belief, at least since January 26, 2023, Saks knowingly encouraged and continues to encourage, it customers to directly infringe one or more claims of the '781 patent, including by Saks' actions that include, without limitation, instructing and encouraging its customers to use the Saks Video Streaming Services through the publishing, distribution, and propagation of targeted user emails, shopping offers, support documents, blog

73

posts, live events, and instructions, including but not limited to the examples of such materials cited above.

126.    On information and belief, at least since acquiring its January 2023 knowledge of the '781 patent, Saks knows the acts Saks induced its customers to take constitute patent infringement and Saks' encouraging acts result in direct infringement of one or more claims of the '781 patent by its customers.

127.    On information and belief, Saks' customers directly infringe at least claim 1 of the '781 patent through their use of the Saks Video Streaming Service.

128.    On information and belief, Saks is in violation of 35 U.S.C. § 271(b) and has been, at least since its January 2023 knowledge of the '781 patent, indirectly infringing and continues to indirectly infringe at least claim 1 of the '781 patent by knowingly and specifically intending to induce infringement by others (including, without limitation, Saks' users) and possessing specific intent to encourage infringement by Saks' users. The Saks Video Streaming Service is specifically configured to function in accordance with the '781 patent claims.

129.    SITO has been damaged by the direct and indirect infringement of Saks, and is suffering and will continue to suffer irreparable harm and damages as a result of this infringement.

### Count VI – Infringement of United States Patent No. 10,769,675

74

Appx298

130.    SITO alleges, and incorporates by reference, as if fully set forth here, the preceding paragraphs of this Complaint.

131.    Saks directly infringes (literally and/or under the doctrine of equivalents) the '675 patent by using the method covered by at least claim 31 of the '675 patent.

132.    On information and belief, and without SITO's approval, authorization and license, Saks owns, controls, operates, and uses a system for streaming media that includes the Saks Streaming Platform, as well as other Saks networks, systems, devices, components, and/or services for streaming media, that practices and infringes the media streaming method recited in at least claim 31 of the '675 patent.

133.    Saks performs a method of streaming video as demonstrated by the example provided below:



*See e.g.,* *https://www.saksfifthavenue.com/c/live-stream/video*

Appx299

134. On information and belief, Saks receives, from each of a plurality of media owners, media for a plurality of events (*e.g.,* media files/videos) for streaming and one or more media rules (e.g., geographic restrictions) governing transmission of the received media, wherein the one or more media rules are used by the streaming system to determine a streaming sequence for the transmission of the received media and determine one or more streaming resources (e.g., CDNs) to which the received media is to be distributed.

135. Saks receives, from a communication device (*e.g.,* personal computer, mobile device, television) via a communication network (*e.g.,* Internet), a request (*e.g.,* GET request) for media for one of the plurality of events to be streamed to the communication device, the media for the requested event comprising a plurality of segments and the requested event being selected by a user of the communication device from a plurality of event options (*e.g.,* media files/videos).

Appx300



*See e.g.,* *https://www.saksfifthavenue.com/c/live-stream/video*

Appx301



Appx302



See e.g., *https://www.saksfifthavenue.com/c/live-stream/video*

136. In response to the received request (*e.g.*, GET request), Saks transmits one or more files (*e.g.*, (M3U8 file)) to the communication device (*e.g.*, personal computer, mobile device, television) over the packet-based telecommunication network (*e.g.*, the Internet) as demonstrated by the example provided below:

Appx303



Appx304



See e.g., *https://www.saksfifthavenue.com/c/live-stream/video*

137.    The M3U8 file includes one or more references (*e.g.*, URLs/filename) to

one or more of the segments of the media for the requested event (e.g., video).



81

Appx305



See e.g., *https://www.saksfifthavenue.com/c/live-stream/video*

138.    On information and belief, the M3U8 file includes information, the

information being based at least in part on the one or more media rules (*e.g.,* geographic

restrictions), for use by the communication device identifying how to communicate

82

with the one or more determined resources (*e.g.*, media streaming server/CDN) to

cause the one or more segments of the media for the requested event to be streamed to

the communication device (*e.g.*, client device) in accordance with the one or more media

rules.



Appx307



See e.g., https://www.saksfifthavenue.com/c/live-stream/video

Appx308



*See e.g.,* *https://www.saksfifthavenue.com/c/live-stream/video*

139.    On information and belief, Saks has been on notice of the '675 patent

at least as early as January 26, 2023, when Saks' in-house counsel responded to

SITO's counsel's January 9, 2023 letter concerning Saks' infringement of the

85

Appx309

patents-in-suit.

140.    On information and belief, at least since January 26, 2023, Saks knowingly encouraged and continues to encourage, it customers to directly infringe one or more claims of the '675 patent, including by Saks' actions that include, without limitation, instructing and encouraging its customers to use the Saks Video Streaming Services through the publishing, distribution, and propagation of targeted user emails, shopping offers, support documents, blog posts, live events, and instructions, including but not limited to the examples of such materials cited above.

141.    On information and belief, at least since acquiring its January 2023 knowledge of the '675 patent, Saks knows the acts Saks induced its customers to take constitute patent infringement and Saks' encouraging acts result in direct infringement of one or more claims of the '675 patent by its customers.

142.    On information and belief, Saks' customers directly infringe at least claim 31 of the '675 patent through their use of the Saks Video Streaming Service.

143.    On information and belief, Saks is in violation of 35 U.S.C. § 271(b) and has been, at least since its January 2023 knowledge of the '675 patent, indirectly infringing and continues to indirectly infringe at least claim 31 of the '675 patent by knowingly and specifically intending to induce infringement by others (including, without limitation, Saks' users) and possessing specific intent to encourage infringement by Saks' users. The Saks Video Streaming Service is specifically configured to function in accordance with the '675 patent claims.

86

Case 2:23-cv-21757-JXK-SAK-JSA-6688Document 82-1 Filed 06/16/23/24 Page 87 of 88 89 PageID: 303

144.   SITO has been damaged by the direct and indirect infringement of Saks, and is suffering and will continue to suffer irreparable harm and damages as a result of this infringement.

## JURY DEMANDED

145.   Pursuant to Federal Rule of Civil Procedure 38(b), SITO hereby requests a trial by jury on all issues so triable.

## PRAYER FOR RELIEF

SITO respectfully requests this Court to enter judgment in SITO's favor and against Saks as follows:

a.   finding that Saks directly infringes, literally and/or under the doctrine of equivalents, one or more claims of each of the patents-in-suit;

b.   finding that Saks indirectly infringes, literally and/or under the doctrine of equivalents, one or more claims of each of the patents-in-suit;

c.   awarding SITO damages under 35 U.S.C. § 284, or otherwise permitted by law, including supplemental damages for any continued post-verdict infringement;

d.   awarding SITO pre-judgment and post-judgment interest on the damages award and costs;

e.   awarding costs of this action (including all disbursements) and attorney fees pursuant to 35 U.S.C. § 285, or as otherwise permitted by the law; and

f.   awarding such other costs and further relief that the Court determines to be just and equitable.

87

Appx311

June 16, 2023

Respectfully submitted,

*/s/ Zachary H. Ellis*

Zachary H. Ellis*
State Bar No. 24122606
zellis@daignaultiyer.com
Tel: 512-829-7992

Ronald M. Daignault (*pro hac vice* to be filed)*
Chandran B. Iyer (*pro hac vice* to be filed)
Jason S. Charkow (*pro hac vice* to be filed)*
**DAIGNAULT IYER LLP**
8618 Westwood Center Drive, Suite 150
Vienna, VA 22182
rdaignault@daignaultiyer.com
cbiyer@daignaultiyer.com
jcharkow@daignaultiyer.com

*\*Not admitted in Virginia*

*Attorneys for Plaintiffs*
*SITO Mobile R&D IP, LLC and*
*SITO Mobile Ltd.*

Appx312

# EXHIBIT B

Appx313



Shailendra Maheshwari
202.997.1925
smaheshwari@daignaultiyer.com

8618 Westwood Center Drive
Suite 150, Vienna, VA 22182

October 6, 2023

Attn: Legal Department
Uniqlo USA, Inc.
546-548 Broadway, Third Floor
New York, NY 10012

Dear Sir or Madam,

We represent SITO Mobile R&D IP, LLC and SITO Mobile, Ltd.'s ("SITO"), owner of the entire rights, titles, and interest in several patents including United States patent nos. 7,191,244; 8,015,307; 8,554,940; 9,349,138; 10,735,781; and 10,769,675 ("Patents-At-Issue") which deal broadly to adaptive bitrate streaming technologies. Our investigation has revealed that Uniqlo's website, uniqlo.com, uses videos that infringe one or more claims of each of the Patents-At-Issue and we have provided a draft patent infringement complaint showing the same.

SITO is interested in licensing its patent portfolio to companies that are using its patented technology and seeks to conduct amicable licensing discussions. To that end, SITO is offering discounted licenses for those parties that engage in early discussions so that each party may avoid the costs of litigation. While SITO has filed other patent infringement lawsuits based on its patents and settled each one, it is SITO's desire to reach a resolution without litigation and, in the interests of exploring such an early resolution, we are writing to invite Uniqlo to enter into licensing negotiations and avoid the costs of litigation.

Please let us know on or before **Friday, October 27, 2023** whether you believe such a negotiation would be beneficial. While we would absolutely prefer to hear from you, if we do not by the aforementioned date we will take it to mean that Uniqlo would prefer that the Court determine the appropriate remedy for Uniqlo's unauthorized use of SITO's patents.

Appx314

October 6, 2023
Page 2

This letter is being sent without prejudice to all claims, defenses, rights, and remedies in law or equity, including the right to seek judicial relief, all of which are expressly reserved.

I look forward to hearing back from you.

Very truly yours,

*Shailendra Maheshwari*

Shailendra Maheshwari
Daignault Iyer LLP

Enclosure:    Complaint for Patent Infringement – SITO v. Uniqlo USA, Inc.

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

SITO MOBILE R&D IP, LLC, and
SITO MOBILE, LTD.,

        Plaintiffs,

    v.

UNIQLO USA, INC.,

        Defendant.

Case No.

Jury Trial Demanded

**COMPLAINT FOR PATENT INFRINGEMENT**

Plaintiffs SITO Mobile R&D IP, LLC and SITO Mobile, Ltd., by and through their undersigned counsel, file this Complaint against Uniqlo USA, Inc. ("Uniqlo") for patent infringement of United States Patent Nos. 7,191,244; 8,015,307; 8,554,940; 9,349,138; 10,735,781; and 10,769,675 (collectively, the "patents-in-suit" and attached as Exhibits 1-6 respectively) and allege as follows:

**NATURE OF THE ACTION**

1.     This is an action for patent infringement arising under the patent laws of the United States, 35 U.S.C. §§ 1 *et seq.*

**THE PARTIES**

2.     Plaintiff SITO Mobile, Ltd. is a company organized and existing under the laws of the State of New York with its principal place of business located at 123 Town Square Place, Suite 419, Jersey City, New Jersey 07310.

Appx316

3.    Plaintiff SITO Mobile R&D IP, LLC is a limited liability company organized and existing under the laws of the State of New York with its principal place of business located at 123 Town Square Place, Suite 419, Jersey City, New Jersey 07310. Plaintiff SITO Mobile R&D IP, LLC is a wholly owned subsidiary of Plaintiff SITO Mobile, Ltd. (collectively "SITO"). SITO Mobile R&D IP, LLC is a patent holding company that does not exist separate from its parent SITO Mobile, Ltd. In that regard, SITO Mobile, Ltd. controls all of SITO Mobile R&D IP, LLC's business operations and SITO Mobile R&D IP, LLC's financials roll-up into SITO Mobile, Ltd.

4.    On information and belief, Defendant Uniqlo is a company organized and existing under the laws of the State of New York with a place of business located at 546-548 Broadway, Third Floor, New York, NY 10012.

## JURISDICTION AND VENUE

5.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1338(a) because this action arises under the patent laws of the United States, 35 U.S.C. §§ 1 *et seq.*

6.    Uniqlo is subject to this Court's personal jurisdiction for the following reasons, in part and on information and belief, Uniqlo transacts business in New York, contracts to supply services and things in New York, and has caused Plaintiff injury in New York.

7.    This Court has personal jurisdiction over Uniqlo because Uniqlo (directly and/or through its agents, subsidiaries, affiliates, or intermediaries) has committed and

Appx317

continues to commit acts of infringement in New York and this judicial district in violation of at least 35 U.S.C. § 271(a).

8.      This Court also has personal jurisdiction over Uniqlo because Uniqlo has sufficient minimum contacts with this forum as a result of business conducted within the State of New York and this judicial district. In particular, this Court has personal jurisdiction over Uniqlo because, on information and belief: (1) has substantial, continuous, and systematic contacts with this State and this judicial district; (2) enjoys substantial income from its operations and sales in this State and this judicial district; and (3) solicits business and markets products, systems and/or services in this State and this judicial district including, without limitation, related to the accused instrumentalities.

9.      Uniqlo has purposefully availed itself of the privileges of conducting business within New York and this judicial district, has established sufficient minimum contacts with this judicial district such that it should reasonably and fairly anticipate being hauled into court in this judicial district, has purposefully directed activities at residents of this judicial district, and at least a portion of the patent infringement claims alleged in this Complaint arise out of or are related to one or more of the foregoing activities.

10.      Venue is proper in this judicial district pursuant to 28 U.S.C. § § 1391(b) and (c) and/or 1400(b). Uniqlo is registered to do business in New York, is deemed to be a resident of New York, and has committed acts of patent infringement in New York.

Appx318

For example, Defendant maintains a regular and established place of business at 546-548 Broadway Third Floor New York, NY 10012.

## Uniqlo VIDEO STREAMING SERVICE

11.    Uniqlo provides high-engagement, e-commerce service to the viewers engages them by providing video live-streams over the Internet.[1]

12.    Uniqlo users can access its services through any device including phones, tablets, and computers.[1]

13.    Uniqlo streams videos using a network(s) of servers ("Uniqlo Streaming Platform"). Uniqlo uses HTTP Live Streaming (HLS) protocol to stream video content. HLS is an HTTP-based adaptive bitrate streaming technique that enables high-quality streaming of media content over the Internet from web servers. The operation of HLS is described in standards documents.[2]

14.    With HLS, a video may be broken up into thousands of small HTTP-based file segments. Each segment contains a short interval of playback time of the video. The segments are encoded at a variety of different bit rates (speeds). After a video is selected to be streamed, the media player on the subscriber device is provided with a file that informs the player, amongst other things, how to obtain the segments sequentially and

---

[1] https://www.uniqlo.com/us/en/information

[2] The HLS standard is available at https://datatracker.ietf.org/doc/html/draft-pantos-hls-rfc8216bis/. A copy of the HLS standard is attached hereto as Exhibit 7.

how to handle ad breaks (if any). As the video is playing, the subscriber device determines the bit rate that it can handle and requests a segment(s) encoded at that bit rate. The player plays the segments in sequential order and continuously requests segments until the player has received all of the segments that make up the video.

## THE PATENTS-IN-SUIT

### United States Patent No. 7,191,244

15.    On March 13, 2007, the USPTO duly and legally issued United States Patent No. 7,191,244 ("the '244 patent") entitled "System and Method for Routing Media" to inventor Charles A. Jennings et al. The '244 patent is attached as Exhibit 1.

16.    The '244 patent is presumed valid under 35 U.S.C. § 282.

17.    SITO Mobile R&D IP, LLC owns all rights, title, and interest in the '244 patent.

18.    SITO Mobile, Ltd maintains equitable title over the '244 patent as SITO Mobile R&D IP, LLC is a wholly-owned subsidiary of SITO Mobile, Ltd. As part of this ownership, SITO Mobile, Ltd. exercises complete control over SITO Mobile R&D IP, LLC, including control over all of SITO Mobile R&D IP, LLC's business decisions and SITO Mobile R&D IP, LLC's patent enforcement, assignment, and licensing policies.

19.    Because of the structure of this corporate relationship and SITO Mobile, Ltd.'s complete control over SITO Mobile R&D iP, LLC's patent licensing and enforcement policies, SITO Mobile, Ltd. has and has had control over the '244 patent and has enjoyed exclusive rights thereunder.

## United States Patent No. 8,015,307

20. On September 06, 2011, the USPTO duly and legally issued United States Patent No. 8,015,307 ("the '307 patent") entitled "System and Method for Streaming Media" to inventor Charles A. Jennings et al. The '307 patent is attached as Exhibit 2.

21. The '307 patent is presumed valid under 35 U.S.C. § 282.

22. SITO Mobile R&D IP, LLC owns all rights, title and interest in the '307 patent.

23. SITO Mobile, Ltd maintains equitable title over the '307 patent as SITO Mobile R&D IP, LLC is a wholly-owned subsidiary of SITO Mobile, Ltd. As part of this ownership, SITO Mobile, Ltd. exercises complete control over SITO Mobile R&D IP, LLC, including control over all of SITO Mobile R&D IP, LLC's business decisions and SITO Mobile R&D IP, LLC's patent enforcement, assignment, and licensing policies.

24. Because of the structure of this corporate relationship and SITO Mobile, Ltd.'s complete control over SITO Mobile R&D IP, LLC's patent licensing and enforcement policies, SITO Mobile, Ltd. has and has had control over the '307 patent and has enjoyed exclusive rights thereunder.

## United States Patent No. 8,554,940

25. On October 08, 2013, the USPTO duly and legally issued United States Patent No. 8,554,940 ("the '940 patent") entitled "System and Method for Routing Media" to inventor Charles A. Jennings et al. The '940 patent is attached as Exhibit 3.

26. The '940 patent is presumed valid under 35 U.S.C. § 282.

Appx321

27.    SITO Mobile R&D IP, LLC owns all rights, title and interest in the '940 patent.

28.    SITO Mobile, Ltd maintains equitable title over the '940 patent as SITO Mobile R&D IP, LLC is a wholly-owned subsidiary of SITO Mobile, Ltd. As part of this ownership, SITO Mobile, Ltd. exercises complete control over SITO Mobile R&D IP, LLC, including control over all of SITO Mobile R&D IP, LLC's business decisions and SITO Mobile R&D IP, LLC's patent enforcement, assignment, and licensing policies.

29.    Because of the structure of this corporate relationship and SITO Mobile, Ltd.'s complete control over SITO Mobile R&D IP, LLC's patent licensing and enforcement policies, SITO Mobile, Ltd. has and has had control over the '940 patent and has enjoyed exclusive rights thereunder.

### United States Patent No. 9,349,138

30.    On May 24, 2016, the USPTO duly and legally issued United States Patent No. 9,349,138 ("the '138 patent") entitled "System and Method for Streaming Media" to inventor Charles A. Jennings et al. The '138 patent is attached as Exhibit 4.

31.    The '138 patent is presumed valid under 35 U.S.C. § 282.

32.    SITO Mobile R&D IP, LLC owns all rights, title and interest in the '138 patent.

33.    SITO Mobile, Ltd maintains equitable title over the '138 patent as SITO Mobile R&D IP, LLC is a wholly-owned subsidiary of SITO Mobile, Ltd. As part of this ownership, SITO Mobile, Ltd. exercises complete control over SITO Mobile R&D IP,

LLC, including control over all of SITO Mobile R&D IP, LLC's business decisions and SITO Mobile R&D IP, LLC's patent enforcement, assignment, and licensing policies.

34.    Because of the structure of this corporate relationship and SITO Mobile, Ltd.'s complete control over SITO Mobile R&D IP, LLC's patent licensing and enforcement policies, SITO Mobile, Ltd. has and has had control over the '138 patent and has enjoyed exclusive rights thereunder.

### United States Patent No. 10,735,781

35.    On August 04, 2020, the USPTO duly and legally issued United States Patent No. 10,735,781 ("the '781 patent") entitled "System and Method for Routing Media" to inventor Charles A. Jennings et al. The '781 patent is attached as Exhibit 5.

36.    The '781 patent is presumed valid under 35 U.S.C. § 282.

37.    SITO Mobile R&D IP, LLC owns all rights, title and interest in the '781 patent.

38.    SITO Mobile, Ltd maintains equitable title over the '781 patent as SITO Mobile R&D IP, LLC is a wholly-owned subsidiary of SITO Mobile, Ltd. As part of this ownership, SITO Mobile, Ltd. exercises complete control over SITO Mobile R&D IP, LLC, including control over all of SITO Mobile R&D IP, LLC's business decisions and SITO Mobile R&D IP, LLC's patent enforcement, assignment, and licensing policies.

39.    Because of the structure of this corporate relationship and SITO Mobile, Ltd.'s complete control over SITO Mobile R&D IP, LLC's patent licensing and

enforcement policies, SITO Mobile, Ltd. has and has had control over the '781 patent and has enjoyed exclusive rights thereunder.

**United States Patent No. 10,769,675**

40.     On September 8, 2020, the USPTO duly and legally issued United States Patent No. 10,769,675 ("the '675 patent") entitled "System and Method for Routing Media" to inventor Charles A. Jennings et al. The '675 patent is attached as Exhibit 6.

41.     The '675 patent is presumed valid under 35 U.S.C. § 282.

42.     SITO Mobile R&D IP, LLC owns all rights, title and interest in the '675 patent.

43.     SITO Mobile, Ltd maintains equitable title over the '675 patent as SITO Mobile R&D IP, LLC is a wholly-owned subsidiary of SITO Mobile, Ltd. As part of this ownership, SITO Mobile, Ltd. exercises complete control over SITO Mobile R&D IP, LLC, including control over all of SITO Mobile R&D IP, LLC's business decisions and SITO Mobile R&D IP, LLC's patent enforcement, assignment, and licensing policies.

44.     Because of the structure of this corporate relationship and SITO Mobile, Ltd.'s complete control over SITO Mobile R&D IP, LLC's patent licensing and enforcement policies, SITO Mobile, Ltd. has and has had control over the '675 patent and has enjoyed exclusive rights thereunder.

## CLAIMS FOR RELIEF

### Count I – Infringement of United States Patent No. 7,191,244

45.    SITO alleges, and incorporates by reference, as if fully set forth here, the preceding paragraphs of this Complaint.

46.    Uniqlo directly infringes (literally and/or under the doctrine of equivalents) the '244 patent by using the method covered by at least claim 2 of the '244 patent.

47.    On information and belief, and without SITO's approval, authorization and license, Uniqlo owns, controls, operates, and uses a system for streaming media that includes the Uniqlo Streaming Platform, as well as other Uniqlo networks, systems, devices, components and/or services for streaming media, that practices and infringes the media streaming method recited in at least claim 2 of the '244 patent.

48.    Uniqlo performs a method of streaming video content based on a request (e.g., GET request) as demonstrated by the example provided below:



*See e.g.,* https://www.uniqlo.com/us/en/special-feature/live-station/54



*See e.g.,* https://www.uniqlo.com/us/en/special-feature/live-station/54



*See e.g.,* https://www.uniqlo.com/us/en/special-feature/live-station/54

49.     Uniqlo identifies at least one program in which at least a portion of the media is available (e.g., STATUS 200 OK).



*See e.g.,* https://www.uniqlo.com/us/en/special-feature/live-station/54

Appx327



*See e.g.,* https://www.uniqlo.com/us/en/special-feature/live-station/54

50.　　Uniqlo processes the request (e.g., GET request) with at least one program rule of the at least one program to generate a presentation (e.g., M3U8 file) identifying the at least the portion of the media.



*See e.g.,* https://www.uniqlo.com/us/en/special-feature/live-station/54

Appx328



*See e.g.,* https://www.uniqlo.com/us/en/special-feature/live-station/54



*See e.g.,* https://www.uniqlo.com/us/en/special-feature/live-station/54

51.    Uniqlo generates a reservation (e.g., connection, session) associated with the presentation as demonstrated by the example provided below:



*See e.g.,* https://www.uniqlo.com/us/en/special-feature/live-station/54



*See e.g.,* https://www.uniqlo.com/us/en/special-feature/live-station/54



*See e.g.,* https://www.uniqlo.com/us/en/special-feature/live-station/54



*See e.g.,* https://www.uniqlo.com/us/en/special-feature/live-station/54



*See e.g.,* https://www.uniqlo.com/us/en/special-feature/live-station/54

52.  Uniqlo identifies at least one resource (e.g., CDN) to stream the presentation for reception by the viewer (e.g., client device) based on the reservation.



*See e.g.,* https://www.uniqlo.com/us/en/special-feature/live-station/54

Appx332



*See e.g.,* https://www.uniqlo.com/us/en/special-feature/live-station/54



*See e.g.,* https://www.uniqlo.com/us/en/special-feature/live-station/54

Appx333



*See e.g.,* https://www.uniqlo.com/us/en/special-feature/live-station/54



*See e.g.,* https://www.uniqlo.com/us/en/special-feature/live-station/54

53. SITO has been damaged by the direct infringement of Uniqlo, and is suffering and will continue to suffer irreparable harm and damages as a result of this infringement.

### Count II– Infringement of United States Patent No. 8,015,307

Appx334

54.     SITO alleges, and incorporates by reference, as if fully set forth here, the preceding paragraphs of this Complaint.

55.     Uniqlo directly infringes (literally and/or under the doctrine of equivalents) the '307 patent by using the method covered by at least claim 30 of the '307 patent.

56.     On information and belief, and without SITO's approval, authorization and license, Uniqlo owns, controls, operates and uses a system for streaming media that includes the Uniqlo Streaming Platform, as well as other Uniqlo networks, systems, devices, components and/or services for streaming media, that practices and infringes the media streaming method recited in at least claim 30 of the '307 patent.

57.     Uniqlo performs a method of streaming video as demonstrated by the example provided below:



*See e.g.,* https://www.uniqlo.com/us/en/special-feature/live-station/54

58.    Uniqlo processes a request (e.g., GET request) for media at a management system (e.g., contained within Uniqlo streaming service server(s)) and builds in response thereto a reservation (e.g., session or connection) comprising a reservation identification (e.g., etag, session tokens) and a presentation identification (e.g., M3U8 file), the presentation identification identifying a presentation (e.g., M3U8 file) comprising at least one network distribution rule (e.g., bandwidth) and a media play list (e.g., segment list for the media) comprising a plurality of media names.



*See e.g.*, https://www.uniqlo.com/us/en/special-feature/live-station/54



See e.g., https://www.uniqlo.com/us/en/special-feature/live-station/54



See e.g., https://www.uniqlo.com/us/en/special-feature/live-station/54

Appx337



*See e.g.*, https://www.uniqlo.com/us/en/special-feature/live-station/54



*See e.g.*, https://www.uniqlo.com/us/en/special-feature/live-station/54

59.     Uniqlo reserves a resource (e.g., Media server) to stream media for the reservation (e.g., connection, session) at the management system (e.g., contained within Uniqlo streaming service server).

Appx338



*See e.g.,* https://www.uniqlo.com/us/en/special-feature/live-station/54



*See e.g.,* https://www.uniqlo.com/us/en/special-feature/live-station/54



*See e.g.,* https://www.uniqlo.com/us/en/special-feature/live-station/54

60. Uniqlo transmits the presentation (e.g., M3U8 file) and reservation data comprising a valid reservation identification (e.g., etag, session tokens) from the management system (e.g., Uniqlo streaming service server(s)) to a routing processor (e.g., Uniqlo streaming server(s)) and transmits the reservation formatted for reception by the viewer.



*See e.g.*, https://www.uniqlo.com/us/en/special-feature/live-station/54



*See e.g.*, https://www.uniqlo.com/us/en/special-feature/live-station/54



*See e.g.,* https://www.uniqlo.com/us/en/special-feature/live-station/54

61. Uniqlo selects a media switch (e.g., CDN) at the routing processor based on the at least one network distribution rule, the at least one network distribution rule comprising at least one member of a group comprising a capacity rule, a load rule, a bandwidth rule, a resource rule, and a session rule.



*See e.g.,* https://www.uniqlo.com/us/en/special-feature/live-station/54



*See e.g.,* https://www.uniqlo.com/us/en/special-feature/live-station/54



*See e.g.,* https://www.uniqlo.com/us/en/special-feature/live-station/54

Appx343

62.    Uniqlo determines, at the routing processor, if the media switch (e.g., CDN) is configured to stream the media identified by the media playlist (e.g., segment list contained within the M3U8 file).



*See e.g.,* https://www.uniqlo.com/us/en/special-feature/live-station/54



*See e.g.,* https://www.uniqlo.com/us/en/special-feature/live-station/54



*See e.g.,* https://www.uniqlo.com/us/en/special-feature/live-station/54



*See e.g.,* https://www.uniqlo.com/us/en/special-feature/live-station/54



*See e.g.,* https://www.uniqlo.com/us/en/special-feature/live-station/54

63.    Uniqlo transmits the reservation data from the routing processor to the media switch (e.g., CDN) if the media switch is configured, at least initially, to stream the media for the media play list.



*See e.g.,* https://www.uniqlo.com/us/en/special-feature/live-station/54

Appx346



*See e.g.,* https://www.uniqlo.com/us/en/special-feature/live-station/54



*See e.g.,* https://www.uniqlo.com/us/en/special-feature/live-station/54

64. Uniqlo validates the reservation identification with the reservation data at the media switch and for each media name on the media play list, streaming at least

partially the media identified by the media name if the reservation identification is valid.



*See e.g.,* https://www.uniqlo.com/us/en/special-feature/live-station/54



*See e.g.,* https://www.uniqlo.com/us/en/special-feature/live-station/54

Appx348



*See e.g.,* https://www.uniqlo.com/us/en/special-feature/live-station/54



*See e.g.,* https://www.uniqlo.com/us/en/special-feature/live-station/54



*See e.g.,* https://www.uniqlo.com/us/en/special-feature/live-station/54

65.     SITO has been damaged by the direct infringement of Uniqlo, and is suffering and will continue to suffer irreparable harm and damages as a result of this infringement.

### Count III– Infringement of United States Patent No. 8,554,940

66.     SITO alleges, and incorporates by reference, as if fully set forth here, the preceding paragraphs of this Complaint.

67.     Uniqlo directly infringes (literally and/or under the doctrine of equivalents) the '940 patent by using the method covered by at least claim 1 of the '940 patent.

68.     On information and belief, and without SITO's approval, authorization and license, Uniqlo owns, controls, operates and uses a system for streaming media that includes the Uniqlo Streaming Platform, as well as other Uniqlo networks, systems,

devices, components and/or services for streaming media, that practices and infringes the media streaming method recited in at least claim 1 of the '940 patent.

69.    Uniqlo performs a method of streaming video as demonstrated by the example provided below:



*See e.g.,* https://www.uniqlo.com/us/en/special-feature/live-station/54

70.    Uniqlo processes a request (e.g., GET request) at a reservation system (e.g., Uniqlo Streaming Service server(s)) to identify at least one program (e.g., requested media or video) comprising at least one program routing rule (e.g., geographic restrictions) and a list of media from which at least a portion of the media is identified.

Appx351



*See e.g.,* https://www.uniqlo.com/us/en/special-feature/live-station/54



*See e.g.,* https://www.uniqlo.com/us/en/special-feature/live-station/54

71.    Uniqlo processes the request (e.g., GET request) with the at least one program routing rule and the list of media of the program to generate a presentation

(e.g., M3U8 file) identifying the at least the portion of the media, the presentation being in a format receivable by the viewer.



*See e.g.,* https://www.uniqlo.com/us/en/special-feature/live-station/54



*See e.g.,* https://www.uniqlo.com/us/en/special-feature/live-station/54



*See e.g.,* https://www.uniqlo.com/us/en/special-feature/live-station/54

72.     Uniqlo generates and transmits a reservation (e.g., session or connection) associated with the presentation (e.g., M3U8 file) from the reservation system.



*See e.g.,* https://www.uniqlo.com/us/en/special-feature/live-station/54

Appx354



*See e.g.,* https://www.uniqlo.com/us/en/special-feature/live-station/54



*See e.g.,* https://www.uniqlo.com/us/en/special-feature/live-station/54

Appx355



*See e.g.,* https://www.uniqlo.com/us/en/special-feature/live-station/54



*See e.g.,* https://www.uniqlo.com/us/en/special-feature/live-station/54

73.　On information and belief, Uniqlo receives the reservation (e.g., session, connection) at a routing processor (e.g., Uniqlo streaming server(s)) and, at the routing processor (e.g., Uniqlo streaming server(s)) determines a priority for a plurality of

media switches (e.g., edge servers of the CDN) available to stream the at least the portion of the media (e.g., media segments contained within the M3U8 file) identified in the presentation (e.g., M3U8 file) based on the at least one program routing rule.

74.    On information and belief, Uniqlo receives the reservation (e.g., session, connection) at a routing processor (e.g., Uniqlo streaming server(s)) and, at the routing processor (e.g., Uniqlo streaming server(s)) selects at least one of the plurality of media switches (e.g., edge servers of the CDN) to stream the at least the portion of the media (e.g., media segments contained within the M3U8 file) identified in the presentation (e.g., M3U8 file) based on the priority.

75.    On information and belief, Uniqlo receives the reservation (e.g., session, connection) at a routing processor (e.g., Uniqlo streaming server(s)) and, at the routing processor (e.g., Uniqlo streaming server(s)) generates an address (e.g., URL) of the selected at least one of the plurality of media switches (e.g., e.g., edge servers of the CDN) in a format receivable by the viewer.



*See e.g.,* https://www.uniqlo.com/us/en/special-feature/live-station/54



*See e.g.,* https://www.uniqlo.com/us/en/special-feature/live-station/54



*See e.g.,* https://www.uniqlo.com/us/en/special-feature/live-station/54



*See e.g.,* https://www.uniqlo.com/us/en/special-feature/live-station/54

Appx359



*See e.g.,* https://www.uniqlo.com/us/en/special-feature/live-station/54

76.     SITO has been damaged by the direct infringement of Uniqlo, and is suffering and will continue to suffer irreparable harm and damages as a result of this infringement.

### Count IV – Infringement of United States Patent No. 9,349,138

77.     SITO alleges, and incorporates by reference, as if fully set forth here, the preceding paragraphs of this Complaint.

78.     Uniqlo directly infringes (literally and/or under the doctrine of equivalents) claim 11 of the '138 patent.

79.     On information and belief, and without SITO's approval, authorization and license, Uniqlo owns, controls, operates and uses a system for streaming media that includes the Uniqlo Streaming Platform, as well as other Uniqlo networks, systems,

devices, components and/or services for streaming media, that practices and infringes claim 11 of the '138 patent.

80. Uniqlo performs a method for managing streaming of video content to a client device (*e.g.*, personal computer, mobile device, and/or television) as demonstrated by the example provided below:



*See e.g.*, https://www.uniqlo.com/us/en/special-feature/live-station/54

81. On information and belief, Uniqlo causes a media switch (e.g., Content delivery network, CDN) to generate a media switch state model, the media switch state model comprises at least one state change for at least one state (e.g., streaming paused, resumed, or skipped to the next segment) occurring for a session of streaming the media to at least one of a plurality of viewers (e.g., client devices), the at least one state change comprising at least one member selected from a group consisting of a session initiation state, a viewing event state, and a session termination state, each comprising a reservation identification (e.g., etag) for the reservation.

82.     On information and belief, Uniqlo generates a routing processor state model of a routing processor (e.g., contained within the Uniqlo streaming server), the routing processor state model comprising an identification of the media switch (e.g., CDN) selected to stream the media and the reservation identification (e.g., etag, session) to the at least one of a plurality of viewers, wherein the media switch is selected based on at least one network distribution rule (e.g., bandwidth supported by the client device).



*See e.g.*, https://www.uniqlo.com/us/en/special-feature/live-station/54



See e.g., https://www.uniqlo.com/us/en/special-feature/live-station/54



See e.g., https://www.uniqlo.com/us/en/special-feature/live-station/54

83.     On information and belief, Uniqlo receives, by at least one processor, a routing processor identification (e.g., contained within the Uniqlo streaming server) and a reservation identification for the reservation (e.g., etag, session), the routing processor

Appx363

identification identifying a routing processor to select a media switch to stream the media to at least one of a plurality of viewers, the routing processor selecting the media switch based on the at least one network distribution rule.



*See e.g.,* https://www.uniqlo.com/us/en/special-feature/live-station/54



*See e.g.,* https://www.uniqlo.com/us/en/special-feature/live-station/54



*See e.g.,* https://www.uniqlo.com/us/en/special-feature/live-station/54



*See e.g.,* https://www.uniqlo.com/us/en/special-feature/live-station/54



*See e.g.,* https://www.uniqlo.com/us/en/special-feature/live-station/54

84.     On information and belief, Uniqlo receives, by the at least one processor, a media switch identification and the reservation identification for the reservation, the media switch identification identifying the media switch selected to stream the media.

85.     On information and belief, Uniqlo receives, by the at least one processor, a state change identification and the reservation identification for the reservation, the state change identification identifying the at least one state change for the at least one state occurring for the session of streaming the media to the at least one of a plurality of viewers, wherein the session initiation state and the session termination state each comprise a reservation identification for the reservation.

86.     SITO has been damaged by the direct infringement of Uniqlo, and is suffering and will continue to suffer irreparable harm and damages as a result of this infringement.

### Count V – Infringement of United States Patent No. 10,735,781

87.     SITO alleges, and incorporates by reference, as if fully set forth here, the preceding paragraphs of this Complaint.

88.     Uniqlo directly infringes (literally and/or under the doctrine of equivalents) the '781 patent by using the method covered by at least claim 1 of the '781 patent.

89.     On information and belief, and without SITO's approval, authorization and license, Uniqlo owns, controls, operates, and uses a system for streaming media that includes the Uniqlo Streaming Platform, as well as other Uniqlo networks, systems, devices, components, and/or services for streaming media, that practices and infringes the media streaming method recited in at least claim 1 of the '781 patent.

90.     Uniqlo performs a method of streaming video content to a client device (*e.g.*, a client device such as a personal computer, mobile device, and/or television) as demonstrated by the example provided below:

Appx367



*See e.g.,* https://www.uniqlo.com/us/en/special-feature/live-station/54

91. On information and belief, Uniqlo provides the video content to a content distribution network for storage in a plurality of geographically separated resources of the content distribution network.

92. Uniqlo selects one or more advertisement media clips based on statistical information associated with a user of the client device.



*See e.g.,* https://www.uniqlo.com/us/en/special-feature/live-station/54

93.     Uniqlo receives, from the client device (*e.g.,* personal computer, mobile device, television) via a packet-based telecommunication network (e.g., Internet), signaling (*e.g.,* GET request) to have the stored video content streamed to the client device as demonstrated by the example provided below:



*See e.g.,* https://www.uniqlo.com/us/en/special-feature/live-station/54

Appx369



*See e.g.,* https://www.uniqlo.com/us/en/special-feature/live-station/54

94.     In response to the received signaling (*e.g.,* GET request), Uniqlo transmits one or more files (*e.g.,* (M3U8 file)) having a format compatible with a media player to the client device (*e.g.,* personal computer, mobile device, television) over the packet-based telecommunication network (*e.g.,* the Internet) as demonstrated by the example provided below:



*See e.g.,* https://www.uniqlo.com/us/en/special-feature/live-station/54



*See e.g.,* https://www.uniqlo.com/us/en/special-feature/live-station/54





*See e.g.,* https://www.uniqlo.com/us/en/special-feature/live-station/54

95. The M3U8 includes an identification (*e.g.*, URL that resolves an IP address) of one or more of the resources (*e.g.*, media streaming server(s)) of the content distribution network available to facilitate streaming of one or more segments of the stored video content to the client device (*e.g.*, personal computer, mobile device, television), the identification is dependent at least in part on a relationship between a geographic location of the client device and geographic locations (*e.g.*, CDNs) of the resources of the content distribution network as demonstrated by the examples provided below:



*See e.g.,* https://www.uniqlo.com/us/en/special-feature/live-station/54



*See e.g.,* https://www.uniqlo.com/us/en/special-feature/live-station/54



*See e.g.,* https://www.uniqlo.com/us/en/special-feature/live-station/54



*See e.g.,* https://www.uniqlo.com/us/en/special-feature/live-station/54

Appx374



*See e.g.*, https://www.uniqlo.com/us/en/special-feature/live-station/54

96.    The M3U8 includes an identification of an advertising server, the identification of the advertising server being dependent at least in part on a relationship between the geographic location (*e.g.*, CDNs) of the client device (*e.g.*, personal computer, mobile device, television) and a geographic location of the advertising server.



*See e.g.,* https://www.uniqlo.com/us/en/special-feature/live-station/54

97.     The M3U8 causes the client device to communicate with resources (*e.g.,* media streaming servers) of the content distribution network and the advertising server to cause the one or more segments of the stored video to be streamed to the client device (*e.g.,* personal computer, mobile device, television) by the identified one or more resources of the content distribution network and cause one or more advertisements to be streamed from the advertising server to the client device.



*See e.g.,* https://www.uniqlo.com/us/en/special-feature/live-station/54



*See e.g.,* https://www.uniqlo.com/us/en/special-feature/live-station/54



*See e.g.,* https://www.uniqlo.com/us/en/special-feature/live-station/54

98.     SITO has been damaged by the direct infringement of Uniqlo, and is suffering and will continue to suffer irreparable harm and damages as a result of this infringement.

### Count VI – Infringement of United States Patent No. 10,769,675

99.     SITO alleges, and incorporates by reference, as if fully set forth here, the preceding paragraphs of this Complaint.

100.    Uniqlo directly infringes (literally and/or under the doctrine of equivalents) the '675 patent by using the method covered by at least claim 31 of the '675 patent.

101.    On information and belief, and without SITO's approval, authorization and license, Uniqlo owns, controls, operates, and uses a system for streaming media that includes the Uniqlo Streaming Platform, as well as other Uniqlo networks, systems,

devices, components, and/or services for streaming media, that practices and infringes the media streaming method recited in at least claim 31 of the '675 patent.

102.    Uniqlo performs a method of streaming video as demonstrated by the example provided below:



See e.g., https://www.uniqlo.com/us/en/special-feature/live-station/54

103.    On information and belief, Uniqlo receives, from each of a plurality of media owners, media for a plurality of events (e.g., media files/videos) for streaming and one or more media rules (e.g., geographic restrictions) governing transmission of the received media, wherein the one or more media rules are used by the streaming system to determine a streaming sequence for the transmission of the received media and determine one or more streaming resources (e.g., CDNs) to which the received media is to be distributed.

104.    Uniqlo receives, from a communication device (e.g., personal computer, mobile device, television) via a communication network (e.g., Internet), a request (e.g.,

GET request) for media for one of the plurality of events to be streamed to the communication device, the media for the requested event comprising a plurality of segments and the requested event being selected by a user of the communication device from a plurality of event options (*e.g.*, media files/videos).



*See e.g.*, https://www.uniqlo.com/us/en/special-feature/live-station/54



*See e.g.,* https://www.uniqlo.com/us/en/special-feature/live-station/54



*See e.g.,* https://www.uniqlo.com/us/en/special-feature/live-station/54

Appx381



*See e.g.,* https://www.uniqlo.com/us/en/special-feature/live-station/54



*See e.g.,* https://www.uniqlo.com/us/en/special-feature/live-station/54

105.    In response to the received request (*e.g.,* GET request), Uniqlo transmits

one or more files (*e.g.,* (M3U8 file)) to the communication device (*e.g.,* personal

Appx382

Case 2:23-cv-21757-JKS-JSA Document 32-2 Filed 10/29/24 Page 71 of 77 PageID: 375

computer, mobile device, television) over the packet-based telecommunication network

(*e.g.*, the Internet) as demonstrated by the example provided below:



*See e.g.,* https://www.uniqlo.com/us/en/special-feature/live-station/54



*See e.g.,* https://www.uniqlo.com/us/en/special-feature/live-station/54



*See e.g.,* https://www.uniqlo.com/us/en/special-feature/live-station/54

106.. The M3U8 file includes one or more references (*e.g.,* URLs/filename) to one or more of the segments of the media for the requested event (e.g., video).



*See e.g.,* https://www.uniqlo.com/us/en/special-feature/live-station/54



See e.g., https://www.uniqlo.com/us/en/special-feature/live-station/54



See e.g., https://www.uniqlo.com/us/en/special-feature/live-station/54

107.    On information and belief, the M3U8 file includes information, the information being based at least in part on the one or more media rules (e.g., geographic restrictions), for use by the communication device identifying how to communicate

with the one or more determined resources (*e.g.*, media streaming server/CDN) to cause the one or more segments of the media for the requested event to be streamed to the communication device (*e.g.*, client device) in accordance with the one or more media rules.



See *e.g.*, https://www.uniqlo.com/us/en/special-feature/live-station/54



See *e.g.*, https://www.uniqlo.com/us/en/special-feature/live-station/54



*See e.g.,* https://www.uniqlo.com/us/en/special-feature/live-station/54



*See e.g.,* https://www.uniqlo.com/us/en/special-feature/live-station/54

Appx387



*See e.g.,* https://www.uniqlo.com/us/en/special-feature/live-station/54

108.    SITO has been damaged by the direct infringement of Uniqlo, and is suffering and will continue to suffer irreparable harm and damages as a result of this infringement.

## JURY DEMANDED

109.    Pursuant to Federal Rule of Civil Procedure 38(b), SITO hereby requests a trial by jury on all issues so triable.

## PRAYER FOR RELIEF

SITO respectfully requests this Court to enter judgment in SITO's favor and against Uniqlo as follows:

a.    finding that Uniqlo directly infringes, literally and/or under the doctrine of equivalents, one or more claims of each of the patents-in-suit;

b.    awarding SITO damages under 35 U.S.C. § 284, or otherwise permitted by law, including supplemental damages for any continued post-verdict infringement;

c.    awarding SITO pre-judgment and post-judgment interest on the damages award and costs;

d.    awarding costs of this action (including all disbursements) and attorney fees pursuant to 35 U.S.C. § 285, or as otherwise permitted by the law; and

e.    awarding such other costs and further relief that the Court determines to be just and equitable.

October __, 2023

Respectfully submitted,

/s/ _____
Ronald M. Daignault*
Chandran B. Iyer
Jason S. Charkow*
DAIGNAULT IYER LLP
8618 Westwood Center Drive, Suite 150
Vienna, VA 22182
rdaignault@daignaultiyer.com
cbiyer@daignaultiyer.com
jcharkow@daignaultiyer.com

*Not admitted in Virginia

Attorneys for Plaintiffs
SITO Mobile R&D IP, LLC and
SITO Mobile Ltd.

Shailendra Maheshwari (001822004)*
Scott R. Samay (040561996)*
Tedd W. Van Buskirk (041261995)*
DAIGNAULT IYER LLP
8229 Bpone Boulevard, Suite 450
Vienna, VA 22182
smaheshwari@daignaultiyer.com
ssamay@daignaultiyer.com
tvanbuskirk@daignaultiyer.com
*Not admitted in Virginia
Attorneys for Defendants
SITO Mobile R&D IP, LLC and
SITO Mobile, Ltd.

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| BAMBUSER AB,<br><br>                    Plaintiff,<br><br>v.<br><br>SITO MOBILE R&D IP, LLC, and<br>SITO MOBILE, LTD.,<br><br>                    Defendants. | Case No. 2:23-cv-21757-JKS-JSA<br><br>(Filed Electronically)<br><br>**STIPULATION AND CONSENT ORDER<br>EXTENDING TIME** |

IT IS HEREBY STIPULATED AND AGREED between plaintiff Bambuser AB

("Bambuser") and defendants SITO Mobile R&D IP, LLC and SITO Mobile, Ltd. (collectively,

"SITO"), by and through each party's undersigned counsel, that: The date for SITO to answer, or

otherwise plead, in response to Bambuser's Amended Complaint (Dkt. 32) is extended to

December 10, 2024.

Appx390

Dated: November 13, 2024

STIPULATED AND AGREED:

KAPLAN BREYER SCHWARZ, LLP

By: _/s/Jeffrey I. Kaplan_
    Jeffrey I. Kaplan
317 George Street Suite 320
New Brunswick, New Jersey 08901
Telephone: (732) 578-0103
Facsimile: (732) 578-0104
jkaplan@kbsiplaw.com

ZUKERMAN GORE BRANDEIS &
CROSSMAN, LLP
John K. Crossman (*pro hac vice*)
Eleven Times Square
New York, New York 10036
Telephone: (212) 223-6700
Facsimile: (212) 223-6433
jcrossman@zukermangore.com

*Attorneys for Plaintiff Bambuser AB*

DAIGNAULT IYER LLP

By: _/s/Shailendra Maheshwari_
    Shailendra Maheshwari
    Scott R. Samay
    Tedd W. Van Buskirk
8229 Boone Blvd., Suite 450
Vienna, Virginia 22182
Tel: (202) 997-1925
smaheshwari@daignaultiyer.com
ssamay@daignaultiyer.com
tvanbuskirk@daignaultiyer.com

*Attorneys for Defendants*
*SITO Mobile R&D IP, LLC and*
*SITO Mobile, Ltd.*

**SO ORDERED:**

_____
HON. JAMEL K. SEMPER, U.S.D.J.

2

Appx391

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

BAMBUSER AB,

        Plaintiff,

  v.

SITO MOBILE R&D IP, LLC and SITO
MOBILE, LTD.,

        Defendants.

Case No. 2:23-cv-21757-JKS-JSA

Motion Date: January 6, 2025

NO HEARING REQUESTED

**NOTICE OF DEFENDANTS' MOTION TO DISMISS
PURSUANT FED. R. CIV. P. 12(b)(1)**

**PLEASE TAKE NOTICE** that on January 6, 2025 or as soon thereafter as counsel may

be heard, Defendants SITO MOBILE R&D IP, LLC and SITO MOBILE, LTD. (collectively

"SITO" or "Defendants"), by and through their attorneys Daignault Iyer LLP, will apply for an

order dismissing this action pursuant to Fed. R. Civ. P. 12(b)(1) for lack of subject-matter

jurisdiction pursuant to the Federal Circuit's holding in *Microsoft Corp. v. DataTern, Inc.*, 755

F.3d 899 (Fed. Cir. 2014). There is related first-filed proceeding pending in the United States

District Court for the Western District of Texas styled *SITO Mobile R&D IP, LLC and SITO*

*Mobile, LTD. v. SFA Holdings, Inc.,(f/k/a/ Saks Incorporated),* 23-cv-00688, which involves the

same subject matter as Plaintiff's second-filed declaratory-judgment action here and where

Plaintiff has come forward to defend and indemnify its customer, SFA Holdings, Inc.

        **PLEASE TAKE FURTHER NOTICE** that a proposed form of Order is also submitted.

Appx394

**PLEASE TAKE FURTHER NOTICE** that Defendants do not request oral argument

per Local Rule 78.1.

Dated: December 9, 2024            Respectfully submitted,

*/s/ Shailendra Maheshwari*
Shailendra Maheshwari (001822004)*
Scott R. Samay (040561996)*
Tedd W. Van Buskirk (041261995)*
DAIGNAULT IYER LLP
8618 Westwood Center Drive, Suite 150
Vienna, VA 22182
smaheshwari@daignaultiyer.com
ssamay@daignaultiyer.com
tvanbuskirk@daignaultiyer.com

*Not admitted in Virginia*

*Attorneys for Plaintiffs*
*SITO Mobile R&D IP, LLC and*
*SITO Mobile Ltd.*

Appx395

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| BAMBUSER AB,<br><br>        Plaintiff,<br><br>   v.<br><br>SITO MOBILE R&D IP, LLC, and<br>SITO MOBILE, LTD.,<br><br>        Defendants. | Case No. 2:23-cv-21757-JKS-JSA<br><br>Motion Date: January 6, 2025 |

**MEMORANDUM IN SUPPORT OF DEFENDANTS'
MOTION TO DISMISS PURSUANT TO FED. R. CIV. P. 12(b)(1)**

Appx396

## **TABLE OF CONTENTS**

I.      INTRODUCTION ................................................................................................. 1

II.     PROCEDURAL HISTORY ................................................................................. 2

III.    ARGUMENT ....................................................................................................... 3

      A.    Under *Microsoft v. DataTern,* Bambuser's Amended Complaint still fails to establish the right to bring a declaratory judgment action solely because SFA has been sued for infringement. ...................................................................... 3

      B.    Bambuser's New Factual Allegations Regarding SFA Fail to Show Direct or Induced Infringement by Bambuser. ........................................................ 6

      C.    Bambuser's New Allegations Regarding Uniqlo Fail to Show Inducement or Direct Infringement by Bambuser; Uniqlo has not been sued. .............................. 10

      D.    Bambuser materially misrepresents SITOs negotiation efforts ............................ 12

      E.    Bambuser, as the indemnitor to SFA, cannot provide any basis as to why it cannot proceed in the first-filed Texas Action. ................................................................. 14

      F.    A dismissal will also conserve judicial resources and promote efficiency. .......... 14

IV.     CONCLUSION .................................................................................................. 15

i

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Merial Ltd. v. Cipla Ltd.*,
  681 F.3d 1283 (Fed. Cir. 2012).............................................................................................15

*Microchip Tech. Inc. v. Chamberlain Grp.*,
  441 F.3d 936 (Fed. Cir. 2006).............................................................................................10

*Microsoft Corp. v. DataTern, Inc.*
  755 F.3d 899 (Fed. Cir. 2014)...................................................................................... *passim*

*Mitek Sys., Inc. v. United Servs. Auto. Ass'n*,
  34 F. 4th 1334 (Fed. Cir. 2022) ..........................................................................................4, 5

*Petruska v. Gannon Univ.*,
  462 F.3d 294 (3d Cir. 2006).....................................................................................................3

*SITO Mobile R&D IP, LLC*,
  23-cv-00688, Order Granting Defendant's Motion to Stay, D.I. 30 (WDTX
  Apr. 19, 2024) ...........................................................................................................................3

*SITO Mobile R&D IP, LLC and SITO Mobile, LTD. v. SFA Holdings, Inc.,(f/k/a/
  Saks Incorporated)*,
  23-cv-00688 ...........................................................................................................................2, 7

**Other Authorities**

Fed. R. Civ. P. 12(B)(1)............................................................................................................1, 1, 2

Federal Rule 408 .............................................................................................................................12

ii

Appx398

## I.    INTRODUCTION

Defendants SITO Mobile R&D IP, LLC and SITO Mobile, Ltd. (collectively "Defendants" or "SITO") hereby move to dismiss Plaintiff Bambuser AB's ("Bambuser") First Amended Complaint for Declaratory Judgement ("Amended Complaint") (D.I. 32) for lack of subject matter jurisdiction pursuant to Fed. R. Civ. P. 12(b)(1).

The Court granted SITO's motion to dismiss the original complaint on 12(b)(1) grounds, and provided a detailed opinion as to why Bambuser did not have standing to bring a declaratory action here in New Jersey, when the same relief was available to it in a first-filed case in the Western District of Texas ("Texas Action"). *See* D.I. 30. Key factors in the Court's analysis focused on 1) Bambuser's acceptance of its indemnification and defense obligations on behalf of its customer, Saks Fifth Avenue ("SFA"), on the identical patents at issue and participation in the Texas Action, and 2) Bambuser's failure to show direct or induced infringement by Bambuser, itself.[1] *Id.* at 7.

This is Bambuser's second bite at the apple. However, Bambuser's Amended Complaint again fails to allege facts sufficient to grant it standing. Indeed, when the "new" factual allegations are examined in even cursory detail, it is readily apparent that they confirm SITO's position. Bambuser cannot establish direct infringement and provides no showing of contributory or induced infringement at all. D.I. 30 at 4-6. Effectively, Bambuser failed to address the findings that this Court detailed in its Order. *Id.* Further, Bambuser's "new" factual allegations in its

---

[1] The Court established that, "SFA has requested Bambuser defend and indemnify SFA, pursuant to the terms of an agreement governing the relationship between SFA and Bambuser" and "Bambuser agreed to defend and indemnify SFA for 'any infringement by Bambuser's video streaming product.'" D.I. 30 at 2. Additionally, Bambuser has accepted its indemnification and defense obligations for its customer, Uniqlo, where there is no pending action. *See* D.I. 32¶¶ 10-16.

1

Appx399

Amended Complaint do not provide any reason why it cannot continue in the Texas Action, where it has already participated, to obtain the same relief it seeks here.

Additionally, certain portions of Bambuser's "new" factual allegations also contain material misrepresentations, including the timing of settlement discussion. When those allegations are contrasted with the evidence of what actually occurred, and coupled with the lack of direct infringement evidence, it verifies that Bambuser simply cannot meet the requirements of showing that it has standing here in New Jersey.

As detailed below, the Court should again grant Defendants' motion to dismiss Bambuser's Amended Complaint for lack of subject matter jurisdiction under Fed. R. Civ. P. 12(b)(1), and the Federal Circuit's holding in *Microsoft v. DataTern*. Moreover, the Federal Circuit's holding in *Microsoft v. DataTern*, remains the controlling authority and Bambuser was given every opportunity to provide a basis for why it should not be made to proceed in the first-filed Texas Action based on this Court's reasoned analysis. It wholly failed to do so. For at least those reasons, this case should be dismissed with prejudice.

## II.    PROCEDURAL HISTORY

A brief recitation of the procedural history is as follows:

- On June 16, 2023, Defendants filed an action styled *SITO Mobile R&D IP, LLC and SITO Mobile, LTD. v. SFA Holdings, Inc.,(f/k/a/ Saks Incorporated)*, 23-cv-00688, in the Western District of Texas against SFA Holdings, Inc. ("SFA") asserting infringement of U.S. patent nos. 7,191,244; 8,015,307; 8,554,940; 9,349,138; 10,735,781; and 10,769,675 (collectively the "asserted patents") by certain accused products (the "Texas Action").

- On November 1, 2023, ***over four months later***, Bambuser filed a declaratory-judgment action in New Jersey. *See* D.I. 1. (Bambuser informed the Court that it has accepted its indemnification and defense obligations for its customer, Saks).

- On December 13, 2023, SFA, through Bambuser, filed a motion to stay the Texas Action. *See SITO Mobile R&D IP, LLC,* 1-23-cv-00688, Defendant's Motion to Stay, D.I. 10 (WDTX Dec. 13, 2023).

2

Appx400

- On January 16, 2024, Defendants filed their motion to dismiss Bambuser's declaratory judgment complaint in New Jersey for lack of subject matter jurisdiction. *See* D.I. 18.

- On April 19, 2024, SFA's motion to stay was granted. *See SITO Mobile R&D IP, LLC,* 23-cv-00688, Order Granting Defendant's Motion to Stay, D.I. 30, (WDTX Apr. 19, 2024). The stay was granted subject to the resolution of the New Jersey matter.

- On September 3, 2024, this Court granted Defendants Motion to Dismiss. *See* D.I. 30. Bambuser was given leave to file an amended complaint within sixty (60) days.

- On October 29, 2024, Bambuser filed an Amended Complaint. *See* D.I. 32.

Despite using nearly all sixty (60) days to file its Amended Complaint, Bambuser still fails to address or incorporate the Court's extensive analysis from the Order granting the motion to dismiss. *See* D.I. 30.[2]

## III. ARGUMENT

### A. Under *Microsoft v. DataTern,* Bambuser's Amended Complaint still fails to establish the right to bring a declaratory judgment action solely because SFA has been sued for infringement.

As with the prior motion to dismiss, SITO's challenge remains a facial 12(b)(1) challenge; SITO's motion attacks the Amended Complaint on its face without contesting its alleged facts and is like a 12(b)(6) motion in requiring the court to "consider the allegations of the complaint as true." *Petruska v. Gannon Univ.*, 462 F.3d 294, 302 n.3 (3d Cir. 2006).

SITO explained in the original motion to dismiss, "Bambuser's affirmative acceptance of its indemnification and defense obligations precludes it from filing a declaratory-judgment action in the Court when there is already a first-filed pending suit in Texas because the Court lacks subject-matter jurisdiction over the declaratory filing." D.I. 18 at 3.

This Court stated, "[t]he Supreme Court has explained that the 'actual controversy' requirement of the [Declaratory Judgement] Act refers to the types of 'cases' and 'controversies'

---

[2] Additionally, all six counts from the originally filed complaint and the Amended Complaint are identical. *Compare* D.I. 1, ¶¶ 16-39 *with* D.I. 32, ¶¶ 36-59.

3

Appx401

justiciable under Article III." *See* D.I. 30 at 4 (*citing MedImmune, Inc. v. Genentech, Inc.*, 549

U.S. 118, 127 (2007)). The Court applied the Federal Circuit's considerations for assessing

whether a plaintiff that is seeking a declaratory judgment has met the case-or-controversy

requirement of Article III, specifically in patent cases. *Id. at 4* (*citing Mitek Sys., Inc. v. United*

*Servs. Auto. Ass'n*, 34 F. 4th 1334 (Fed. Cir. 2022)). Under *Mitek*, to determine whether a

plaintiff might reasonably be liable for infringement, a district court should look to the elements

of the potential cause of action, then consider both the patent claims at issue and the alleged facts

concerning the plaintiff in light of those elements. *Id.* (*citing Mitek,* 34 F. 4th at 1343).

In granting SITO's motion to dismiss, the Court applied the Federal Circuit's holding in

*Microsoft Corp. v. DataTern, Inc*. *Id.* at 6 (*citing Microsoft Corp. v. DataTern, Inc*. 755 F.3d 899

(Fed. Cir. 2014)). As explained in *Microsoft:*

> To prove inducement of infringement, unlike direct infringement, the
> patentee must show that the accused inducer took an affirmative act to
> encourage infringement with the knowledge that the induced acts
> constitute patent infringement. [citation omitted]. Absent the knowledge
> and affirmative act of encouragement, no party could be charged with
> inducement. Thus, in determining whether there is a case or controversy of
> sufficient immediacy to establish declaratory judgment jurisdiction we
> look to the elements of the potential cause of action. [citation
> omitted]. Certainly, it is not the case that definitive proof must exist that
> would establish each element. But, to establish a substantial controversy
> regarding inducement, there must be allegations by the patentee or other
> record evidence that establish at least a reasonable potential that such a
> claim could be brought.

*Microsoft*, 755 F.3d at 904-905 (citations omitted). The Court specifically stated that

"[t]he threshold question for declaratory judgment jurisdiction is 'whether the facts alleged,

under all the circumstances, show that there is a substantial controversy, between parties having

adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a

declaratory judgment.'" D.I. 30 at 6 (*citing MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118,

4

Appx402

127 (2007)). As articulated previously, under *Mitek*, this Court must provide a good reason for dismissing a declaratory judgment action. *Id*.

The Order also stated that "[c]ritically, the *Microsoft* Court specified that plaintiffs do not have a right to bring a declaratory judgment action solely because their customers have been sued for direct infringement." *Id*. at 7, citing *Microsoft*, 755 F.3d at 904. And the Order explained thoroughly that while Defendants did not accuse Bambuser of direct infringement, Bambuser agreed to indemnify SFA in the underlying Texas Action. Id. at 7. Most importantly:

> However, even an obligation to indemnify "would not justify" what
> Bambuser seeks here: a case has already been filed against Bambuser's
> customer in the Western District of Texas. [citation omitted]. In agreeing
> to indemnify their customer, Bambuser could defend SFA and effectively
> participate in the SFA Action.

*Id.* (citation omitted). Bambuser, despite having sixty (60) days to do so, has not provided any additional relevant evidence to provide it with the standing required for the Amended Complaint to proceed in New Jersey, rather than proceeding with the first-filed Texas Action. As the Order explained, there are "no claims or factual allegations that could be read to allege that Bambuser encouraged the use of [SITO] patents that would amount to direct infringement." *Id*. Further, "[t]he record does not provide this Court with sufficient evidence establishing substantial controversy regarding inducement." *Id.* at 7-8. In its Amended Complaint, Bambuser again fails to provide any evidence to support any factual allegations or claims that would address the Court's Order. *See* D.I. 32.

Indeed, the Court's prior analysis of *Microsoft* remains fully applicable with respect to the Amended Complaint, "Bambuser's Complaint and other submissions do not sufficiently show that there is a substantial controversy of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." D.I. 30 at 8 (*citing MedImmune*, 549 U.S. at 127).

5

Appx403

Further, Bambuser still will not be able to provide any reason why it cannot effectively participate in the first-filed Texas action where it has accepted and stepped in to defend and indemnify its customer, SFA. The Court's Order directly addresses this issue and Bambuser's Amended Complaint fails for the exact same reasons that the first action failed.

> **B.      Bambuser's New Factual Allegations Regarding SFA Fail to Show Direct or Induced Infringement by Bambuser.**

Bambuser includes "new" allegations in its Amended Complaint purporting to detail why there is evidence of induced infringement or direct infringement by Bambuser in the Texas Action. *See* D.I. 32, ¶¶ 10-16.[3] But the fundamental problem with each of these new allegations is that the complaint in the Texas Action is directed to SFA's system (the "Saks System") which carries out the infringing activities. The only indication that Bambuser is the party supplying the software to SFA is that Bambuser stepped in to defend and indemnify SFA under the terms of their contract and through the filing of the declaratory action here in New Jersey. There was ***no*** other indication that Bambuser was involved in providing the infringing services, at all. Put more simply, no allegations in the complaint in the Texas Action even mention Bambuser. Indeed, the infringement allegations identify the Saks System and only allege infringement by the Saks System. As exemplary Count I of the Texas Action states:

> 52. Saks streams videos using a network(s) of servers ("Saks Streaming Platform"). Saks uses HTTP Live Streaming (HLS) protocol to stream video content. HLS is an HTTP-based adaptive bitrate streaming technique that enables high-quality streaming of media content over the Internet from web servers"
> 53. Saks owns, controls, operates, and uses a system for streaming media that includes the Saks Streaming Platform, as well as other Saks networks, systems, devices, components and/or services for streaming media, that practices and

---

[3] Bambuser refers to claim charts that are included with the Saks Complaint. However, there were no standalone claim charts included, and it is likely that the claim charts refer to the element-by-element infringement allegations in the complaint.

6

Appx404

> infringes the media streaming method recited in at least claim 2 of the '244 patent.
>
> 54. Saks performs a method of streaming video content based on a request (e.g., GET request) as demonstrated by the example provided below.

*See* D.I. 32, Ex. A, *SITO Mobile R&D IP, LLC,* 23-cv-00688, Compl., D.I. 1, ¶¶ 52-54

(WDTX Jun. 16, 2023). Further, each and every link included in the Texas complaint to support

SITO's allegations are directed to the SFA website - https://www.saksfifthavenue.com/c/live-

stream/video. *Id.* at ¶¶ 54-58, 68-75, 85-88, 91, 101, 103, 104, 116, 119-121, 123, 133, 135-138.

None of those links indicate that Bambuser controls SFA's website or provides the technology

that powers the website. In fact, the more detailed packet tracing evidence in the complaint

consistently shows that the data is being pulled from the https://www.saksfifthavenue.com

7

Appx405

website (*see* "**Origin**" or "**Referer**" fields).

54.    Saks performs a method of streaming video content based on a request (e.g., GET request) as demonstrated by the example provided below:



See e.g., *https://www.saksfifthavenue.com/c/live-stream/video*



8

*Id.* at ¶ 54.[4] Thus, it is unclear how any reasonable person could reach a conclusion that it is not the Saks System which is carrying out the method accused of infringement. Therefore, the "new" factual allegations in the Amended Complaint cannot rise to the level of direct infringement by Bambuser. *See Gould Elecs. Inc.*, 220 F.3d at 178.

Further, Bambuser has *no* evidence whatsoever regarding inducement or contributory infringement. The *only* allegation in the complaint states: "Both the Uniqlo Complaint and the SFA Complaint allege infringement by Bambuser's customers based upon the use of Bambuser's product supplied to those customers. Such infringement allegations carry an *implied* assertion that Bambuser is committing contributory and/or induced infringement." D.I. 32, ¶ 27. There are no allegations by SITO and certainly no showing that Bambuser took affirmative acts to encourage infringement with the knowledge that the induced acts constitute patent infringement. *See Microsoft,* 755 F.3d 899 (Fed. Cir. 2014)) (*citing Global-Tech Appliances, Inc. v. SEB S.A.,* 131 S. Ct. 2060, 2068, (2011)). Thus, Bambuser has not provided the Court with anything new to address that "[t]he record does not provide this Court with sufficient evidence establishing substantial controversy regarding inducement." D.I. 30 at 7-8.

Accordingly, there are *no* allegations of direct or induced infringement against Bambuser apart from manufactured attorney allegations that could confer standing upon Bambuser for its Amended Complaint. Indeed, Bambuser concedes this key fact and reveals its hand when it states in the Amended Complaint here that "such infringement allegations carry an *implied* assertion that Bambuser is committing contributory and/or induced infringement. *See* D.I. 32, ¶

---

[4] To the extent that Bambuser claims that its technology is implicated in the packet tracing, it is impossible to know that without the express admission by Bambuser. The packet tracing analysis identifies numerous other technology companies including: Doubleclick, Google, Akamai, Mozilla, Firefox, etc. Nothing in the evidence implicitly, or explicitly, indicates that Bambuser is providing the accused technology.

9

Appx407

27 (emphasis added). Effectively, Bambuser asks this Court to manufacture the evidence it failed to (and cannot) provide for the inducement and contributory infringement allegations which simply do not exist so that it can support its flawed Amended Complaint. Moreover, the Court cited the *Microsoft* decision to address Bambuser's previous attempt to latch onto an implied assertion of contributory infringement for standing purposes. D.I. 30, at 8. Nothing has changed. The infringement allegations in the Texas Action certainly do not state that the Bambuser technology[5] is "not a staple article or commodity of commerce suitable for substantial non-infringing use." *Id.* at 8 (citing 35 U.S.C. § 271(c) (2012)). And nothing in the record shows any evidence that Bambuser's technology is not suitable for substantial non-infringing uses, or that Bambuser knew that it was "especially made or adapted for use in an infringement" of SITO's patents. *Id.* at 8. Therefore, the "new" allegations in the Amended Complaint fail to show direct or induced/contributory infringement. *See Microchip Tech. Inc. v. Chamberlain Grp.,* 441 F.3d 936, 945 (Fed. Cir. 2006) (finding the Plaintiff failed to satisfy the criteria for a Declaratory Judgment Action because the Plaintiff did not produce enough evidence to indicate contributory or induced infringement).

>    **C.    Bambuser's New Allegations Regarding Uniqlo Fail to Show Inducement or Direct Infringement by Bambuser; Uniqlo has not been sued.**

In further hopes of manufacturing a case or controversy for the Amended Complaint, Bambuser adds "new" allegations regarding its customer, Uniqlo. First, Uniqlo has not been sued. Second, SITO's last and only contact with Uniqlo was a settlement discussion with Uniqlo's in-house counsel who did not indicate any involvement by Bambuser. Since that meeting, Bambuser has notified SITO that it is indemnifying and defending Uniqlo for use of

---

[5] As noted, the Bambuser technology is not even named, rather the Saks System is the only item referenced in the SFA complaint.

Appx408

Bambuser technology and that all communication must be conducted through Bambuser's counsel. Third, the Court previously addressed Uniqlo in its Order, stating:

> Of note, Bambuser invokes Sito's threatened litigation against another Bambuser customer, Uniqlo, in the Southern District of New York. (Opp. at 9, Compl. ¶¶ 8-10.) To the extent that Plaintiff attempts to pursue an economic theory out of concern for its current or potential customers' freedom to operate, this is an economic theory rejected by the Federal Circuit. *Arris*, 639 F.3d at 1374 ("[W]e have not held that economic injury alone is sufficient to confer standing in patent cases seeking a declaratory judgment.") As such, the Complaint does not state a case or controversy on this issue either.

D.I. 30, at 8, fn. 4. Nothing has changed with Uniqlo, and, accordingly, Bambuser's customer, Uniqlo, is not in any imminent danger of a suit from SITO.[6]

It is notable, however, that Bambuser's efforts fail for the same reasons stated with respect to the "new" SFA allegations, *supra*. Bambuser parrots the almost identical allegations it used with respect to SFA. *See* D.I. 32, compare ¶¶ 10-16 for SFA and ¶¶ 19-23 for Uniqlo. As with the SFA allegations, every link in the draft Uniqlo complaint is to www.uniqlo.com. *See* D.I. 32-2, Ex. B, ¶¶ 49-52. Every allegation is made specifically to Uniqlo and the Uniqlo system (Example: "Uniqlo identifies at least one program"). *Id.* at ¶ 49. Just as with SFA, no reasonable person would understand that Uniqlo was not the party carrying out the method accused of infringement, unless it was informed after the fact just like Bambuser did with respect to SITO.

Further, Bambuser asserts the same *implied* assertion theory of contributory/induced infringement. *See* D.I. 32, ¶ 27 (emphasis added). Again, Bambuser provides *no* allegations by SITO, and certainly no showing that Bambuser itself took affirmative acts to encourage infringement with the knowledge that the induced acts constitute patent infringement. *See*

---

[6] Additionally, SITO's last communication with Uniqlo was on or about October 26, 2023. Over 13 months have passed since that time, supporting SITO's contention that it has no plan on suing Uniqlo.

11

*Microsoft,* 755 F.3d 899 (Fed. Cir. 2014)) (*citing Global-Tech Appliances, Inc. v. SEB S.A.,* 131 S. Ct. 2060, 2068, 179 L. Ed. 2d 1167 (2011)). As detailed with respect to the SFA allegations, Bambuser's implied theory of contributory/induced infringement fails and should not be given credence.

### D.    Bambuser materially misrepresents SITOs negotiation efforts

The Amended Complaint plays fast and loose with the facts surrounding settlement discussions between SITO and Bambuser.[7] Bambuser states that "[a]fter filing the SFA Complaint and transmitting the Uniqlo Complaint, SITO requested that Bambuser resolve all SITO's allegations of infringement against SFA, Uniqlo, and all other Bambuser customers by taking a license directly from SITO." *See* D.I. 32, ¶ 28. Bambuser purposefully misrepresents and omits relevant facts. SITO was in communication with Saks' counsel, Mr. Michael Zinna, for over six (6) months prior to even learning of Bambuser. *See* Decl. of S. Maheshwari, Ex. 1, Email Chain between SITO and Saks counsel, Feb.3, 2023. Similarly, SITO was in communication with Uniqlo's in-house counsel, Mr. Aron Weiss, before it ever learned of Bambuser. *See* Decl. of S. Maheshwari, Ex. 2, Email Chain between SITO and Uniqlo counsel, Oct. 26, 2023. Indeed, Bambuser was never mentioned by either party, nor was SITO directed to contact Bambuser by either Saks or Uniqlo. The *first* time SITO learned of Bambuser was through Bambuser's filing of the original declaratory action here in New Jersey and an email from its counsel. *See* Decl. of S. Maheshwari, Ex. 3, Email Chain between SITO and Bambuser counsel, Nov. 26, 2023. Further, only from the New Jersey complaint did SITO learn that Bambuser was accepting indemnification and defense obligations for Saks. D.I. 1 at 7. Thus,

---

[7] As it did in prior filings when it disclosed SITO's settlement offer, Bambuser is once again violating Federal Rule 408 by disclosing the substance of confidential settlement communications between the parties.

12

Appx410

Bambuser's assertion that SITO unilaterally approached Bambuser to discuss a license is far from reality. Only once Bambuser made itself known as the provider of the infringing technology and after it accepted indemnity and defense obligations requiring SITO to communicate directly with Bambuser, were any discussions held between SITO and Bambuser regarding a license agreement. Therefore, Bambuser allegations in paragraphs ¶¶ 29-30 are also a misrepresentation of the facts as they occurred. *Bambuser* is the party that explained to SITO that its technology is what was accused in the Texas Action (and in the draft Uniqlo complaint). Accordingly, and logically, upon being provided that knowledge, SITO could only have discussed a license directly with Bambuser. In contrast, in *Microsoft v. DataTern*, Microsoft contacted DataTern to discuss ongoing lawsuits, and it was during those discussions that Microsoft stated that they had no obligation to "defend or indemnify its customers…". *Microsoft,* 755 F.3d at 902. Additionally, during those discussions, "DataTern assured Microsoft that it did not intend to sue Microsoft." *Id.* at 906. Here, Bambuser has accepted indemnification obligations, including for the Texas Action, where it has already participated. Therefore, SITO is obligated to discuss any settlement and/or license with Bambuser directly. There is no apprehension that SITO will file suit against another Bambuser Customer.

> But more importantly, the Court also addressed the negotiations in its Order:
>
> Bambuser also invokes negotiations with Sito for a global license for Bambuser's customers. To the extent this off-handed remark is relevant, the Court notes that these negotiations do not appear to rise to the level of a "protracted negotiation process" that might have supported jurisdiction. *See Microsoft,* 755 F.3d at 906; *see also Arris*, 639 F.3d at 1381.

D.I. 30, at 8, fn. 3. As with Bambuser's other "new" allegations, nothing has changed here. To preempt any further misrepresentations by Bambuser, SITO and Bambuser have recently had one

13

follow-up meeting regarding settlement. That would be only the second settlement discussion between the parties in over one year. There are no protracted negotiations between the parties.

**E.      Bambuser, as the indemnitor to SFA, cannot provide any basis as to why it cannot proceed in the first-filed Texas Action.**

As detailed, nothing has changed since the filing of the original complaint. Despite attempting (and failing) to create "new" factual allegations regarding direct and induced infringement, Bambuser cannot escape the Federal Circuit's holding in *Microsoft*, which was also cited by the Court:

> However, even an obligation to indemnify "would not justify" what Bambuser seeks here: a case has already been filed against Bambuser's customer in the Western District of Texas. [citation omitted] In agreeing to indemnify their customer, Bambuser could defend SFA and effectively participate in the SFA Action.

D.I. 30 at 7 (*citing Microsoft,* 755 F.3d at 904 (Fed. Cir. 2014)). As the Court detailed in its Order dismissing the original complaint, "Bambuser's Complaint and other submissions do not sufficiently show that there is a substantial controversy of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." D.I. 30 at 7 (citation omitted). While it is a cliché, "having your cake and eating it, too" is appropriate to describe what Bambuser seeks here. Bambuser has already actively participated in the Texas Action through its indemnification and defense obligations, including the filing for a stay. The relief it seeks here is identical to that which will be addressed in Texas. There remains no substantial controversy of sufficient immediacy to warrant a declaratory judgment here. D.I. 30 at 6.

**F.      A dismissal will also conserve judicial resources and promote efficiency.**

As detailed in the prior motion to dismiss, a significant and additional benefit to all parties and the Courts, and one that is grounded in the law, is that a dismissal will conserve judicial resources and promote efficiency. *See* D.I. 18 at 5-6. Though discussed in the context of

Appx412

the first-to-file rule in SITO's earlier motion to stay (D.I. 10 at 3), the same considerations are applicable here with respect to a motion to dismiss. Dismissing in favor of the first-filed case, which is required under *Microsoft*, "avoid[s] conflicting decisions and promote[s] judicial efficiency, that favors pursuing only the first-filed action when multiple lawsuits involving the same claims are filed in different jurisdictions." *Merial Ltd. v. Cipla Ltd.*, 681 F.3d 1283, 1299 (Fed. Cir. 2012) (citations omitted). Accordingly, consistent with Federal Circuit's precedent in *Microsoft*, this Court should dismiss this action in favor of the Texas Action which will allow for the conservation of judicial resources and avoid duplication and/or the possibility of inconsistent results in the two jurisdictions.

## IV.   CONCLUSION

For the reasons stated above, the Court should dismiss Bambuser's Amended Complaint with prejudice for lack of subject matter jurisdiction and in light of the Federal Circuit's holding in *Microsoft v. DataTern*.

December 9, 2024                                    Respectfully submitted,

                                                   */s/ Shailendra Maheshwari*
                                                   Shailendra Maheshwari (001822004)*
                                                   Scott R. Samay (040561996)*
                                                   Tedd W. Van Buskirk (041261995)*
                                                   DAIGNAULT IYER LLP
                                                   8229 Boone Boulevard, Suite 450
                                                   Vienna, VA 22182
                                                   smaheshwari@daignaultiyer.com
                                                   ssamay@daignaultiyer.com
                                                   tvanbuskirk@daignaultiyer.com

                                                   *Not admitted in Virginia*

15

Appx413

*Attorneys for Plaintiffs*
*SITO Mobile R&D IP, LLC and*
*SITO Mobile Ltd.*

## CERTIFICATE OF SERVICE

I hereby certify that on this 9th day of December, 2024, a true and correct copy of the foregoing pleading was filed via ECF filing and forwarded by electronic mail to all counsel of record for Plaintiff.

*/s/ Shailendra Maheshwari*
Shailendra Maheshwari

16

Appx414

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY**

<table>
<tr><td>
BAMBUSER AB,<br><br>
       Plaintiff,<br><br>
  v.<br><br><br>
SITO MOBILE R&D IP, LLC and SITO MOBILE, LTD.,<br><br>
       Defendants.
</td>
<td>
Case No. 2:23-cv-21757-JKS-JSA<br><br>
Motion Date: January 6, 2025<br><br>
NO HEARING REQUESTED
</td></tr>
</table>

**DECLARATION OF SHAILENDRA MAHESHWARI IN SUPPORT
OF DEFENDANTS' MOTION TO DISMISS
PURSUANT TO FED. R. CIV. P. 12(b)(1)**

I, Shailendra Maheshwari, hereby declare as follows:

1.    I am an attorney with the firm Daignault Iyer LLP, counsel of record for Defendants SITO Mobile R&D IP, LLC and SITO Mobile, Ltd. (collectively "Defendants" or "SITO"). I submit this Declaration in support of Defendants' Motion to Dismiss pursuant to Federal Rules of Civil Procedure 12(b)(1).

2.    I make this declaration on the basis of personal knowledge, and if called to testify as a witness, I would and could testify competently here.

3.    Attached as **Exhibit 1** is a true and correct copy of the email chain between the Saks Incorporated attorneys and Defendants' attorneys discussing licensing opportunities, dated September 8, 2023.

Appx415

4.      Attached as **Exhibit 2** is a true and correct copy of the email chain between Uniqlo's attorneys and Defendants' attorneys discussing licensing opportunities dated October 26, 2023.

5.      Attached as **Exhibit 3** is a true and correct copy of the email chain serving notice to Defendants' attorneys, Daignault Iyer LLP, of the Declaratory Judgment Action filed by Bambuser AB dated November 3, 2023.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.


Dated: December 9, 2024                          */s/ Shailendra Maheshwari*
                                                 Shailendra Maheshwari

Appx416

Case 2:23-cv-21757-JKS-JSA  Document 35-3  Filed 12/09/24  Page 1 of 17 PageID: 409

# EXHIBIT 1

**Erin Hadi**

---

| | |
|---|---|
| **From:** | Zinna, Michael <MZinna@KelleyDrye.com> |
| **Sent:** | Friday, September 8, 2023 12:04 PM |
| **To:** | Shalu Maheshwari |
| **Subject:** | RE: SITO Mobile v. Saks |

Hi – Joining now.

**MICHAEL ZINNA**

**Kelley Drye & Warren LLP**
Tel: (973) 503-5964
Tel: (212) 808-7964
Cell: (973) 223-5163

---

**From:** Shalu Maheshwari <SMaheshwari@daignaultiyer.com>
**Sent:** Friday, September 8, 2023 12:04 PM
**To:** Zinna, Michael <MZinna@KelleyDrye.com>
**Subject:** RE: SITO Mobile v. Saks

**CAUTION: This message originated outside of Kelley Drye and was sent by: smaheshwari@daignaultiyer.com**

---

Hi Michael – I just the call – are you still able to join? Thanks!

**From:** Zinna, Michael <MZinna@KelleyDrye.com>
**Sent:** Tuesday, September 5, 2023 10:07 AM
**To:** Shalu Maheshwari <SMaheshwari@daignaultiyer.com>
**Subject:** RE: SITO Mobile v. Saks

Hi Shalu,

12 pm or 4 pm ET on Friday works. If one of those times works for you, please send a planner.

Thanks,
Mike

**MICHAEL ZINNA**

**Kelley Drye & Warren LLP**
Tel: (973) 503-5964
Tel: (212) 808-7964
Cell: (973) 223-5163

Appx418

**From:** Shalu Maheshwari <SMaheshwari@daignaultiyer.com>
**Sent:** Tuesday, September 5, 2023 8:56 AM
**To:** Zinna, Michael <MZinna@KelleyDrye.com>
**Subject:** RE: SITO Mobile v. Saks

**CAUTION: This message originated outside of Kelley Drye and was sent by: smaheshwari@daignaultiyer.com**

Hi Michael –

I hope you are well and had a good long weekend.

I wanted to follow up and see if we can make some progress here and try to reach an agreement.

Would it make sense to schedule a call this week? I am free Thursday and Friday.

Thanks!
Shalu

**From:** Shalu Maheshwari
**Sent:** Tuesday, August 15, 2023 5:09 PM
**To:** Zinna, Michael <MZinna@KelleyDrye.com>
**Subject:** RE: SITO Mobile v. Saks

Thanks – let's do 3pm? I will send the invite now.

**From:** Zinna, Michael <MZinna@KelleyDrye.com>
**Sent:** Tuesday, August 15, 2023 4:40 PM
**To:** Shalu Maheshwari <SMaheshwari@daignaultiyer.com>
**Subject:** RE: SITO Mobile v. Saks

Sure – I am free from 1:30 – 3:30 pm ET.

**MICHAEL ZINNA**

**Kelley Drye & Warren LLP**
Tel: (973) 503-5964
Tel: (212) 808-7964
Cell: (973) 223-5163

**From:** Shalu Maheshwari <SMaheshwari@daignaultiyer.com>
**Sent:** Monday, August 14, 2023 5:32 PM
**To:** Zinna, Michael <MZinna@KelleyDrye.com>
**Subject:** RE: SITO Mobile v. Saks

Appx419

CAUTION: This message originated outside of Kelley Drye and was sent by: smaheshwari@daignaultiyer.com

Hi Michael – shall we try tomorrow?

Thanks,
Shalu

**From:** Shalu Maheshwari
**Sent:** Saturday, August 12, 2023 6:51 AM
**To:** 'Zinna, Michael' <MZinna@KelleyDrye.com>
**Subject:** RE: SITO Mobile v. Saks

Sorry the last 2 days got away from me.

Monday is good – 10:30am onward – but I think we can do the call within 10 mins.

**From:** Zinna, Michael <MZinna@KelleyDrye.com>
**Sent:** Thursday, August 10, 2023 9:58 AM
**To:** Shalu Maheshwari <SMaheshwari@daignaultiyer.com>
**Subject:** RE: SITO Mobile v. Saks

Hi Shalu – Interviews for next year's summer class are starting so I am swamped. If I end up with some time late in the date I will email and we can try to set something up relatively impromptu. Otherwise, how does Monday look?

**MICHAEL ZINNA**

**Kelley Drye & Warren LLP**
Tel: (973) 503-5964
Tel: (212) 808-7964
Cell: (973) 223-5163

**From:** Shalu Maheshwari <SMaheshwari@daignaultiyer.com>
**Sent:** Thursday, August 10, 2023 7:49 AM
**To:** Zinna, Michael <MZinna@KelleyDrye.com>
**Subject:** RE: SITO Mobile v. Saks

CAUTION: This message originated outside of Kelley Drye and was sent by: smaheshwari@daignaultiyer.com

Following up Michael – any time today? Just trying to move this along. Thanks!

**From:** Shalu Maheshwari
**Sent:** Tuesday, August 8, 2023 10:42 AM
**To:** Zinna, Michael <MZinna@KelleyDrye.com>
**Subject:** RE: SITO Mobile v. Saks

3

Appx420

Hi Michael,

I spoke with SITO and I can provide an update on the licenses. Do you have 5 mins for a call today?

Thanks,
Shalu

---

**From:** Zinna, Michael <MZinna@KelleyDrye.com>
**Sent:** Tuesday, August 1, 2023 12:29 PM
**To:** Shalu Maheshwari <SMaheshwari@daignaultiyer.com>
**Subject:** RE: SITO Mobile v. Saks

Friday, 4 pm ET?

**MICHAEL ZINNA**

**Kelley Drye & Warren LLP**
Tel: (973) 503-5964
Tel: (212) 808-7964
Cell: (973) 223-5163

---

**From:** Shalu Maheshwari <SMaheshwari@daignaultiyer.com>
**Sent:** Tuesday, August 1, 2023 12:14 PM
**To:** Zinna, Michael <MZinna@KelleyDrye.com>
**Subject:** RE: SITO Mobile v. Saks

**CAUTION: This message originated outside of Kelley Drye and was sent by: smaheshwari@daignaultiyer.com**

---

Hi Mike – any suggestions? I realize you are driving and visiting – but just want to lock it in so we don't forget/double book.

Thanks,
Shalu

---

**From:** Shalu Maheshwari
**Sent:** Monday, July 31, 2023 9:51 AM
**To:** Zinna, Michael <mzinna@kelleydrye.com>
**Subject:** Re: SITO Mobile v. Saks

Enjoy the visits. Thursday is good most anytime except 9:30am E and 2:30pm E (both for 30 mins). Friday is good too - but after 1:30pm E.

> On Jul 31, 2023, at 9:37 AM, Zinna, Michael <mzinna@kelleydrye.com> wrote:

Appx421

Hi Shalu – I am traveling on college visits with my daughter so calls will not be easy for the next few days because I will be out and about. Please let me know if you are free for a call on Thursday or Friday. Thanks.

## MICHAEL ZINNA

**Kelley Drye & Warren LLP**
Tel: (973) 503-5964
Tel: (212) 808-7964
Cell: (973) 223-5163

**From:** Shalu Maheshwari <SMaheshwari@daignaultiyer.com>
**Sent:** Monday, July 31, 2023 9:00 AM
**To:** Zinna, Michael <MZinna@KelleyDrye.com>
**Subject:** RE: SITO Mobile v. Saks

> **CAUTION: This message originated outside of Kelley Drye and was sent by:**
> **smaheshwari@daignaultiyer.com**

Michael,

Hope you are well – do you have 5 mins for a call today. We have a counter + some information around it. I think we can potentially speed the process up – but I think a call will help.

Thanks,
Shalu

**From:** Zinna, Michael <MZinna@KelleyDrye.com>
**Sent:** Wednesday, July 12, 2023 6:09 PM
**To:** Shalu Maheshwari <SMaheshwari@daignaultiyer.com>
**Cc:** Chandran Iyer <cbiyer@daignaultiyer.com>; Ron Daignault <rdaignault@daignaultiyer.com>; Bruce Bernstein <bruce@bernsteiniplaw.com>; Ferraro, Vincent M. <VFerraro@KelleyDrye.com>
**Subject:** RE: SITO Mobile v. Saks

Great

## MICHAEL ZINNA

**Kelley Drye & Warren LLP**
Tel: (973) 503-5964
Tel: (212) 808-7964
Cell: (973) 223-5163

Appx422

**From:** Shalu Maheshwari <SMaheshwari@daignaultiyer.com>
**Sent:** Wednesday, July 12, 2023 6:08 PM
**To:** Zinna, Michael <MZinna@KelleyDrye.com>
**Cc:** Chandran Iyer <cbiyer@daignaultiyer.com>; Ron Daignault <rdaignault@daignaultiyer.com>; Bruce Bernstein <bruce@bernsteiniplaw.com>; Ferraro, Vincent M. <VFerraro@KelleyDrye.com>
**Subject:** RE: SITO Mobile v. Saks

---

**CAUTION: This message originated outside of Kelley Drye and was sent by: smaheshwari@daignaultiyer.com**

---

Ok thanks – Let's do Tuesday at 11:30am please.

I'll update the invite now. Thanks.

---

**From:** Zinna, Michael <MZinna@KelleyDrye.com>
**Sent:** Wednesday, July 12, 2023 6:05 PM
**To:** Shalu Maheshwari <SMaheshwari@daignaultiyer.com>
**Cc:** Chandran Iyer <cbiyer@daignaultiyer.com>; Ron Daignault <rdaignault@daignaultiyer.com>; Bruce Bernstein <bruce@bernsteiniplaw.com>; Ferraro, Vincent M. <VFerraro@KelleyDrye.com>
**Subject:** RE: SITO Mobile v. Saks

Hi Shalu – I am travelling Monday afternoon. I can do Tuesday between 11:30 am – 2 pm ET or Wednesday from 1:30 pm – 4 pm.

**MICHAEL ZINNA**

**Kelley Drye & Warren LLP**
Tel: (973) 503-5964
Tel: (212) 808-7964
Cell: (973) 223-5163

---

**From:** Shalu Maheshwari <SMaheshwari@daignaultiyer.com>
**Sent:** Wednesday, July 12, 2023 5:39 PM
**To:** Zinna, Michael <MZinna@KelleyDrye.com>
**Cc:** Chandran Iyer <cbiyer@daignaultiyer.com>; Ron Daignault <rdaignault@daignaultiyer.com>; Bruce Bernstein <bruce@bernsteiniplaw.com>; Ferraro, Vincent M. <VFerraro@KelleyDrye.com>
**Subject:** RE: SITO Mobile v. Saks

---

**CAUTION: This message originated outside of Kelley Drye and was sent by: smaheshwari@daignaultiyer.com**

---

Hi Michael,

6

Appx423

Hope all is well. Could we move the Monday call to the afternoon please? I have a conflict that morning that I am not sure will end in time.

Thanks,
Shalu

---

**From:** Zinna, Michael <MZinna@KelleyDrye.com>
**Sent:** Friday, June 16, 2023 5:57 PM
**To:** Shalu Maheshwari <SMaheshwari@daignaultiyer.com>
**Cc:** Chandran Iyer <cbiyer@daignaultiyer.com>; Ron Daignault <rdaignault@daignaultiyer.com>; Bruce Bernstein <bruce@bernsteiniplaw.com>; Ferraro, Vincent M. <VFerraro@KelleyDrye.com>
**Subject:** RE: SITO Mobile v. Saks

Hi Shalu,

Thank you for your email. I was already aware of the filing, as is my client.

We appreciate the courtesy of holding off on service.

I am traveling for a claim construction hearing out West next week, and I am sure you can appreciate that my client may want a little time to consider the best next steps in the face of this new lawsuit. Might I suggest that we set a call for the afternoon of June 27 or 28 to touch base? This should give my client time to digest this turn of events, and will give me a day or so to connect with them when I am back in the office and before our call. 3 pm ET on either day works for me.

Thanks,
Mike

**MICHAEL ZINNA**

**Kelley Drye & Warren LLP**
Tel: (973) 503-5964
Tel: (212) 808-7964
Cell: (973) 223-5163

---

**From:** Shalu Maheshwari <SMaheshwari@daignaultiyer.com>
**Sent:** Friday, June 16, 2023 5:40 PM
**To:** Zinna, Michael <MZinna@KelleyDrye.com>
**Cc:** Chandran Iyer <cbiyer@daignaultiyer.com>; Ron Daignault <rdaignault@daignaultiyer.com>; Bruce Bernstein <bruce@bernsteiniplaw.com>
**Subject:** RE: SITO Mobile v. Saks

> **CAUTION: This message originated outside of Kelley Drye and was sent by:**
> **smaheshwari@daignaultiyer.com**

---

Hi Michael,

7

Appx424

Hope all is well. Unfortunately, due the lengthy delay and lack of any substantive conversations on this matter at all – SITO required us to file the attached complaint against your client (I wanted to send it to you before you see a PACER or Docket Nav alert).

However, please note that with much effort we were able to convince SITO to hold off on serving the complaint because we indicated that you were trying to get a response from your client. We believe it makes more sense to try to reach a resolution through discussions – and will try to hold off on service as long as possible.

That said – and I've brought it up previously – it's been almost 4 months since we spoke with literally no substantive discussion since that time. I also sent you an NDA almost 2 months ago – per your request – which hasn't been signed yet. It would be great to have some discussions in earnest so that we can show SITO that there is a possibility of resolving this matter without litigation – but we request some cooperation on your part as well.

I am around the majority of next week if you'd like to schedule a call.

Thanks,
Shalu

---

**From:** Zinna, Michael <MZinna@KelleyDrye.com>
**Sent:** Tuesday, June 6, 2023 3:04 PM
**To:** Shalu Maheshwari <SMaheshwari@daignaultiyer.com>
**Cc:** Chandran Iyer <cbiyer@daignaultiyer.com>; Ron Daignault <rdaignault@daignaultiyer.com>; Bruce Bernstein <bruce@bernsteiniplaw.com>
**Subject:** RE: SITO Mobile v. Saks

Hi Shalu,

I will confer with my client and get back to you, but without knowing in-house counsel's availability this week, I may not be able to get back to you this week. For my part, I am in the office with no travel this week and next and will follow up with you as soon as I can.

Thanks,
Mike

**MICHAEL ZINNA**

**Kelley Drye & Warren LLP**
Tel: (973) 503-5964
Tel: (212) 808-7964
Cell: (973) 223-5163

---

**From:** Shalu Maheshwari <SMaheshwari@daignaultiyer.com>
**Sent:** Tuesday, June 6, 2023 2:56 PM
**To:** Zinna, Michael <MZinna@KelleyDrye.com>
**Cc:** Chandran Iyer <cbiyer@daignaultiyer.com>; Ron Daignault <rdaignault@daignaultiyer.com>; Bruce

Appx425

Bernstein <bruce@bernsteiniplaw.com>
**Subject:** RE: SITO Mobile v. Saks

| CAUTION: This message originated outside of Kelley Drye and was sent by: smaheshwari@daignaultiyer.com |
|---|

Hi Michael,

Please let us know by the end of this week if you will have a counter-offer for us. We are 3.5 months in now.

Thanks,
Shalu

**From:** Shalu Maheshwari
**Sent:** Monday, May 1, 2023 2:32 PM
**To:** Zinna, Michael <MZinna@KelleyDrye.com>
**Cc:** Chandran Iyer <cbiyer@daignaultiyer.com>; Ron Daignault <rdaignault@daignaultiyer.com>; Bruce Bernstein <bruce@bernsteiniplaw.com>
**Subject:** RE: SITO Mobile v. Saks

Sounds good – thanks!

**From:** Zinna, Michael <MZinna@KelleyDrye.com>
**Sent:** Monday, May 1, 2023 2:31 PM
**To:** Shalu Maheshwari <SMaheshwari@daignaultiyer.com>
**Cc:** Chandran Iyer <cbiyer@daignaultiyer.com>; Ron Daignault <rdaignault@daignaultiyer.com>; Bruce Bernstein <bruce@bernsteiniplaw.com>
**Subject:** RE: SITO Mobile v. Saks

I have been traveling for mediation and hearings for most of the last two weeks. I will respond this week.

Thanks,
Mike

**MICHAEL ZINNA**

**Kelley Drye & Warren LLP**
Tel: (973) 503-5964
Tel: (212) 808-7964
Cell: (973) 223-5163

**From:** Shalu Maheshwari <SMaheshwari@daignaultiyer.com>
**Sent:** Monday, May 1, 2023 2:24 PM
**To:** Zinna, Michael <MZinna@KelleyDrye.com>
**Cc:** Chandran Iyer <cbiyer@daignaultiyer.com>; Ron Daignault <rdaignault@daignaultiyer.com>; Bruce

Appx426

Bernstein <bruce@bernsteiniplaw.com>
**Subject:** RE: SITO Mobile v. Saks

**CAUTION: This message originated outside of Kelley Drye and was sent by:**
**smaheshwari@daignaultiyer.com**

Michael,

While we would like to keep discussions ongoing – it's hard to say that we are actually having any discussions or making any progress here. It's been 2 weeks since I provided the NDA that you requested. Can you please get this signed?

You also stated that you would be talking to your client about a counter-offer to our proposal – that was almost 1 month ago. What was their response to our offer? Is there any movement on this front?

I'd like to tell SITO that there is progress here, so please let me know.

Thanks,
Shalu

**From:** Shalu Maheshwari
**Sent:** Monday, April 24, 2023 9:35 AM
**To:** Zinna, Michael <MZinna@KelleyDrye.com>
**Cc:** Chandran Iyer <cbiyer@daignaultiyer.com>; Ron Daignault <rdaignault@daignaultiyer.com>; Bruce Bernstein <bruce@bernsteiniplaw.com>
**Subject:** RE: SITO Mobile v. Saks

Hi Michael,

I provided the NDA last week – are you able to sign this please?

Thanks,
Shalu

**From:** Shalu Maheshwari
**Sent:** Monday, April 17, 2023 12:07 PM
**To:** Zinna, Michael <MZinna@KelleyDrye.com>
**Cc:** Chandran Iyer <cbiyer@daignaultiyer.com>; Ron Daignault <rdaignault@daignaultiyer.com>; Bruce Bernstein <bruce@bernsteiniplaw.com>
**Subject:** RE: SITO Mobile v. Saks

Michael,

Please see the attached NDA. Please have it signed and returned as soon as possible so we can try to move this process forward – I think it's nearing 3 months without any substantive movement.

Thanks,
Shalu

Appx427

**From:** Zinna, Michael <MZinna@KelleyDrye.com>
**Sent:** Monday, April 17, 2023 9:29 AM
**To:** Shalu Maheshwari <SMaheshwari@daignaultiyer.com>
**Cc:** Chandran Iyer <cbiyer@daignaultiyer.com>; Ron Daignault <rdaignault@daignaultiyer.com>; Bruce Bernstein <bruce@bernsteiniplaw.com>
**Subject:** Re: SITO Mobile v. Saks

Good morning Shalu,

Please provide a draft NDA for my review.

Best,
Mike

Get Outlook for iOS

**From:** Shalu Maheshwari <SMaheshwari@daignaultiyer.com>
**Sent:** Monday, March 27, 2023 6:30 PM
**To:** Zinna, Michael <MZinna@kelleydrye.com>
**Cc:** Chandran Iyer <cbiyer@daignaultiyer.com>; Ron Daignault <rdaignault@daignaultiyer.com>; Bruce Bernstein <bruce@bernsteiniplaw.com>
**Subject:** RE: SITO Mobile v. Saks

> **CAUTION: This message originated outside of Kelley Drye and was sent by:**
> **smaheshwari@daignaultiyer.com**

Hi Michael –

Hope all is well. It's been over a month since we spoke and I've followed up multiple times as well, including indicating that we can disclose the name of the settled parties under NDA.

Can you please get back to me soon so we can see if we can make some progress in resolving this? We appreciate that you are busy, but we are getting inquiries from our client as to the status of this matter.

Thanks,
Shalu

**From:** Shalu Maheshwari
**Sent:** Monday, March 6, 2023 7:56 AM
**To:** Zinna, Michael <MZinna@KelleyDrye.com>
**Cc:** Chandran Iyer <cbiyer@daignaultiyer.com>; Oded Burger <oburger@daignaultiyer.com>
**Subject:** RE: SITO Mobile v. Saks

Hi Michael,

Hope you are well. Wanted to follow up on this. If you are able to enter an NDA – we can disclose certain names.

11

Appx428

Thanks,
Shalu

---

**From:** Shalu Maheshwari
**Sent:** Sunday, February 26, 2023 1:52 PM
**To:** Zinna, Michael <MZinna@KelleyDrye.com>
**Cc:** Chandran Iyer <cbiyer@daignaultiyer.com>; Oded Burger <oburger@daignaultiyer.com>
**Subject:** RE: SITO Mobile v. Saks

Michael,

Hope you are having a good weekend. Good news of sorts – I can disclose the names of some of the licensees – but will have to do so under NDA (cannot disclose terms).

Please let me know if this will work for you?

Thanks,
Shalu

---

**From:** Shalu Maheshwari
**Sent:** Monday, February 20, 2023 4:55 PM
**To:** Zinna, Michael <MZinna@KelleyDrye.com>
**Cc:** Chandran Iyer <cbiyer@daignaultiyer.com>; Oded Burger <oburger@daignaultiyer.com>
**Subject:** RE: SITO Mobile v. Saks

Sorry – missed a conflict on Thursday.

I'll send for Wednesday. Thanks.

---

**From:** Shalu Maheshwari
**Sent:** Monday, February 20, 2023 4:51 PM
**To:** Zinna, Michael <MZinna@KelleyDrye.com>
**Cc:** Chandran Iyer <cbiyer@daignaultiyer.com>; Oded Burger <oburger@daignaultiyer.com>
**Subject:** RE: SITO Mobile v. Saks

Michael - No problem at all – hope you have recovered. I did get an OOO which is why I waited til this week.

I think Thursday looks good – I'll send an invite.

Thanks,
Shalu

---

**From:** Zinna, Michael <MZinna@KelleyDrye.com>
**Sent:** Monday, February 20, 2023 4:49 PM
**To:** Shalu Maheshwari <SMaheshwari@daignaultiyer.com>
**Cc:** Chandran Iyer <cbiyer@daignaultiyer.com>; Oded Burger <oburger@daignaultiyer.com>
**Subject:** RE: SITO Mobile v. Saks

12

Appx429

Hi Shalu – Thanks for the follow up. I had been travelling extensively. How about 2:30 ET tomorrow, Wednesday or Thursday? Let me know.

Thanks,
Mike

**MICHAEL ZINNA**
Partner

**Kelley Drye & Warren LLP**
One Jefferson Road
Parsippany, NJ 07054
Tel: (973) 503-5964
Cell: (973) 223-5163

3 World Trade Center
175 Greenwich Street
New York, NY 10007
Tel: (212) 808-7964

mzinna@kelleydrye.com

---

**From:** Shalu Maheshwari <SMaheshwari@daignaultiyer.com>
**Sent:** Monday, February 20, 2023 4:40 PM
**To:** Zinna, Michael <MZinna@KelleyDrye.com>
**Cc:** Chandran Iyer <cbiyer@daignaultiyer.com>; Oded Burger <oburger@daignaultiyer.com>
**Subject:** RE: SITO Mobile v. Saks

> **CAUTION: This message originated outside of Kelley Drye and was sent by: smaheshwari@daignaultiyer.com**

---

Hi Michael – hope all is well.

Could you let me know some times that may work this week? We haven't heard back from you despite multiple emails.

Thanks,
Shalu

---

**From:** Shalu Maheshwari
**Sent:** Tuesday, February 7, 2023 2:57 PM
**To:** Zinna, Michael <MZinna@KelleyDrye.com>
**Cc:** Chandran Iyer <cbiyer@daignaultiyer.com>; Oded Burger <oburger@daignaultiyer.com>; Kevin Sprenger <ksprenger@daignaultiyer.com>
**Subject:** RE: SITO Mobile v. Saks

13

Appx430

Hi Michael –

Following up here – does Thursday this week still work?

Thanks,
Shalu

---

**From:** Shalu Maheshwari
**Sent:** Friday, February 3, 2023 2:42 PM
**To:** Zinna, Michael <MZinna@KelleyDrye.com>
**Cc:** Chandran Iyer <cbiyer@daignaultiyer.com>; Oded Burger <oburger@daignaultiyer.com>; Kevin Sprenger <ksprenger@daignaultiyer.com>
**Subject:** RE: SITO Mobile v. Saks

Hi Michael –

Next Tuesday, Thursday or Friday from 9am-11am are free. The week after is pretty open in general as well.

Thanks,
Shalu

---

**From:** Zinna, Michael <MZinna@KelleyDrye.com>
**Sent:** Friday, February 3, 2023 1:43 PM
**To:** Shalu Maheshwari <SMaheshwari@daignaultiyer.com>
**Cc:** Chandran Iyer <cbiyer@daignaultiyer.com>; Oded Burger <oburger@daignaultiyer.com>; Kevin Sprenger <ksprenger@daignaultiyer.com>
**Subject:** RE: SITO Mobile v. Saks


Hello Shalu,

Please provide some dates and times that you are free for a call in the next few weeks.

Best,
Mike


**MICHAEL ZINNA**
Partner

**Kelley Drye & Warren LLP**
One Jefferson Road
Parsippany, NJ 07054
Tel: (973) 503-5964
Cell: (973) 223-5163

3 World Trade Center
175 Greenwich Street
New York, NY 10007
Tel: (212) 808-7964

14

Appx431

mzinna@kelleydrye.com

**From:** Taraneh Marciano <taraneh.marciano@saks.com>
**Sent:** Friday, February 3, 2023 1:38 PM
**To:** Shalu Maheshwari <SMaheshwari@daignaultiyer.com>
**Cc:** Eliza Wahler <eliza.grodzki@saks.com>; Chandran Iyer <cbiyer@daignaultiyer.com>; Oded Burger <oburger@daignaultiyer.com>; Kevin Sprenger <ksprenger@daignaultiyer.com>; Zinna, Michael <MZinna@KelleyDrye.com>
**Subject:** Re: SITO Mobile v. Saks

> **CAUTION: This message originated outside of Kelley Drye and was sent by:**
> **taraneh.marciano@saks.com**

Hi Shalu,

I'm copying here our outside patent counsel, Michael Zinna at Kelley Drye, who will connect with you directly.

Thanks,
Tara

-----
**Taraneh J. Marciano** | She/Her | VP, Associate General Counsel
**Saks** | taraneh.marciano@saks.com | C: 917.715.7502

On Thu, Jan 26, 2023 at 9:08 AM Shalu Maheshwari <SMaheshwari@daignaultiyer.com> wrote:

> Hi Eliza and Taraneh –
>
> Thank you for the email. It may also be useful to have short discussion to allow us to present SITO's licensing structure which could also assist in your analysis and review.
>
> Please let me know if that would work and any times next week that are open for a short discussion.
>
> Thank you,
>
> Shalu
>
>
> **From:** Eliza Wahler <eliza.grodzki@saks.com>
> **Date:** January 26, 2023 at 8:54:02 AM EST
> **To:** Chandran Iyer <cbiyer@daignaultiyer.com>
> **Cc:** Taraneh Marciano <taraneh.marciano@saks.com>
> **Subject: SITO Mobile v. Saks**

15

Appx432

Dear Mr. Iyer:

Your correspondence of January 10, 2022 was received yesterday by the Saks legal department. Saks takes all allegations of patent infringement seriously. We are reviewing your allegations and will contact you when our investigation is complete.

Thank you.


----------
**Eliza Wahler** | She, Her | Senior Paralegal
**Saks** | Eliza.Grodzki@saks.com | (332) 237-6104


This transmission, and any attached files, may contain information from the law firm of Daignault Iyer LLP which is confidential and/or legally privileged. Such information is intended only for the use of the individual or entity to whom this transmission is addressed. If you are not the intended recipient, you are hereby notified that any disclosure, copying, distribution or the taking of any action in reliance on the contents of this transmitted information is strictly prohibited, that copies of this transmission and any attached files should be deleted from your disk directories immediately, and that any printed copies of this transmission or attached files should be returned to this firm. If you have received this transmission in error, please notify us by telephone or e-mail immediately, and we will arrange for the return to Daignault Iyer LLP of any printed copies.

This message is subject to Kelley Drye & Warren LLP's email communication policy.
KDW-Disclaimer

Appx433

# EXHIBIT 2

Appx434

**Erin Hadi**

| | |
|---|---|
| **From:** | aron.weiss@fastretailing.com |
| **Sent:** | Thursday, October 26, 2023 2:46 PM |
| **To:** | Shalu Maheshwari |
| **Cc:** | Chandran Iyer; Inna Shestul |
| **Subject:** | Re: [EXTERNAL] RE: SITO / UNIQLO |

Let's do Tuesday at 11:30. Can you send a calendar invite and call details? Thanks!
Aron

---

Shalu Maheshwari <SMaheshwari@daignaultiyer.com>
Thursday, October 26, 2023 2:36:42 PM
WEISS Aron[FRUS:Legal] <aron.weiss@fastretailing.com>
Chandran Iyer <cbiyer@daignaultiyer.com>; Inna Shestul <ishestul@daignaultiyer.com>
[EXTERNAL] RE: SITO / UNIQLO

Hi Aron,
Thanks for your email. We would definitely like to speak and provide more information – we have found such an early discussion to be very beneficial to other licensees as well.
Next week – Tuesday or Wednesday look pretty good. I am free on Tuesday from 11:30am-4pm EST. Wednesday is 11:30am E – 3pm E.
Do any of those times work for you?
Thanks,
Shalu

---

aron.weiss@fastretailing.com <aron.weiss@fastretailing.com>
Thursday, October 26, 2023 1:52 PM
Shalu Maheshwari <SMaheshwari@daignaultiyer.com>
SITO / UNIQLO

Dear Mr. Maheshwari,
My name is Aron Weiss and I am in-house counsel to UNIQLO USA LLC.
We are in receipt of your October 6, 2023 letter (copy attached) (asking for a response by October 27, 2023).
UNIQLO is still investigating the allegations detailed in your letter.
While such fact finding is ongoing, however, we would also like to schedule a call to better understand a potential settlement and license agreement.
Please let me know some days/times that you are available next week and hopefully we can discuss then.
All of UNIQLO's rights and defenses are hereby reserved.
Thank you for your time and attention.
Aron Weiss
VP, Legal

The information contained in this e-mail is for the exclusive use of the intended recipients and may be confidential. If you receive this e-mail in error, please do not use, print, copy, forward, or disclose any part of it. Please also delete this e-mail and notify us by return e-mail.
This transmission, and any attached files, may contain information from the law firm of Daignault Iyer LLP which is confidential and/or legally privileged. Such information is intended only for the use of the individual or entity to whom this transmission is addressed. If you are not the intended recipient, you are hereby notified that any disclosure, copying, distribution or the taking of any action in reliance on the contents of this transmitted information is strictly prohibited, that copies of this transmission and any attached files should be deleted from your disk directories immediately, and that any printed copies of this transmission or attached files should be returned to this firm. If you have received this transmission

Appx435

Case 2:23-cv-21757-JKS-JSA    Document 35-4    Filed 12/09/24    Page 3 of 3 PageID: 428

in error, please notify us by telephone or e-mail immediately, and we will arrange for the return to Daignault Iyer LLP of any printed copies.

Appx436

# EXHIBIT 3

**Erin Hadi**

| | |
|---|---|
| **From:** | Ron Daignault <rdaignault@daignaultiyer.com> |
| **Sent:** | Friday, November 3, 2023 3:09 PM |
| **To:** | Shalu Maheshwari |
| **Cc:** | Chandran Iyer |
| **Subject:** | FW: Sito Patents |
| **Attachments:** | 1 - Complaint for Declaratory Judgment- Non-Infringement & Invalidity.pdf; 1 [2] - Summons (Sito Mobile R&D IP, LLC ).pdf; 1 [3] - Summons (Sito Mobile, Ltd.).pdf; 2 - Corporate Disclosure Statement.pdf; 3 - Civil Cover Sheet with Signature.pdf |

Hi Shalu – please see below. I will ask him for some days/times next week



**Ronald M. Daignault**
Partner

Daignault Iyer LLP
917.838.9795
rdaignault@daignaultiyer.com
daignaultiyer.com

**From:** Jeffrey Kaplan <jkaplan@kbsiplaw.com>
**Date:** Friday, November 3, 2023 at 11:36 AM
**To:** Ron Daignault <rdaignault@daignaultiyer.com>, Chandran Iyer <cbiyer@daignaultiyer.com>
**Cc:** John Crossman <jcrossman@zukermangore.com>
**Subject:** Sito Patents

Mssrs. Daignault and Iyer:

I'm Jeff Kaplan, and, along with co-counsel John Crossman, represent Bambuser AB.

I am attaching here a declaratory judgment action filed this week in the District of New Jersey concerning several Sito owned patents.

John and I would like to have a brief introductory call with you.

Would you kindly let us know if you are available for such a call over the coming few days?

We look forward to hearing from you.

*Jeffrey I. Kaplan*



1

Appx438

**Kaplan Breyer Schwarz, LLP**
**South Wing**
**197 Route 18 South Suite 3000**
**East Brunswick NJ 08816**
**www.kbsiplaw.com**

**jkaplan@kbsiplaw.com**
**732-578-0103 Ext. 231 (T)**
**732-718-0857 (M)**
**732-578-0104 (F)**

**New York Office (By appointment)**
**600 Third Avenue Second Floor**
**New York, NY 10016**
**646-571-2300**

**This e-mail message and any documents accompanying it contain information that belongs to Kaplan Breyer Schwarz, LLP, and may be confidential and/or legally privileged. The information is intended for the use of the individual(s) or entity(ies) named above. If you are not the intended recipient, you are hereby notified that any disclosure, copying, distribution or the taking of any action in reliance on the contents of this message and/or accompanying documents is strictly prohibited. If you have received this e-mail message in error, please immediately notify us by telephone at +1-732-578-0103 x231.**

Appx439

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY**

|  |  |
|---|---|
| BAMBUSER AB,<br><br>       Plaintiff,<br><br>  v.<br><br>SITO MOBILE R&D IP, LLC and SITO MOBILE, LTD.,<br><br>       Defendants. | Case No. 2:23-cv-21757-JKS-JSA<br><br>Motion Date: January 6, 2025 |

**[PROPOSED] ORDER GRANTING DEFENDANTS' MOTION TO DISMISS
PURSUANT TO FED. R. CIV. P. 12(b)(1)**

THIS MATTER, having been opened to the Court by Defendants for entry of an order dismissing this proceeding pursuant to Fed. R. Civ. P. 12(b)(1), and pursuant to the Federal Circuit's holding in *Microsoft Corp. v. DataTern, Inc.*, 755 F.3d 899 (Fed. Cir. 2014), and in favor of a related first-filed proceeding in the United States District Court for the Western District of Texas styled *SITO Mobile R&D IP, LLC and SITO Mobile, LTD. v. SFA Holdings, Inc.,(f/k/a/ Saks Incorporated)*, 23-cv-00688 where Plaintiff can litigate any and all claims on behalf of its customer, SFA Holdings, Inc., whom it is indemnifying in that action, and the Court having considered the Motion and for good cause shown;

IT IS on this _____ day of _____, 2025 ORDERED as follows:

1. Defendants' Motion to Dismiss is Granted in its entirety; and

2. This case is dismissed with prejudice.

_____
Hon. Jamel K. Semper, District Judge

Appx440

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEW JERSEY

BAMBUSER AB,

                Plaintiff,

v.

SITO MOBILE R&D IP, LLC, and
SITO MOBILE, LTD.,

                Defendants.

Case No. 2:23-cv-21757-SDW-JSA

Motion Date: February 20, 2024

(Filed Electronically)

## Plaintiff's Memorandum in Opposition To
## <u>Defendants' Motion To Dismiss</u>

Appx445

# **TABLE OF CONTENTS**

I. Introduction.............................................................................................. 1

II. Argument ............................................................................................... 2

    A. SITO's Indemnity Rule is Incorrect – SITO Misreads *Microsoft* .......... 2

    B. SITO Ignores the Allegations of the FAC ............................................. 7

    C. SITO's Uniqlo Complaint Is Sufficient To Establish Jurisdiction ....... 14

    D. SITO's Remaining Arguments are Meritless........................................ 16

III. Conclusion............................................................................................ 18

i

Appx446

## **TABLE OF AUTHORITIES**

**Cases**

*Am. Honda Motor Co. v. Wingard, No. 1:14-CV-3522-TWT,*
   2015 WL 3488170 (N.D. Ga. June 1, 2015) ........................................................ 9

*BroadSign Int'l, LLC v. T-Rex Prop. AB, No. 16-CV-04586-LTS-HBP,*
   2018 WL 3418778 (S.D.N.Y. July 13, 2018) ................................................. 9-10

*Finisar Corp. v. Capella Photonics, Inc., Case No. 20-cv-07629-EMC,*
   2021 WL 810227 (N.D. Cal. Mar. 3, 2021) ........................................................ 9

*GreatGigz Sols., LLC v. Costco Wholesale Corp., No. 6-21-CV-00807,*
   2022 WL 1037114 (W.D. Tex. Apr. 6, 2022) ..................................................... 17

*Lighthouse Consulting Grp., LLC v. Truist Bank, No. 2:19-CV-00340-JRG,*
   2020 WL 6781977 (E.D. Tex. Apr. 7, 2020) ..................................................... 17

*Mantissa Corp. v. Old Second Bancorp, Inc., No. 17 C 9175,*
   2018 WL 3059604 (N.D. Ill. June 20, 2018) .................................................. 4, 6

*MedImmune, Inc. v. Genentech, Inc.,*
   549 U.S. 118 (2007) .................................................................................... 1, 15

*Microsoft Corp. v. DataTern, Inc.,*
   755 F.3d 899 (Fed. Cir. 2014) ...................................................................... 3, 4

*SyncView Techs., LLC v. Grande Commc'ns Networks, LLC, No. A-18-CV-00412-LY,*
   2019 WL 7758916 (W.D. Tex. Sept. 23, 2019) ................................................ 17

**Statutes**

35 U.S.C § 271 ............................................................................................ 11,13
UCC §2-312 ..................................................................................................... 6

**Rules**

Rule 12 ............................................................................................................ 7

Appx447

## I.      <u>Introduction</u>

SITO's Motion to Dismiss explicitly states it presents only a *facial* challenge to this Court's jurisdiction under Rule 12(b)(6). (Dkt# 35-1 ("SITO Br."), p. 3). Therefore, the issue presently before the Court is whether the allegations in First Amended Complaint (Dkt# 32, "FAC") and supporting documents, all of which must be taken as true, establish that SITO's litigation efforts against Bambuser's customers carried an implied assertion of infringement against Bambuser.  If so, there is a substantial controversy of sufficient immediacy between SITO and Bambuser such that this Court is vested with declaratory judgment jurisdiction. (Dkt# 30 ("Opinion"), pp. 4-8)(citing *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 127 (2007)).

Remarkably, SITO *does not address* the allegations of the FAC anywhere in its entire brief, and certainly does not explain why those allegations do not establish SITO impliedly accused Bambuser of patent infringement.  Instead, SITO relies largely upon two arguments, both of which simply misstate the law.

First, SITO repeats its erroneous assertion that if a supplier is indemnifying its customers, there is no jurisdiction over a declaratory judgment action brought by the supplier.  However, numerous cases in which a supplier has agreed to indemnify customers that were previously sued for patent infringement have frequently found jurisdiction *did* exist over the supplier's declaratory judgment

1

Appx448

action against a patent.  In fact, SITO previously made the same incorrect argument previously, and two different judges have already independently rejected it. (Exs. 1, 2)(highlighting in both exhibits added here).

Second, SITO argues that its underlying customer suits do not *explicitly* accuse Bambuser of patent infringement.  This however, is not the proper legal test, and directly contradicts an entire, well-established body of precedent SITO simply ignores.  What's more, SITO's novel rule would allow the patent owner to defeat a supplier's declaratory judgment action on jurisdictional grounds in *every single case* – rendering the entire body of law on the matter meaningless.

None of SITO's remaining arguments even attempt to point out any deficiency in the allegations of the FAC.  SITO's Motion to Dismiss should thus be denied.

## II.    <u>Argument</u>

### A. <u>SITO's Indemnity Rule is Incorrect – SITO Misreads *Microsoft*</u>

SITO argues that, because Bambuser has agreed to indemnify SFA in SITO's patent litigation against SFA in Texas, this Court lacks subject matter jurisdiction over the present declaratory judgment action.  (SITO Br., p. 3). This is incorrect.

To determine whether this Court has subject matter jurisdiction over the present declaratory judgment action, this Court must examine the allegations of the

2

Appx449

FAC, take them all as true, and determine whether they establish that SITO's prior

patent enforcement efforts against Bambuser customers SFA and Uniqlo carry an

implied assertion of direct, contributory, or inducement of infringement against

Bambuser itself.  *Arris Group, Inc. v. British Telecommunications PLC*, 639 F.3d

1368, 1375 (Fed. Cir. 2011); *Microsoft Corp. v. DataTern, Inc.*, 755 F.3d 899 (Fed.

Cir. 2014); *See also,* Opinion, pp. 4-8.

Since *Microsoft*, a significant number of cases have considered the issue of

jurisdiction over a supplier's declaratory judgment action when its customers are

sued for, or threatened with, patent infringement claims by the patent owner.  In

many such cases, the supplier had agreed to indemnify the customers that had been

sued for infringement.  Yet, as far as Bambuser is aware, not a single such case has

ever considered the indemnity obligation as even *relevant to* that analysis, much

less dispositive of the issue as SITO claims.  *UCP Int'l Co. v. Balsam Brands, Inc.,*

787 F. App'x 691, 695, 698-700 (Fed. Cir. 2019)(finding "UCP [as supplier]

agreed to defend and indemnify [the customer that was sued]" but also holding that

the court had jurisdiction over UCP's declaratory judgment action because

customer suit implicated supplier's product);  *Mitek Sys. v. United Servs. Auto.*

*Ass'n*, 34 F.4th 1334, 1338-39 (Fed. Cir. 2022)(noting supplier's contractual

obligation to indemnify customers sued by patent owner, and analyzing subject

matter jurisdiction under *Microsoft* based upon patent owner's infringement

3

Appx450

allegations, *without any mention of indemnity*); *Arris Grp., Inc. v. British Telecomms. PLC*, 639 F.3d 1368, 1374-75 (Fed. Cir. 2011)(Noting that declaratory judgment action may proceed because supplier's product was impliedly accused of infringement, also noting indemnity obligation); *Mantissa Corp. v. Old Second Bancorp, Inc.*, No. 17 C 9175, 2018 WL 3059604, at *2, 5 (N.D. Ill. June 20, 2018)(Permitting supplier's later filed declaratory judgment to proceed after finding supplier was obligated to indemnify customers the patent owner had sued).

SITO's claim that *Microsoft* holds there is no jurisdiction if the supplier is indemnifying the customer that has been sued misreads *Microsoft*. In *Microsoft*, the patent owner sued Microsoft's customer in Texas for infringement of the '402 and '502 patents. Microsoft then filed a declaratory judgment action against the same two patents in the Southern District of New York. The Federal Circuit found there was no jurisdiction in the New York case over the '402 patent, but that there was jurisdiction for Microsoft's declaratory judgment action with respect to the '502 patent. *Microsoft*, 755 F.3d at 905, 911.

Nothing in the Federal Circuit's entire jurisdictional analysis in *Microsoft* even remotely implied a rule that the indemnity obligation destroys subject matter jurisdiction over a separate declaratory judgment action. Instead, the Court's reasoning was directed entirely to a detailed analysis of the infringement allegations and claim charts presented in the Texas customer suit with respect to

4

Appx451

each patent.  Ultimately, the Court concluded that the patent owner's claim charts for the '502 patent impliedly accused Microsoft itself of infringement, but the patent owner's claim charts for the '402 patent were directed to the activities of Microsoft's customer.  *Microsoft*, at 905-906.

The Federal Circuit did note that Microsoft's indemnity obligation to its customer might allow Microsoft to participate in the patent owner's existing lawsuit against that customer, but that indemnity obligation alone was insufficient to establish jurisdiction for a different forum to hear Microsoft's declaratory judgment action.  Such jurisdiction would require an <u>implied charge of infringement against Microsoft itself</u>.  *Microsoft*, at 904-906.

Not surprisingly, when SITO offered this exact same "indemnity destroys jurisdiction" misreading of *Microsoft* previously, the Court rejected it completely in a lengthy well-reasoned opinion.  (Ex. 1)(highlighting added).  Yet, SITO again makes no attempt here to explain why Bambuser's indemnification of SFA and Uniqlo has <u>anything at all to do with</u> whether or not SITO's infringement allegations and claim charts against Uniqlo and SFA impliedly accuse Bambuser's product of either direct, contributory, or inducement of infringement.  Those claim charts do not change based upon whether there is an indemnity obligation.

Finally, a simple example shows SITO's novel rule leads to absurd results and cannot be correct.  Consider a patent owner that separately sues 10 companies

5

Appx452

for direct patent infringement for selling infringing widgets, where those ten companies are all distributors simply reselling the accused widgets that they purchased from the same supplier S.

Such a case is *the textbook example* of when the court has jurisdiction of a declaratory judgment action brought by supplier S against the patent – so much so, that the declaratory judgment action typically should be given priority and proceed first, even before the earlier filed infringement suits. *Spread Spectrum Screening LLC v. Eastman Kodak Co.*, 657 F.3d 1349, 1357-58 (Fed. Cir. 2011)(holding jurisdiction exists for supplier's declaratory judgment action when customers are mere resellers of supplier product, citing *William Gluckin & Co., Inc. v. Int'l Playtex Corp.*, 407 F.2d 177, 178 (2d Cir. 1969)); *Mantissa Corp. v. Old Second Bancorp, Inc.*, No. 17 C 9175, 2018 WL 3059604, at *2, 5 (N.D. Ill. June 20, 2018).

Yet, under SITO's logic, if the supplier agreed to indemnify its customers (or, perhaps was required to do so under UCC §2-312), the supplier would have no recourse against the patent owner bringing ten different suits in ten different forums against ten different customers in order to extract a settlement from each – all for selling the exact same item provided by supplier S. This is not the law.

In short, SITO's newly invented "indemnity destroys jurisdiction" rule is contrary to extensive law and logic, and should thus be rejected here as it was in

Appx453

Texas.  Whether or not Bambuser indemnifies its customers is simply irrelevant to the analysis of whether SITO's infringement allegations against SFA and Uniqlo implicate Bambuser's product.[1]

## B. <u>SITO Ignores the Allegations of the FAC</u>

As pointed out above, this Court must examine the allegations of the FAC and determine whether they properly allege that SITO has impliedly accused Bambuser of either direct, contributory, or induced infringement in its prior litigation activities against Bambuser customers.  *Microsoft Corp. v. DataTern, Inc.*, 755 F.3d 899, 905 (Fed. Cir. 2014).

Remarkably, SITO does not in any way *even argue* that the allegations of the FAC are insufficient to plead that SITO has impliedly accused Bambuser of

---

[1] SITO also claims Bambuser "has not provided any additional <u>relevant evidence</u> [regarding] standing" and that Bambuser "has *no* <u>evidence</u> whatsoever regarding inducement or contributory infringement [and has made] <u>no showing</u>" regarding inducement. (SITO Br., pp. 5, 9)(underlining added here).  Such arguments may be appropriate for a *factual* challenge to jurisdiction under Rule 12(b)(1) after discovery, but they are not appropriate for consideration under the *facial* Rule 12(b)(1) challenge SITO has brought, where this Court must take all allegations in the FAC as true.  *Mitek Sys. v. United Servs. Auto. Ass'n*, 34 F.4th 1334, 1343-34 (Fed. Cir. 2022)(vacating improper dismissal of declaratory judgment action for lack of jurisdiction, and admonishing about the importance on remand of clearly distinguishing between facial and factual challenges under Rule 12(b)(1), and using the correct standard for each).  To the extent the Court decides SITO's motion to dismiss should be treated as a *factual* challenge,  Bambuser requests the opportunity to gather and submit evidence that, for example, SITO's claim charts are directed exclusively to Bambuser supplied technology, etc.

Appx454

infringement in the Uniqlo and SFA Complaints.  Instead, SITO focuses on its own

SFA and Uniqlo Complaints not <u>explicitly</u> accusing Bambuser of direct,

contributory, or inducement of infringement.  For example, as to direct

infringement, SITO claims "the fundamental problem with [the FAC] is that the

[SFA] Complaint is directed to SFA's system…no allegations in the [SFA

Complaint] even mention Bambuser."  (SITO Br., p. 6).  As to inducement and

contributory infringement, SITO continues: "There are no allegations by SITO [in

the SFA Complaint] that <u>Bambuser</u> took affirmative acts to encourage

infringement [and the SFA Complaint does not state the] "Bambuser technology is

not…suitable for substantial non-infringing use."  (SITO Br., pp. 7-10).  SITO also

claims: "None of those [infringement allegations in the SFA Complaint] indicate

that Bambuser controls SFA's website or provides the technology that powers the

website.  (SITO Br., p. 7).

First, using contributory infringement as the example, the relevant inquiry

here is *not* whether the SFA or Uniqlo Complaints, which allege direct

infringement against Bambuser's customers, also *explicitly* claim that those

customers' infringement was caused by Bambuser selling them a product that was

not a staple article of commerce capable of non-infringing uses.  Neither *Microsoft,*

nor any other case of which Bambuser is aware or which SITO has cited, holds that

the infringement complaint in the cusstomer suit must *explicitly* accuse the supplier

8

Appx455

of contributory infringement in order to impliedly accuse the supplier of

contributory infringement. *Am. Honda Motor Co. v. Wingard,* No. 1:14-CV-3522-

TWT, 2015 WL 3488170, at *2 (N.D. Ga. June 1, 2015) ("There is no requirement

that the patent holder [suing the supplier's customer] expressly accuse

the supplier of contributory infringement")(underlining added).

Instead, as SITO's motion is a facial challenge to this Court's jurisdiction

over the FAC here, (SITO Br., p. 3), the relevant inquiry is whether the FAC here

properly alleges that the direct infringement allegations in SITO's SFA and Uniqlo

Complaints are, in fact, directed to SFA's use of a Bambuser technology that has

no substantial non-infringing uses. *Finisar Corp. v. Capella Photonics, Inc.*, Case

No. 20-cv-07629-EMC, 2021 WL 810227, at *3 (N.D. Cal. Mar. 3,

2021)("Finisar alleges [in its declaratory judgment complaint] that it sold WSS

products to the Texas Defendants…On a motion to dismiss, the Court must accept

this allegation as true."); *BroadSign Int'l, LLC v. T-Rex Prop. AB*, No. 16-CV-

04586-LTS-HBP, 2018 WL 3418778, at *1, 5 (S.D.N.Y. July 13,

2018)("[A]ccording to the allegations of the [declaratory judgment complaint],

BroadSign's future sales will be made with knowledge of T-Rex's patents…

*BroadSign sufficiently alleges* it has knowledge of the Patents-in-Suit [and] *also*

*alleges* that all of BroadSign's products are built to order for its

customers…*BroadSign alleges* [in its declaratory judgment complaint that] its

9

products are built to order for customers who are the subject of T-Rex's infringement lawsuits, those products are especially designed for use in the accused invention").

Here, it is clear that the FAC properly pleads that SITO's allegations in its Uniqlo and SFA Complaints impliedly accuse Bambuser of infringement – SITO does not argue to the contrary.

As to direct infringement, the FAC attaches the specific claim charts submitted to the court by SITO in its Complaint against SFA Holdings, Inc. ("SFA claim charts"). The FAC further alleges that the SFA claim charts "point directly and exclusively to technology supplied by Bambuser to SFA." (FAC, ¶ 11). The FAC further alleges that the SFA claim charts "cite… only items implemented by the Bambuser supplied software" and even provides several specific and detailed examples of SITO pointing only to specific features of the Bambuser software in order to allege SFA meets certain claim limitations. (FAC, ¶¶ 11, 13-16).

Similarly, the claim charts relied upon in the draft Uniqlo complaint accuse "Uniqlo of direct infringement based solely on Uniqlo's use of Bambuser technology." (FAC, ¶¶ 20, 17-21)(emphasis added). Here too, the FAC recites specific and detailed examples of the Uniqlo claim charts citing only to features of the Bambuser software. (FAC, ¶¶ 20, 17-21).

10

Appx457

As to contributory infringement, the FAC further alleges that "[o]ther than the features relied upon and shown in the claim charts contained in the Uniqlo and SFA Complaints to allege infringement, the Bambuser technology does not have any substantial other uses." (FAC, ¶ 26). This is sufficient to plead that SITO's allegations of direct infringement against SFA impliedly accuse Bambuser of contributory infringement.

As to induced infringement under 35 U.S.C § 271(c), the FAC, in addition to alleging that all of the features cited by SITO in the SFA claim charts point to Bambuser supplied technology, also alleges that the "features cited in the SFA and Uniqlo Complaints to map the patent claims to the SFA and Uniqlo websites are all features practiced by the Bambuser technology as used by those entities in exactly the manner in which Bambuser intends and instructs those entities to use it, and Bambuser knows its technology will be so used when provided to its customers." (FAC, ¶ 25). This is sufficient to plead that Bambuser is being impliedly accused of inducing that infringement. The same can be said for the draft Uniqlo Complaint SITO threatened to file. (FAC, ¶¶ 17-23).[2]

---

[2] Inducement also requires knowledge by the Defendant of the patent, but that element of inducement is met by the fact that the Complaint indicates Bambuser was in possession of the SFA and Uniqlo Complaints (and claim charts) prior to filing the present lawsuit. (Dkt# 1, ¶¶ 8-10). *IOENGINE, LLC v. Paypal Holdings, Inc.*, Civil Action No. 18-452-WCB, 2019 WL 330515, at*3-5 (D. Del. Jan. 25, 2019); *Groove Digital, Inc. v. Jam City, Inc.*, Civil Action No. 1:18-cv-01331-RGA, 2019 WL 351254, at *4 (D. Del. Jan. 29, 2019)(both holding

11

Appx458

SITO provides no reason at all as to why the above allegations, taken as true as they must be here, do not sufficiently plead that the Uniqlo and SFA Complaints impliedly accuse Bambuser and its technology of infringement.

Second, under SITO's logic, *Microsoft* and its extensive progeny would be rendered entirely meaningless because the patent owner could defeat a supplier's declaratory judgment action in every single case – that is, the supplier would *never* be able to establish declaratory judgment jurisdiction.

Consider the previously described example, in which a patent owner separately sues 10 distributors for selling widgets, in ten different forums, all of whom are simply reselling the same widgets they acquired from the same supplier S.  Despite such facts clearly establishing jurisdiction for supplier S to bring a declaratory judgment action on the patent, a patent owner could *always* avoid such jurisdiction by simply not mentioning supplier S in the customer infringement complaints.  Then, the patent owner could argue, as SITO does here,  that its "Complaint is directed to [the customer's] system…no allegations in the [customer Complaint] even mention [supplier S.  Only the customers are accused of selling widgets]."  (SITO Br., p. 6).

---

defendant's receipt of patent owner's complaint is sufficient to satisfy knowledge requirement as of the date of such notice for indirect infringement claims).  SITO is apparently aware of this, since it does not challenge the knowledge element of indirect infringement claims.

Appx459

SITO's logic would also mean that the patent owner could *always* defeat a supplier's declaratory judgment action on jurisdictional grounds with respect to a supplier impliedly accused of contributing to or inducing infringement of its customer. Both types of infringement require, by definition, that the supplier *must cause direct infringement by the customer*. 35 U.S.C. §§271(b), (c); *Bio-Rad Labs., Inc. v. Int'l Trade Comm'n*, 998 F.3d 1320, 1335 (Fed. Cir. 2021)(induced or contributory infringement requires proof of the direct infringement allegedly induced or contributed to).

Consider a patent owner that sues ten defendants for direct infringement for using patented method X, all of whom had independently purchased a particular machine to perform the patented method X from supplier S. If that machine was not a staple article of commerce, and not capable of doing anything *other than* the patented method X, declaratory judgment jurisdiction would exist, because such allegations impliedly accuse the supplier of contributory infringement.

Under SITO's logic however, the patent owner could simply sue all ten companies for their direct infringement, and easily avoid a declaratory judgment action by the supplier, by simply not mentioning the supplier in its customer suits.

In short, the fundamental problem with SITO's argument – that its patent infringement complaint against SFA only points to SFA's system to establish infringement (SITO Br., p. 6-8) – is that it ignores the fact that the FAC here

13

Appx460

alleges the accused SFA system to which SITO points was supplied by Bambuser

and has no substantial non-infringing uses, and that all other elements of direct,

induced and contributory infringement are also present.  Taking the allegations of

the FAC as correct, this is sufficient to vest jurisdiction for the present action in

this Court.[3]

###### C.     SITO's Uniqlo Complaint Is Sufficient To Establish Jurisdiction

SITO makes three additional arguments as to why the allegations of the FAC

with respect to SITO's Uniqlo Complaint are insufficient to establish jurisdiction.

None of these arguments are followed by any citations to authority, undoubtedly

because all are directly contrary to well established case law.

First, SITO points out that Uniqlo has never been sued.  However, sending a

ready-to-file draft complaint, with a letter stating that absent Uniqlo taking a

license, SITO will proceed to have "the Court determine the appropriate remedy

---

[3] Remarkably, SITO faults Bambuser for asserting, with respect to the Uniqlo Complaint, "the same *implied* assertion theory of contributory induced infringement [but] provides *no* allegations by SITO [against Bambuser]." (SITO Br., p. 11)(emphasis in original).  This argument simply emphasizes SITO's misunderstanding of the law.  As pointed out above, the *correct* legal test is, in fact, whether SITO's infringement allegations against Uniqlo "impliedly" accuse Bambuser's technology of infringement, not whether SITO allegations in the Uniqlo complaint are *explicitly* directed at Bambuser. *Microsoft*, at 906; *Am. Honda Motor Co.,* at *2 (N.D. Ga. June 1, 2015)("There is no requirement that the patent holder expressly accuse the supplier of contributory infringement")(underlining added). .

14

Appx461

for Uniqlo's unauthorized use of SITO's patents" presents the same controversy "of sufficient immediacy and reality to warrant the issuance of a declaratory judgment" as a lawsuit does. (Opinion, p. 6); *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 127 (2007). In fact, none of the cases considering the jurisdictional issue here distinguish in any way between a controversy of sufficient immediacy based upon a letter threatening a patent infringement lawsuit, and one based upon a previously filed lawsuit. *Mitek Sys. v. United Servs. Auto. Ass'n*, 34 F.4th 1334, 1338 (Fed. Cir. 2022)(analyzing jurisdictional issue after noting USAA sent "patent licensing demand letters to [supplier] Mitek customers"); *Arris Group, Inc. v. British Telecommunications PLC*, 639 F.3d 1368, 1371-75 (Fed. Cir. 2011)(finding jurisdiction over supplier's declaratory judgment action due to patent owner having sent threatening letters to supplier's customer).

Next, SITO asserts this Court has no jurisdiction because "SITO's last and only contact with Uniqlo was a settlement discussion with Unqlo's in-house counsel who did not indicate any involvement by Bambuser." (SITO Br., p. 10). Even if there were evidence of any such conversation (there is none), and even if it were proper for the Court to consider such evidence on a *facial* challenge a motion to dismiss (it is not), this argument would fail. This Court's jurisdiction to hear a declaratory judgment action based upon an explicit threat SITO made – with a copy of a ready to file draft complaint – does not evaporate as a result of SITO's

15

counsel claiming Uniqlo allegedly did not mention Bambuser in an *ex parte*

conversation SITO allegedly had with Uniqlo.

SITO's final argument against the Uniqlo Complaint establishing

jurisdiction is to cite to this Court's analysis of the previous Complaint here.

(SITO Br., p. 11).  However, none of the relevant allegations in the FAC that

establish jurisdiction based upon the Uniqlo Complaint were contained in the

previous Complaint.  (Compare FAC, ¶¶ 18-27, with Complaint at Dkt# 1).

The FAC allegations with respect to the Uniqlo Complaint independently

support this Court's jurisdiction in this case.

D.     **SITO's Remaining Arguments are Meritless**

SITO claims (incorrectly) that Bambuser misrepresented the parties'

negotiations (SITO Br., p. 12) because, according to SITO, "[t]he first time SITO

learned of Bambuser was through Bambuser's filing of the original declaratory

judgment action here in New Jersey and an email from its counsel."  (SITO Br., pp.

12-13).  It is difficult to ascertain what SITO believes this has to do with whether

SITO's infringement allegations against SFA and Uniqlo impliedly accuse

Bambuser's technology of direct, contributory, or induced infringement – the sole

issue dispositive of the present motion to dismiss for lack of jurisdiction.

SITO next argues that since there is a first-filed Texas action, Bambuser can

participate in that case.  (SITO Br., p. 14).  However, the same argument could be

16

Appx463

made in *every* case where a supplier brings a declaratory judgment action in a forum other than where the patent owner sued the customers.  Yet, courts routinely not only find jurisdiction over the separate declaratory judgment action, but often give that later-filed declaratory judgment suit priority over the earlier filed customer lawsuits under the customer-suit exception.  *SyncView Techs., LLC v. Grande Commc'ns Networks, LLC*, No. A-18-CV-00412-LY, 2019 WL 7758916, at *2 n.2 (W.D. Tex. Sept. 23, 2019); *GreatGigz Sols., LLC v. Costco Wholesale Corp.*, No. 6-21-CV-00807, 2022 WL 1037114 (W.D. Tex. Apr. 6, 2022); *Lighthouse Consulting Grp., LLC v. Truist Bank*, No. 2:19-CV-00340-JRG, 2020 WL 6781977 (E.D. Tex. Apr. 7, 2020).

Finally, SITO claims dismissing this case would promote efficiency.  (SITO Br., pp. 14-15).  However, the issues of whether Bambuser's technology infringes SITO's patents, and whether those patents are invalid, can be resolved one of two ways:  One way is to have SITO, <u>a company headquartered in New Jersey</u>, litigate that issue <u>once</u>, with the supplier of the accused technology, in a New Jersey court. Alternatively, as SITO proposes, SITO, as a New Jersey based company, can sue one Bambuser customer in Texas for using Bambuser's technology (FAC, Ex. A), a second Bambuser customer in the Southern District of New York for using that same technology (FAC, Ex. B), and then continue, one by one, to sue any number of other Bambuser customers for the same use of Bambuser's same technology in

17

Appx464

numerous jurisdictions around the country.  SITO's claim that the latter method is more efficient is nothing short of bizarre, and understandably, was already soundly rejected in a detailed analysis by the very Texas Court presiding over SITO's infringement suit against SFA.  (Ex. 2).  Indeed, the Texas action is currently stayed based upon the customer-suit exception, in large part because the Texas Court determined it is more efficient for the present declaratory judgment action to proceed first and resolve what would otherwise be multiple customer lawsuits in multiple forums.  (Ex. 2).

In short, SITO raises a variety of red herring issues, but nowhere does SITO dispute that the FAC properly alleges that Bambuser supplied the technology cited by SITO in its patent infringement complaints against SFA and Uniqlo, and that the FAC also properly alleges the other required elements to show the SFA and Uniqlo Complaints contain an implied charge of contributory and inducement of infringement.  Accordingly, this Court has jurisdiction over this Action.

III.   **Conclusion**

For the foregoing reasons, the Court should deny SITO's motion.

18

Dated: January 22, 2025     Respectfully submitted,

            KAPLAN BREYER SCHWARZ, LLP


            By: */s/ Jeffrey I. Kaplan/*
             Jeffrey I. Kaplan
            317 George Street, Ste 320
            New Brunswick, New Jersey 08901
            Telephone: (732) 578-0103
            jkaplan@kbsiplaw.com

            ZUKERMAN GORE BRANDEIS &
            CROSSMAN, LLP
            John K. Crossman (*pro hac vice*)
            Eleven Times Square
            New York, New York 10036
            Telephone: (212) 223-6700
            Facsimile: (212) 223-6433
            jcrossman@zukermangore.com

            *Attorneys for Plaintiff Bambuser AB*

Appx466

# EXHIBIT 1

Appx467

# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

<table>
<tr><td>Chambers of<br><b>Jessica S. Allen</b><br>United States Magistrate Judge</td><td>Martin Luther King, Jr. Federal Bldg.<br>& U.S. Courthouse<br>50 Walnut Street<br>Newark, New Jersey 07102<br>(973) 645-2580</td></tr>
</table>

May 10, 2024

## LETTER ORDER

TO:   ALL COUNSEL OF RECORD

Re:   **Bambuser AB v. SITO Mobile R&D IP, LLC, et al.**
      **Civil Action No. 23-21757 (JKS) (JSA)**

Dear Counsel:

This matter comes before the Court upon the motion of Defendants SITO Mobile R&D IP, LLC ("SMIP") and SITO Mobile, Ltd. ("SM") (sometimes collectively, "Sito") to stay this case, or alternatively transfer it to the United States District Court for the Western District of Texas, pursuant to 28 U.S.C. § 1404(a). (ECF No. 10). Plaintiff Bambuser AB ("Bambuser") opposes the motion. The Court did not hear oral argument, pursuant to Federal Rule of Civil Procedure 78. Having considered all of the parties' submissions (ECF Nos. 10, 16, 19, 22), and for good cause shown, and for the reasons set forth below, Sito's motion is **DENIED**.

## I.   RELEVANT BACKGROUND

As alleged in the Complaint, Bambuser is a manufacturer of a "video commerce software." (Compl. ¶ 3, ECF No. 1). Sito "claim[s] to own or control licensing rights to at least six (6) United States patents (the 'Patents in Suit') that Sito claims deal broadly with adaptive bitrate streaming technologies." (*Id.* at ¶ 6). According to Bambuser, Sito specifically "claims to own and/or control" U.S. Patent Nos. 7,191,244; 8,015,307; 8,554,940; 9,349,138; 10,735,781; and 10,769,675. (*Id.* at ¶ 7).

On June 16, 2023, Sito commenced a patent infringement action regarding the Patents in Suit against SFA Holdings, Inc. ("SFA"). (*Id.* at ¶ 8). That action captioned *SITO Mobile R&D IP, LLC v. SFA Holdings, Inc. f/k/a Saks Incorporated*, Civil Action No. 23-688, is presently pending in the United States Court for the Western District of Texas (the "SFA Action"). (*Id.*). There, Sito alleges that SFA "uses [an] HTTP Live Streaming (HLS) protocol to stream video content. HLS is an HTTP-based adaptive bitrate streaming technique that enables high-quality streaming of media content over the Internet from web servers." (SFA Action, ECF No. 1 ¶ 19). According to Sito, SFA has infringed upon the Patents in Suit by "own[ing], control[ling],

Appx468

operat[ing], and us[ing] a system for streaming media . . . that practices and infringes the media streaming method" covered by the patents and inducing customers to use the same. (*See, e.g.*, *id.* ¶¶ 52–53, 59–64).

SFA is one of Bambuser's customers. (Compl. ¶ 9, ECF No. 1; Kaplan Decl. ¶ 5, ECF No. 16-1; Ex. A, Zinna Decl. ¶ 7, ECF No. 16-2). According to Bambuser, Sito sued SFA based on its use of Bambuser's supplied technology. (*Id.*). Bambuser is not a party in the SFA Action. However, SFA has requested Bambuser defend and indemnify SFA, pursuant to the terms of an agreement governing the relationship between SFA and Bambuser. (*Id.*; ECF No. 16 at 3 (citing Kaplan Decl. ¶ 8, ECF No. 16-1); Ex. A, Zinna Decl. ¶ 9, ECF No. 16-2). Bambuser agreed to defend and indemnify SFA for "any infringement by Bambuser's video-streaming product." (ECF No. 16 at 3 (citing Kaplan Decl. ¶ 9, ECF No. 16-1); Ex. A, Zinna Decl. ¶ 10, ECF No. 16-2; *see also* ECF No. 10-1 at 1 (citing Compl. ¶ 9, ECF No. 1)).

On November 1, 2023, Bambuser filed suit against Sito in this Court, requesting a declaratory judgment that Bambuser has not infringed the six Patents in Suit and/or that the six Patents in Suit are invalid. (Compl. at ¶ 1, ECF No. 1). Sito's instant motion to stay ensued, (ECF No. 10), followed by Sito's motion to dismiss Bambuser's complaint for lack of subject matter jurisdiction. (ECF No. 18).[1]

On December 13, 2023, SFA filed a motion to stay the SFA Action pending resolution of this action. (ECF No. 16 at 4–5; SFA Action, ECF No. 10). On April 19, 2024, the Court in the SFA Action granted SFA's motion to stay. (*See* Bambuser 4/22/24 Ltr, ECF No. 26 & Order, ECF No. 26-1)). Applying the customer suit exception to the first-to-file rule, the Court found that SFA is a "mere reseller" of Bambuser's supplied technology—a notion not challenged by Sito. (ECF No. 26-1 at 5). The Court also found that SFA agreed to be bound by the outcome of the instant declaratory judgment suit. (*Id.*). Finally, the Court determined that Bambuser is the only source of the allegedly infringing technology—a factor not addressed by Sito. (*Id.* at 6). Based on these three factors, the Court concluded that a stay was appropriate. (*Id.* at 6). The Court further found that the traditional stay factors weighed in favor of a stay. (*Id.* at 6–7).

Against this backdrop, this Court considers Sito's motion to stay, or in the alternative, transfer.

## II.   MOTION TO STAY, OR ALTERNATIVELY, TRANSFER

Sito asserts that the "first-to-file rule" requires a stay of this action, pending the resolution of the SFA Action, or alternatively, a transfer to the Western District of Texas. (ECF No. 10-1 at 2–7). According to Sito, the first-to-file rule, in the interests of comity, "'favors pursuing only the first-filed action when multiple lawsuits involving the same claims are filed in different jurisdictions.'" (*Id.* at 3 (quoting *Merial Ltd. v. Cipla Ltd.*, 681 F.3d 1283, 1299 (Fed. Cir. 2012))). Sito continues that when there are two overlapping actions, as here, for patent infringement and declaratory judgment, the later-filed action—here, the instant declaratory judgment action—is generally dismissed, stayed, or transferred to the forum of the infringement action. (*Id.*). Relying on the Third Circuit's decision in *EEOC v. University of Pennsylvania*, 850 F.2d 969 (3d Cir.

---

[1] Sito's motion to dismiss is currently pending before the Honorable Jamel K. Semper, U.S.D.J.

Appx469

1988), Sito claims that the first-to-file rule requires that the court which first obtained possession of the subject of the dispute must decide it. (*Id.* at 4). Sito continues that "principles of judicial economy, the avoidance of piecemeal litigation, as well as the discretionary jurisdiction conferred by the Declaratory Judgment Act" warrant a stay of this action. (*Id.* at 5). As alternative relief, Sito asserts that, even if the Court declines to stay this action, the first-to-file rule is "alone sufficient to support transfer" under 28 U.S.C. § 1404(a). (*Id.* at 6–7).

In opposition, Bambuser contends that the "customer-suit exception" to the first-to-file rule requires that this action, *i.e.*, the manufacturer's suit, proceed before the SFA Action, *i.e.*, the customer suit. (ECF No. 16 at 1–2, 5–9). Bambuser advances three primary arguments. First, the customer suit exception permits the manufacturer, the "real party in interest" in the patent infringement suit, to "litigate infringement and validity issues in one forum." (*Id.* at 1). According to Bambuser, the customer suit exception applies when the customer-defendant in the earlier-filed action is a "mere reseller," the customer-defendant agrees to be bound by the later-filed action, and the manufacturer is the "only source" of the allegedly infringing product. (*Id.* at 5–9). Bambuser relies on the declarations of SFA's counsel of record in the SFA Action, wherein counsel confirmed that SFA is a customer of Bambuser that "merely uses" Bambuser's product and "agrees to be bound by the outcome of [this action]." (*Id.* at 7–8; Ex. A, Zinna Decl. ¶ 11, ECF No. 16-2; Ex. B, Zinna Decl. ¶¶ 9, 11, ECF No. 16-3). Second, Bambuser asserts that application of the first-to-file rule is discretionary and depends on "convenience" factors, such as the relative proximity of witnesses to New Jersey as compared to Texas and challenges to establishing personal jurisdiction over Bambuser in the Western District of Texas. Bambuser submits that these factors all weigh in favor of litigating its declaratory judgment action in the District of New Jersey. (*Id.* at 10–13). Finally, Bambuser contends that, should the Court consider transferring this action under Section 1404(a), the relevant factors identified by the Third Circuit in *Jumara v. State Farm Insurance Company*, 55 F.3d 873 (3d Cir. 1995), on balance, weigh against transfer. (*Id.* at 13–15).

On reply, Sito argues that, consistent with the Federal Circuit's decision in *Microsoft Corporation v. Data Tern, Inc.*, 755 F.3d 899 (Fed. Cir. 2014), the customer suit exception does not apply where, as here, the manufacturer has agreed to indemnify the customer-defendant in the patent infringement action. (ECF No. 19 at 1–5). According to Sito, in such situations, the manufacturer lacks standing to bring its own suit. (*Id.* at 2–5). And so, Bambuser cannot bring an action related to the Patents in Suit in this Court. (*Id.* at 5–6).

On sur-reply, Bambuser responds that *Microsoft Corporation v. Data Tern, Inc.* is not applicable as that case addresses Article III standing, not the customer suit exception. Bambuser continues that, even considering the Federal Circuit's decision in *Microsoft*, manufacturers, like Bambuser, have standing to bring their own declaratory judgment actions, so long as the disputed infringing conduct is attributable to the manufacturer, not the customer. [2] (ECF No. 22 at 1–5).

---

[2] On January 16, 2024, Sito filed a Rule 12(b)(1) motion to dismiss this action for lack of subject matter jurisdiction, solely on the grounds that Bambuser lacks standing following the Federal Circuit's decision in *Microsoft Corporation v. DataTern, Inc*. (ECF No. 18). That motion is pending before the Honorable Jamel K. Semper. The Undersigned need not (and does not) reach the merits of the parties' dispute over standing to decide Sito's motion to stay. To be clear, the Undersigned makes no findings as to whether Bambuser has standing to bring the instant declaratory judgment suit, which is at the heart of Sito's motion to dismiss before Judge Semper.

3

Appx470

### III.  ANALYSIS

The first-to-file rule is a "doctrine of federal comity" under which, generally, "a district court may choose to stay, transfer, or dismiss a duplicative later-filed action" in favor of the earlier so-called "first-filed" action. *Merial Ltd. v. Cipla Ltd.*, 681 F.3d 1283, 1299 (Fed. Cir. 2012).  The "key objectives" of the rule are "minimization or avoidance of duplication of effort, waste of judicial resources, and risk of inconsistent rulings that would accompany parallel litigation." *Futurewei Techs., Inc. v. Acacia Rsch. Corp.*, 737 F.3d 704, 709 (Fed. Cir. 2013) (internal quotation marks omitted).  "[T]he rule is not rigidly or mechanically applied," and courts wield an "ample degree of discretion" to either apply the rule or certain exceptions.  *Merial Ltd.*, 681 F.3d at 1299 (citing *Kerotest Mfg. Co. v. C-O Two Fire Equip. Co.*, 342 U.S. 180, 183–84 (1952)); *see, e.g.*, *Micron Tech., Inc. v. Mosaid Techs., Inc.*, 518 F.3d 897, 904 (Fed. Cir. 2008) ("The first-filed suit rule, for instance, will not always yield the most convenient and suitable forum.").  Indeed, the Third Circuit, in *EEOC v. University of Pennsylvania*, on which Sito relies, emphasized that the first-to-file rule does not require a "wooden application" and that courts "have always had discretion to retain jurisdiction given appropriate circumstances justifying departure from the first-filed rule."  850 F.2d at 972 (internal citations omitted).  As detailed below, the customer suit exception is an appropriate circumstance warranting departure from the rule in this case.

Contrary to Sito's assertions, the "customer suit exception" to the first-to-file rule applies.  The exception provides that "[w]hen a patent owner files an infringement suit against a manufacturer's customer and the manufacturer then files an action of noninfringement or patent invalidity, the suit by the manufacturer generally take precedence." *In re Nintendo of Am., Inc.*, 756 F.3d 1363, 1365 (Fed. Cir. 2014).  The exception "exists to avoid, if possible, imposing the burdens of trial on the customer, for it is the manufacturer who is generally the 'true defendant' in the dispute."  *Id.  See Katz v. Lear Siegler, Inc.*, 909 F.2d 1459, 1464 (Fed. Cir. 1990) ("'[I]t is a simple fact of life that a manufacturer must protect its customers, either as a matter of contract, or good business, or in order to avoid the damaging impact of an adverse ruling against its products.'") (citation omitted).  As with the first-to-file rule, "the guiding principles in the customer suit exception cases are efficiency and judicial economy." *Tegic Commc'ns Corp. v. Bd. of Regents of Univ. of Texas Sys.*, 458 F.3d 1335, 1343 (Fed. Cir. 2006).  "Generally speaking, courts apply the customer suit exception to stay earlier-filed litigation against a customer while a later-filed case involving the manufacturer proceeds in another forum." *Spread Spectrum Screening LLC v. Eastman Kodak Co.*, 657 F.3d 1349, 1357 (Fed. Cir. 2011).  "The customer suit exception 'is based on the manufacturer's presumed greater interest in defending its actions against charges of patent infringement; and to guard against possibility of abuse.'"  *Id.* (quoting *Kahn. v. Gen. Motors Corp.*, 889 F.2d 1078, 1081 (Fed. Cir. 1989)).

A review of the judicial landscape reveals that neither the Federal Circuit nor the Third Circuit have adopted a uniform set of factors to consider in evaluating the customer suit exception. *See, e.g., Tegic Commc'ns Corp.*, 458 F.3d at 1343; *Spread Spectrum Screening LLC*, 657 F.3d at 1358; *Katz*, 909 F.2d 1464.  However, this Court has synthesized these decisions, which have stated that the relevant inquiry turns on whether the manufacturer's suit for declaratory judgment has "the potential to resolve the 'major issues' concerning the claims against the customer—not

4

Appx471

every issue—in order to justify a stay of the customer suits." *Spread Spectrum Screening LLC*, 657 F.3d at 1358 (quoting *Katz*, 909 F.2d at 1464); *Tegic Commc'ns Corp.*, 458 F.3d at 1343 (quoting *Katz*, 909 F.2d at 1463 ("[I]n evaluating the customer suit exception 'the primary question is whether the issues and parties are such that the disposition of one case would be dispositive of the other.'")).  Here, it is undisputed that the SFA Action is the first-filed action and this suit is the later-filed manufacturer's declaratory judgment action.  (Compl. ¶ 8, ECF No. 1; ECF No. 10-1 at 1; ECF No. 16 at 3).  Further, the parties agree both actions involve the same patents and allegedly infringing products.  (ECF No. 16 at 1; ECF No. 10-1 at 2; Ex. A, Zinna Decl. ¶ 12, ECF No. 16-2).  Bambuser and SFA certify that SFA is Bambuser's customer and Bambuser supplied SFA with all of its video streaming technology at issue in both lawsuits.  (Kaplan Decl. ¶¶ 5, 8, ECF No. 16-1; Ex. A, Zinna Decl. ¶¶ 7, 8, 11, ECF No. 16-2).  Sito does not argue otherwise in support of its instant motion.  (ECF No. 10-1 at 1 (citing Compl. ¶ 9, ECF No. 1); ECF No. 19 at 2).  SFA avers that Bambuser is the only manufacturer providing SFA with this technology.  (Ex. A, Zinna Decl. ¶ 8, ECF No. 16-2).  Accordingly, this Court finds that Bambuser is the true defendant in interest, and this action has the potential to resolve the major issues in the SFA Action, including Bambuser's allegedly infringing technology and the validity of the Patents in Suit.

The Federal Circuit and several courts in this Circuit have analyzed two other factors.  First, courts have considered whether the customer-defendant in the infringement action is a "mere reseller" of the manufacturer's product.  *See Kahn*, 889 F.2d at 1082 (collecting cases).  *See also Early Warning Servs., LLC v. Grecia*, 2021 WL 1264029, at *9 (E.D. Pa. Apr. 6, 2021) (exception applied where customer used computer product "exclusively made and distributed" by manufacturer); *Pragmatus Telecom, LLC v. Advanced Store Co.*, 2012 WL 2803695, at *3 (D. Del. July 10, 2012) (exception applied where customers claimed infringement actions were for "ordinary use" of technology); *Ricoh Co., Ltd. v. Aeroflex Inc.*, 279 F. Supp. 2d 554, 557 (D. Del. 2003) (manufacturer's declaratory judgment action should be given preference over patentee's suit against customers when customers "are being sued for their ordinary use of the manufacturer's products").  Second, courts have considered whether the manufacturer's customer has agreed to be bound by the results of this instant action.  *Katz*, 909 F.2d at 1464 (citing *Kahn,* 889 F.2d at 1082 ("considering whether the customer would be bound in declaratory judgment action by manufacturer")).

Turning to the "mere reseller" factor, as previously noted, the parties do not dispute that SFA is Bambuser's customer.  Further, Bambuser and SFA have certified that Bambuser supplied SFA with the disputed video streaming technology.  (Kaplan Decl. ¶¶ 5, 8, ECF No. 16-1; Ex. A, Zinna Decl. ¶¶ 7, 8, 11, ECF No. 16-2).  Sito does not argue to the contrary.  (ECF No. 10-1 at 1 (citing Compl. ¶ 9, ECF No. 1); ECF No. 19 at 2).  Finally, SFA certifies that the disputed technology is supplied *exclusively* by Bambuser.  (Ex. A, Zinna Decl. ¶ 8, ECF No. 16-2).  Thus, the Undersigned finds that SFA is a mere reseller of Bambuser's video streaming technology that has no role in the development or manufacture of the technology, and Sito does not contest SFA's reseller status in its motion papers.

As to the secondary consideration, SFA has agreed to be bound by the outcome of this action.  (Ex. B, Zinna Decl. ¶ 11, ECF No. 16-3).  Finally, as a practical consideration, this Court notes that the Court in the SFA Action granted SFA's motion to stay based on similar factors applicable to the customer suit exception.  (ECF No. 26-1 at 4–6).  Accordingly, the Undersigned

Appx472

finds that, based on all of the relevant considerations, the customer suit exception to the first-to-file rule applies, and thus **DENIES** Sito's motion to stay the instant action.

As to Sito's alternative relief for a transfer to the Western District of Texas, its sole basis in support of a transfer is that the first-to-file rule is "alone sufficient to support transfer" under 28 U.S.C. § 1404(a). (ECF No. 10-1 at 6–7; ECF No. 19 at 6 ("The transfer factors do not need to be considered. . . .")). This conclusory argument alone does not support a transfer especially when the Court has found already that the customer suit exception applies to the first-to-file rule, and thus serves as an independent basis to deny the stay. In any event, Sito's passing reference to Section 1404(a) does not carry its burden "of establishing the need for transfer." *Jumara*, 55 F.3d at 879 (citations omitted). Indeed, Sito's papers are silent on the propriety of transfer under the applicable *Jumara* factors that courts must consider in a Section 1404(a) analysis. *See id.* Accordingly, the Court **DENIES** Sito's request for a transfer on these grounds.

## IV.     CONCLUSION

For the foregoing reasons, Sito's motion to stay, or in the alternative, to transfer, is **DENIED**. The Clerk of the Court is directed to terminate the motion filed as ECF No. 10.


          **SO ORDERED.**

                                        */s/ Jessica S. Allen*
                                        **HON. JESSICA S. ALLEN**
                                        **United States Magistrate Judge**



   cc:     **Hon. Jamel K. Semper, U.S.D.J.**

6

Appx473

# EXHIBIT 2

Case 2:23Case17237-dk-90698-RPDocumeate38-30   Filed 04/29/25   Ptaye 2 of 89 PageID: 467

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| SITO MOBILE R&D IP, LLC and SITO MOBILE, LTD., | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | No. 1:23-CV-688-RP |
| | § | |
| SFA HOLDINGS INC. f/k/a SAKS INCORPORATED, | § | |
| | § | |
| Defendant. | § | |

## ORDER

Before the court is Defendant SFA Holding Inc.'s Opposed Motion to Stay Pending Resolution of True Defendant's Declaratory Judgment Action (Dkt. 10) and all related briefing.[1] Having considered the parties' written submissions and determining that a hearing is unnecessary, the undersigned **GRANTS** the motion.

### I.   BACKGROUND

Plaintiffs SITO Mobile R&R IP, LLC and SITO Mobile, Ltd. (together "SITO") are suing Defendant SFA Holdings Inc. ("Saks") for patent infringement. Dkt. 1 at 1.[2] Saks seeks to the stay this proceeding until a pending declaratory judgment action ("Declaratory Suit") filed by non-party Bambuser AB ("Bambuser") in the District of New Jersey is resolved. Dkt. 10 at 5. Bambuser provided the allegedly infringing technology to Saks and has acknowledged a contractual obligation to defend Saks in this case. *Id.* Saks contends the Declaratory Suit "will address the non-infringement and invalidity of the exact same allegedly infringing technology at issue here." *Id.*[3]

---

[1] United States District Judge Robert Pitman referred this Motion to the undersigned for disposition pursuant to 28 U.S.C. § 636(b)(1)(A), Rule 72 of the Federal Rules of Civil Procedure, and Rule 1(c) of Appendix C of the Local Rules of the United States District Court for the Western District of Texas. Text Order, March 14, 2024.

[2] Page numbers correspond to the page number in the CM/ECF-generated header.

[3] Saks also points out that both Plaintiffs' principal places of business are in New Jersey. Dkt. 5 at 5.

1

Appx475

Saks argues that this case should be stayed pursuant to the customer-suit exception to the first-filed rule or, in the alternative, pursuant to the general principles courts typically consider when determining whether to grant a stay. SITO opposes a stay.

## II.    APPLICABLE LAW

### A.  Customer-suit exception

A trial court has broad discretion to stay an action against a party to promote judicial economy. *Anderson v. Red River Waterway Comm'n*, 231 F.3d 211, 214 (5th Cir. 2000); *see also Landis v. N. Am. Co.*, 299 U.S. 248, 254–55 (1936) ("[T]he power to stay proceedings is incidental to the power inherent in every court to control the disposition of the causes on its docket with economy of time and effort for itself, for counsel, and for litigants."). Where suit is brought against a manufacturer and its customers, the action against the customers should be stayed pending resolution of the case against the manufacturer to promote judicial economy. *See In re Nintendo of Am., Inc.*, 756 F.3d 1363, 1365–66 (Fed. Cir. 2014).

The "customer-suit exception" to the first-filed rule provides that "litigation against or brought by the manufacturer of infringing goods takes precedence over a suit by the patent owner against customers of the manufacturer." *Katz v. Lear Siegler*, 909 F.2d 1459, 1464 (Fed. Cir. 1990). This exception "exists to avoid, if possible, imposing the burdens of trial on the customer, for it is the manufacturer who is generally the 'true defendant' in the dispute." *Nintendo*, 756 F.3d at 1365 (citation omitted). "[C]ourts apply the customer suit exception to stay earlier-filed litigation against a customer while a later-filed case involving the manufacturer proceeds in another forum." *Spread Spectrum Screening v. Eastman Kodak Co.*, 657 F.3d 1349, 1357 (Fed. Cir. 2011). The Federal Circuit has applied the customer-suit exception to cases in which the supplier and customer are named as defendants in the same case. *Nintendo*, 756 F.3d at 1365.

2

To warrant a stay of the customer suit, the case involving the manufacturer "need only have the potential to resolve the 'major issues' concerning the claims against the customer—not every issue." *Spread Spectrum*, 657 F.3d at 1358 (citing *Katz*, 909 F.2d at 1464). Courts use a "flexible approach" to avoid wasteful expenditure of resources, and therefore "stay[] proceedings if the other suit is so closely related that substantial savings of litigation resources can be expected." *In re Google*, 588 F. App'x 988, 991 (Fed. Cir. 2014); *see also Nintendo*, 756 F.3d at 1365–66 (determining that the customer-suit exception is "designed to facilitate just, convenient, efficient, and less expensive determination" (citations omitted)).

In determining whether the customer suit exception applies, courts analyze three factors: "(1) whether the customer-defendant in the earlier-filed case is merely a reseller; (2) whether the customer-defendant agrees to be bound by any decision in the later-filed case that is in favor of the patent owner; and (3) whether the manufacturer is the only source of the infringing product." *Dodots Licensing Sols. v. Samsung Elecs. Co.*, No. 6:22-CV-00535-ADA, 2023 U.S. Dist. LEXIS 125803, at *5 (W.D. Tex. 2023) (quoting *CyWee Grp. v. Huawei Device Co.*, No. 2:17-CV-495-WCB, 2018 U.S. Dist. LEXIS 142173, at *14 (E.D. Tex. Aug. 22, 2018)). The "guiding principles in the customer suit exception cases are efficiency and judicial economy." *Spread Spectrum*, 657 F.3d at 1357 (citation omitted).

**B. Stays generally**

The factors courts typically consider when determining whether to grant a stay include: "(1) whether a stay would unduly prejudice or present a clear tactical disadvantage to the non-moving party; (2) whether a stay will simplify the issues and trial of the case; (3) whether discovery is completed; and (4) whether a trial date has been set." *In re Trustees of Bos. Univ. Patent Cases*,

3

Appx477

No. CV 13-12327-PBS, 2014 U.S. Dist. LEXIS 206352, 2014 WL 12576638, at *2 (D. Mass. May 16, 2014).

### III. ANALYSIS

### A. Customer-suit exception

Saks contends that a stay is warranted because all of the customer-suit exception factors are met. Dkt. 10 at 12. SITO responds that "[t]he customer-suit exception to the first-to-file doctrine does not apply here because [non-party] Bambuser admits . . . that is has accepted its indemnification and defense obligations for Saks and is stepping in to fulfill those obligations here in Texas." Dkt. 14 at 5 (citing Saks's Motion at 1).[4]

The customer-suit exception applies because: (1) SITO's infringement claims against Saks hinge on Saks's use of Bambuser's technology; (2) Saks agrees to be bound by the outcome of the Declaratory Suit; and (3) Bambuser is the only source of the accused products.

### 1. Whether Saks is merely a reseller

Saks contends it is merely a reseller of Bambuser's technology. Dkt. 10 at 12. It asserts "Saks is a customer of Bambuser, who created, licensed, white-labeled, and supplied Saks with video streaming technology." *Id.* at 12–13. Saks posits that it "merely uses the Bambuser product in furtherance of its business operations and plays no role in the creation of the accused technology supplied by Bambuser." *Id.* at 13.

SITO, contending that Bambuser is representing Saks in the instant action, argues that "whatever nuance Bambuser is trying to put forward, a reseller is a customer" and "under *Microsoft v. Data Tern* [*sic*], the customer-suit exception to the first-to-file rule does not apply here." Dkt. 14 at 11. But *Microsoft* and the follow-on cases SITO cites are inapposite. Those cases addressed

---

[4] SITO's statement is inaccurate or its citation does not support the statement.

4

Article III standing. Indeed, nowhere does *Microsoft* address or allude to the customer-suit exception. *See generally*, *Microsoft Corp. v. DataTern*, 755 F.3d 899, 901 (Fed. Cir. 2014).

The court concludes that Saks is a "mere reseller" of Bambuser's technology because it is an end user of Bambuser's product in furtherance of its own business. SITO does not challenge this notion. Courts in the Fifth Circuit have consistently found that the first customer-suit exception factor weighs in favor of a stay where a customer-defendant is accused of merely using, operating, or promoting an accused product that had been developed and supplied by a third-party. *See, e.g., Topia Tech. v. Dropbox*, No. 6:21-CV-01373-ADA, 2022 U.S. Dist. LEXIS 234470, 2022 WL 18109619, at *4 (W.D. Tex. Dec. 29, 2022) (finding the first factor favored applying the customer-suit exception because the plaintiff only accused the defendants of "using or promoting" the manufacturer's accused products.); *GreatGigz Sols. v. Costco Wholesale*, No. 6-21-CV-00807, 2022 U.S. Dist. LEXIS 63778, at *3 (W.D. Tex. 2022) (finding the first factor favored applying the customer-suit exception because the complaint was "predicated entirely on Defendants' use of the supplier's product"); *Lighthouse Consulting Group v. Truist Bank*, No. 2:19-CV-03340-JRG, 2020 U.S. Dist. LEXIS 219276, 2020 WL 6781977, at *2 (E.D. Tex. Apr. 7, 2020) (finding the first factor favored applying the customer-suit exception because the defendants did not develop or create the accused technology, but merely licensed it from the actual developer and supplier).

*2. Whether Saks agrees to be bound by the outcome of the Declaratory Suit*

"Saks agrees to be bound by the outcome of the declaratory suit . . . ." Dkt. 10 at 13. Such an agreement "weighs heavily in favor of staying the current suit." *Slick Slide v. NKDZ DFW*, No. 4:23-cv-00643-O, 2024 U.S. Dist. LEXIS 28411, at *10 (N.D. Tex. 2024) (quoting *Wapp Tech. v. Hewlett-Packard Enter. Co.*, No. 4:18-CV-00468, 2019 U.S. Dist. LEXIS 137091, 2019 WL 3818761, at *4 (E.D. Tex. Aug. 14, 2019)). This factor favors granting the stay.

5

Appx479

*3. Whether Bambuser is the only source of the allegedly infringing technology*

Saks argues that the Complaint alleges that "Bambuser is the only manufacturer providing the Accused Technology to [Saks]." Dkt. 10 at 14. Or "[p]ut another way, Saks does not get what it obtains from Bambuser from another vendor too." *Id.* "[A]s things now stand, Bambuser is providing a complete defense to Saks and it is understood that the case is about Bambuser's technology." *Id.* at 14–15. SITO does not address this factor. Thus, the third factor counsels in favor of a stay.

Because all three of the customer-suit exception factors weigh in favor of a stay, the undersigned will grant the Motion.

## B. Traditional stay factors

The court gives great weight to the three factors considered under the customer-suit exception. But, for the sake of completeness, the court considers the traditional stay factors.

*1. Whether SITO is unduly prejudiced by a stay*

Saks argues that "[a] stay will not unduly prejudice SITO because the major issues present in its suit against Saks will be heard in the Declaratory Suit, in which SITO is a party." Dkt. 10 at 18 (citing *Glob. Equity Mgmt. (SA) Pty. Ltd. v. Ericsson*, No. 2:16-cv-00618-RWS-RSP, 2017 U.S. Dist. LEXIS 9971, at *10 (E.D. Tex. 2017). Saks goes on that "[a] stay would also not unduly delay any potential enforcement of SITO's patent rights." *Id.* at 19 (citing *GreatGigz Sols.*, 2022 WL 1037114 at *3). And it cites *VirtualAgility v. Salesforce.com*, 759 F.3d 1307, 1318 (Fed. Cir. 2014), for the principle that "[a] stay will not diminish the monetary damages to which [plaintiff] will be entitled if it succeeds in its infringement suit—it only delays realization of those damages and delays any potential injunctive remedy." Saks concludes that "the venue of the District of New

6

Appx480

Jersey does not disadvantage SITO, as both SITO entities have their principal place of business in New Jersey." *Id.* (citing *In re Google*, 588 F. App'x at 991).

SITO responds by pointing back to *Microsoft*, the Article III case, and urges "just as the customer-suit factors are not applicable or relevant, the traditional stay factors are not relevant and have no applicability to, and provide no support for, Bambuser's motion to stay." Dkt. 14 at 12.[5]

A stay would not prejudice SITO's vindication of its patent rights.

### 2. Whether a stay would simplify the issues in this case

As Saks points out, "[t]he Declaratory Suit seeks a declaration of invalidity and non-infringement of the same six patents asserted in this case." Dkt. 10 at 20. "Thus, if those patents are found to be invalid or not infringed, that will be dispositive of SITO's infringement claims here." *Id.*

SITO did not specifically address this factor, but urged that "the traditional stay factors are not relevant." Dkt. 14 at 12.

The court finds that a stay would also simplify the issues in this case. As the Federal Circuit has held, "resolution of the major issues" in Bambuser's Declaratory Suit will likely "resolve the[] issues as to their customers." *Katz v. Lear Siegler*, 909 F.2d at 1464. Thus, the court finds that this factor weighs in favor of a stay.

### 3. Whether discovery is completed and whether a trial date has been set

The court notes that after briefing was complete on this Motion, a scheduling order was entered in this case. Dkt. 29. Discovery has begun and the trial date has been set. *Id.* However, as discovery has *just* begun and the trial date is more than two years away in October 2026, *id.*, the court finds this factor is neutral.

---

[5] The court notes the Motion is Saks's.

7

## IV.    CONCLUSION & ORDER

Under both the customer-suit exception factors and the traditional stay factors, Saks has demonstrated that a stay is appropriate in this case. Indeed, a stay serves efficiency and judicial economy, *see Spread Spectrum*, 657 F.3d at 1357, and "substantial savings of litigation resources can be expected." *In re Google*, 588 F. App'x at 991. Accordingly, Defendant SFA Holding Inc.'s Opposed Motion to Stay Pending Resolution of True Defendant's Declaratory Judgment Action (Dkt. 10) is **GRANTED**.

This case is **STAYED** pending full and final resolution of the declaratory judgment action pending in the District of New Jersey, in an action captioned: *Bambuser AB v. SITO Mobile R&D IP, LLC and SITO Mobile, Ltd.*, C.A. No. 2:23-cv-21757.

SIGNED April 19, 2024.

_____
MARK LANE
UNITED STATES MAGISTRATE JUDGE

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

BAMBUSER AB,

               Plaintiff,

      v.

SITO MOBILE R&D IP, LLC, and
SITO MOBILE, LTD.,

               Defendants.

Case No. 2:23-cv-21757-JKS-JSA

Motion Date: February 18, 2025

**REPLY BRIEF IN SUPPORT OF DEFENDANTS'**
**MOTION TO DISMISS PURSUANT TO FED. R. CIV. P. 12(b)(1)**

Appx483

**TABLE OF CONTENTS**

I.    INTRODUCTION ................................................................................................ 1

II.   ARGUMENT ..................................................................................................... 2

A.    *Microsoft v. DataTern* is clear that a supplier's acceptance of its indemnification and defense obligations for a customer is highly relevant to subject matter jurisdiction. .................................................................................. 2

B.    The "new" allegations of the First Amended Complaint do not establish direct, contributory, or implied infringement. ................................................... 6

C.    Bambuser fails to address the impact on judicial efficiency. ................................ 8

III.  CONCLUSION ................................................................................................... 8

i

Appx484

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Arris Group Inc. v. British Telecommunications PLC*,
    639 F.3d 1368 (Fed. Cir. 2011)........................................................................3, 4, 8

*Microsoft Corp. v. DataTern*,
    755 F.3d 899 (Fed. Cir. 2014)........................................................................ *passim*

*Mitek Sys. v. United Servs. Auto. Ass'n*,
    34 F.4th 1334 (Fed. Cir. 2022) ..............................................................................3

*Spread Spectrum Screening LLC v. Eastman Kodak Co.*,
    657 F.3d 1349 (Fed. Cir. 2011)...........................................................................5, 6

**Statutes**

28 U.S.C. § 1404(a) and...............................................................................................5

**Other Authorities**

Fed. R. Civ. P. 12(b)(1)................................................................................................8

Fed. R. Civ. P. 12(b)(6)................................................................................................1

Fed. R. Civ. P. 18........................................................................................................2, 3

Appx485

## I.     INTRODUCTION

Neither Bambuser's First Amended Complaint nor its Opposition Memorandum address the holdings set forth in the Opinion previously issued by this Court. Bambuser has, for a second time, failed to understand that under Federal Circuit precedent, as the indemnitor in the first-filed Texas Action on the identical patents for which it seeks declaratory judgment order here, it must litigate in the first-filed jurisdiction. Accordingly, SITO respectfully requests this Court to dismiss Bambuser's declaratory judgment action with prejudice.

Bambuser begins its Opposition by incorrectly stating that SITO's motion to dismiss "explicitly states it presents only a facial challenge to this Court's jurisdiction under Rule 12(b)(6)." D.I. 38 at 1. As stated in the opening brief, SITO is moving to dismiss Plaintiffs under 12(b)(**1**) for lack of subject matter jurisdiction. D.I. 35-1 at 3 ("As with the prior motion to dismiss, SITO's challenge remains a facial 12(b)(1) challenge…).

Further, Bambuser fails to explain or show how SITO has alleged Bambuser of direct, contributory, or induced infringement, continues to misinterpret caselaw, and fails to address the analysis and holdings found in this Court's Opinion. Further, Bambuser's "new" factual allegations do not allow it to escape the holding of *Microsoft* or provide any reason why it cannot join the Texas Action where it has already actively participated, to obtain the same relief it seeks here.

At this stage, Bambuser is attempting to correct its procedural error. When it was informed of the Texas Action against its customer, as an example, Bambuser could have joined

Appx486

the Texas Action.[1] *See* Fed. R. Civ. P. 18 (Joinder). Instead, it rushed to file a declaratory action here.

SITO does not dispute that Bambuser sold its products to SAKS and Uniqlo which it learned *after* Bambuser stepped into defend and indemnify SAKS. However, as before, SITO's argument remains focused on the fact that this Court does not have subject matter jurisdiction over Bambuser's declaratory judgment action. Indeed, Bambuser has not addressed the very specific detailed showing by SITO explaining why Bambuser was not accused of infringement in the Texas Action. For at least those reasons, this case should be dismissed with prejudice.

## II.    ARGUMENT

### A.    *Microsoft v. DataTern* is clear that a supplier's acceptance of its indemnification and defense obligations for a customer is highly relevant to subject matter jurisdiction.

Bambuser claims that the issue to be addressed is whether SITO's Texas Action carries an "implied assertion of direct, contributory, or inducement of infringement against Bambuser itself." D.I. 38 at 3. Yet, as explained in the Court's prior issued Opinion,

> "where a patent holder accuses customers of direct infringement based on the sale or use of a supplier's equipment, the supplier has standing to commence a declaratory judgment action if . . . *there is a controversy between the patentee and the supplier as to the supplier's liability for induced or contributory infringement based on the alleged acts of direct infringement by its customers*." (emphasis added)(citation omitted).

D.I. 30 at 6. (citing *Arris Group Inc. v. British Telecommunications PLC,* 639 F.3d 1368, 1375 (Fed. Cir. 2011)). Even if Bambuser has established that it is the supplier of the infringing products, there is still no controversy between Bambuser and SITO because Bambuser has not

---

[1] Bambuser participated in filing for a stay in Texas, i.e., Bambuser was able to participate when it deemed such participation convenient for itself. That is not the law.

Appx487

properly established that SITO accused it of direct, contributory, or indirect infringement in the Texas Action necessitating the filing of a declaratory judgment action here.

Bambuser argues that its indemnity obligation is not relevant to the analysis of jurisdiction. *See* D.I. 38 at 3. Bambuser is wrong and the cases it cites are inapposite. Bambuser cites *UCP Int'l Co. v. Balsam Brands, Inc.,* claiming that the indemnification obligation is not relevant to the issue of jurisdiction; however, the supplier and customer litigations in that case "*took place in the same court and in front of the same judge*." 787 F. App'x 691, 695 (Fed. Cir. 2019) (emphasis added). Additionally, the patent owner in that case was fully aware of the supplier but chose not to sue the supplier. *See id.* Here, the first-filed action is in the Western District of Texas against only SAKS and SITO has explained multiple times through briefing that they were not aware of Bambuser as the supplier until Bambuser came forth after this declaratory judgment action was filed. Accordingly, Bambuser's reliance on *UCP Int'l Co.* is misplaced and uninstructive.

Bambuser also cites *Mitek Sys. v. United Servs. Auto. Ass'n*, as an example of subject matter jurisdiction analysis "without any mention of indemnity." D.I. 38 at 3-4 (citing *Mitek Sys. v. United Servs. Auto. Ass'n*, 34 F.4th 1334, 1338-39 (Fed. Cir. 2022). This is a blatant misreading of the case. The Court in *Mitek* directly addressed why indemnification was relevant in other sections of its opinion. *See Mitek Sys.,* 34 F.4th at 1338 (explaining Mitek's indemnification obligation to its customers and the relevancy). Despite Bambuser's omission of the pertinent analysis, *Mitek* also provides Bambuser with no support for its position.

Bambuser again cites *Arris* as an example of a case where the declaratory judgment action was allowed to proceed because the supplier's product was impliedly accused of infringement and noted an indemnity obligation. D.I. 38 at 4. But *Arris* states "[this Court] need

3

not reach the indemnification issue, for we conclude that, applying the standard articulated by the Supreme Court in *MedImmune*, there is an actual controversy between Arris and BT concerning Arris' liability for, at least, contributory infringement." *Arris Grp., Inc. v. British Telecomms. PLC*, 639 F.3d 1368, 1375 (Fed. Cir. 2011). Again, Bambuser has failed to set forth an actual controversy here because SITO did not accuse Bambuser of infringement.

Next, Bambuser attempts to cherry pick the language of *Microsoft v. DataTern* by stating that the Court found "that there <u>was</u> jurisdiction for Microsoft's declaratory judgment action with respect to the '502 patent." D.I. 38 at 4 (citing *Microsoft Corp. v. DataTern*, 755 F.3d 899, 905, 911 (Fed. Cir. 2014)). But below is the *Microsoft* Court's exact reasoning:

> The claim charts cite to Microsoft-provided online documentation for each limitation of the '502 patent's representative claims. Thus, these claim charts can be read to allege that Microsoft is encouraging the exact use which DataTern asserts amount to direct infringement. This record evidence supports Microsoft's claim that there is a substantial controversy regarding inducement. Under the totality of the circumstances, we conclude that Microsoft established declaratory judgment jurisdiction for its suit on the '502 patent. The '402 patent claim charts as they relate to Microsoft's customers, however, are <u>*substantively different*</u>.

*Microsoft*, 755 F.3d at 905 (emphasis added). The analysis cited by this Court in its earlier issued Opinion and in SITO's motion to dismiss mirror the *Microsoft* Court's analysis of the '402 patent, *i.e.*, there was no indication that Bambuser was accused of infringement in any manner. *See* D.I. 30 at 4-8. Accordingly, there is no subject matter jurisdiction for this Court.

Further, Bambuser proclaims that "[n]othing in the Federal Circuit's entire jurisdictional analysis in *Microsoft* even remotely implied a rule that the indemnity obligation destroys subject matter jurisdiction over a separate declaratory judgment action." D.I. 38 at 4. However, *Microsoft* explained plainly and in detail:

> Importantly, even if there were such an obligation—to indemnify a customer already sued by the patentee in Texas—it would not justify what Appellees seek

4

here. A case has already been filed against these customers in the Eastern District of Texas. Appellees cannot seek a declaration from a New York court on behalf of customers they must indemnify where a suit against these very same customers on all the same issues was already underway in a Texas court. By agreeing to indemnify any one of their customers, Microsoft could defend its customers and efficiently and effectively participate in the Texas action.

*Microsoft Corp.*, 755 F.3d at 904 (Fed. Cir. 2014) (citation omitted). This exact language was emphasized by this Court in its previously Opinion. *See* D.I. 30 at 7. Yet Bambuser has gone out of its way repeatedly to avoid analyzing *Microsoft* consistent with this Court's holding. Bambuser's indemnification obligation dictates subject matter jurisdiction as explained in *Microsoft*. Bambuser was not a party that the Texas Action was brought against and had no obligation to join that suit if it did not wish to do so – but it proactively chose to do so through its indemnification obligation (and assistance in filing a stay). Therefore, this Court does not have subject matter jurisdiction for this declaratory judgment action for the reasons stated above and in SITO's opening brief.

Finally, again ignoring *Microsoft*, Bambuser asserts that a declaratory judgment action should proceed before the earlier filed infringement suit and cites the *Spread Spectrum Screening LLC* case to support its flawed position. *See* D.I. 38 at 6. However, Bambuser ignores the essential facts of *Spread Spectrum. Spread Spectrum* involved a case filed by plaintiff Spread Spectrum against Kodak **and** four of its customers in the **same** action in the Northern District of Illinois. *Spread Spectrum Screening LLC v. Eastman Kodak Co.,* 657 F.3d 1349, 1351 (Fed. Cir. 2011). Kodak moved for a transfer pursuant to 28 U.S.C. § 1404(a) and to sever and stay the case against its customers. *Id.* at 1352. Nothing in *Spread Spectrum* even touches on the facts here,

Appx490

where a case against SAKS was filed in Texas, not against Bambuser.[2] Bambuser did not move

to transfer the Texas Action to this forum, though it could have. Nor did *Spread Spectrum*

address how the indemnification obligations of Kodak were relevant to the multiple actions. *Id.*

Instead, as detailed in each of SITO's briefs and the Court's Opinion, Bambuser stepped in to

indemnify and defend SAKS in Texas and also filed a separate declaratory judgment action here

in New Jersey seeking the same relief, instead of proceeding in Texas. Bambuser's actions fall

squarely within the holding of *Microsoft*, and Bambuser's refusal to address those facts is

puzzling. Moreover, none of the authority cited by Bambuser is relevant to the issues raised here

and each is readily distinguishable from the situation here.

> **B.    The "new" allegations of the First Amended Complaint do not establish direct, contributory, or implied infringement.**

Bambuser accuses SITO of not addressing the allegations of the First Amended

Complaint. *See* D.I. 38 at 7-12. Bambuser's claims make no sense because SITO spent several

pages squarely addressing those allegations. *See* D.I. 35-1 at 6-11. SITO specifically stated that

"the fundamental problem with each of these new allegations is that the complaint in the Texas

Action is directed to SFA's system (the "Saks System") which carries out the infringing

activities." *Id.* at 6. SITO addressed on an allegation-by-allegation basis (i.e., paragraph-by-

paragraph) why Bambuser has not been accused of direct, implied, or contributory infringement.

*Id.* at 9-10. Indeed, it is *Bambuser* who has done nothing in its Opposition to address SITOs

arguments.

Instead, Bambuser argues that a supplier does not have to be expressly accused in order

to be impliedly accused of contributory infringement. *See* D.I. 38 at 8-9. However, SITO

---

[2] As noted previously, SITO was not even aware of Bambuser until after it filed the declaratory action. This is the opposite of Spread Spectrum, where Kodak was named in the same suit as its customers.

6

Appx491

provided detailed reasoning and exhibits to show that SITO was not even impliedly accusing

Bambuser of any sort of infringement. *See* D.I. 35-1 at 6-11. Additionally, Bambuser has made

no showing that it commits any "affirmative acts to encourage infringement with the knowledge

that the induced acts constitute patent infringement." *Id.* at 9 (citing *Microsoft,* 755 F.3d 899

(Fed. Cir. 2014)) (*citing Global-Tech Appliances, Inc. v. SEB S.A.,* 131 S. Ct. 2060, 2068,

(2011))). In fact, Bambuser has not addressed this issue in its Opposition at all. *See, e.g.,* D.I. 38.

At no point has SITO accused Bambuser of implied infringement, further verifying that this

Court does not have subject matter jurisdiction for the declaratory judgment action. And, as

addressed in SITO's opening brief, any attempts by Bambuser to claim that settlement

negotiation discussions gave rise to declaratory jurisdiction are simply *ex post facto* - SITO first

learned of Bambuser's involvement only after the declaratory action was filed. *See* D.I. 35-1 at

12.

Next, Bambuser argues that under SITO's logic *Microsoft* would be rendered

"meaningless" because a supplier would never be able to establish declaratory judgment

jurisdiction. D.I. 38 at 12. This again mischaracterizes the Federal Circuit's (and this Court's)

analysis in *Microsoft*. Under *Microsoft,* Bambuser is not free to bring a declaratory action

seeking identical relief because there is already a first-filed action in Texas where Bambuser has

accepted its indemnity and defense obligations **and** because Bambuser has failed to establish that

SITO accused it of infringement. *Microsoft* is clear on this issue.

Finally, Bambuser again attempts to insert its customer Uniqlo into this case, but it is

important to reiterate that Uniqlo is not a named party to any action at this point in time (nor will

it be). *See* D.I. 35-1 at 10. Once Bambuser stepped in to indemnify its customers, SAKS and

Uniqlo, there was no further contact with Uniqlo. *See Id*. at 11. More importantly, this Court has

Appx492

already addressed Bambuser's reliance on Uniqlo, citing *Arris* in its previously issued Opinion. *See* D.I. 30, at 8, fn. 4 ("To the extent that Plaintiff attempts to pursue an economic theory out of concern for its current or potential customers' freedom to operate, this is an economic theory rejected by the Federal Circuit. *Arris*, 639 F.3d at 1374 ("[W]e have not held that economic injury alone is sufficient to confer standing in patent cases seeking a declaratory judgment."). Bambuser has not plead any facts to disturb the Court's holding.

> C.      **Bambuser fails to address the impact on judicial efficiency.**

Dismissing this case and allowing the Texas Action to proceed would promote judicial efficiency. Bambuser has not provided any reason *at all* why it cannot fully join the first-filed Texas Action (where it already assisted in filing a motion to stay) when it is seeking relief here that is identical to what will be addressed in that action. *See* D.I. 35-1 at 14.[3] Accordingly, consistent with the Federal Circuit's precedent in *Microsoft*, and consistent with this Court's prior Opinion addressing these same issues, this Court should again dismiss this action in favor of the Texas Action which will allow for the conservation of judicial resources and avoid duplication and/or the possibility of inconsistent results in the two jurisdictions.

## III.     CONCLUSION

For the reasons stated above, the Court should dismiss Bambuser's Amended Complaint with prejudice for lack of subject matter jurisdiction under Fed. R. Civ. P. 12(b)(1) and in light of the Federal Circuit's holding in *Microsoft v. DataTern*.

---

[3] While Western District of Texas has stayed the Texas Action, it has continued to issue orders seeking status reports on this case.

Appx493

Dated: February 6, 2025

Respectfully submitted,

*/s/ Shailendra Maheshwari*
Shailendra Maheshwari (001822004)\*
Tedd W. Van Buskirk (041261995)\*
DAIGNAULT IYER LLP
8229 Boone Boulevard, Suite 450
Vienna, VA 22182
smaheshwari@daignaultiyer.com
tvanbuskirk@daignaultiyer.com

*\*Not admitted in Virginia*

*Attorneys for Defendants*
*SITO Mobile R&D IP, LLC and*
*SITO Mobile Ltd.*

Appx494

## CERTIFICATE OF SERVICE

I hereby certify that on this 6th day of February 2025, a true and correct copy of the

foregoing pleading was filed via ECF filing and forwarded by electronic mail to all counsel of

record for Plaintiff.

/s/ Shailendra Maheshwari
Shailendra Maheshwari

Appx495

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEW JERSEY

BAMBUSER AB,

      Plaintiff,

      v.

SITO MOBILE R&D IP, LLC AND
SITO MOBILE, LTD.,

      Defendant.

C.A. No. 2:23-cv-21757

## NOTICE

Notice is hereby given that Plaintiff Bambuser AB chooses to stand on its First

Amended Complaint (Dkt# 32, "FAC") and will not replead.


Dated: October 10, 2025

KAPLAN BREYER SCHWARZ, LLP

/s/Jeffrey I. Kaplan
Jeffrey I. Kaplan
317 George Street – Suite 320
New Brunswick, NJ 08901
jkaplan@kbsiplaw.com

ZUKERMAN GORE BRANDEIS &
CROSSMAN, LLC
John K. Crossman *(pro hac vice)*
Eleven Times Square
New York, NY 10036
212 223 6700
jcrossman@zukermangore.com

*Attorneys for Plaintiff Bambuser AB*

1

Appx496

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

BAMBUSER AB,

     Plaintiff,

     v.

SITO MOBILE R&D IP, LLC AND
SITO MOBILE, LTD.,

     Defendant.

C.A. No. 2:23-cv-21757

**NOTICE OF APPEAL**

     Notice is hereby given that Plaintiff Bambuser AB hereby appeals to the United States Court of Appeals for the Federal Circuit from the Opinion and Order (Dkt# 40 and 41) of the United States District Court, District of New Jersey, entered in this Action on September 30, 2025, dismissing Bambuser's First Amended Complaint. Bambuser's appeal includes all underlying factual findings and legal conclusions, and all prior orders and rulings of this Court related to the matter.

     Dated: October 10, 2025

KAPLAN BREYER SCHWARZ, LLP

/s/Jeffrey I. Kaplan
Jeffrey I. Kaplan
317 George Street – Suite 320
New Brunswick, NJ 08901
jkaplan@kbsiplaw.com

1

Appx497

ZUKERMAN GORE BRANDEIS &
CROSSMAN, LLC
John K. Crossman (*pro hac vice*)
Eleven Times Square
New York, New York 10036
212 223 6700
jcrossman@zukermangore.com

*Attorneys for Plaintiff Bambuser AB*

2

**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

——————————————————————— x
    :
BROADSIGN INTERNATIONAL, LLC,    :
    :
    :
    :  Civil Action No.:  1:16-cv-04586 (LTS)
    Plaintiff,    :
    :
v.    :
    :
    :
T-REX PROPERTY AB,    :
    :
    :
    :
    Defendant.    :
    :
——————————————————————— x

**SECOND AMENDED COMPLAINT FOR DECLARATORY JUDGMENT**

1.    Plaintiff, BroadSign International, LLC ("BroadSign"), brings this action for a declaratory judgment against Defendant, T-Rex Property AB ("T-Rex"). BroadSign seeks, among other things, a declaratory judgment of non-infringement and invalidity of U.S. Patent No. RE39,470 ("the '470 patent") (attached hereto as Exhibit 1); U.S. Patent No. 7,382,334 ("the '334 patent") (attached hereto as Exhibit 2); and U.S. Patent No. 6,430,603 ("the '603 patent") (attached hereto as Exhibit 3); (collectively, the "Patents-in-Suit"), and that BroadSign has intervening rights with respect to the '470 patent.  In support thereof, BroadSign alleges as follows:

**NATURE OF THE ACTION**

2.    This is an action for a declaratory judgment of non-infringement and invalidity of the '470 patent, the '334 patent, and the '603 patent, and for intervening rights to the '470 patent.

**THE PARTIES**

3.    Plaintiff is a Delaware limited liability company with its principal place of business located at 453 N. Lindbergh Blvd. St. Louis, Missouri 63141.  BroadSign is an industry

Appx499

leader in the business of providing digital out-of-home software and solutions for digital signage and displays in venues such as airports, cinemas, shopping malls and offices.

4.     Upon information and belief, Defendant T-Rex is a company organized and existing under the laws of Sweden.

5.     Upon information and belief, T-Rex's business is directed to owning and enforcing in litigation the Patents-in-Suit. Upon information and belief, over the last several years, T-Rex has filed approximately 59 patent infringement lawsuits against 80 defendants in 17 judicial districts throughout the United States.  Upon information and belief, T-Rex does not itself manufacture or sell any products or offer for sale any products or services in the United States.

<b><u>JURISDICTION AND VENUE</u></b>

6.     This action arises under the Declaratory Judgment Act, 28 U.S.C. §§2201, et seq., and under the Patent Laws of the United States, as enacted under Title 35 of the United States Code. This Court has jurisdiction over this action pursuant to 35 U.S.C. §§ 271, et seq., and 28 U.S.C. §§ 1331, 1338, 2201, and 2202.

7.     This Court has both general and specific personal jurisdiction over T-Rex because T-Rex regularly conducts its enforcement and licensing business in New York State.  T-Rex has also conducted business in and directed at New York pertaining to the Patents-in-Suit. T-Rex has at least conducted business in New York by filing suit in this forum state in an attempt to enforce the Patents-in-Suit.  T-Rex most recently filed suit in the United States District Court for the Southern District of New York on February 1, 2016, asserting these same three Patents-in-Suit in an action against Blue Outdoor Holdings, LLC and its subsidiaries (*T-Rex Property AB v. Blue Outdoor LLC*, et. al., 1-16-cv-00733-DLC).  T-Rex has filed numerous other suits asserting one or more of these patents in the United States District Court for the Southern District of New

2

Appx500

York located including the following: *T-Rex Property AB, v. Adspace Networks, Inc.*, 1-15-cv-09073-DLC, filed on November 18, 2015 ('470 patent and '334 patent); *T-Rex Property AB, v. Interactivation Health Networks, LLC, et al.*, 1-15-cv-08259-PKC, filed on October 20, 2015 ('470 patent); *T-Rex Property AB, v. Wellness Network, LLC*, 1-15-cv-07847-PKC, filed on October 5, 2015 ('470 patent); and *T-Rex Property AB, v. Captivate, LLC*, 1-15-cv-04188-PAE, filed on May 29, 2015 ('470 patent and '334 patent).

8.      Venue is proper in this Court under 28 U.S.C. § 1391 (b) and 1391(c) because T-Rex is subject to personal jurisdiction in this judicial district and has conducted business in this judicial district.  Additionally, T-Rex has accused at least two of BroadSign's customers (Blue Outdoor Holdings and Adspace Networks) of patent infringement through their use of BroadSign's products in this judicial district, and such products are being used in this judicial district.

### A SUBSTANTIAL CONTROVERSY EXISTS BETWEEN THE PARTIES

9.      Upon information and belief, T-Rex is the assignee and owner of the right, title and interest in and to the Patents-in-Suit, including the right to assert all causes of action arising under the Patents-in-Suit and the right to any remedies for infringement.

10.      Upon information and belief, the business of T-Rex in the United States is to enforce one or more of the Patents-in-Suit against operating businesses that provide information, advertising, medical information and other content on digital displays over a digital signage network in locations that are accessible to the public such as at airports, in elevators, in shopping malls and at medical facilities (hereinafter referred to as "Digital Content Providers").

11.      BroadSign is a supplier of hardware and software solutions to operators of networks of digital displays. BroadSign's platform includes an interface for managing a network of BroadSign Players associated with the digital displays, and among other things, upload

Appx501

desired content, book and manage advertising campaigns and monitor network health. The BroadSign Players organize the content based on booked advertising campaigns and enable content to be played on the associated digital displays.

12. As a supplier of digital out-of-home media products to the digital advertising industry, Plaintiff is under threat of litigation because T-Rex's aggressive litigation strategy involves asserting the Patents-in-Suit against both customers and suppliers. T-Rex has filed complaints alleging patent infringement of the Patents-in-Suit against suppliers similarly-situated to BroadSign, including suppliers of digital out-of-home media software and/or hardware. T-Rex has filed complaints against BroadSign's direct-competitor suppliers, including at least: Barco, Inc., Prismview, LLC (A Samsung Electronics Company), Table Top Media, LLC, Clear Channel Outdoor Holdings, Inc., GPS Industries, LLC, Quality Systems Technology, Inc., Four Winds Interactive, LLC, AutoNetTV Media, Inc., Cardinal Health, Inc., Zoom Media Corp., ANC Sports Enterprises, LLC, iPort Media Networks, LLC, Reach Sports Marketing Group, Inc., RMG Networks Holding Corporation, and Time-O-Matic d/b/a Watchfire.

13. Each of these suppliers has supplied software and/or hardware products to advertising customers in the digital out-of-home media space, and T-Rex's complaints allege infringement of the Patents-in-Suit against those products.

14. In its complaint against Barco, Inc., T-Rex alleged that the "infringing devices and systems include Defendant's digital signage network that employs Barco's digital signage platform, including its digital displays, digital media players, and DISplay Studio software platform." *T-Rex Property AB v. Barco, Inc.*, Case No. 1:16-cv-6938 (N.D. Ill. July 1, 2016); *T-Rex Property AB v. Barco, Inc.*, Case No. 1:16-cv-6940 (N.D. Ill. July 1, 2016). Barco's "digital signage network that employs Barco's digital signage platform, including its digital displays,

Appx502

digital media players, and DISplay Studio software platform" makes it a direct competitor in the same industry as BroadSign.

15.    In its complaint against Prismview, LLC (A Samsung Electronics Company), T-Rex alleged that "the infringing devices and systems include Defendant's digital signs, other electronic displays and its PrismView digital signage software and systems that are used to control the display of images on its digital sign(s) and other electronic display(s)."    *T-Rex Property AB v. Prismview*, LLC, Case No. 4:16-cv-00404 (E.D. Tex. June 16, 2016). Prismview's "digital signage software and systems that are used to control the display of images on its digital sign(s) and other electronic display(s)" make it a direct competitor in the same industry as BroadSign.

16.    In its complaint against Table Top Media, LLC, T-Rex alleged that "the infringing devices and systems include Defendant's digital signage network and displays that use the Android OS based digital signage platform."    *T-Rex Property AB v. Table Top Media, LLC*, Case No. 1:16-cv-6932 (N.D. Ill. July 1, 2016).  Table Top Media's "digital signage network and displays that use the Android OS based digital signage platform" make it a direct competitor in the same industry as BroadSign.

17.    In its complaint against Clear Channel Outdoor Holdings, Inc., T-Rex alleged that "the infringing devices and systems include Clear Channel's digital advertising network and the Clear Channel Airports digital media and advertising network, which is also marketed as the ClearVision Network and/or the ClearVision Airport Television Network."    *T-Rex Property AB v. Clear Channel Outdoor Holdings, Inc. et al*, Case No. 6:16-cv-00974 (E.D. Tex. June 30, 2016); *T-Rex Property AB v. Clear Channel Outdoor Holdings, Inc.*, Case No. 5:12-cv-01162 (N.D. Tex. Dec. 11, 2012).  Clear Channel Outdoor's "digital advertising network and the Clear

5

Appx503

Channel Airports digital media and advertising network, which is also marketed as the ClearVision Network and/or the ClearVision Airport Television Network" make it a direct competitor in the same industry as BroadSign.

18.    In its complaint against GPS Industries, LLC, T-Rex alleged that "the infringing devices and systems include Defendant's Visage Media Network." *T-Rex Property AB v. GPS Industries, LLC*, Case No. 4:16-cv-00458 (E.D. Tex. June 30, 2016).  GPS Industries's "Visage Media Network" make it a direct competitor in the same industry as BroadSign.

19.    In its complaint against Quality Systems Technology, Inc., T-Rex alleged that "the infringing devices and systems include Defendant's digital signage network, including its digital signage platform, displays, and Quest Player software." *T-Rex Property AB v. Quality Systems Technology, Inc.*, Case No. 1:16-cv-6942 (N.D. Ill. July 1, 2016).  Quality Systems Technology's "digital signage network, including its digital signage platform, displays, and Quest Player software" make it a direct competitor in the same industry as BroadSign.

20.    In its complaint against Four Winds Interactive, LLC, T-Rex alleged that "the infringing devices and systems include Defendant's digital signage network and displays that use FWI's Content Manager and FWI's Content Player Software." *T-Rex Property AB v. Four Winds Interactive, LLC*, Case No. 1:16-cv-6934 (N.D. Ill. July 1, 2016).  Four Winds Interactive's "digital signage network and displays that use FWI's Content Manager and FWI's Content Player Software" make it a direct competitor in the same industry as BroadSign.

21.    In its complaint against AutoNetTV Media, Inc., T-Rex alleged that "the infringing devices and systems include Defendant's digital network that uses 1-2-1 VIEW's content management software." *T-Rex Property AB v. AutoNetTV Media, Inc.*, Case No. 1:16-

Appx504

cv-6649 (N.D. Ill. July 1, 2016). AutoNetTV Media's "digital network that uses 1-2-1 VIEW's content management software" make it a direct competitor in the same industry as BroadSign.

22.    In its complaint against Cardinal Health, Inc., T-Rex alleged that "the infringing devices and systems include Defendant's Pharmacy Health Network." *T-Rex Property AB v. Cardinal Health, Inc.*, Case No. 1:16-cv-5484 (N.D. Ill. May 23, 2016). Cardinal Health's "Pharmacy Health Network" makes it a direct competitor in the same industry as BroadSign.

23.    In its complaint against Zoom Media Corp., T-Rex alleged that "the infringing devices and systems include Defendant's Zoom Fitness Video Network, which includes…digital signage." *T-Rex Property AB v. Zoom Media Corp.*, Case No. 0:16-cv-581 (N.D. Ill. March 21, 2016). Zoom Media's "Zoom Fitness Video Network, which includes…digital signage" make it a direct competitor in the same industry as BroadSign.

24.    In its complaint against ANC Sports Enterprises, LLC, T-Rex alleged that "the infringing devices and systems include Defendant's digital media software, signage operation and control systems, which include integrated digital signage, and media management and playback software that is used to broadcast dynamic images" and "vSOFT, Defendant's proprietary media management and playback software." *T-Rex Property AB v. ANC Sports Enterprises, LLC*, Case No. 0:16-cv-581 (D. Minn. March 7, 2016). ANC Sports Enterprises's "digital media software, signage operation and control systems, which include integrated digital signage, and media management and playback software that is used to broadcast dynamic images" and "vSOFT, Defendant's proprietary media management and playback software" make it a direct competitor in the same industry as BroadSign.

25.    In its complaint against iPort Media Networks, LLC, T-Rex alleged that "the infringing devices and systems include Defendant's digital place-based media networks that

7

Appx505

operate under the iPort Optical Network and the Your Life Your Skin Network branding." *T-Rex Property AB v. iPort Media Networks, LLC*, Case No. 1:16-cv-1583 (N.D. Ill. Jan. 29, 2016). iPort Media Networks's "digital place-based media networks" make it a direct competitor in the same industry as BroadSign.

26.    In its complaint against Reach Sports Marketing Group, Inc., T-Rex alleged that "the infringing devices and systems include Defendant's digital place-based media network." *T-Rex Property AB v. Reach Sports Marketing Group, Inc.*, Case No. 0:16-cv-070 (D. Minn. Jan. 13, 2016). Reach Sports Marketing Group's "digital place-based media network" make it a direct competitor in the same industry as BroadSign.

27.    In its complaint against RMG Networks Holding Corporation, T-Rex alleged infringement of the Patents-in-Suit because "content management systems, which include, for example and without limitation, the Symon Design Studio to manage and schedule broadcast content for display in its corporate headquarters in Texas at least during certain demonstrations for customers or for prospective customers." *T-Rex Property AB v. RMG Networks Holding Corporation*, Case No. 3:15-cv-738 (N.D. Tex. March 5, 2015). RMG Networks Holding's "content management systems, which include, for example and without limitation, the Symon Design Studio to manage and schedule broadcast content for display…for customers or for prospective customers" make it a direct competitor in the same industry as BroadSign.

28.    In its complaint against Time-O-Matic (d/b/a Watchfire), T-Rex alleges that Watchfire's "digital display boards that operate on a digital information system through its Ignite software, user manuals, and other documents that instruct customers" to infringe the Patents-in-Suit. *T-Rex Property AB v. Time-O-Matic, LLC*, Case No. 1:14-cv-1488 (C.D. Ill. Dec. 23,

Appx506

2014).  Watchfire's "digital display boards that operate on a digital information system through its Ignite software" make it a direct competitor in the same industry as BroadSign.

29.     To date, at least seven (7) BroadSign customers who are Digital Content Providers have been sued by T-Rex for patent infringement on one or more of the Patents-in-Suit.  One of those customers, Health Media Network, LLC ("HMN"), was sued on May 27, 2016, in the United States District Court for the Northern District of Illinois in an action entitled *T-Rex Property AB v. Health Media Network, LLC*, Case No. 1:16-cv-05673 (hereinafter, the "HMN Action").  A copy of the complaint in the HMN Action is annexed hereto as Exhibit 4.  In the HMN Action, T-Rex accuses BroadSign's customer of infringing the '470 patent and identifies the allegedly infringing devices and systems as the defendant's "digital health media advertising network."  The accused "digital health media advertising network" which T-Rex claims to infringe the '470 patent is the product that BroadSign sold and delivered to HMN.  HMN has no other platform provider for its "digital health media network."

30.     In the HMN Action, HMN has also been accused by T-Rex of infringing the '334 patent (Exh. 4 at 16).  Again, T-Rex identifies HMN's "digital health media advertising network" provided to HMN by BroadSign as the allegedly infringing product. HMN has no other platform provider for its "digital health media network."

31.     In the HMN Action, HMN has also been accused by T-Rex of infringing the '603 patent (Exhibit 4 at 18).  Again, T-Rex identifies HMN's "digital health media advertising network" provided to HMN by BroadSign as the allegedly infringing product. HMN has no other platform provider for its "digital health media network."

32.     In another action filed by T-Rex against a BroadSign customers ContextMedia Inc. and ContextMedia Health, LLC, on July 11, 2016 in the United States District Court for the

9

Appx507

Northern District of Illinois, Case No. 1:16-cv-04826 (the "ContextMedia Action"), T-Rex accuses the defendants' "Digital Waiting Room Screen" product of infringing the '470 Patent, the '334 Patent and the '603 Patent. A copy of the Amended Complaint in the ContextMedia Action is attached hereto as Exhibit 5. The ContextMedia defendants have no other platform provider for its "Digital Waiting Room Screen" product other than the BroadSign platform.

33. In the ContextMedia Action, T-Rex set forth its basis for alleging that ContextMedia infringes the '470 Patent, the '334 Patent, and the '603 Patent by comparing each of the limitations of at least one claim of each patent to the Digital Waiting Room Screen product, which includes BroadSign components and software (the Broadsign Player). *See* Exhibit 5 at 15-18.

34. For example, in the ContextMedia Action, T-Rex alleged that each of the limitations of claim 25 of the '470 Patent are met by BroadSign's software within the Digital Waiting Room Screen product in the form of a prose claim chart.

35. Claim 25 of the '470 Patent (Exhibit 1) recites:

A method of selectively displaying digital information at one or more of a plurality of locations, said method comprising:

receiving control instructions from at least one external information mediator;

using said control instructions to generate an exposure list, said exposure list specifying three or more of the following items:

i)      what information content is to be displayed;

ii)     at which of said plurality of locations said information content is to be displayed;

iii)    when said information content is to be displayed for each location at which content is to be displayed; and

10

Appx508

iv)    how long said information content is to be displayed for each location at which

content is to be displayed

displaying images at one or more of said locations in accordance with said exposure list;

and

permitting said exposure list to be dynamically updated.

36.    T-Rex alleged that the Digital Waiting Room Screen product meets the first limitation of claim 25 of the '470 Patent: "receives control instructions from at least one external information mediator."  *See*, Exhibit 5 at ¶ 50.  While BroadSign disputes the ultimate issue of whether its components meet this limitation, the functionality identified by T-Rex that allegedly meets this claim limitation is provided by BroadSign's software components within the Digital Waiting Room Screen product (i.e. the BroadSign Player).  T-Rex alleged that the Digital Waiting Room Screen product meets the second limitation of claim 25 of the '470 Patent: "generate an exposure list, with said exposure list specifying three or more of the following items: i) what information content is to be displayed; ii) at which of the plurality of locations the information content is to be displayed; iii) when the information  content is to be displayed for each location at which content is to be displayed; and iv) how long the information content  is  to be displayed for each location at which content is to be displayed."  *See*, Exhibit 5 at ¶ 51. T-Rex further alleged that the Digital Waiting Room Screen product meets this limitation by using "smart playlist technology [to curate] programming that is customized to each office according to its specific patient population."  *See*, Exhibit 5 at ¶ 51. While BroadSign disputes the ultimate issue of whether its components meet this limitation, the functionality identified by T-Rex that allegedly meets this claim limitation is provided by BroadSign's

11

Appx509

software components within the Digital Waiting Room Screen product (i.e. the BroadSign Player).

37.    T-Rex alleged that the Digital Waiting Room Screen product meets the third limitation of claim 25 of the '470 Patent: "displays images at one or more of said locations in accordance with the exposure list." *See*, Exhibit 5 at ¶ 52. T-Rex further alleged that the Digital Waiting Room Screen product meets this limitation by delivering "condition-specific content to patients while they wait." *See*, Exhibit 5 at ¶ 52. While BroadSign disputes the ultimate issue of whether its components meet this limitation, the functionality identified by T-Rex that allegedly meets this claim limitation is provided by BroadSign's software components within the Digital Waiting Room Screen product (i.e. the BroadSign Player).

38.    T-Rex alleged that the Digital Waiting Room Screen product meets the fourth and final limitation of claim 25 of the '470 Patent: "permit[] the exposure list to be dynamically updated." *See*, Exhibit 5 at ¶ 53. T-Rex further alleged that the Digital Waiting Room Screen product meets this limitation because "content is refreshed daily and sent to screens based on patient demographic data." *See*, Exhibit 5 at ¶ 53. While BroadSign disputes the ultimate issue of whether its components meet this limitation, the functionality identified by T-Rex that allegedly meets this claim limitation is provided by BroadSign's software components within the Digital Waiting Room Screen product (i.e. the BroadSign Player).

39.    T-Rex has also alleged in an element by element textual claim chart that each limitation of claim 22 of the '334 Patent is met by BroadSign's Digital Waiting Room Screen product. *See*, Exhibit 5 at ¶¶ 63-75. While BroadSign disputes the ultimate issue of whether its components meet these limitations, the functionality identified by T-Rex that allegedly meets

12

these claim limitations is provided by BroadSign's software components within the Digital Waiting Room Screen product (i.e. the BroadSign Player).

40.    T-Rex has also alleged in an element by element textual claim chart that each limitation of claims 42 and 43 of the '603 Patent is met by BroadSign's Digital Waiting Room Screen product.  *See*, Exhibit 5 at ¶¶ 77-87.  While BroadSign disputes the ultimate issue of whether its components meet these limitations, the functionality identified by T-Rex that allegedly meets these claim limitations is provided by BroadSign's software components within the Digital Waiting Room Screen product (i.e. the BroadSign Player).

41.    The claim charts set forth as prose in the ContextMedia Amended Complaint are sufficient to support declaratory judgment standing.  *Arris Group v. British Telecomm*., 639 F.3d 1368, 1375, 1381 (Fed. Cir. 2011).

42.    BroadSign has knowledge of T-Rex's allegations that the components of the Digital Waiting Room product provided by BroadSign are specially made and adapted to function in a way that meets each limitation of at least one claim of each of the '470, '334, and '603 Patents.

43.    In another action filed by T-Rex against BroadSign customers JCDecaux North America Holdings, Inc. and JCDecaux North America, Inc., filed on May 9, 2016, in the United States District Court for the Eastern District of Texas, Case No. 4:16-cv-00303 (the "JCDecaux Action"), T-Rex accused the defendants' products (*i.e.*, "Showscreens, a digital media product that is used in their Mallscape network, Defendants' digital billboards, and Defendants' digital airport advertising network, including their Prestige digital network") of infringing the Patents-in-Suit.  BroadSign is a platform provider for the accused JCDecaux products.

Appx511

44.    As a direct result of T-Rex's complaints, customers including ContextMedia and JCDecaux, have sought indemnification from BroadSign.

45.    BroadSign knows that its hardware and software solutions, including the BroadSign Player product, is used in HMN's "digital health media advertising network," ContextMedia's "Digital Waiting Room Screen," and JCDecaux's "Showscreens," "Mallscape network," "digital billboards," "digital airport advertising network," and "Prestige digital network." BroadSign works with customers HMN, ContextMedia, and JCDecaux to make its hardware and software solutions (including the BroadSign Player product) and to adapt its hardware and software solutions (including the BroadSign Player product) for use in HMN's "digital health media advertising network," ContextMedia's "Digital Waiting Room Screen," and JCDecaux's "Showscreens," "Mallscape network," "digital billboards," "digital airport advertising network," and "Prestige digital network."

46.    BroadSign's hardware and software solutions (including the BroadSign Player portion of the Digital Waiting Room Screen product) (e.g., Exhibit 5 at ¶¶ 50-87) are built to order for its customers.

47.    T-Rex has had direct discussions and in-person meetings with BroadSign in which T-Rex has demanded that BroadSign take a license to the Patents-in-Suit in order for T-Rex to stop suing BroadSign's customers for patent infringement. On June 28, 2016, BroadSign and T-Rex met in a meeting room in Landvetter Airport Conference, Gothenberg, Sweden. During that meeting, BroadSign requested that T-Rex agree to dismiss the pending lawsuits against BroadSign's customers and give BroadSign a covenant not to sue that would cover BroadSign and its customers. In the first week of July, 2016, and without prior discussion of a license, Mats Hylin, T-Rex's CEO, sent BroadSign a "Patent Agreement." The agreement

14

Appx512

required an unspecified monetary payment in exchange for a license. The agreement expressly provides that one of the purposes for the parties entering into it is so that BroadSign can obtain from T-Rex a covenant not to sue its customers to the extent they operate digital display systems consisting of BroadSign's products. T-Rex assured BroadSign that agreeing to take a license was the only way to protect BroadSign and its customers from litigation and future law suits. BroadSign did not request any sample agreements or any draft or form of license agreement.

48.    As a result of (a) the T-Rex lawsuits filed against BroadSign's customers accusing BroadSign's products and services of infringing each of the Patents-in-Suit; (b) the T-Rex lawsuits filed against suppliers similarly-situated to BroadSign accusing those suppliers' products and services of infringing each of the Patents-in-Suit; and (c) the demands by T-Rex that BroadSign take a license to the Patents-in-Suit to prevent further patent infringement actions against BroadSign's customers, there exists a real, immediate and justiciable controversy between T-Rex and BroadSign concerning infringement of sufficient immediacy to warrant the issuance of a declaratory judgment. There exists a real and palpable threat of suit by T-Rex against BroadSign and/or against additional BroadSign customers arising from their use of BroadSign's products. This threat is real and not idle. Not only has T-Rex demanded that BroadSign take a license to the Patents-in-Suit and has brought suits against its customers, but .in addition T-Rex has brought suits against BroadSign's direct competitors in the same industry.

49.    T-Rex's actions have placed a cloud over BroadSign and its business and continues to injure BroadSign's business, creating a concrete and immediate justiciable controversy between BroadSign and T-Rex. BroadSign cannot simply stand by while its business suffers irreparable harm to await yet another filing of litigation by T-Rex at a future

15

date.  BroadSign seeks a declaratory judgment so that its business can move forward without the imminent and ever-present threat of litigation.

## CAUSES OF ACTION

### COUNT ONE
### Declaratory Judgment of Non-Infringement of U.S. Patent No. RE39,470

50.     BroadSign repeats and reasserts each of the allegations contained in paragraphs 1 through 49 as if fully set forth herein.

51.     BroadSign has not directly infringed and does not directly infringe, either literally or under the doctrine of equivalents, any valid and enforceable claim of the '470 patent.

52.     BroadSign has not indirectly infringed and does not indirectly infringe any valid and enforceable claim of the '470 patent, either by inducing infringement or contributory infringement.

53.     T-Rex has accused BroadSign's products of infringing at least claims 25 and 26 of the '470 patent.  Claim 26 depends from claim 25.

54.     BroadSign's products do not infringe claim 25 of the '470 patent, and therefore do not infringe any dependent claim of claim 26, for at least the reason that BroadSign's products do not "receiv[e] control instructions from at least one external information mediator" as required by the claim.

55.     Accordingly, BroadSign seeks a declaratory judgment pursuant to 28 U.S.C. §§ 2201-02 that no valid and enforceable claim of the '470 patent is infringed by BroadSign.

Appx514

## COUNT TWO
### Declaratory Judgment of Non-Infringement of U.S. Patent No. 7,382,334

56.     BroadSign repeats and reasserts each of the allegations contained in paragraphs 1 through 49 as if fully set forth herein.

57.     BroadSign has not directly infringed and does not directly infringe, either literally or under the doctrine of equivalents, any valid and enforceable claim of the '334 patent.

58.     BroadSign has not indirectly infringed and does not indirectly infringe any valid and enforceable claim of the '334 patent, either by inducing infringement or contributory infringement.

59.     T-Rex has accused BroadSign's products of infringing at least claims 22 and 32 of the '334 patent.

60.     BroadSign's products do not infringe claim 22 of the '334 patent for at least the reason that BroadSign's products do not "us[e] a control center for coordinating and controlling electronic displays."  Similarly, claim 32 of the '334 patent is not infringed for at least the reason that BroadSign's products do not have the claimed "computerized control center means."

61.     Accordingly, BroadSign seeks a declaratory judgment pursuant to 28 U.S.C. §§ 2201-02 that no valid and enforceable claim of the '334 patent is infringed by BroadSign.

## COUNT THREE
### Declaratory Judgment of Non-Infringement of U.S. Patent No. 6,430,603

62.     BroadSign repeats and reasserts each of the allegations contained in paragraphs 1 through 49 as if fully set forth herein.

63.     BroadSign has not directly infringed and does not directly infringe, either literally or under the doctrine of equivalents, any valid and enforceable claim of the '603 patent.

17

Appx515

64.    BroadSign has not indirectly infringed and does not indirectly infringe any valid and enforceable claim of the '603 patent, either by inducing infringement or contributory infringement.

65.    T-Rex has accused BroadSign's products of infringing at least claims 42 and 43 of the '603 patent.  Claims 42 and 43 depend from claim 13.

66.    BroadSign's products do not infringe claim 13 of the '603 patent, and therefore do not infringe any dependent claim of claim 13, for at least the reason that BroadSign's products do not include the claimed "network interconnecting a plurality of electronic displays provided at various geographic locations."

67.    Accordingly, BroadSign seeks a declaratory judgment pursuant to 28 U.S.C. §§ 2201-02 that no valid and enforceable claim of the '603 patent is infringed by BroadSign.

### COUNT FOUR
**Declaratory Judgment of Intervening Rights with Respect to U.S. Patent No. RE39,470**

68.    BroadSign repeats and reasserts each of the allegations contained in paragraphs 1 through 49 as if fully set forth herein.

69.    The '470 patent is a reissue of U.S. Patent No. 6,005,534 ("the '534 patent").

70.    As of January 16, 2007, when the '470 patent reissued, BroadSign was selling the product that has been accused by T-Rex of infringement in lawsuits against BroadSign's customers.

71.    Each of the original claims of the '534 patent were amended during reissue.

72.    The claims of the '470 patent are not substantially identical to the claims of the '534 patent as originally issued.

73.    BroadSign and its customers are entitled to absolute and equitable intervening rights with respect to the '470 patent pursuant to 35 U.S.C. § 252.

18

Appx516

74.    As a result of the acts described herein, there exists a substantial controversy of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.

75.    An actual and justiciable controversy exists between BroadSign and T-Rex as to whether BroadSign has absolute and/or equitable intervening rights. A judicial declaration is necessary and appropriate so that BroadSign may ascertain its rights regarding the '470 patent.

**COUNT FIVE**
**Declaratory Judgment of Invalidity with Respect to U.S. Patent No. RE39,470**

76.    BroadSign repeats and reasserts each of the allegations contained in paragraphs 1 through 49 as if fully set forth herein.

77.    As a result of the acts described herein, there exists a substantial controversy of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.

78.    The claims of the '470 patent are invalid for failing to meet one or more of the requirements and/or conditions for patentability under various sections of the United States Code, including without limitation, 35 U.S.C. §§ 101, 102, 103, and/or 112. For example, upon information and belief, claim 1 is unpatentable as anticipated under 35 U.S.C. § 102(a) by Japanese Patent Application Heisei 07-168544 by Nakamura ("Nakamura"). For example, upon information and belief, claim 4 is unpatentable under 35 U.S.C. § 103(a) as obvious over Nakamura in view of U.S. Patent Number 5,740,549 to Reilly ("Reilly"). For example, upon information and belief, claim 4 is unpatentable under 35 U.S.C. § 103(a) as obvious over Nakamura in view of U.S. Patent Number 5,566,353 to Cho ("Cho"). For example, upon information and belief, claim 1 is unpatentable under 35 U.S.C. § 101 as being directed to an impermissible abstract idea. *Alice Corp. Pty. Ltd. v. CLS Bank Int'l*, 134 S. Ct. 2347, 2355 (2014). For example, claim 26 is unpatentable under 35 U.S.C. § 112 as an improper means-plus-function claim and as indefinite.

19

Appx517

79. Pursuant to the Federal Declaratory Judgment Act, 28 U.S.C. § 2201, *et seq.*, Counterclaimant is entitled to judgment from this Court that the '470 patent is not valid.

## COUNT SIX
### Declaratory Judgment of Invalidity with Respect to U.S. Patent No. 7,382,334

80. BroadSign repeats and reasserts each of the allegations contained in paragraphs 1 through 49 as if fully set forth herein.

81. As a result of the acts described herein, there exists a substantial controversy of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.

82. The claims of the '334 patent are invalid for failing to meet one or more of the requirements and/or conditions for patentability under various sections of the United States Code, including without limitation, 35 U.S.C. §§ 101, 102, 103, and/or 112. For example, upon information and belief, claim 1 is unpatentable as anticipated under 35 U.S.C. § 102(a) by Japanese Patent Application Heisei 07-168544 by Nakamura ("Nakamura"). For example, upon information and belief, claim 4 is unpatentable under 35 U.S.C. § 103(a) as obvious over Nakamura in view of U.S. Patent Number 5,740,549 to Reilly ("Reilly"). For example, upon information and belief, claim 22 is unpatentable under 35 U.S.C. § 103(a) as obvious over Nakamura in view of U.S. Patent Number 5,566,353 to Cho ("Cho"). For example, upon information and belief, claim 1 is unpatentable under 35 U.S.C. § 101 as being directed to an impermissible abstract idea. *Alice Corp. Pty. Ltd. v. CLS Bank Int'l*, 134 S. Ct. 2347, 2355 (2014). For example, claim 32 is unpatentable under 35 U.S.C. § 112 as an improper means-plus-function claim and as indefinite.

83. Pursuant to the Federal Declaratory Judgment Act, 28 U.S.C. § 2201, *et seq.*, Counterclaimant is entitled to judgment from this Court that the '334 patent is not valid.

Appx518

## COUNT SEVEN
### Declaratory Judgment of Invalidity with Respect to U.S. Patent No. 6,430,603

84.    BroadSign repeats and reasserts each of the allegations contained in paragraphs 1 through 49 as if fully set forth herein.

85.    As a result of the acts described herein, there exists a substantial controversy of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.

86.    The claims of the '603 patent are invalid for failing to meet one or more of the requirements and/or conditions for patentability under various sections of the United States Code, including without limitation, 35 U.S.C. §§ 101, 102, 103, and/or 112.  For example, upon information and belief, claim 1 is unpatentable as anticipated under 35 U.S.C. § 102(a) by Japanese Patent Application Heisei 07-168544 by Nakamura ("Nakamura").  For example, upon information and belief, claim 1 is unpatentable as anticipated under 35 U.S.C. § 102 by U.S. Patent Number 7,382,334 to Hylin or U.S. Patent Number USRE39470 to Hylin.  For example, upon information and belief, claim 4 is unpatentable under 35 U.S.C. § 103(a) as obvious over Nakamura in view of U.S. Patent Number 5,740,549 to Reilly ("Reilly").  For example, upon information and belief, claim 23 is unpatentable under 35 U.S.C. § 103(a) as obvious over Nakamura in view of U.S. Patent Number 5,566,353 to Cho ("Cho").  For example, upon information and belief, claim 1 is unpatentable under 35 U.S.C. § 101 as being directed to an impermissible abstract idea. *Alice Corp. Pty. Ltd. v. CLS Bank Int'l*, 134 S. Ct. 2347, 2355 (2014).  For example, claim 1 is unpatentable under 35 U.S.C. § 112 as an improper means-plus-function claim and as indefinite.

87.    Pursuant to the Federal Declaratory Judgment Act, 28 U.S.C. § 2201, *et seq.*, Counterclaimant is entitled to judgment from this Court that the '603 patent is not valid.

21

Appx519

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff BroadSign respectfully requests the following relief:

A.  a declaratory judgment that no valid and enforceable claim of the '470 patent is infringed by BroadSign;

B.  a declaratory judgment that no valid and enforceable claim of the '334 patent is infringed by BroadSign;

C.  a declaratory judgment that no valid and enforceable claim of the '603 patent is infringed by BroadSign;

D.  a declaratory judgment that BroadSign has absolute and/or equitable intervening rights pursuant to 35 U.S.C. § 252 with respect to the '470 patent;

E.  a declaratory judgment that the claims of the '470 patent are invalid;

F.  a declaratory judgment that the claims of the '334 patent are invalid;

G.  a declaratory judgment that the claims of the '603 patent are invalid; an order enjoining T-Rex, its officers, directors, agents, counsel, servants and employees, and successors in interest and assigns, all persons in active concert or participation with any of them, from alleging infringement or instituting an action based on infringement of the '470 patent, '334 patent, and '603 patent against BroadSign or any of BroadSign's customers or downstream users of BroadSign's products;

H.  an order declaring that BroadSign is the prevailing party and that this is an exceptional case under 35 U.S.C. § 285 and awarding BroadSign its costs and attorneys' fees in connection with this action; and

I.  such other and further relief as the Court deems just, reasonable and proper.

22

Appx520

Dated: July 19, 2018                Respectfully submitted,

                                    **BROWN RUDNICK LLP**

                                    By:    */s/ Alfred R. Fabricant*

                                    Alfred R. Fabricant
                                    Email: afabricant@brownrudnick.com
                                    Lawrence C. Drucker
                                    Email: ldrucker@brownrudnick.com
                                    Peter Lambrianakos
                                    Email: plambrianakos@brownrudnick.com
                                    Vincent J. Rubino, III
                                    Email:  vrubino@brownrudnick.com
                                    Alessandra Carcaterra Messing
                                    Email: amessing@brownrudnick.com
                                    BROWN RUDNICK LLP
                                    7 Times Square
                                    New York, NY 10036
                                    Telephone: (212) 209-4800

                                    ***ATTORNEYS FOR PLAINTIFF***
                                    ***BROADSIGN INTERNATIONAL, LLC***

Appx521

**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

T-REX PROPERTY AB,

        Plaintiff,

      v.

HEALTH MEDIA NETWORK, LLC,

        Defendant.

Case No.:  1:16-cv-5673

**JURY TRIAL DEMANDED**

## PLAINTIFF'S COMPLAINT FOR PATENT INFRINGEMENT

Plaintiff T-Rex Property AB for its Complaint against Defendant Health Media Network, LLC, states as follows:

## NATURE OF THE ACTION

1.      This is an action for patent infringement arising under the patent laws of the United States, 35 U.S.C. § 1 *et seq.*, including 35 U.S.C. §§ 271, 281, 283, 284 and 285.

## PARTIES

2.      Plaintiff T-Rex Property AB is a company organized and existing under the laws of Sweden with its principal place of business at Vårvägen 6, 18274 Stocksund, Sweden.

3.      On information and belief, Defendant Health Media Network, LLC, is a Connecticut corporation, with a principal place of business at 1 Station Place, Stamford, Connecticut 06902.

## JURISDICTION AND VENUE

4.      This Court has subject matter jurisdiction over this patent infringement action under 28 U.S.C. §§ 1331 and 1338(a).

Appx522

5.　　This Court has personal jurisdiction over Defendant, because, on information and belief, Defendant has systematic and continuous contacts with Illinois and this judicial district because Defendant regularly transacts business in the State of Illinois and this judicial district and it has thereby purposefully availed itself of the benefits and protections of the laws of the State of Illinois. Furthermore, this Court has personal jurisdiction over Defendant because, as described further below, Defendant has committed acts of patent infringement giving rise to this action within the State of Illinois and has thus established minimum contacts such that the exercise of personal jurisdiction over Defendant does not offend traditional notions of fair play and substantial justice.

6.　　Venue is proper in this Judicial District under 28 U.S.C. §§ 1391 and 1400(b).

## THE PATENTS-IN-SUIT

7.　　The allegations set forth in the foregoing paragraphs 1 through 6 are hereby re-alleged and incorporated herein by reference.

### The '470 Patent

8.　　On January 16, 2007, U.S. Patent Number RE39,470 (the "'470 Patent"), entitled "Digital Information System," was duly and legally issued by the United States Patent and Trademark Office.  A true and correct copy of the '470 Patent is attached as Exhibit A to this Complaint.

9.　　The '470 Patent is a reissue of U.S. Patent Number 6,005,534, which was filed on July 2, 1996 and which claims priority under 35 U.S.C. § 119(e) to U.S. Provisional Patent Application Number 60/017,403, which was filed on May 14, 1996. The '534 Patent also claims priority under 35 U.S.C. § 119(a)-(d) to foreign patent application number 9601603-5, which was filed on April 26, 1996 in Sweden. As "[p]riority under section 119, 365(a), 365(b), 386(a), or 386(b) shall not be taken into account in determining the term of a patent," (35 U.S.C. § 154(a)(3)), the '470 Patent expires 20 years from July 2, 1996.

2

Appx523

10.     The innovations disclosed in the '470 Patent "relate[] to a method and apparatus for controlling and coordinating" electronic displays "in a digital information system for displaying information on at least one display device . . . said information being displayed in places that are accessible to and frequented by a general public." ('470 Patent at 1:15-21.)  "An object of the present invention is to provide a flexible system in which external information mediators are able to dynamically control in real time the transmission of display instructions to a larger public in different places" "and to enable similar or specific information to be displayed in places that are mutually far apart." (*Id.* at 2:39-42; 2:52-54.)

11.     A system operating according to an embodiment of the '470 Patent can include a control center with a communication interface that connects devices to create and update a display list in real time using control instruction fields sent from external mediators and to transmit and display the desired images to one or more electronic displays that can be controlled independently of other electronic displays. (*Id.* at 3:4-19; 4:42-45.)  In embodiments, the control center can include one or more servers, workstations, and databases stored on one or more physical storage devices, and can include redundancy, of both computer hardware and the information stored, where the devices can be connected using a network, such as a LAN (Local Area Network) or by using a cable-carried ISDN solution (Integrated Services Digital Network) or other fixed lines that have a similar capacity. (*Id.* at 4:57-5:16; 5:59-67; 6:41-59; 12:55-13:7.) In one embodiment of the devices or projectors, the projector is a large picture screen in LCD or LED technology or the like that includes or is connected to a computer. (*Id*. at 6:26-32.)

12.     In one embodiment of the invention, personnel operating a work station can enter information to be displayed from an external mediator via projector control instructions in the exposure list created by the server. (*Id.* at 8:10-26.) Operators are able to interrupt a queue in the server in order to update the exposure list with information generated centrally from the control center or with information from an external information mediator. (*Id.*)

13.     Information mediators can use an exposure program to deliver complete images (*e.g.* an image, a series of images or a video clip) for display which would not require processing

3

by the control center. (*Id.* at 11:19-28.) These can be dynamically added to the exposure list by the exposure handler. (*Id.*) External information mediators can thus deliver a complete image for display (an image, a series of images or a video clip) which can be processed automatically and inserted into the exposure list, or an administrator can select information from an external mediator and process the information so that it can be inserted into the exposure list via the exposure handler. (*Id.* at 8:27-41.)

**The '334 Patent**

14. On June 3, 2008, U.S. Patent Number 7,382,334, entitled "Digital Information System," was duly and legally issued by the United States Patent and Trademark Office. A true and correct copy of the '334 Patent is attached as Exhibit B to this Complaint.

15. The innovations described by the '334 Patent relate to methods and arrangements "for controlling and coordinating" digital display devices "in a digital information system for displaying information on at least one display device" "wherein the information is displayed in places that are accessible to and frequented by a general public." ('334 Patent at Abstract; 1:13-24; 5:20-32.) The present invention is able "to provide a flexible system in which external information mediators are able to dynamically control in real time the transmission of display instructions to a larger public in different places" "and to enable similar or specific information to be displayed in places that are mutually far apart." (*Id.* at 2:56-60; 3:5-11.)

16. A system operating according to an embodiment of the '334 Patent can include a control center with a communication interface that connects devices to create and update a display list in real time using control instruction fields sent from external mediators and to transmit and display the desired images to one or more electronic displays that can be controlled independently of other electronic displays. (*Id.* at 3:38-60; 5:29-30.) In embodiments, the control center can include one or more servers, workstations, and databases stored on one or more physical storage devices, and can include redundancy, of both computer hardware and the information stored, where the devices can be connected using a network, such as a LAN (Local

4

Area Network) or by using a cable-carried ISDN solution (Integrated Services Digital Network) or other fixed lines that have a similar capacity. (*Id.* at 6:17-45; 7:17-29; 11:60-67.) In some embodiments, a relational database can be used to store image and video data and each electronic display can be assigned a unique TCP/IP (Transmission Control Protocol / Internet Protocol) address such that each display can be individually addressed and sent content for display. (*Id.* at 14:50-15:8.)

17.     In one embodiment of the invention, personnel operating a work station can enter information to be displayed from an external mediator via projector control instructions in the exposure list created by the server. (*Id.* at 9:45-61.) Operators are able to interrupt a queue in the server in order to update the exposure list with information generated centrally from the control center or with information from an external information mediator. (*Id.*)

18.     Information mediators can use an exposure program to deliver complete images (*e.g.* an image, a series of images or a video clip) for display which would not require processing by the control center.  (*Id.* at 12:12-22.)  These can be dynamically added to the exposure list by the exposure handler. (*Id.*) External information mediators can thus deliver a complete image for display (an image, a series of images or a video clip) which can be processed automatically and inserted into the exposure list, or an administrator can select information from an external mediator and process the information so that it can be inserted into the exposure list via the exposure handler. (*Id.* at 9:62-10:9.)

**The '603 Patent**

19.     On August 6, 2002, U.S. Patent Number 6,430,603, entitled "System for Direct Placement of Commercial Advertising, Public Service Announcements and Other Content on Electronic Billboard Displays" was duly and legally issued by the United States Patent and Trademark Office.  A true and correct copy of the '603 Patent is attached as Exhibit C to this Complaint.

5

Appx526

20. The innovations described by the '603 Patent "relate[] to systems permitting advertisers to target geographical regions and demographic groups with ever changing, current advertising content without incurring the high fixed cost of traditional single-message billboards." ('603 Patent at 1:7-10.)

21. A typical system can include a network that connects a central information processing center with a number of electronic displays. (*Id.* at 2:7; 2:54-56.) "The means for transmitting content information" from the central information processing center "to the display locations may take a number of forms." (*Id.* at 3:31-32.) "[T]he means include: [a] High speed cable [b] Satellite [c] Dedicated phone [d] High speed line (e.g., ISDN) [e] Cellular or PCS [f] Internet [g] Radio/radio pulse transmission [h] High speed optical fiber." (*Id.* at 3:35-45.) "[A]ny form" of network "may be utilized" depending on the system requirements "at various locations within the network," which can include combinations of the examples listed. (*Id.* at 3:32-33.)

22. Plaintiff T-Rex Property AB is the assignee and owner of the right, title and interest in and to the '470 Patent, the '334 Patent, and the '603 Patent (collectively, the "Patents-In-Suit"), including the right to assert all causes of action arising under the Patents-In-Suit and the right to any remedies for infringement.

## BACKGROUND ON THE PRIOR ART AND THE '470 PATENT

23. In 1994, the traditional Out-of-Home advertising industry was in need of a change, an evolutionary improvement. See Declaration of Mats Hylin ("Hylin Decl.") at ¶ 8 (attached as Exhibit D, and hereby incorporated, in its entirety, by reference herein at paragraph 23). Mats Hylin, the first named inventor of the '470 Patent, recognized that the "demands from advertisers" were not being met; what advertisers wanted was "more flexibility and speed" and "the possibility of changing the message" instead of "having the same advertisement [displayed] during the whole period." *Id.* This may be because advertisers wish to avoid a stagnant message, or because advertisers desire campaign evaluation feedback —"the results of a first campaign are

6

Appx527

fundamental in order to create the next campaign." *Id.* at ¶ 15. In addition to addressing these revenue issues, distribution efficiencies were "one of the most important areas to create higher margins." *Id.* at ¶ 6. One method to address this was through the use of digital advertising copy—which could be distributed via "the internet, or any other network"—rather than incur the costs associated with physical distribution and display of paper or other printed advertising copy. *Id.* at ¶¶ 8-9.

24.    With respect to the '470 Patent and claim 25 in particular, claim 25 "solves specific needs and problems over other technologies that existed in 1996." Declaration of Zaydoon Jawadi ("Jawadi Decl.") ¶ 22 (attached as Exhibit E, and hereby incorporated, in its entirety, by reference herein at paragraph 24). Such problems and shortcomings included "controlling and coordinating digital signage displays in concrete, specific ways beyond merely scheduling content to be displayed on remote screens." *Id.* "Prior to the inventions disclosed in claim 25 . . . there was no flexible way for external information mediators . . . to dynamically control and coordinate, display devices located in different places." *Id.* at ¶ 23. "Content from external information mediators could not be directly displayed; instead, displaying such content required administrative processing and manual intervention to update the display systems." *Id.*

25.    The inventions embodied in claim 25 "improved the operation of digital signage that existed in 1996" by "impos[ing] meaningful limitations" that "allow[ed] external information mediator(s) to dynamically control and coordinate display devices located in different places, extending the usefulness of the digital signage technology." *Id.* at ¶¶ 26-27. "[C]laim 25 of the '470 Patent incorporates unique, innovative, non-conventional, non-generic elements" that work together to improve the operation of a digital signage system. *Id.* at ¶ 28. "The functions, application, and implementations of these elements inherently and necessarily are rooted in and require computer technology, communication technology, and digital display technology in order to overcome specific problems arising in the realm of digital signage in 1996." *Id.* at ¶ 29. Importantly, "the claim goes beyond the mere concept of simply using a computer to perform distributed signage." *Id.* "This is because computers, communication

7

interfaces, and digital display devices are not ancillary or incidental additions but germane and integral parts of the inventions disclosed by claim 25 of the '470 Patent." *Id.* The limitations of claim 25 "relate to the functioning of hardware and software" that are "inextricably tied to digital signage computer technology, communication technology, and digital display technology" such that the "unique, innovative, non-conventional, non-generic" hardware and software incorporated in claim 25 are used to achieve these technological innovations. *Id.* at ¶¶ 28, 30.

26.    The physical combination of elements that are referenced in claim 25 represent an innovation over the prior art. More particularly, claim 25 references an "information mediator." At the time of the invention, in about the 1995 to 1996 time frame, the term "information mediator," within the context of the field of art, could have referred to "an agent between producer and consumer of information" where the "agent could be a software component, software with accompanying hardware, a system, an organization (such as advertising agency) or an individual." *Id.* at ¶ 33. Claim 25 also references "location(s)" which at the time of the invention could have referred, again within the context of the field of art, to "a particular physical or geographical place or position where the message or advertisement is displayed on an electronic display device." *Id.* at ¶ 34. Taking into account the meaning of these terms, as well as the claim as a whole, implementation of claim 25 would require "industrial computers, servers, PCs, networking routers or switches, networking cables, computer graphics capabilities, display devices . . . database management systems as well as specialized software drivers to interface between mediators and system computers, to decipher control lists, to create and update exposure lists, and to decipher and act upon exposure lists." *Id.* at ¶ 35. Such a combination of elements represented a significant and non-conventional innovation over the prior art which resulted in an improvement in the operation of digital signage. *Id.* at ¶ 38.

27.    "Furthermore, claim 25 . . . is distinct and different from the other claims of the '470 Patent." *Id.* at ¶ 37. "In particular, claim 25 . . . is distinct and different from claim 26 of the '470 Patent." *Id.* For example, "[c]laim 26 discloses a computerized control center, communication interfaces, means for generating and dynamically updating an exposure list, a

8

means for displaying images and a computerized device situated at each location—limitations that claim 25 does not disclose." *Id.*

28. Claim 25 embodies an entirely new combination of special purpose and interconnected physical equipment to present information publicly. The inventions embodied in claim 25 arose in a specialized context—back in or about the 1995 to 1996 time frame—and the inventors came up with a specific solution, manifested in a concrete combination of devices, interfaces, and software, networked together with physical displays viewable by the target audience, to resolve particular problems.

29. With respect to claim 26 of the '470 Patent, the inventions embodied in claim 26 "improved the operation of digital signage that existed in 1996" *Id.* at ¶ 45. "[C]laim 26 of the '470 Patent incorporates unique, innovative, non-conventional, non-generic elements." *Id.* at ¶ 47. These elements include a "computerized control center[,] . . . means (within the computerized control center) for generating and dynamically updating an exposure list . . . [and] computerized devices" which are situated at "a plurality of locations." *Id.* at ¶¶ 40, 47. The computerized devices are "electronically coupled to the computerized control center" and include a means "for displaying images in accordance with the exposure list." *Id.* at ¶ 47. The limitations of claim 26 "relate to both the hardware and software technology for digital signage, as well as to the functioning of hardware and software technology for digital signage" and are "manifested in a concrete combination of devices, interfaces, and software, networked together with physical displays viewable by the target audience." *Id.* at ¶¶ 41, 49.

30. The physical combination of elements that are referenced in claim 26 represent an innovation over the prior art. More particularly, in addition to "information mediator" and "location(s)," claim 26 references "communication interfaces." At the time of the invention, in about the 1995 to 1996 time frame, the term communication interfaces, within the context of the field of art, could have referred to "electronic hardware, software, and protocols allowing systems (such as computers) to communicate and exchange data." *Id.* at ¶ 54. Claim 26 also references a "computerized control center" which at the time of the invention could have

9

referred, again within the context of the field of art, to "a computer or set of computers that control and coordinate the interaction between networked computers or equipment." *Id.* at ¶ 55. Such a combination of elements represented a significant and non-conventional innovation over the prior art which resulted in an improvement in the operation of digital signage. *Id.* at ¶ 59.

31.    Claim 26 embodies an entirely new combination of special purpose and interconnected physical equipment to present information publicly. The inventions embodied in claim 26 arose in a specialized context—back in or about the 1995 to 1996 time frame—and the inventors came up with a specific solution, manifested in a concrete combination of devices, interfaces, and software, networked together with physical displays viewable by the target audience, to resolve particular problems in digital technology.

## BACKGROUND ON THE '334 PATENT

32.    Claim 22 the '334 Patent "solves specific needs and problems over other technologies that existed in 1996." Jawadi Decl. at ¶ 63. Such problems and shortcomings included "controlling and coordinating digital signage displays in concrete, specific ways beyond merely scheduling content to be displayed on remote screens." *Id.* More specifically, "[p]rior to the inventions disclosed in claim 22 . . . there was no flexible way for external information mediators . . . to dynamically control and coordinate, in real time, display devices located in different places." *Id.* at ¶ 64. "Content from external information mediators could not be directly displayed, and particularly not in real time or in near real time; instead, displaying such content required administrative processing and manual intervention to update the display systems." *Id.*

33.    The inventions embodied in claim 22 "improved the operation of digital signage that existed in 1996" by "impos[ing] meaningful limitations" that "allow[ed] external information mediator(s) to dynamically control and coordinate, in real time, display devices located in different places, extending the usefulness of the digital signage technology." *Id.* at ¶¶ 67-68. "[C]laim 22 of the '334 Patent incorporates unique, innovative, non-conventional, non-generic elements" that work together to improve the operation of a digital signage system. *Id.* at

10

¶ 69. "The functions, application, and implementations of these elements inherently and necessarily are rooted in and require computer technology, communication technology, and digital display technology in order to overcome specific problems arising in the realm of digital signage in 1996." *Id.* at ¶ 70. Importantly, "the claim goes beyond the mere concept of simply using a computer to perform distributed signage." *Id.* "This is because computers, communication interfaces, and digital display devices are not ancillary or incidental additions but germane and integral parts of the inventions disclosed by claim 22 of the '334 Patent." *Id.* The limitations of claim 22 "relate to the functioning of hardware and software" that are "inextricably tied to digital signage computer technology, communication technology, and digital display technology" such that the "unique, innovative, non-conventional, non-generic" hardware and software incorporated in claim 22 are used to achieve these technological innovations. *Id.* at ¶¶ 69, 71.

34.    The physical combination of elements that are referenced in claim 22 represent an innovation over the prior art. Taking into account the meaning of these elements, as well as the claim as a whole, implementation of claim 22 would require "industrial computers, servers, PCs, networking routers or switches, networking cables, computer graphics capabilities, display devices . . . database management systems as well as specialized software drivers to interface between mediators and system computers, to decipher control lists, to create and update exposure lists, and to decipher and act upon exposure lists." *Id.* at 74. Such a combination of elements represented a significant and non-conventional innovation over the prior art which resulted in an improvement in the operation of digital signage. *Id.* at ¶ 77.

35.    "Furthermore, claim 22 of the '334 Patent is distinct and different from the other claims of the '334 Patent as well as being distinct and different from the claims of the '470 Patent." *Id.* at ¶ 76. "In particular, claim 22 . . . is distinct and different from claim 32 of the '334 Patent. *Id.* For example, "[c]laim 32 discloses computerized control center means (hardware and/or software . . .), communication interfaces (of the control center), computerized means

11

(hardware and/or software . . . ) . . . and exposure handler means (hardware and/or software . . . ) —limitations that claim 22 does not disclose." *Id.*

36.    Claim 22 embodies an entirely new combination of special purpose and interconnected physical equipment to present information publicly. The inventions embodied in claim 22 arose in a specialized context—back in or about the 1995 to 1996 time frame—and the inventors came up with a specific solution, manifested in a concrete combination of devices, interfaces, and software, networked together with physical displays viewable by the target audience, to resolve particular problems.

37.    The inventions embodied in claim 32 also "improved the operation of digital signage that existed in 1996" *Id.* at ¶ 84. "[C]laim 32 of the '334 Patent incorporates unique, innovative, non-conventional, non-generic elements." *Id.* at ¶ 86. These elements include "a computerized control center means," "computerized means . . . for coordinating and controlling electronic displays" and "exposure handler means . . . for creating and updating an exposure list." *Id.* The limitations of claim 32 "relate to both the hardware and software technology for digital signage, as well as to the functioning of hardware and software technology for digital signage." *Id.* at ¶ 88.

38.    The physical combination of elements that are referenced in claim 32 represent an innovation over the prior art. Taking into account the meaning of these elements, as well as the claim as a whole, the arrangement of claim 32 would require "industrial computers, servers, PCs, networking routers or switches, networking cables, computer graphics capabilities, display devices . . . database management systems as well as specialized software drivers to interface between mediators and system computers, to decipher control lists, to create and update exposure lists, and to decipher and act upon exposure lists." *Id.* at ¶ 93. "Due to the application of outdoor advertising, additional specialized equipment, such as special duty and/or ruggedized computers (which could include ruggedized media players, for example) could be necessary." *Id.* Such a combination of elements represented a significant and non-conventional innovation over the prior art which resulted in an improvement in the operation of digital signage. *Id.* at ¶ 96.

12

39.     "Furthermore, claim 32 of the '334 Patent . . . is distinct and different from the claims of the '470 Patent." *Id.* at ¶ 95.

### BACKGROUND ON THE '603 PATENT

40.     Claim 42 the '603 Patent "solves specific needs and problems that existed in 1999." Jawadi Decl. ¶ 101. Such problems and shortcomings included "targeting geographical regions and demographic groups with ever changing, current advertising content in concrete, specific ways beyond merely scheduling content to be displayed on remote screens." *Id.* More specifically, "the inventions disclosed in claim 42" allowed "content providers . . . to directly access a network of electronic displays located in various geographic locations and to directly send their own content—which could be formatted for the use of a split screen display—to the network to be displayed at locations and times selected by the providers." *Id.* at ¶ 102.

41.     "Claim 42 incorporates non-conventional, non-generic hardware and software that imposes meaningful limitations to improve on the existing 1999 era digital signage technology." *Id.* "The functions, application, and implementations of these elements inherently and necessarily are rooted in and require computer technology, communication technology, and digital display technology in order to achieve specific solutions in the realm of digital signage." *Id.* at ¶ 104. Importantly, "the claim goes beyond the mere concept of simply using a computer to perform distributed signage." *Id.* "This because computers, communication interfaces, and digital display devices are not ancillary or incidental additions but germane and integral parts of the inventions disclosed by claim 42 of the '603 Patent. *Id.* The limitations of claim 42 "relate to both the hardware and software technology for digital signage, as well as to the functioning of hardware and software technology for digital signage" that are "inextricably tied to digital signage computer technology, communication technology, and digital display technology" such that the "unique, innovative, non-conventional, non-generic" hardware and software incorporated in claim 42 are used to achieve these technological innovations. *Id.* at ¶¶ 103, 105.

13

Appx534

42.    "Furthermore, claim 42 of the '603 Patent is distinct and different from the claims of the '334 Patent and it is distinct and different from the claims of the '470 Patent. *Id.* at ¶ 108.

43.    Claim 42 embodies a new combination of special purpose and interconnected physical equipment to present information publicly. The inventions embodied in claim 42 arose in a specialized context—in or about the 1998 to 1999 time frame—and the inventors came up with a specific solution, manifested in a concrete combination of devices, interfaces, and software, networked together with physical displays viewable by the target audience, to resolve particular problems.

44.    The inventions embodied in claim 42 "improve upon existing digital signage." *Id.* at ¶ 110. Claim 42 includes a "combination of interconnected hardware and software elements that are incorporated within the limitations of claim 42—and that claim 42 as a whole—improves upon existing digital signage hardware." *Id.*

## COUNT I – INFRINGEMENT OF U.S. PATENT NO. RE39,470

45.    The allegations set forth in the foregoing paragraphs 1 through 44 are hereby re-alleged and incorporated herein by reference.

46.    Upon information and belief, in violation of 35 U.S.C. § 271(a), Defendant has directly infringed and continues to directly infringe, literally or under the doctrine of equivalents, one or more claims of the '470 Patent by making, using, offering for sale, selling, or importing devices or systems, in this judicial district and elsewhere in the United States (directly or through intermediaries), that perform the steps of receiving control instructions from at least one external information mediator, using the control instructions to generate an exposure list that specifies three or more of the following items: i) what information content is to be displayed; ii) at which of a plurality of locations the information content is to be displayed; iii) when the information content is to be displayed for each location at which content is to be displayed; and  iv) how long the information content is to be displayed for each location at which content is to be displayed, displaying images at one or more of the locations in accordance with the exposure list, and

14

permitting the exposure list to be dynamically updated as claimed in at least claim 25 of the '470 Patent, without the authority of Plaintiff T-Rex Property AB.

47.    Upon information and belief, in violation of 35 U.S.C. § 271(a), Defendant has directly infringed and continues to directly infringe, literally or under the doctrine of equivalents, one or more claims of the '470 Patent by making, using, offering for sale, selling, or importing devices or systems, in this judicial district and elsewhere in the United States (directly or through intermediaries), that comprise a computerized control center that has a plurality of communication interfaces for receiving control instructions from at least one external information mediator, the computerized control center includes a means for generating and dynamically updating an exposure list from the control instructions, the exposure list specifying three or more of the following items: i) what information content is to be displayed; ii) at which of the plurality of locations the information content is to be displayed; iii) when the information content is to be displayed for each location at which content is to be displayed; and iv) how long the information content is to be displayed for each location at which content is to be displayed, a computerized device situated at each one of the plurality of locations and electronically coupled to the computerized control center, and a means for displaying images in accordance with the exposure list associated with each one of the computerized devices as claimed in at least claim 26 of the '470 Patent, without the authority of Plaintiff T-Rex Property AB.

48.    More specifically, the infringing devices and systems include Defendant's digital health media advertising network.

49.    Upon information and belief, Defendant has directly infringed and continues to directly infringe one or more claims of the '470 Patent, including at least claims 25 and 26, by operating its digital health media advertising network in Illinois and elsewhere in the United States.

50.    Defendant has had knowledge of the '470 Patent since at least the date that this Complaint was served.

15

51.    Because of Defendant's infringing activities, Plaintiff T-Rex Property AB has suffered damages and will continue to suffer damages in the future. T-Rex Property AB is entitled to recover from Defendant the damages sustained by T-Rex Property AB as a result of Defendant's wrongful acts in an amount subject to proof at trial, which, by law, cannot be less than a reasonable royalty, together with interest and costs as fixed by this Court under 35 U.S.C. § 284.

## COUNT II – INFRINGEMENT OF U.S. PATENT NO. 7,382,334

52.    The allegations set forth in the foregoing paragraphs 1 through 51 are hereby re-alleged and incorporated herein by reference.

53.    Upon information and belief, in violation of 35 U.S.C. § 271(a), Defendant has directly infringed and continues to directly infringe, literally or under the doctrine of equivalents, one or more claims of the '334 Patent by making, using, offering for sale, selling, or importing devices or systems, in this judicial district and elsewhere in the United States (directly or through intermediaries), that perform the steps of generating an exposure list comprising control instructions for coordinating and controlling electronic displays with regard to what shall be exposed, when it shall be exposed, where it shall be exposed and for how long it shall be exposed, using a control center for coordinating and controlling electronic displays, where the control center is able to create and update the exposure list in real time, with control instruction fields via dynamic booking of information, in time for exposure, from mediators, and where the exposure list enables each electronic display to be controlled, independently of other electronic displays, to receive the same or different information in accordance with the exposure list for the exposure of respective electronic display as claimed in at least claim 22 of the '334 Patent, without the authority of T-Rex Property AB.

54.    Upon information and belief, in violation of 35 U.S.C. § 271(a), Defendant has directly infringed and continues to directly infringe, literally or under the doctrine of equivalents, one or more claims of the '334 Patent by making, using, offering for sale, selling, or importing

16

devices or systems, in this judicial district and elsewhere in the United States (directly or through intermediaries), that comprise a computerized control center means, where the control center has communication interfaces against; a computerized means for coordinating and controlling electronic displays; and an exposure handler means whereby the control center functions, in real time and through the medium of the exposure handler, to create and update an exposure list that has control instruction fields, via dynamic booking of display information from mediators and where the exposure list contains control instructions, that coordinate and control the electronic displays in question with respect to what shall be exposed, where it shall be exposed, when it shall be exposed, and for how long it shall be exposed, and enables each electronic display, independently of other electronic displays, to receive the same or different information according to the exposure list for exposure or display by the respective electronic display as claimed in at least claim 32 of the '334 Patent, without the authority of T-Rex Property AB.

55.     More specifically, the infringing devices and systems include Defendant's digital health media advertising network.

56.     Upon information and belief, Defendant has directly infringed and continues to directly infringe one or more claims of the '334 Patent, including at least claims 22 and 32, by operating its digital health media advertising network in Illinois and elsewhere in the United States.

57.     Defendant has had knowledge of the '334 Patent since at least the date that this Complaint was served.

58.     Because of Defendant's infringing activities, T-Rex Property AB has suffered damages and will continue to suffer damages in the future. T-Rex Property AB is entitled to recover from Defendant the damages sustained by T-Rex Property AB as a result of Defendant's wrongful acts in an amount subject to proof at trial, which, by law, cannot be less than a reasonable royalty, together with interest and costs as fixed by this Court under 35 U.S.C. § 284.

17

## COUNT III – INFRINGEMENT OF U.S. PATENT NO. 6,430,603

59.     The allegations set forth in the foregoing paragraphs 1 through 58 are hereby re-alleged and incorporated herein by reference.

60.     Upon information and belief, in violation of 35 U.S.C. § 271(a), Defendant has directly infringed and continues to directly infringe, literally or under the doctrine of equivalents, one or more claims of the '603 Patent by making, using, offering for sale, selling, or importing devices or systems, in this judicial district and elsewhere in the United States (directly or through intermediaries), that perform the steps of scheduling the presentation of video or still-image content at selected time slots on selected electronic displays, that are provided at various geographic locations and interconnected by a network, receiving video or still-image content from a content provider, communicating scheduled content to respective server devices associated with corresponding selected electronic displays and initiating display of the content at selected times on corresponding selected electronic displays of the network, where split screen images can be displayed as claimed in at least claims 42 and 43 of the '603 Patent, without the authority of T-Rex Property AB.

61.     More specifically, the infringing devices and systems include Defendant's digital health media advertising network.

62.     Upon information and belief, Defendant has directly infringed and continues to directly infringe one or more claims of the '603 Patent, including at least claims 42 and 43, by operating its digital health media advertising network in Illinois and elsewhere in the United States.

63.     Defendant has had knowledge of the '603 Patent since at least the date that this Complaint was served.

64.     Because of Defendant's infringing activities, T-Rex Property AB has suffered damages and will continue to suffer damages in the future. T-Rex Property AB is entitled to recover from Defendant the damages sustained by T-Rex Property AB as a result of Defendant's

18

wrongful acts in an amount subject to proof at trial, which, by law, cannot be less than a reasonable royalty, together with interest and costs as fixed by this Court under 35 U.S.C. § 284.

## JURY DEMAND

Plaintiff T-Rex Property AB hereby requests a trial by jury pursuant to Rule 38 of the Federal Rules of Civil Procedure.

## PRAYER FOR RELIEF

Plaintiff T-Rex Property AB respectfully requests that the Court find in its favor and against Defendant, and that the Court grant Plaintiff the following relief:

A.      an adjudication that Defendant has infringed the '470 Patent, the '334 Patent, and the '603 Patent;

B.      an award of damages to be paid by Defendant adequate to compensate Plaintiff for Defendant's past infringement of the '470 Patent, the '334 Patent, and the '603 Patent and any continuing or future infringement through the date such judgment is entered, including prejudgment and post-judgment interest, costs, expenses and an accounting of all infringing acts including, but not limited to, those acts not presented at trial;

C.      an injunction ordering Defendant to pay an ongoing royalty in an amount to be determined for any continued infringement after the date judgment is entered; and,

D.      an award to Plaintiff of such further relief at law or in equity as the Court deems just and proper, including, but not limited to costs, fees, expenses, interest, and/or attorneys' fees.

19

Appx540

Dated:  May 27, 2016

Respectfully submitted,


/s/ _William Cory Spence_
William Cory Spence
Jacob Robert Graham
SPENCE, P.C.
405 N. Wabash Ave., Suite P2E
Chicago, Illinois 60611
312-704-8882
William.Spence@spencepc.com
Jacob.Graham@spencepc.com
*Counsel for Plaintiff*
*T-Rex Property AB*

20

Appx541

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| T-REX PROPERTY AB,<br><br>                Plaintiff,<br><br>        v.<br><br>CONTEXTMEDIA INC., and<br>CONTEXTMEDIA HEALTH, LLC,<br><br>                Defendants. | Case No.:  1:16-cv-04826<br><br>**JURY TRIAL DEMANDED** |

## PLAINTIFF'S AMENDED COMPLAINT FOR PATENT INFRINGEMENT

Plaintiff T-Rex Property AB, for its Amended Complaint against Defendants ContextMedia, Inc., and ContextMedia Health, LLC, states as follows:

## NATURE OF THE ACTION

1.      This is an action for patent infringement arising under the patent laws of the United States, 35 U.S.C. § 1 *et seq*., including 35 U.S.C. §§ 271, 281, 283, 284 and 285.

## PARTIES

2.      Plaintiff T-Rex Property AB is a company organized and existing under the laws of Sweden with its principal place of business at Vårvägen 6, 18274 Stocksund, Sweden.

3.      On information and belief, Defendant ContextMedia, Inc., is an Illinois corporation with an office located at 330 N. Wabash Ave., Suite 2500, Chicago, Illinois.

4.      On information and belief, Defendant ContextMedia Health, LLC, is a Delaware limited liability corporation with a principal office located at 330 N. Wabash Ave., Suite 2500, Chicago, Illinois.  On information and belief, Defendant's registered agent is Corporation Service Company, 2711 Centerville Rd, Suite 400, Wilmington, Delaware 19808.

Appx542

**JURISDICTION AND VENUE**

5.    This Court has subject matter jurisdiction over this patent infringement action under 28 U.S.C. §§ 1331 and 1338(a).

6.    This Court has personal jurisdiction over Defendant ContextMedia, Inc., because, on information and belief, Defendant has systematic and continuous contacts with Illinois and this judicial district because Defendant has an office located in this judicial district, it regularly transacts business in the State of Illinois and this judicial district and it has thereby purposefully availed itself of the benefits and protections of the laws of the State of Illinois. Furthermore, this Court has personal jurisdiction over Defendant because, as described further below, Defendant has committed acts of patent infringement giving rise to this action within the State of Illinois and has thus established minimum contacts such that the exercise of personal jurisdiction over Defendant does not offend traditional notions of fair play and substantial justice.

7.    This Court has personal jurisdiction over Defendant ContextMedia Health, LLC, because, on information and belief, Defendant has systematic and continuous contacts with Illinois and this judicial district because Defendant has an office located in this judicial district, it regularly transacts business in the State of Illinois and this judicial district and it has thereby purposefully availed itself of the benefits and protections of the laws of the State of Illinois. Furthermore, this Court has personal jurisdiction over Defendant because, as described further below, Defendant has committed acts of patent infringement giving rise to this action within the State of Illinois and has thus established minimum contacts such that the exercise of personal jurisdiction over Defendant does not offend traditional notions of fair play and substantial justice.

8.    Venue is proper in this Judicial District under 28 U.S.C. §§ 1391 and 1400(b).

**THE PATENTS-IN-SUIT**

9.    The allegations set forth in the foregoing paragraphs 1 through 8 are hereby re-alleged and incorporated herein by reference.

2

Appx543

**The '470 Patent**

10.    On January 16, 2007, U.S. Patent Number RE39,470 (the "'470 Patent"), entitled "Digital Information System," was duly and legally issued by the United States Patent and Trademark Office.  A true and correct copy of the '470 Patent is attached as Exhibit A to this Amended Complaint.

11.    The '470 Patent is a reissue of U.S. Patent Number 6,005,534, which was filed on July 2, 1996 and which claims priority under 35 U.S.C. § 119(e) to U.S. Provisional Patent Application Number 60/017,403, which was filed on May 14, 1996. The '534 Patent also claims priority under 35 U.S.C. § 119(a)-(d) to foreign patent application number 9601603-5, which was filed on April 26, 1996 in Sweden. As "[p]riority under section 119, 365(a), 365(b), 386(a), or 386(b) shall not be taken into account in determining the term of a patent," (35 U.S.C. § 154(a)(3)), the '470 Patent expires 20 years from July 2, 1996.

12.    The innovations disclosed in the '470 Patent "relate[] to a method and apparatus for controlling and coordinating" electronic displays "in a digital information system for displaying information on at least one display device . . . said information being displayed in places that are accessible to and frequented by a general public." ('470 Patent at 1:15-21.)  "An object of the present invention is to provide a flexible system in which external information mediators are able to dynamically control in real time the transmission of display instructions to a larger public in different places" "and to enable similar or specific information to be displayed in places that are mutually far apart." (*Id.* at 2:39-42; 2:52-54.)

13.    A system operating according to an embodiment of the '470 Patent can include a control center with a communication interface that connects devices to create and update a display list in real time using control instruction fields sent from external mediators and to transmit and display the desired images to one or more electronic displays that can be controlled independently of other electronic displays. (*Id.* at 3:4-19; 4:42-45.)  In embodiments, the control center can include one or more servers, workstations, and databases stored on one or more

3

Appx544

physical storage devices, and can include redundancy, of both computer hardware and the information stored, where the devices can be connected using a network, such as a LAN (Local Area Network) or by using a cable-carried ISDN solution (Integrated Services Digital Network) or other fixed lines that have a similar capacity. (*Id.* at 4:57-5:16; 5:59-67; 6:41-59; 12:55-13:7.) In one embodiment of the devices or projectors, the projector is a large picture screen in LCD or LED technology or the like that includes or is connected to a computer. (*Id*. at 6:26-32.)

14.     In one embodiment of the invention, personnel operating a work station can enter information to be displayed from an external mediator via projector control instructions in the exposure list created by the server. (*Id.* at 8:10-26.) Operators are able to interrupt a queue in the server in order to update the exposure list with information generated centrally from the control center or with information from an external information mediator. (*Id.*)

15.     Information mediators can use an exposure program to deliver complete images (*e.g.* an image, a series of images or a video clip) for display which would not require processing by the control center. (*Id.* at 11:19-28.)  These can be dynamically added to the exposure list by the exposure handler. (*Id.*)  External information mediators can thus deliver a complete image for display (an image, a series of images or a video clip) which can be processed automatically and inserted into the exposure list, or an administrator can select information from an external mediator and process the information so that it can be inserted into the exposure list via the exposure handler. (*Id.* at 8:27-41.)

**The '334 Patent**

16.     On June 3, 2008, U.S. Patent Number 7,382,334, entitled "Digital Information System," was duly and legally issued by the United States Patent and Trademark Office.  A true and correct copy of the '334 Patent is attached as Exhibit B to this Amended Complaint.

17.     The innovations described by the '334 Patent relate to methods and arrangements "for controlling and coordinating" digital display devices "in a digital information system for displaying information on at least one display device" "wherein the information is displayed in

Appx545

places that are accessible to and frequented by a general public." ('334 Patent at Abstract; 1:13-24; 5:20-32.) The present invention is able "to provide a flexible system in which external information mediators are able to dynamically control in real time the transmission of display instructions to a larger public in different places" "and to enable similar or specific information to be displayed in places that are mutually far apart." (*Id.* at 2:56-60; 3:5-11.)

18.    A system operating according to an embodiment of the '334 Patent can include a control center with a communication interface that connects devices to create and update a display list in real time using control instruction fields sent from external mediators and to transmit and display the desired images to one or more electronic displays that can be controlled independently of other electronic displays. (*Id.* at 3:38-60; 5:29-30.) In embodiments, the control center can include one or more servers, workstations, and databases stored on one or more physical storage devices, and can include redundancy, of both computer hardware and the information stored, where the devices can be connected using a network, such as a LAN (Local Area Network) or by using a cable-carried ISDN solution (Integrated Services Digital Network) or other fixed lines that have a similar capacity. (*Id.* at 6:17-45; 7:17-29; 11:60-67.) In some embodiments, a relational database can be used to store image and video data and each electronic display can be assigned a unique TCP/IP (Transmission Control Protocol / Internet Protocol) address such that each display can be individually addressed and sent content for display. (*Id.* at 14:50-15:8.)

19.    In one embodiment of the invention, personnel operating a work station can enter information to be displayed from an external mediator via projector control instructions in the exposure list created by the server. (*Id.* at 9:45-61.) Operators are able to interrupt a queue in the server in order to update the exposure list with information generated centrally from the control center or with information from an external information mediator. (*Id.*)

20.    Information mediators can use an exposure program to deliver complete images (*e.g.* an image, a series of images or a video clip) for display which would not require processing by the control center.  (*Id.* at 12:12-22.)  These can be dynamically added to the exposure list by

5

Appx546

the exposure handler. (*Id.*) External information mediators can thus deliver a complete image for display (an image, a series of images or a video clip) which can be processed automatically and inserted into the exposure list, or an administrator can select information from an external mediator and process the information so that it can be inserted into the exposure list via the exposure handler. (*Id.* at 9:62-10:9.)

**The '603 Patent**

21.    On August 6, 2002, U.S. Patent Number 6,430,603, entitled "System for Direct Placement of Commercial Advertising, Public Service Announcements and Other Content on Electronic Billboard Displays" was duly and legally issued by the United States Patent and Trademark Office.  A true and correct copy of the '603 Patent is attached as Exhibit C to this Amended Complaint.

22.    The innovations described by the '603 Patent "relate[] to systems permitting advertisers to target geographical regions and demographic groups with ever changing, current advertising content without incurring the high fixed cost of traditional single-message billboards." ('603 Patent at 1:7-10.)

23.    A typical system can include a network that connects a central information processing center with a number of electronic displays. (*Id.* at 2:7; 2:54-56.) "The means for transmitting content information" from the central information processing center "to the display locations may take a number of forms." (*Id.* at 3:31-32.) "[T]he means include: [a] High speed cable [b] Satellite [c] Dedicated phone [d] High speed line (e.g., ISDN) [e] Cellular or PCS [f] Internet [g] Radio/radio pulse transmission [h] High speed optical fiber." (*Id.* at 3:35-45.) "[A]ny form" of network "may be utilized" depending on the system requirements "at various locations within the network," which can include combinations of the examples listed. (*Id.* at 3:32-33.)

24.    Plaintiff T-Rex Property AB is the assignee and owner of the right, title and interest in and to the '470 Patent, the '334 Patent, and the '603 Patent (collectively, the "Patents-

6

In-Suit"), including the right to assert all causes of action arising under the Patents-In-Suit and the right to any remedies for infringement.

## BACKGROUND ON THE PRIOR ART AND THE '470 PATENT

25.    In 1994, the traditional Out-of-Home advertising industry was in need of a change, an evolutionary improvement. See Declaration of Mats Hylin ("Hylin Decl.") at ¶ 8 (attached as Exhibit D, and hereby incorporated, in its entirety, by reference herein at paragraph 17). Mats Hylin, the first named inventor of the '470 Patent, recognized that the "demands from advertisers" were not being met; what advertisers wanted was "more flexibility and speed" and "the possibility of changing the message" instead of "having the same advertisement [displayed] during the whole period." *Id.* This may be because advertisers wish to avoid a stagnant message, or because advertisers desire campaign evaluation feedback —"the results of a first campaign are fundamental in order to create the next campaign." *Id.* at ¶ 15. In addition to addressing these revenue issues, distribution efficiencies were "one of the most important areas to create higher margins." *Id.* at ¶ 6. One method to address this was through the use of digital advertising copy—which could be distributed via "the internet, or any other network"—rather than incur the costs associated with physical distribution and display of paper or other printed advertising copy. *Id.* at ¶¶ 8-9.

26.    With respect to the '470 Patent and claim 25 in particular, claim 25 "solves specific needs and problems over other technologies that existed in 1996." Declaration of Zaydoon Jawadi ("Jawadi Decl.") ¶ 22 (attached as Exhibit E, and hereby incorporated, in its entirety, by reference herein at paragraph 18).  Such problems and shortcomings included "controlling and coordinating digital signage displays in concrete, specific ways beyond merely scheduling content to be displayed on remote screens." *Id.*  "Prior to the inventions disclosed in claim 25 . . . there was no flexible way for external information mediators . . . to dynamically control and coordinate, display devices located in different places." *Id.* at ¶ 23. "Content from

7

Appx548

external information mediators could not be directly displayed; instead, displaying such content required administrative processing and manual intervention to update the display systems." *Id.*

27.     The inventions embodied in claim 25 "improved the operation of digital signage that existed in 1996" by "impos[ing] meaningful limitations" that "allow[ed] external information mediator(s) to dynamically control and coordinate display devices located in different places, extending the usefulness of the digital signage technology." *Id.* at ¶¶ 26-27. "[C]laim 25 of the '470 Patent incorporates unique, innovative, non-conventional, non-generic elements" that work together to improve the operation of a digital signage system. *Id.* at ¶ 28. "The functions, application, and implementations of these elements inherently and necessarily are rooted in and require computer technology, communication technology, and digital display technology in order to overcome specific problems arising in the realm of digital signage in 1996." *Id.* at ¶ 29. Importantly, "the claim goes beyond the mere concept of simply using a computer to perform distributed signage." *Id.* "This is because computers, communication interfaces, and digital display devices are not ancillary or incidental additions but germane and integral parts of the inventions disclosed by claim 25 of the '470 Patent." *Id.* The limitations of claim 25 "relate to the functioning of hardware and software" that are "inextricably tied to digital signage computer technology, communication technology, and digital display technology" such that the "unique, innovative, non-conventional, non-generic" hardware and software incorporated in claim 25 are used to achieve these technological innovations. *Id.* at ¶¶ 28, 30.

28.     The physical combination of elements that are referenced in claim 25 represent an innovation over the prior art. More particularly, claim 25 references an "information mediator." At the time of the invention, in about the 1995 to 1996 time frame, the term "information mediator," within the context of the field of art, could have referred to "an agent between producer and consumer of information" where the "agent could be a software component, software with accompanying hardware, a system, an organization (such as advertising agency) or an individual." *Id.* at ¶ 33. Claim 25 also references "location(s)" which at the time of the invention could have referred, again within the context of the field of art, to "a particular

8

Appx549

physical or geographical place or position where the message or advertisement is displayed on an electronic display device." *Id.* at ¶ 34. Taking into account the meaning of these terms, as well as the claim as a whole, implementation of claim 25 would require "industrial computers, servers, PCs, networking routers or switches, networking cables, computer graphics capabilities, display devices . . . database management systems as well as specialized software drivers to interface between mediators and system computers, to decipher control lists, to create and update exposure lists, and to decipher and act upon exposure lists." *Id.* at ¶ 35. Such a combination of elements represented a significant and non-conventional innovation over the prior art which resulted in an improvement in the operation of digital signage. *Id.* at ¶ 38.

29.    "Furthermore, claim 25 . . . is distinct and different from the other claims of the '470 Patent." *Id.* at ¶ 37. "In particular, claim 25 . . . is distinct and different from claim 26 of the '470 Patent." *Id.* For example, "[c]laim 26 discloses a computerized control center, communication interfaces, means for generating and dynamically updating an exposure list, a means for displaying images and a computerized device situated at each location—limitations that claim 25 does not disclose." *Id.*

30.    Claim 25 embodies an entirely new combination of special purpose and interconnected physical equipment to present information publicly. The inventions embodied in claim 25 arose in a specialized context—back in or about the 1995 to 1996 time frame—and the inventors came up with a specific solution, manifested in a concrete combination of devices, interfaces, and software, networked together with physical displays viewable by the target audience, to resolve particular problems.

31.    With respect to claim 26 of the '470 Patent, the inventions embodied in claim 26 "improved the operation of digital signage that existed in 1996" *Id.* at ¶ 45. "[C]laim 26 of the '470 Patent incorporates unique, innovative, non-conventional, non-generic elements." *Id.* at ¶ 47. These elements include a "computerized control center[,] . . . means (within the computerized control center) for generating and dynamically updating an exposure list . . . [and] computerized devices" which are situated at "a plurality of locations." *Id.* at ¶¶ 40, 47. The

9

Appx550

computerized devices are "electronically coupled to the computerized control center" and include a means "for displaying images in accordance with the exposure list." *Id.* at ¶ 47. The limitations of claim 26 "relate to both the hardware and software technology for digital signage, as well as to the functioning of hardware and software technology for digital signage" and are "manifested in a concrete combination of devices, interfaces, and software, networked together with physical displays viewable by the target audience." *Id.* at ¶¶ 41, 49.

32.    The physical combination of elements that are referenced in claim 26 represent an innovation over the prior art. More particularly, in addition to "information mediator" and "location(s)," claim 26 references "communication interfaces." At the time of the invention, in about the 1995 to 1996 time frame, the term communication interfaces, within the context of the field of art, could have referred to "electronic hardware, software, and protocols allowing systems (such as computers) to communicate and exchange data." *Id.* at ¶ 54. Claim 26 also references a "computerized control center" which at the time of the invention could have referred, again within the context of the field of art, to "a computer or set of computers that control and coordinate the interaction between networked computers or equipment." *Id.* at ¶ 55. Such a combination of elements represented a significant and non-conventional innovation over the prior art which resulted in an improvement in the operation of digital signage. *Id.* at ¶ 59.

33.    Claim 26 embodies an entirely new combination of special purpose and interconnected physical equipment to present information publicly. The inventions embodied in claim 26 arose in a specialized context—back in or about the 1995 to 1996 time frame—and the inventors came up with a specific solution, manifested in a concrete combination of devices, interfaces, and software, networked together with physical displays viewable by the target audience, to resolve particular problems in digital technology.

### BACKGROUND ON THE '334 PATENT

34.    Claim 22 the '334 Patent "solves specific needs and problems over other technologies that existed in 1996." Jawadi Decl. at ¶ 63. Such problems and shortcomings

10

included "controlling and coordinating digital signage displays in concrete, specific ways beyond merely scheduling content to be displayed on remote screens." *Id.* More specifically, "[p]rior to the inventions disclosed in claim 22 . . . there was no flexible way for external information mediators . . . to dynamically control and coordinate, in real time, display devices located in different places." *Id.* at ¶ 64. "Content from external information mediators could not be directly displayed, and particularly not in real time or in near real time; instead, displaying such content required administrative processing and manual intervention to update the display systems." *Id.*

35. The inventions embodied in claim 22 "improved the operation of digital signage that existed in 1996" by "impos[ing] meaningful limitations" that "allow[ed] external information mediator(s) to dynamically control and coordinate, in real time, display devices located in different places, extending the usefulness of the digital signage technology." *Id.* at ¶¶ 67-68. "[C]laim 22 of the '334 Patent incorporates unique, innovative, non-conventional, non-generic elements" that work together to improve the operation of a digital signage system. *Id.* at ¶ 69. "The functions, application, and implementations of these elements inherently and necessarily are rooted in and require computer technology, communication technology, and digital display technology in order to overcome specific problems arising in the realm of digital signage in 1996." *Id.* at ¶ 70. Importantly, "the claim goes beyond the mere concept of simply using a computer to perform distributed signage." *Id.* "This is because computers, communication interfaces, and digital display devices are not ancillary or incidental additions but germane and integral parts of the inventions disclosed by claim 22 of the '334 Patent." *Id.* The limitations of claim 22 "relate to the functioning of hardware and software" that are "inextricably tied to digital signage computer technology, communication technology, and digital display technology" such that the "unique, innovative, non-conventional, non-generic" hardware and software incorporated in claim 22 are used to achieve these technological innovations. *Id.* at ¶¶ 69, 71.

36. The physical combination of elements that are referenced in claim 22 represent an innovation over the prior art. Taking into account the meaning of these elements, as well as the

11

Appx552

claim as a whole, implementation of claim 22 would require "industrial computers, servers, PCs, networking routers or switches, networking cables, computer graphics capabilities, display devices . . . database management systems as well as specialized software drivers to interface between mediators and system computers, to decipher control lists, to create and update exposure lists, and to decipher and act upon exposure lists." *Id.* at 74. Such a combination of elements represented a significant and non-conventional innovation over the prior art which resulted in an improvement in the operation of digital signage. *Id.* at ¶ 77.

37.    "Furthermore, claim 22 of the '334 Patent is distinct and different from the other claims of the '334 Patent as well as being distinct and different from the claims of the '470 Patent." *Id.* at ¶ 76. "In particular, claim 22 . . . is distinct and different from claim 32 of the '334 Patent. *Id.* For example, "[c]laim 32 discloses computerized control center means (hardware and/or software . . .), communication interfaces (of the control center), computerized means (hardware and/or software . . . ) . . . and exposure handler means (hardware and/or software . . . ) —limitations that claim 22 does not disclose." *Id.*

38.    Claim 22 embodies an entirely new combination of special purpose and interconnected physical equipment to present information publicly. The inventions embodied in claim 22 arose in a specialized context—back in or about the 1995 to 1996 time frame—and the inventors came up with a specific solution, manifested in a concrete combination of devices, interfaces, and software, networked together with physical displays viewable by the target audience, to resolve particular problems.

39.    The inventions embodied in claim 32 also "improved the operation of digital signage that existed in 1996" *Id.* at ¶ 84. "[C]laim 32 of the '334 Patent incorporates unique, innovative, non-conventional, non-generic elements." *Id.* at ¶ 86. These elements include "a computerized control center means," "computerized means . . . for coordinating and controlling electronic displays" and "exposure handler means . . . for creating and updating an exposure list." *Id.* The limitations of claim 32 "relate to both the hardware and software technology for

12

digital signage, as well as to the functioning of hardware and software technology for digital signage." *Id.* at ¶ 88.

40.    The physical combination of elements that are referenced in claim 32 represent an innovation over the prior art. Taking into account the meaning of these elements, as well as the claim as a whole, the arrangement of claim 32 would require "industrial computers, servers, PCs, networking routers or switches, networking cables, computer graphics capabilities, display devices . . . database management systems as well as specialized software drivers to interface between mediators and system computers, to decipher control lists, to create and update exposure lists, and to decipher and act upon exposure lists." *Id.* at 93. "Due to the application of outdoor advertising, additional specialized equipment, such as special duty and/or ruggedized computers (which could include ruggedized media players, for example) could be necessary." *Id.* Such a combination of elements represented a significant and non-conventional innovation over the prior art which resulted in an improvement in the operation of digital signage. *Id.* at ¶ 96.

41.    "Furthermore, claim 32 of the '334 Patent . . . is distinct and different from the claims of the '470 Patent." *Id.* at ¶ 95.

## BACKGROUND ON THE '603 PATENT

42.    Claim 42 the '603 Patent "solves specific needs and problems that existed in 1999." Jawadi Decl. ¶ 101. Such problems and shortcomings included "targeting geographical regions and demographic groups with ever changing, current advertising content in concrete, specific ways beyond merely scheduling content to be displayed on remote screens." *Id.* More specifically, "the inventions disclosed in claim 42" allowed "content providers . . . to directly access a network of electronic displays located in various geographic locations and to directly send their own content—which could be formatted for the use of a split screen display—to the network to be displayed at locations and times selected by the providers." *Id.* at ¶ 102.

43.    "Claim 42 incorporates non-conventional, non-generic hardware and software that imposes meaningful limitations to improve on the existing 1999 era digital signage technology."

13

Appx554

*Id.* "The functions, application, and implementations of these elements inherently and necessarily are rooted in and require computer technology, communication technology, and digital display technology in order to achieve specific solutions in the realm of digital signage." *Id.* at ¶ 104. Importantly, "the claim goes beyond the mere concept of simply using a computer to perform distributed signage." *Id.* "This because computers, communication interfaces, and digital display devices are not ancillary or incidental additions but germane and integral parts of the inventions disclosed by claim 42 of the '603 Patent. *Id.* The limitations of claim 42 "relate to both the hardware and software technology for digital signage, as well as to the functioning of hardware and software technology for digital signage" that are "inextricably tied to digital signage computer technology, communication technology, and digital display technology" such that the "unique, innovative, non-conventional, non-generic" hardware and software incorporated in claim 42 are used to achieve these technological innovations. *Id.* at ¶¶ 103, 105.

44.    "Furthermore, claim 42 of the '603 Patent is distinct and different from the claims of the '334 Patent and it is distinct and different from the claims of the '470 Patent. *Id.* at ¶ 108.

45.    Claim 42 embodies a new combination of special purpose and interconnected physical equipment to present information publicly. The inventions embodied in claim 42 arose in a specialized context—in or about the 1998 to 1999 time frame—and the inventors came up with a specific solution, manifested in a concrete combination of devices, interfaces, and software, networked together with physical displays viewable by the target audience, to resolve particular problems.

46.    The inventions embodied in claim 42 "improve upon existing digital signage." *Id.* at ¶ 110. Claim 42 includes a "combination of interconnected hardware and software elements that are incorporated within the limitations of claim 42—and that claim 42 as a whole—improves upon existing digital signage hardware." *Id.*

14

Appx555

## COUNT I – INFRINGEMENT OF U.S. Patent No. RE39,470

47.     The allegations set forth in the foregoing paragraphs 1 through 46 are hereby re-alleged and incorporated herein by reference.

48.     Upon information and belief, in violation of 35 U.S.C. § 271(a), Defendants have directly infringed and continue to directly infringe, literally or under the doctrine of equivalents, one or more claims of the '470 Patent by making, using, offering for sale, selling, or importing devices or systems, in this judicial district and elsewhere in the United States (directly or through intermediaries), that perform the steps of receiving control instructions from at least one external information mediator, using the control instructions to generate an exposure list that specifies three or more of the following items: i) what information content is to be displayed; ii) at which of a plurality of locations the information content is to be displayed; iii) when the information content is to be displayed for each location at which content is to be displayed; and  iv) how long the information content is to be displayed for each location at which content is to be displayed, displaying images at one or more of the locations in accordance with the exposure list, and permitting the exposure list to be dynamically updated as claimed in at least claim 25 of the '470 Patent, without the authority of Plaintiff T-Rex Property AB.

49.     More specifically, the infringing devices and systems include Defendants' digital advertising and services platform, including Defendants' "Digital Waiting Room Screen" product, which delivers, *inter alia,* "condition-specific content to patients while they wait" in the "waiting    rooms    of    physician    practices    across    all    50    states." *See, e.g.,* http://www.contextmediainc.com/what-we-do/ (last visited April 28, 2016).

50.     Defendants' digital advertising and services platform receives control instructions from at least one external information mediator. For example, upon information and belief, Defendants' digital advertising and services platform receives control instructions from medical content providers, including without limitation "patient education producers and health

15

Appx556

organizations" and advertisers. *See, e.g.,* http://www.contextmediahealth.com/faq/ (last visited April 28, 2016).

51.     The control instructions received by Defendants' digital advertising and services platform are used to generate an exposure list, with said exposure list specifying three or more of the following items: i) what information content is to be displayed; ii) at which of the plurality of locations the information content is to be displayed; iii) when the information content is to be displayed for each location at which content is to be displayed; and iv) how long the information content is to be displayed for each location at which content is to be displayed. For example, upon information and belief, Defendants deliver, via its content providers, "condition-specific content to patients" and use "smart playlist technology [to curate] programming that is customized to each office according to its specific patient population" *See, e.g.,* http://www.contextmediainc.com/what-we-do/ (last visited April 28, 2016).

52.     Defendants' digital advertising and services platform displays images at one or more of said locations in accordance with the exposure list. For example, Defendants' "Digital Waiting Room Screen is placed in the waiting rooms of physician practices across all 50 states, and delivers "condition-specific content to patients while they wait" *See, e.g.,* http://www.contextmediainc.com/what-we-do/ (last visited April 28, 2016).

53.     Defendants' digital advertising and services platform permits the exposure list to be dynamically updated. For example, "[c]ontent [is] refreshed daily and sent to screens based on patient demographic data." *See, e.g.,* http://partner.contextmediahealth.com/assets/pdfs/digital_waiting_room_sales_sheet.pdf (last visited April 28, 2016).

54.     Upon information and belief, in violation of 35 U.S.C. § 271(a), Defendants have directly infringed and continue to directly infringe, literally or under the doctrine of equivalents, one or more claims of the '470 Patent by making, using, offering for sale, selling, or importing devices or systems, in this judicial district and elsewhere in the United States (directly or through intermediaries), that comprise a computerized control center that has a plurality of

16

communication interfaces for receiving control instructions from at least one external information mediator, the computerized control center includes a means for generating and dynamically updating an exposure list from the control instructions, the exposure list specifying three or more of the following items: i) what information content is to be displayed; ii) at which of the plurality of locations the information content is to be displayed; iii) when the information content is to be displayed for each location at which content is to be displayed; and iv) how long the information content is to be displayed for each location at which content is to be displayed, a computerized device situated at each one of the plurality of locations and electronically coupled to the computerized control center, and a means for displaying images in accordance with the exposure list associated with each one of the computerized devices as claimed in at least claim 26 of the '470 Patent, without the authority of Plaintiff T-Rex Property AB.

55.    More specifically, the infringing devices and systems include Defendants' digital advertising and services platform, including the Defendants' "Digital Waiting Room Screen" product, which delivers, *inter alia,* "condition-specific content to patients while they wait" in the "waiting    rooms    of    physician    practices    across    all    50    states." *See, e.g.,* http://www.contextmediainc.com/what-we-do/ (last visited April 28, 2016).

56.    Defendants' digital advertising and services platform comprises a computerized control center that has a plurality of communication interfaces for receiving control instructions from at least one external information mediator, the computerized control center includes a means for generating and dynamically updating an exposure list from the control instructions, the exposure list specifying three or more of the following items: i) what information content is to be displayed; ii) at which of the plurality of locations the information content is to be displayed; iii) when the information content is to be displayed for each location at which content is to be displayed; and iv) how long the information content is to be displayed for each location at which content is to be displayed. For example, upon information and belief, Defendants' digital advertising and services platform comprises a computerized control center that includes Internet connectivity. Defendants' computerized control center, upon information and belief, receives

17

Appx558

control instructions from medical content providers, including "patient education producers and health organizations" and advertisers. *See, e.g.,* http://www.contextmediahealth.com/faq/ (last visited April 28, 2016).

57.    Defendants' digital advertising and services platform comprises a computerized device that is situated at each location and each computerized device is electronically coupled to the computerized control center. For example, upon information and belief, in Defendants' digital advertising and services platform the "[p]rogramming is delivered via Internet directly to the mini-PC mounted to the back of the TV." *See, e.g.,* http://www.contextmediahealth.com/faq/ (last visited April 28, 2016).

58.    Defendants' digital advertising and services platform comprises a means for displaying images in accordance with the exposure list that is associated with each of the computerized devices. For example, upon information and belief, Defendants' digital advertising and services platform comprises a mini-PC, which is mounted to the back of a TV, which sends the received programming to the TV, such that the TV can visually display the content.

59.    Upon information and belief, Defendants have directly infringed and continue to directly infringe one or more claims of the '470 Patent, including at least claims 25 and 26, by operating their digital network in Illinois and elsewhere in the United States.

60.    Defendants have had knowledge of the '470 Patent since at least the date that the Complaint was served.

61.    Because of Defendants' infringing activities, Plaintiff T-Rex Property AB has suffered damages and will continue to suffer damages in the future. T-Rex Property AB is entitled to recover from Defendants the damages sustained by T-Rex Property AB as a result of Defendants' wrongful acts in an amount subject to proof at trial, which, by law, cannot be less than a reasonable royalty, together with interest and costs as fixed by this Court under 35 U.S.C. § 284.

Appx559

### COUNT II – INFRINGEMENT OF U.S. Patent No. 7,382,334

62. The allegations set forth in the foregoing paragraphs 1 through 53 are hereby re-alleged and incorporated herein by reference.

63. Upon information and belief, in violation of 35 U.S.C. § 271(a), Defendants have directly infringed and continue to directly infringe, literally or under the doctrine of equivalents, one or more claims of the '334 Patent by making, using, offering for sale, selling, or importing devices or systems, in this judicial district and elsewhere in the United States (directly or through intermediaries), that perform the steps of generating an exposure list comprising control instructions for coordinating and controlling electronic displays with regard to what shall be exposed, when it shall be exposed, where it shall be exposed and for how long it shall be exposed, using a control center for coordinating and controlling electronic displays, where the control center is able to create and update the exposure list in real time, with control instruction fields via dynamic booking of information, in time for exposure, from mediators, and where the exposure list enables each electronic display to be controlled, independently of other electronic displays, to receive the same or different information in accordance with the exposure list for the exposure of respective electronic display as claimed in at least claim 22 of the '334 Patent, without the authority of T-Rex Property AB.

64. More specifically, the infringing devices and systems include Defendants' digital advertising and services platform, including the Defendants' "Digital Waiting Room Screen" product, which delivers, *inter alia,* "condition-specific content to patients while they wait" in the "waiting rooms of physician practices across all 50 states." *See, e.g.,* http://www.contextmediainc.com/what-we-do/ (last visited April 28, 2016).

65. Defendants' digital advertising and services platform generates an exposure list that comprises control instructions for coordinating and controlling electronic displays with regard to what is exposed, when it is exposed, where it is exposed, and for how long it is exposed. For example, Defendants' digital advertising and services platform delivers "condition-

Appx560

specific content to patients" and uses "smart playlist technology [to curate] programming that is customized to each office according to its specific patient population." *See, e.g.,* http://www.contextmediainc.com/what-we-do/ (last visited April 28, 2016).

66.     Defendants' digital advertising and services platform uses a control center for coordinating and controlling electronic displays, wherein the control center is able to create and update the exposure list in real time with control instruction fields via dynamic booking of information in time for exposure from mediators. For example, upon information and belief, Defendants' digital advertising and services platform includes a centralized computer or server wherein "content is refreshed daily and sent to screens based on patient demographic data."

*See,*                                                                                                *e.g.,* http://partner.contextmediahealth.com/assets/pdfs/digital_waiting_room_sales_sheet.pdf     (last visited April 28, 2016).

67.     The exposure list of Defendants' digital advertising and services platform enables each electronic display to be controlled, independently of other electronic displays, to receive the same or different information in accordance with the exposure list for exposure of the respective electronic display. For example, Defendants' digital advertising and services platform "delivers condition-specific content to patients while they wait." Additionally, the Defendants "[curate] programming that is customized to each office according to its specific patient population." *See*, *e.g.,* http://www.contextmediainc.com/what-we-do/ (last visited April 28, 2016).

68.     Upon information and belief, in violation of 35 U.S.C. § 271(a), Defendants have directly infringed and continue to directly infringe, literally or under the doctrine of equivalents, one or more claims of the '334 Patent by making, using, offering for sale, selling, or importing devices or systems, in this judicial district and elsewhere in the United States (directly or through intermediaries), that comprise a computerized control center means, where the control center has communication interfaces against; a computerized means for coordinating and controlling electronic displays; and an exposure handler means whereby the control center functions, in real time and through the medium of the exposure handler, to create and update an exposure list that

20

Appx561

has control instruction fields, via dynamic booking of display information from mediators and where the exposure list contains control instructions, that coordinate and control the electronic displays in question with respect to what shall be exposed, where it shall be exposed, when it shall be exposed, and for how long it shall be exposed, and enables each electronic display, independently of other electronic displays, to receive the same or different information according to the exposure list for exposure or display by the respective electronic display as claimed in at least claim 32 of the '334 Patent, without the authority of T-Rex Property AB.

69.    More specifically, the infringing devices and systems include Defendants' digital advertising and services platform, including the Defendants' "Digital Waiting Room Screen" product, which delivers, *inter alia,* "condition-specific content to patients while they wait" in the "waiting rooms of physician practices across all 50 states." *See, e.g.,* http://www.contextmediainc.com/what-we-do/ (last visited April 28, 2016).

70.    Defendants' digital advertising and services platform comprises a computerized control center means where the control center has a communication interface. Upon information and belief, Defendants' digital advertising and services platform includes a centralized computer and/or server, wherein each computer and/or server includes a way to connect to the Internet. For example, "[p]rogramming is delivered via Internet directly to the mini-PC mounted to the back of the TV." This illustrates that a centralized control center includes at least one communications interface because it delivers programming to each display via an Internet connection.

71.    Defendants' digital advertising and services platform further comprises exposure handler means whereby the control center functions, in real time and through the medium of the exposure handler, to create and update an exposure list that has control instruction fields, via dynamic booking of display information from mediators. For example, "[c]ontent [is] refreshed daily and sent to screens based on patient demographic data." *See, e.g.,* http://partner.contextmediahealth.com/assets/pdfs/digital_waiting_room_sales_sheet.pdf    (last visited April 28, 2016).

21

Appx562

72.    The exposure list of Defendants' digital advertising and services platform contains control instructions, that coordinate and control the electronic displays in question with respect to what shall be exposed, where it shall be exposed, when it shall be exposed, and for how long it shall be exposed, and enables each electronic display, independently of other electronic displays, to receive the same or different information according to the exposure list for exposure or display by the respective electronic display. For example, upon information and belief, the Defendants deliver, via its content providers, "condition-specific content to patients" and use "smart playlist technology [to curate] programming that is customized to each office according to its specific patient population." *See, e.g.,* http://www.contextmediainc.com/what-we-do/ (last visited April 28, 2016).

73.    Upon information and belief, Defendants have directly infringed and continue to directly infringe one or more claims of the '334 Patent, including at least claims 22 and 32, by operating their digital advertising network in Illinois and elsewhere in the United States.

74.    Defendants have had knowledge of the '334 Patent since at least the date that the Complaint was served.

75.    Because of Defendants' infringing activities, T-Rex Property AB has suffered damages and will continue to suffer damages in the future. T-Rex Property AB is entitled to recover from Defendants the damages sustained by T-Rex Property AB as a result of Defendants' wrongful acts in an amount subject to proof at trial, which, by law, cannot be less than a reasonable royalty, together with interest and costs as fixed by this Court under 35 U.S.C. § 284.

### COUNT III – INFRINGEMENT OF U.S. Patent No. 6,430,603

76.    The allegations set forth in the foregoing paragraphs 1 through 60 are hereby re-alleged and incorporated herein by reference.

77.    Upon information and belief, in violation of 35 U.S.C. § 271(a), Defendants have directly infringed and continue to directly infringe, literally or under the doctrine of equivalents,

Appx563

one or more claims of the '603 Patent by making, using, offering for sale, selling, or importing devices or systems, in this judicial district and elsewhere in the United States (directly or through intermediaries), that perform the steps of scheduling the presentation of video or still-image content at selected time slots on selected electronic displays, that are provided at various geographic locations and interconnected by a network, receiving video or still-image content from a content provider, communicating scheduled content to respective server devices associated with corresponding selected electronic displays and initiating display of the content at selected times on corresponding selected electronic displays of the network, where split screen images can be displayed as claimed in at least claims 42 and 43 of the '603 Patent, without the authority of T-Rex Property AB.

78.     More specifically, the infringing devices and systems include Defendants' digital advertising and services platform, including the Defendants' "Digital Waiting Room Screen" product, which delivers, *inter alia,* "condition-specific content to patients while they wait" in the "waiting rooms of physician practices across all 50 states." *See, e.g.,* http://www.contextmediainc.com/what-we-do/ (last visited April 28, 2016).

79.     Defendants' digital advertising and services platform comprises a network that interconnects a plurality of electronic displays that are provided at various geographic locations. For example, "[t]he Digital Waiting Room Screen is placed in the waiting rooms of physician practices across all 50 states" and "[p]rogramming is delivered via Internet directly to the mini-PC mounted to the back of the TV." *See, e.g.,* http://www.contextmediainc.com/what-we-do/ (last visited April 28, 2016); http://partner.contextmediahealth.com/assets/pdfs/digital_waiting_room_sales_sheet.pdf (last visited April 28, 2016).

80.     Defendants' digital advertising and services platform further comprises a means for scheduling the presentation of video or still-image content at selected time slots on selected electronic displays, which are part of the network, and receiving video or still-image content from a content provider. For example, Defendants' digital advertising and services platform

23

Appx564

"delivers condition-specific content to patients while they wait in a waiting room" where the content is provided by "patient education producers and health organizations" and advertisers. *See, e.g.,* http://www.contextmediainc.com/what-we-do/ (last visited April 28, 2016); http://www.contextmediahealth.com/faq/ (last visited April 28, 2016).

81.      Additionally, the Defendants' digital advertising and services platform delivers "condition-specific content to patients" and uses "smart playlist technology [to curate] programming that is customized to each office according to its specific patient population." *See, e.g.,* http://www.contextmediainc.com/what-we-do/ (last visited April 28, 2016).

82.      Defendants' digital advertising and services platform further comprises transmission means in communication with the receiving means for communicating scheduled content to respective server devices that are associated with corresponding selected electronic displays, where each associated device initiates display of the video or still image content as selected times on a corresponding electronic display. For example, "[p]rogramming is delivered via Internet directly to the mini-PC mounted to the back of the TV." *See, e.g.,* http://www.contextmediahealth.com/faq/ (last visited April 28, 2016). Additionally, the programming is "condition specific" and Defendants' digital advertising and services platform "curates programming that is customized to each office according to its specific patient population." *See, e.g.,* http://www.contextmediainc.com/what-we-do/ (last visited April 28, 2016).

83.      Defendants' digital advertising and services platform further includes means for enabling split screen images to be displayed at the electronic display. For example, the Defendants' website shows a display screen, which is intended for a waiting room, displaying video content on one section of the screen and weather and breaking news on another section. *See, e.g.,* http://www.contextmediainc.com/what-we-do/ (last visited April 28, 2016).

84.      Further, the split screen capability of Defendants' digital advertising and services platform is utilized to present a still image portion of the image in one display area, and one of real time video, near real time video, or still frame in a second display area. For example, the

24

Defendants' website shows a display screen, which is intended for a waiting room, displaying video content on one section of the screen and weather and breaking news on another section. *See, e.g.,* http://www.contextmediainc.com/what-we-do/ (last visited April 28, 2016).

85.     Upon information and belief, Defendants have directly infringed and continue to directly infringe one or more claims of the '603 Patent, including at least claims 42 and 43, by operating their digital advertising network in Illinois and elsewhere in the United States.

86.     Defendants have had knowledge of the '603 Patent since at least the date that the Complaint was served.

87.     Because of Defendants' infringing activities, T-Rex Property AB has suffered damages and will continue to suffer damages in the future. T-Rex Property AB is entitled to recover from Defendants the damages sustained by T-Rex Property AB as a result of Defendants' wrongful acts in an amount subject to proof at trial, which, by law, cannot be less than a reasonable royalty, together with interest and costs as fixed by this Court under 35 U.S.C. § 284.

### JURY DEMAND

Plaintiff T-Rex Property AB hereby requests a trial by jury pursuant to Rule 38 of the Federal Rules of Civil Procedure.

### PRAYER FOR RELIEF

Plaintiff T-Rex Property AB respectfully requests that the Court find in its favor and against Defendants, and that the Court grant Plaintiff the following relief:

A.     an adjudication that Defendants have infringed the '470 Patent, the '334 Patent, and the '603 Patent;

B.     an award of damages to be paid by Defendants adequate to compensate Plaintiff for Defendants' past infringement of the '470 Patent, the '334 Patent, and the '603 Patent and any continuing or future infringement through the date such judgment is entered, including

Appx566

prejudgment and post-judgment interest, costs, expenses and an accounting of all infringing acts including, but not limited to, those acts not presented at trial;

C.      an injunction ordering Defendants to pay an ongoing royalty in an amount to be determined for any continued infringement after the date judgment is entered; and,

D.      an award to Plaintiff of such further relief at law or in equity as the Court deems just and proper, including, but not limited to costs, fees, expenses, interest, and/or attorneys' fees.


Dated:  July 11, 2016                    Respectfully submitted,


                                         */s/ William Cory Spence*_____
                                         William Cory Spence
                                         Jacob Robert Graham
                                         SPENCE, P.C.
                                         405 N. Wabash Ave., Suite P2E
                                         Chicago, Illinois 60611
                                         312-704-8882
                                         William.Spence@spencepc.com
                                         Jacob.Graham@spencepc.com
                                         *Counsel for Plaintiff*
                                         *T-Rex Property AB*


26


Appx567

**UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION**

T-Rex Property AB,

          Plaintiff,

   v.

JCDecaux North America, Inc. and
JCDecaux North America Holdings, Inc.,

        Defendants.

Civil Action No.: 4:16-cv-303

**JURY TRIAL DEMANDED**

**PLAINTIFF'S COMPLAINT FOR PATENT INFRINGEMENT**

Plaintiff T-Rex Property AB, by and through its undersigned counsel, files this Complaint against Defendants JCDecaux North America, Inc. and JCDecaux North America Holdings, Inc. as follows:

**NATURE OF THE ACTION**

1.     This is an action for patent infringement arising under the patent laws of the United States, 35 U.S.C. § 1 *et seq*., including 35 U.S.C. §§ 271, 281, 283, 284 and 285.

**PARTIES**

2.     Plaintiff T-Rex Property AB is a company organized and existing under the laws of Sweden with its principal place of business at Vårvägen 6, 18274 Stocksund, Sweden.

3.     On information and belief, Defendant JCDecaux North America, Inc. is a Delaware corporation with its head office located at 3 Park Avenue, 33rd Floor, New York, NY 10016, and has The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, DE 19801 as its registered agent.

Appx568

4.     On information and belief, Defendant JCDecaux North America Holdings, Inc. is a Delaware corporation with its head office located at 3 Park Avenue, 33rd Floor, New York, NY 10016, and has Corporation Service Company, 2711 Centerville Road, Suite 400, Wilmington, DE 19808 as its registered agent.

## JURISDICTION AND VENUE

5.     This Court has subject matter jurisdiction over this patent infringement action under 28 U.S.C. §§ 1331 and 1338(a).

6.     This Court has personal jurisdiction over Defendant JCDecaux North America because, on information and belief, Defendant has systematic and continuous contacts with Texas and this judicial district because Defendant regularly transacts business in the State of Texas and in this judicial district and it has thereby purposefully availed itself of the benefits and protections of the laws of the State of Texas. Furthermore, this Court has personal jurisdiction over Defendant because, as described further below, Defendant has committed acts of patent infringement giving rise to this action within the State of Texas and this judicial district and has thus established minimum contacts such that the exercise of personal jurisdiction over Defendant does not offend traditional notions of fair play and substantial justice.

7.     This Court has personal jurisdiction over Defendant JCDecaux North America Holdings because, on information and belief, Defendant has systematic and continuous contacts with Texas and this judicial district because Defendant regularly transacts business in the State of Texas and in this judicial district and it has thereby purposefully availed itself of the benefits and protections of the laws of the State of Texas. Furthermore, this Court has personal jurisdiction over Defendant because, as described further below, Defendant has committed acts of patent infringement giving rise to this action within the State of Texas and this judicial district and has thus established minimum contacts such that the exercise of personal jurisdiction over Defendant does not offend traditional notions of fair play and substantial justice.

8.     Venue is proper in this Judicial District under 28 U.S.C. §§ 1391 and 1400(b).

2

Appx569

**THE PATENTS-IN-SUIT**

9.      The allegations set forth in the foregoing paragraphs 1 through 8 are hereby re-alleged and incorporated herein by reference.

10.     On January 16, 2007, U.S. Patent Number RE39,470, entitled "Digital Information System," was duly and legally issued by the United States Patent and Trademark Office. A true and correct copy of the '470 Patent is attached as Exhibit A to this Complaint.

11.     The '470 Patent is a reissue of U.S. Patent Number 6,005,534, which was filed on July 2, 1996 and which claims priority under 35 U.S.C. § 119(e) to U.S. Provisional Patent Application Number 60/017,403, which was filed on May 14, 1996. The '534 Patent also claims priority under 35 U.S.C. § 119(a)-(d) to foreign patent application number 9601603-5, which was filed on April 26, 1996 in Sweden. As "[p]riority under section 119, 365(a), 365(b), 386(a), or 386(b) shall not be taken into account in determining the term of a patent," (35 U.S.C. § 154(a)(3)) the '470 Patent expires 20 years from July 2, 1996.

12.     The innovations described by the '470 Patent "relate[] to a method and apparatus for controlling and coordinating" electronic displays "in a digital information system for displaying information on at least one display device . . . said information being displayed in places that are accessible to and frequented by a general public." ('470 Patent at 1:15-21; 6:25-29.) "An object of the present invention is to provide a flexible system in which external information mediators are able to dynamically control in real time the transmission of display instructions to a larger public in different places" "and to enable similar or specific information to be displayed in places that are mutually far apart." (*Id.* at 2:39-42; 2:52-54.)

13.     A system operating according to an embodiment of the '470 Patent can include a control center with a communication interface that connects devices to create and update a display list in real time using control instruction fields sent from external mediators and to transmit and display the desired images to one or more electronic displays that can be controlled independently of other electronic displays. (*Id.* at 3:4-19; 4:42-45.) In embodiments, the control

Appx570

center can include one or more servers, workstations, and databases stored on one or more physical storage devices, and can include redundancy, of both computer hardware and the information stored, where the devices can be connected using a network, such as a LAN (Local Area Network) or by using a cable-carried ISDN solution (Integrated Services Digital Network) or other fixed lines that have a similar capacity. (*Id.* at 4:57-5:16; 5:59-67; 6:41-59; 12:55-13:7.)

14.    In one embodiment of the invention, personnel operating a work station can enter information to be displayed from an external mediator via projector control instructions in the exposure list created by the server. (*Id.* at 8:10-26.) Operators are able to interrupt a queue in the server in order to update the exposure list with information generated centrally from the control center or with information from an external information mediator. (*Id.*)

15.    Information mediators can use an exposure program to deliver complete images (*e.g.* an image, a series of images or a video clip) for display which would not require processing by the control center. (*Id.* at 11:19-28.) These can be dynamically added to the exposure list by the exposure handler. (*Id.*) External information mediators can thus deliver a complete image for display (an image, a series of images or a video clip) which can be processed automatically and inserted into the exposure list, or an administrator can select information from an external mediator and process the information so that it can be inserted into the exposure list via the exposure handler. (*Id.* at 8:27-41.)

16.    On June 3, 2008, U.S. Patent Number 7,382,334, entitled "Digital Information System," was duly and legally issued by the United States Patent and Trademark Office. A true and correct copy of the '334 Patent is attached as Exhibit B to this Complaint.

17.    The innovations described by the '334 Patent relate to methods and arrangements "for controlling and coordinating" digital display devices "in a digital information system for displaying information on at least one display device" "wherein the information is displayed in places that are accessible to and frequented by a general public." ('334 Patent at Abstract; 1:13-24; 5:20-32.) The present invention is able "to provide a flexible system in which external information mediators are able to dynamically control in real time the transmission of display

4

Appx571

instructions to a larger public in different places" "and to enable similar or specific information to be displayed in places that are mutually far apart." (*Id.* at 2:56-60; 3:5-11.)

18.     A system operating according to an embodiment of the '334 Patent can include a control center with a communication interface that connects devices to create and update a display list in real time using control instruction fields sent from external mediators and to transmit and display the desired images to one or more electronic displays that can be controlled independently of other electronic displays. (*Id.* at 3:38-60; 5:29-30.) In embodiments, the control center can include one or more servers, workstations, and databases stored on one or more physical storage devices, and can include redundancy, of both computer hardware and the information stored, where the devices can be connected using a network, such as a LAN (Local Area Network) or by using a cable-carried ISDN solution (Integrated Services Digital Network) or other fixed lines that have a similar capacity. (*Id.* at 6:17-45; 7:17-29; 11:60-67.) In some embodiments, a relational database can be used to store image and video data and each electronic display can be assigned a unique TCP/IP (Transmission Control Protocol /Internet Protocol) address such that each display can be individually addressed and sent content for display. (*Id.* at 14:50-15:8.)

19.     In one embodiment of the invention, personnel operating a work station can enter information to be displayed from an external mediator via projector control instructions in the exposure list created by the server. (*Id.* at 9:45-61.) Operators are able to interrupt a queue in the server in order to update the exposure list with information generated centrally from the control center or with information from an external information mediator. (*Id.*)

20.     Information mediators can use an exposure program to deliver complete images (*e.g.* an image, a series of images or a video clip) for display which would not require processing by the control center. (*Id.* at 12:12-22.) These can be dynamically added to the exposure list by the exposure handler. (*Id.*) External information mediators can thus deliver a complete image for display (an image, a series of images or a video clip) which can be processed automatically and inserted into the exposure list, or an administrator can select information from an external

5

Appx572

mediator and process the information so that it can be inserted into the exposure list via the exposure handler. (*Id.* at 9:62-10:9.)

21.     On August 6, 2002, U.S. Patent Number 6,430,603, entitled "System for Direct Placement of Commercial Advertising, Public Service Announcements and Other Content on Electronic Billboard Displays" was duly and legally issued by the United States Patent and Trademark Office. A true and correct copy of the '603 Patent is attached as Exhibit C to this Complaint.

22.     The innovations described by the '603 Patent "relate[] to systems permitting advertisers to target geographical regions and demographic groups with ever changing, current advertising content without incurring the high fixed cost of traditional single-message billboards." ('603 Patent at 1:7-10.)

23.     A system operating according to an embodiment of the '603 Patent can include "a central information processing center," a network of "high resolution electronic displays located in high traffic areas." (*Id.* at 2:7; 1:15-16.) "The electronic displays preferably are large (e.g., 23×33½ ft.) flat LED displays that are driven by their own video or image servers. (*Id.* at 2:16-18.) "In preferred embodiments, each display is a . . . high resolution, full color display that provides brilliant light emission from a flat panel screen." (*Id.* at 2:62-65.) "Commercial advertisers" can "directly send their own advertisements electronically to the network to be displayed at locations and times selected by the advertiser." (*Id.* at 1:12-18.)

24.     A typical system can include a network that connects a central information processing center with a number of electronic displays. (*Id.* at 2:7; 2:54-56.) "The means for transmitting content information" from the central information processing center "to the display locations may take a number of forms." (*Id.* at 3:31-32.) "[T]he means include: [a] High speed cable [b] Satellite [c] Dedicated phone [d] High speed line (e.g., ISDN) [e] Cellular or PCS [f] Internet [g] Radio/radio pulse transmission [h] High speed optical fiber." (*Id*. at 3:35-45.) "[A]ny form" of network "may be utilized" depending on the system requirements "at various locations within the network," which can include combinations of the examples listed. (*Id.* at 3:32-33.)

6

Appx573

25. In one embodiment, a display "takes the form of a 23 feet by 33½ feet seamless flat screen display including multiple flat panel display modules." (*Id.* at 4:49-51.) "The panels utilize advanced semiconductor technology to provide high resolution, full color images utilizing light emitting diodes" that can provide "a high spatial resolution" that is "easily viewable in bright sunlight." (*Id.* at 4:51-53, 62-65.) In such a display device, LEDs can be "aligned in an integrated array with each pixel having a red, green and blue LED" and that if each "red, green and blue emitter is accessed with 24 bit resolution" the resulting display "provid[es] 16.7 million colors for every pixel" "produc[ing] the desired light output." (*Id.* at 4:54-65.)

26. T-Rex is the assignee and owner of the right, title and interest in and to the '470, the '334 and the '603 Patents (henceforth collectively the "patents-in-suit"), including the right to assert all causes of action arising under the patents-in-suit and the right to any remedies for infringement.

### COUNT I – INFRINGEMENT OF U.S. Patent No. RE39,470

27. The allegations set forth in the foregoing paragraphs 1 through 26 are hereby re-alleged and incorporated herein by reference.

28. Upon information and belief, in violation of 35 U.S.C. § 271(a), Defendants have directly infringed and continue to directly infringe, literally or under the doctrine of equivalents, one or more claims of the '470 Patent by making, using, offering for sale, selling, or importing devices or systems, in this judicial district and elsewhere in the United States (directly or through intermediaries), that perform the steps of receiving control instructions from at least one external information mediator, using the control instructions to generate an exposure list that specifies three or more of the following items: i) what information content is to be displayed; ii) at which of a plurality of locations the information content is to be displayed; iii) when the information content is to be displayed for each location at which content is to be displayed; and iv) how long the information content is to be displayed for each location at which content is to be displayed, displaying images at one or more of the locations in accordance with the exposure list, and

7

Appx574

permitting the exposure list to be dynamically updated as claimed in at least claim 25 of the '470 Patent, without the authority of T-Rex.

29.     Upon information and belief, in violation of 35 U.S.C. § 271(a), Defendants have directly infringed and continue to directly infringe, literally or under the doctrine of equivalents, one or more claims of the '470 Patent by making, using, offering for sale, selling, or importing devices or systems, in this judicial district and elsewhere in the United States (directly or through intermediaries), that comprise a computerized control center that has a plurality of communication interfaces for receiving control instructions from at least one external information mediator, the computerized control center includes a means for generating and dynamically updating an exposure list from the control instructions, the exposure list specifying three or more of the following items: i) what information content is to be displayed; ii) at which of the plurality of locations the information content is to be displayed; iii) when the information content is to be displayed for each location at which content is to be displayed; and iv) how long the information content is to be displayed for each location at which content is to be displayed, a computerized device situated at each one of the plurality of locations and electronically coupled to the computerized control center, and a means for displaying images in accordance with the exposure list associated with each one of the computerized devices as claimed in at least claim 26 of the '470 Patent, without the authority of T-Rex.

30.     More specifically, the infringing devices and systems include Defendants' Showscreens, a digital media product that is used in their Mallscape network, Defendants' digital billboards, and Defendants' digital airport advertising network, including their Prestige digital network.

31.     Upon information and belief, Defendants have directly infringed and continue to directly infringe one or more claims of the '470 Patent, including at least claims 25 and 26, by operating Showscreens in their Mallscape network in this judicial district, elsewhere in Texas and throughout the United States, by operating digital billboards elsewhere in the United States, and by operating their Prestige digital network in Texas and throughout the United States.

Appx575

32.    In 1994, the traditional Out-of-Home advertising industry was in need of a change, an evolutionary improvement. See Declaration of Mats Hylin ("Hylin Decl.") at ¶ 8 (attached as Exhibit D, and hereby incorporated, in its entirety, by reference herein at paragraph 32). Mats Hylin, the first named inventor of the '470 and the '334 Patents, recognized that the "demands from advertisers" were not being met; what advertisers wanted was "more flexibility and speed" and "the possibility of changing the message" instead of "having the same advertisement [displayed] during the whole period." *Id.* This may be because advertisers wish to avoid a stagnant message, or because advertisers desire campaign evaluation feedback —"the results of a first campaign are fundamental in order to create the next campaign." *Id.* at ¶ 15. Mr. Hylin also recognized that in order "to increase the revenue from" the "most attractiv[ely situated] billboards," an approach that extended beyond merely increasing the rates was required. *Id.* In addition to addressing these revenue issues, distribution efficiencies was "one of the most important areas to create higher margins." *Id.* at ¶ 6. One method to address this was through the use of digital advertising copy—which could be distributed via "the internet, or any other network"—rather than incur the costs associated with physical distribution and display of paper or other printed advertising copy. *Id.* at ¶¶ 8-9.

33.    More particularly, claim 25 "solves specific needs and problems over other technologies that existed in 1996." Declaration of Zaydoon Jawadi ("Jawadi Decl.") ¶ 22 (attached as Exhibit E, and hereby incorporated, in its entirety, by reference herein at paragraph 33). Such problems and shortcomings included "controlling and coordinating digital signage displays in concrete, specific ways beyond merely scheduling content to be displayed on remote screens." *Id.* More specifically, "[p]rior to the inventions disclosed in claim 25 . . . there was no flexible way for external information mediators . . . to dynamically control and coordinate, display devices located in different places." *Id.* at ¶ 23. "Content from external information mediators could not be directly displayed; instead, displaying such content required administrative processing and manual intervention to update the display systems." *Id.*

9

Appx576

34.     The inventions embodied in claim 25 "improved the operation of digital signage that existed in 1996" by "impos[ing] meaningful limitations" that "allow[ed] external information mediator(s) to dynamically control and coordinate display devices located in different places, extending the usefulness of the digital signage technology." *Id.* at ¶¶ 26-27. "[C]laim 25 of the '470 Patent incorporates unique, innovative, non-conventional, non-generic elements" that work together to improve the operation of a digital signage system. *Id.* at ¶ 28. "The functions, application, and implementations of these elements inherently and necessarily are rooted in and require computer technology, communication technology, and digital display technology in order to overcome specific problems arising in the realm of digital signage in 1996." *Id.* at ¶ 29. Importantly, "the claim goes beyond the mere concept of simply using a computer to perform distributed signage." *Id.* "This is because computers, communication interfaces, and digital display devices are not ancillary or incidental additions but germane and integral parts of the inventions disclosed by claim 25 of the '470 Patent." *Id.* The limitations of claim 25 "relate to the functioning of hardware and software" that are "inextricably tied to digital signage computer technology, communication technology, and digital display technology" such that the "unique, innovative, non-conventional, non-generic" hardware and software incorporated in claim 25 are used to achieve these technological innovations. *Id.* at ¶¶ 28, 30.

35.     The physical combination of elements that are referenced in claim 25 represent an innovation over the prior art. More particularly, claim 25 references an "information mediator." At the time of the invention, in about the 1995 to 1996 time frame, the term "information mediator," within the context of the field of art, could have referred to "an agent between producer and consumer of information" where the "agent could be a software component, software with accompanying hardware, a system, an organization (such as advertising agency) or an individual." *Id.* at ¶ 33. Claim 25 also references "location(s)" which at the time of the invention could have referred, again within the context of the field of art, to "a particular physical or geographical place or position where the message or advertisement is displayed on an electronic display device." *Id.* at ¶ 34. Taking into account the meaning of these terms, as well as

10

the claim as a whole, implementation of claim 25 would require "industrial computers, servers, PCs, networking routers or switches, networking cables, computer graphics capabilities, display devices . . . database management systems as well as specialized software drivers to interface between mediators and system computers, to decipher control lists, to create and update exposure lists, and to decipher and act upon exposure lists." *Id.* at ¶ 35. Such a combination of elements represented a significant and non-conventional innovation over the prior art which resulted in an improvement in the operation of digital signage. *Id.* at ¶ 38.

36.      "Furthermore, claim 25 . . . is distinct and different from the other claims of the '470 Patent." *Id.* at ¶ 37. "In particular, claim 25 . . . is distinct and different from claim 26 of the '470 Patent." *Id.* For example, "[c]laim 26 discloses a computerized control center, communication interfaces, means for generating and dynamically updating an exposure list, a means for displaying images and a computerized device situated at each location—limitations that claim 25 does not disclose." *Id.*

37.      Claim 25 embodies an entirely new combination of special purpose and interconnected physical equipment to present information publicly. The inventions embodied in claim 25 arose in a specialized context—back in or about the 1995 to 1996 time frame—and the inventors came up with a specific solution, manifested in a concrete combination of devices, interfaces, and software, networked together with physical displays viewable by the target audience, to resolve particular problems.

38.      The inventions embodied in claim 26 also "improved the operation of digital signage that existed in 1996" *Id.* at ¶ 45. "[C]laim 26 of the '470 Patent incorporates unique, innovative, non-conventional, non-generic elements." *Id.* at ¶ 47. These elements include a "computerized control center[,] . . . means (within the computerized control center) for generating and dynamically updating an exposure list . . . [and] computerized devices" which are situated at "a plurality of locations." *Id.* at ¶¶ 40, 47. The computerized devices are "electronically coupled to the computerized control center" and include a means "for displaying images in accordance with the exposure list." *Id.* at ¶ 47. The limitations of claim 26 "relate to

11

both the hardware and software technology for digital signage, as well as to the functioning of hardware and software technology for digital signage" and are "manifested in a concrete combination of devices, interfaces, and software, networked together with physical displays viewable by the target audience." *Id.* at ¶¶ 41, 49.

39.     The physical combination of elements that are referenced in claim 26 represent an innovation over the prior art. More particularly, in addition to "information mediator" and "location(s)," claim 26 references "communication interfaces." At the time of the invention, in about the 1995 to 1996 time frame, the term communication interfaces, within the context of the field of art, could have referred to "electronic hardware, software, and protocols allowing systems (such as computers) to communicate and exchange data." *Id.* at ¶ 54. Claim 26 also references a "computerized control center" which at the time of the invention could have referred, again within the context of the field of art, to "a computer or set of computers that control and coordinate the interaction between networked computers or equipment." *Id.* at ¶ 55. Such a combination of elements represented a significant and non-conventional innovation over the prior art which resulted in an improvement in the operation of digital signage. *Id.* at ¶ 59.

40.     Claim 26 embodies an entirely new combination of special purpose and interconnected physical equipment to present information publicly. The inventions embodied in claim 26 arose in a specialized context—back in or about the 1995 to 1996 time frame—and the inventors came up with a specific solution, manifested in a concrete combination of devices, interfaces, and software, networked together with physical displays viewable by the target audience, to resolve particular problems.

41.     T-Rex provided actual notice to Defendants of the '470 Patent, and specifically referred to claim 25 of the '470 Patent, in a June 10, 2010 letter sent by Federal Express to Mr. Jean-Luc Decaux, Co-Chief Executive Officer, JCDecaux North America.

42.     Defendants have had actual knowledge of the '470 Patent since at least the date that Defendants received the June 10, 2010 letter. Defendants have had constructive knowledge of the infringing nature of their activities, or at least a willful blindness regarding the infringing

12

Appx579

nature of their activities, with respect to the '470 Patent since at least the date that Defendants received the June 10, 2010 letter.

43.     Despite Defendants knowledge of the '470 Patent and their constructive knowledge of their infringing actions, on information and belief, Defendants thereafter continued to infringe the '470 Patent. On information and belief, Defendants' infringement has been and continues to be willful since at least June 10, 2010.

44.     Because of Defendants' infringing activities, T-Rex has suffered damages and will continue to suffer damages in the future. T-Rex is entitled to recover from Defendants the damages sustained by T-Rex as a result of Defendants' wrongful acts in an amount subject to proof at trial, which, by law, cannot be less than a reasonable royalty, together with interest and costs as fixed by this Court under 35 U.S.C. § 284.

## COUNT II – INFRINGEMENT OF U.S. Patent No. 7,382,334

45.     The allegations set forth in the foregoing paragraphs 1 through 44 are hereby re-alleged and incorporated herein by reference.

46.     Upon information and belief, in violation of 35 U.S.C. § 271(a), Defendants have directly infringed and continue to directly infringe, literally or under the doctrine of equivalents, one or more claims of the '334 Patent by making, using, offering for sale, selling, or importing devices or systems, in this judicial district and elsewhere in the United States (directly or through intermediaries), that perform the steps of generating an exposure list comprising control instructions for coordinating and controlling electronic displays with regard to what shall be exposed, when it shall be exposed, where it shall be exposed and for how long it shall be exposed, using a control center for coordinating and controlling electronic displays, where the control center is able to create and update the exposure list in real time, with control instruction fields via dynamic booking of information, in time for exposure, from mediators, and where the exposure list enables each electronic display to be controlled, independently of other electronic displays, to receive the same or different information in accordance with the exposure list for the

13

Appx580

exposure of respective electronic display as claimed in at least claim 22 of the '334 Patent, without the authority of T-Rex.

47.     Upon information and belief, in violation of 35 U.S.C. § 271(a), Defendants have directly infringed and continue to directly infringe, literally or under the doctrine of equivalents, one or more claims of the '334 Patent by making, using, offering for sale, selling, or importing devices or systems, in this judicial district and elsewhere in the United States (directly or through intermediaries), that comprise a computerized control center means, where the control center has communication interfaces against; a computerized means for coordinating and controlling electronic displays; and an exposure handler means whereby the control center functions, in real time and through the medium of the exposure handler, to create and update an exposure list that has control instruction fields, via dynamic booking of display information from mediators and where the exposure list contains control instructions, that coordinate and control the electronic displays in question with respect to what shall be exposed, where it shall be exposed, when it shall be exposed, and for how long it shall be exposed, and enables each electronic display, independently of other electronic displays, to receive the same or different information according to the exposure list for exposure or display by the respective electronic display as claimed in at least claim 32 of the '334 Patent, without the authority of T-Rex.

48.     More specifically, the infringing devices and systems include Defendants' Showscreens, a digital media product that is used in their Mallscape network, Defendants' digital billboards, and Defendants' digital airport advertising network, including their Prestige digital network.

49.     Upon information and belief, Defendants have directly infringed and continue to directly infringe one or more claims of the '334 Patent, including at least claims 22 and 32, by operating Showscreens in their Mallscape network in this judicial district, elsewhere in Texas and throughout the United States, by operating digital billboards elsewhere in the United States, and by operating their Prestige digital network in Texas and throughout the United States.

14

Appx581

50.    Claim 22 the '334 Patent "solves specific needs and problems over other technologies that existed in 1996." Jawadi Decl. at ¶ 63. Such problems and shortcomings included "controlling and coordinating digital signage displays in concrete, specific ways beyond merely scheduling content to be displayed on remote screens." *Id.* More specifically, "[p]rior to the inventions disclosed in claim 22 . . . there was no flexible way for external information mediators . . . to dynamically control and coordinate, in real time, display devices located in different places." *Id.* at ¶ 64. "Content from external information mediators could not be directly displayed, and particularly not in real time or in near real time; instead, displaying such content required administrative processing and manual intervention to update the display systems." *Id.*

51.    The inventions embodied in claim 22 "improved the operation of digital signage that existed in 1996" by "impos[ing] meaningful limitations" that "allow[ed] external information mediator(s) to dynamically control and coordinate, in real time, display devices located in different places, extending the usefulness of the digital signage technology." *Id.* at ¶¶ 67-68. "[C]laim 22 of the '334 Patent incorporates unique, innovative, non-conventional, non-generic elements" that work together to improve the operation of a digital signage system. *Id.* at ¶ 69. "The functions, application, and implementations of these elements inherently and necessarily are rooted in and require computer technology, communication technology, and digital display technology in order to overcome specific problems arising in the realm of digital signage in 1996." *Id.* at ¶ 70. Importantly, "the claim goes beyond the mere concept of simply using a computer to perform distributed signage." *Id.* "This is because computers, communication interfaces, and digital display devices are not ancillary or incidental additions but germane and integral parts of the inventions disclosed by claim 22 of the '334 Patent." *Id.* The limitations of claim 22 "relate to the functioning of hardware and software" that are "inextricably tied to digital signage computer technology, communication technology, and digital display technology" such that the "unique, innovative, non-conventional, non-generic" hardware and software incorporated in claim 22 are used to achieve these technological innovations. *Id.* at ¶¶ 69, 71.

Appx582

52.     The physical combination of elements that are referenced in claim 22 represent an innovation over the prior art. Taking into account the meaning of these elements, as well as the claim as a whole, implementation of claim 22 would require "industrial computers, servers, PCs, networking routers or switches, networking cables, computer graphics capabilities, display devices . . . database management systems as well as specialized software drivers to interface between mediators and system computers, to decipher control lists, to create and update exposure lists, and to decipher and act upon exposure lists." *Id.* at 74. Such a combination of elements represented a significant and non-conventional innovation over the prior art which resulted in an improvement in the operation of digital signage. *Id.* at ¶ 77.

53.     "Furthermore, claim 22 of the '334 Patent is distinct and different from the other claims of the '334 Patent as well as being distinct and different from the claims of the '470 Patent." *Id.* at ¶ 76. "In particular, claim 22 . . . is distinct and different from claim 32 of the '334 Patent. *Id.* For example, "[c]laim 32 discloses computerized control center means (hardware and/or software . . .), communication interfaces (of the control center), computerized means (hardware and/or software . . . ) . . . and exposure handler means (hardware and/or software . . . ) —limitations that claim 22 does not disclose." *Id.*

54.     Claim 22 embodies an entirely new combination of special purpose and interconnected physical equipment to present information publicly. The inventions embodied in claim 22 arose in a specialized context—back in or about the 1995 to 1996 time frame—and the inventors came up with a specific solution, manifested in a concrete combination of devices, interfaces, and software, networked together with physical displays viewable by the target audience, to resolve particular problems.

55.     The inventions embodied in claim 32 also "improved the operation of digital signage that existed in 1996" *Id.* at ¶ 84. "[C]laim 32 of the '334 Patent incorporates unique, innovative, non-conventional, non-generic elements." *Id.* at ¶ 86. These elements include "a computerized control center means," "computerized means . . . for coordinating and controlling electronic displays" and "exposure handler means . . . for creating and updating an exposure

16

Appx583

list." *Id.* The limitations of claim 32 "relate to both the hardware and software technology for digital signage, as well as to the functioning of hardware and software technology for digital signage." *Id.* at ¶ 88.

56.     The physical combination of elements that are referenced in claim 32 represent an innovation over the prior art. Taking into account the meaning of these elements, as well as the claim as a whole, the arrangement of claim 32 would require "industrial computers, servers, PCs, networking routers or switches, networking cables, computer graphics capabilities, display devices . . . database management systems as well as specialized software drivers to interface between mediators and system computers, to decipher control lists, to create and update exposure lists, and to decipher and act upon exposure lists." *Id.* at 93. "Due to the application of outdoor advertising, additional specialized equipment, such as special duty and/or ruggedized computers (which could include ruggedized media players, for example) could be necessary." *Id.* Such a combination of elements represented a significant and non-conventional innovation over the prior art which resulted in an improvement in the operation of digital signage. *Id.* at ¶ 96.

57.     "Furthermore, claim 32 of the '334 Patent . . . is distinct and different from the claims of the '470 Patent." *Id.* at ¶ 95.

58.     T-Rex provided constructive notice to Defendants of the '334 Patent in a June 10, 2010 letter sent by Federal Express to Mr. Jean-Luc Decaux, Co-Chief Executive Officer, JCDecaux North America. In the June 10, 2010 letter, T-Rex identified the '470 Patent, which shares the same parent application as the '334 Patent.

59.     Defendants have had constructive knowledge of the '334 Patent and of the infringing nature of their activities, or at least a willful blindness regarding the infringing nature of their activities, with respect to the '334 Patent since at least the date that Defendants received the June 10, 2010 letter.

60.     Despite Defendants constructive knowledge of the '334 Patent and of their infringing actions, on information and belief, Defendants thereafter continued to infringe the

17

Appx584

'334 Patent. On information and belief, Defendants' infringement has been and continues to be willful since at least June 10, 2010.

61.    Because of Defendants' infringing activities, T-Rex has suffered damages and will continue to suffer damages in the future. T-Rex is entitled to recover from Defendants the damages sustained by T-Rex as a result of Defendants' wrongful acts in an amount subject to proof at trial, which, by law, cannot be less than a reasonable royalty, together with interest and costs as fixed by this Court under 35 U.S.C. § 284.

## COUNT III – INFRINGEMENT OF U.S. Patent No. 6,430,603

62.    The allegations set forth in the foregoing paragraphs 1 through 61 are hereby re-alleged and incorporated herein by reference.

63.    Upon information and belief, in violation of 35 U.S.C. § 271(a), Defendants have directly infringed and continue to directly infringe, literally or under the doctrine of equivalents, one or more claims of the '603 Patent by making, using, offering for sale, selling, or importing devices or systems, in this judicial district and elsewhere in the United States (directly or through intermediaries), that perform the steps of scheduling the presentation of video or still-image content at selected time slots on selected electronic displays, that are provided at various geographic locations and interconnected by a network, receiving video or still-image content from a content provider, communicating scheduled content to respective server devices associated with corresponding selected electronic displays and initiating display of the content at selected times on corresponding selected electronic displays of the network, where split screen images can be displayed as claimed in at least claims 42 and 43 of the '603 Patent, without the authority of T-Rex.

64.    More specifically, the infringing devices and systems include Defendants' Showscreens, a digital media product that is used in their Mallscape network, Defendants' digital billboards, and Defendants' digital airport advertising network, including their Prestige digital network.

18

Appx585

65.     Upon information and belief, Defendants have directly infringed and continue to directly infringe one or more claims of the '603 Patent, including at least claims 42 and 43, by operating Showscreens in their Mallscape network in this judicial district, elsewhere in Texas and throughout the United States, by operating digital billboards elsewhere in the United States, and by operating their Prestige digital network in Texas and throughout the United States

66.     Claim 42 the '603 Patent "solves specific needs and problems that existed in 1999." Jawadi Decl. ¶ 101. Such problems and shortcomings included "targeting geographical regions and demographic groups with ever changing, current advertising content in concrete, specific ways beyond merely scheduling content to be displayed on remote screens." *Id.* More specifically, "the inventions disclosed in claim 42" allowed "content providers . . . to directly access a network of electronic displays located in various geographic locations and to directly send their own content—which could be formatted for the use of a split screen display—to the network to be displayed at locations and times selected by the providers." *Id.* at ¶ 102.

67.     "Claim 42 incorporates non-conventional, non-generic hardware and software that imposes meaningful limitations to improve on the existing 1999 era digital signage technology." *Id.* "The functions, application, and implementations of these elements inherently and necessarily are rooted in and require computer technology, communication technology, and digital display technology in order to achieve specific solutions in the realm of digital signage." *Id.* at ¶ 104. Importantly, "the claim goes beyond the mere concept of simply using a computer to perform distributed signage." *Id*. "This because computers, communication interfaces, and digital display devices are not ancillary or incidental additions but germane and integral parts of the inventions disclosed by claim 42 of the '603 Patent. *Id.* The limitations of claim 42 "relate to both the hardware and software technology for digital signage, as well as to the functioning of hardware and software technology for digital signage" that are "inextricably tied to digital signage computer technology, communication technology, and digital display technology" such that the "unique, innovative, non-conventional, non-generic" hardware and software incorporated in claim 42 are used to achieve these technological innovations. *Id.* at ¶¶ 103, 105.

19

Appx586

68.    "Furthermore, claim 42 of the '603 Patent is distinct and different from the claims of the '334 Patent and it is distinct and different from the claims of the '470 Patent. *Id.* at ¶ 108.

69.    Claim 42 embodies a new combination of special purpose and interconnected physical equipment to present information publicly. The inventions embodied in claim 42 arose in a specialized context—in or about the 1998 to 1999 time frame—and the inventors came up with a specific solution, manifested in a concrete combination of devices, interfaces, and software, networked together with physical displays viewable by the target audience, to resolve particular problems.

70.    The inventions embodied in claim 42 "improve upon existing digital signage." *Id.* at ¶ 110. Claim 42 includes a "combination of interconnected hardware and software elements that are incorporated within the limitations of claim 42—and that claim 42 as a whole—improves upon existing digital signage hardware." *Id.*

71.    Defendants have had knowledge of the '603 Patent since at least the date that this Complaint was served.

72.    Because of Defendants' infringing activities, T-Rex has suffered damages and will continue to suffer damages in the future. T-Rex is entitled to recover from Defendants the damages sustained by T-Rex as a result of Defendants' wrongful acts in an amount subject to proof at trial, which, by law, cannot be less than a reasonable royalty, together with interest and costs as fixed by this Court under 35 U.S.C. § 284.

## JURY DEMAND

Plaintiff hereby requests a trial by jury pursuant to Rule 38 of the Federal Rules of Civil Procedure.

## PRAYER FOR RELIEF

Plaintiff respectfully requests that the Court find in its favor and against Defendants, and that the Court grant Plaintiff the following relief:

Appx587

A.     an adjudication that Defendants have infringed the '470, the '334 and the '603 Patents;

B.     an award of damages to be paid by Defendants adequate to compensate T-Rex for Defendants' past infringement of the '470, the '334 and the '603 Patents and any continuing or future infringement through the date such judgment is entered, including prejudgment and post-judgment interest, costs, expenses and an accounting of all infringing acts including, but not limited to, those acts not presented at trial;

C.     an injunction ordering Defendants to pay an ongoing royalty in an amount to be determined for any continued infringement after the date judgment is entered;

D.     an award of treble damages under 35 U.S.C. § 284; and,

E.     an award to T-Rex of such further relief at law or in equity as the Court deems just and proper, including, but not limited to costs, fees, expenses, interest, and/or attorneys' fees.

Dated:  May 9, 2016                              Respectfully submitted,

                                                 */s/ Steven R. Daniels*
                                                 Steven R. Daniels
                                                 Texas State Bar No. 24025318
                                                 FARNEY DANIELS PC
                                                 800 South Austin Ave., Suite 200
                                                 Georgetown, Texas 78626
                                                 Email: sdaniels@farneydaniels.com
                                                 Telephone: (512) 582-2828
                                                 Fax: (512) 582-2829

                                                 *Counsel for Plaintiff*
                                                 *T-Rex Property AB*

21

Appx588